# EXHIBIT 32

APRIL 10, 2013

CREDIT POLICY





SPECIAL COMMENT

Rate this Research »

## Table of Contents:

I. SOVEREIGN BOND RESTRUCTURINGS
HAVE GENERALLY BEEN RESOLVED
QUICKLY ............................................... 3
II. HOLDOUTS HAVE NOT PRESENTED
SIGNIFICANT PROBLEMS .............. 8
III. CACS AND EXIT CONSENTS HAVE
PLAYED A SIGNIFICANT ROLE IN BOND
EXCHANGES .................................... 11
IV. CONCLUSION ........................... 13
REFERENCES .................................... 14
MOODY'S RELATED RESEARCH .... 16
APPENDIX: SOVEREIGN BOND
EXCHANGES SINCE 1997 – DEBT
EXCHANGE DETAILS AND INVESTOR
LOSSES ............................................. 17

## Analyst Contacts:

NEW YORK                        +1 212.553.1653

[illegible name]                +1 212.553.[illegible]
[illegible title]
[illegible]@moodys.com

Richard Cantor                  +1 212.553.3628
Chief Credit Officer
richard.cantor@moodys.com

Bart Oosterveld                 +1 212.553.7914
Managing Director – Sovereign Risk
bart.oosterveld@moodys.com

# Sovereign Defaults Series:
# The Role of Holdout Creditors and CACs in Sovereign Debt Restructurings

Creditor litigation in the case of Argentina is drawing attention to the role of holdout creditors in sovereign debt restructurings. At the same time, in order to facilitate sovereign debt exchanges, the European Stability Mechanism (ESM) Treaty is mandating that Collective Action Clauses (CACs) be introduced into euro area bond contracts. Despite the ongoing discussion in the capital markets and the extensive theoretical literature on the subject, empirical evidence on sovereign debt litigation and the effect of CACs is scarce. In this report, we survey the 34 sovereign bond exchanges since 1997 and examine the role of holdout creditors, CACs, and exit consent clauses in them.[1] Our findings include:

» Sovereign bond restructurings have generally been resolved quickly, without severe creditor coordination problems, and involving little litigation.

» On average, sovereign bond restructurings closed 10 months after the government had announced its intention to restructure and 7 months after the start of negotiations with creditors.

» Of the 34 sovereign bond exchanges since 1997, only two have been affected by holdout creditors – the exchanges of Argentina in 2005 and Dominica in 2004. Holdouts did not impact the recent large Greek debt exchanges.

» A high level of participation in sovereign bond restructuring offers has been the norm outcome: creditor participation averaged 95%. The only exchanges with lower participation rates were those of Argentina and Dominica, where the realized participation rates were 76% and 72% respectively immediately after the exchange. Later on, however, participation rates increased to 93% in Argentina and close to 100% in Dominica.

» About 35% of sovereign debt exchanges relied on using CACs or exit consents included in the bond contracts in order to bind a larger share of creditors in the restructuring.

The creditor coordination problem has been one of the most widespread concerns about sovereign debt restructurings in the modern era of bond finance, both in terms of coordinating potentially thousands of bondholders to agree on a restructuring proposal in a timely fashion, and in terms of free rider incentives. Creditor coordination problems have also motivated a large body of theoretical work in the sovereign debt literature.

---

[1] This comment does not represent a legal opinion or interpretation but summarizes our views on the potential credit implications in light of the structure of sovereign bond contracts and past experience with sovereign restructurings. The author would like to thank Rodrigo Olivares-Caminal and Lee Buchheit for valuable comments. The views in this report as well as remaining errors are responsibility of the author.

Our analysis of the 34 sovereign bond restructurings over the past decade and a half shows that concerns over coordination problems are exaggerated. In most cases, a bondholder committee was formed within a reasonably short time frame and negotiations over the restructuring were concluded relatively quickly, even though almost half of debt exchanges involved a dispersed creditor structure.

We find that concerns about free rider problems are exaggerated as well. Among the 34 sovereign bond exchanges, in only two cases did holdout creditors represent more than 10% of the value of outstanding bonds and only one case – that of Argentina – resulted in persistent litigation. Moreover, the case of Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring.

Two strategies have been employed in order to bind non-participating investors in sovereign debt exchanges – the use of CACs in order to amend the payment terms of bonds and the use of exit consents to amend non-payment terms. In bonds issued under New York law, CACs became popular after 2003 as an alternative to the top-down administered mechanism for sovereign debt restructuring (SDRM) suggested by the IMF. They are currently commonly included in almost all New York law issuances. CACs originated in English law bonds in 1879. English law bonds at least since the 1990s have typically contained "modification clauses" that enable bondholders to approve a restructuring in a vote that binds even dissenting bondholders. The modification clause in English law bonds requires between 18.75% and 75% voting thresholds,[2] compared to the 75% threshold typical of New York law CACs.

Starting in January 2013, the euro area has mandated the inclusion of CACs in all euro area bond issuances, as part of the Treaty establishing the European Stability Mechanism (ESM). The euro area CAC clause applies a 66.6% majority threshold to individual bond series and also includes a novel feature – an aggregate CAC across all bond series with a 75% majority threshold. In principle, the inclusion of CACs represents a weakening of bondholder rights, and to the extent that CACs increase the likelihood of a debt restructuring to the detriment of bondholders, they are credit negative for bondholders. In practice, however, the impact is likely only marginal.

The majority of euro area debt is issued under domestic law. Domestic law bonds can be restructured with an act of legislature or CACs can be retroactively inserted in domestic law bonds by an act of legislature, as was done in Greece in early 2012. For English law bonds, the impact will depend on whether the new CAC clause replaces an existing modification clause, which could have a majority threshold higher or lower than 66.6%; in the latter case, the new CAC might actually make a debt restructuring more difficult.

---

[2]  The 18.75% threshold could be reached in the case where a bondholder meeting does not reach a quorum and after a second meeting the quorum is ratcheted down.

CREDIT POLICY

## I. Sovereign Bond Restructurings Have Generally Been Resolved Quickly

Creditor coordination problems have motivated a large body of theoretical work in the sovereign debt
literature. Creditor coordination has been one of the most widespread concerns about sovereign debt
restructurings, especially in the modern era of bond finance which substituted the concentrated
creditor structure of bank lending of the 1970s and 1980s with the dispersed creditor structure of
bond financing of the 1990s and 2000s. It was feared that the dispersed bond ownership would create
problems both in terms of coordinating potentially thousands of bondholders to agree on a
restructuring proposal in a timely fashion, and in terms of free rider incentives.

Despite the large body of theoretical literature, empirical evidence on the subject is scarce. In this
study, we examine the role of creditor coordination problems by analyzing the sovereign bond
exchanges that have occurred over the past decade and a half.

### On average, sovereign bond exchanges were negotiated in 7 months

There have been 34 exchanges of sovereign bonds since 1997, including both Moody's-rated and
unrated debt instruments. The exchanges have involved 20 sovereign governments, 9 of which
performed several debt exchanges in a row -- either one after the other, or with several years in between
the exchanges. Most recent were the debt exchanges announced by Belize and by Jamaica in February
2013.[3] Belize's 2013 exchange follows a previous debt exchange in February 2007; similarly, Jamaica's
exchange follows a previous bond exchange in February 2010.

In Exhibit 1, we measure the length of time it took to negotiate each bond exchange. For each one, we
note the date of:

» The initial announcement of the intent to restructure by the government. In some cases, this
  coincided with the date of missed payment on the debt instrument; in other cases, this coincided
  with the announcement of the first debt offer.

» The start of negotiations with creditors. In some cases, this was the date of the first exchange offer
  by the government.

» The formal announcement of the final exchange offer.

» The distressed exchange date, which is generally the date of closing of the exchange.

We find that contrary to widespread concerns, sovereign bond restructurings have generally been
resolved quickly and without severe creditor coordination problems. On average, the exchanges closed
10 months after the government announcement of the intention to restructure and 7 months after the
start of negotiations with creditors. The average exchange closed within 2 months of the launching of
the final exchange offer.[4]

---

[3] See Belize Debt Restructuring Fails to Resolve Credit Challenges, Belize debt restructuring: 2007 vs 2012, and Moody's downgrades Jamaica's government debt rating to Caa3, outlook stable.

[4] Evidence presented in Benjamin and Wright (2009) suggests that restructurings of commercial loans have taken much longer to resolve, almost 8 years on average in their sample of foreign debt restructurings over the 1980-2004 period. Further, evidence presented in Trebesch (2008) (covering a different sample over the 1980-2006 period) also suggests that the average restructuring time was the shortest for the post-1998 period, during which bond debt was the main lending vehicle. Our findings are in line with Bi, Chamon and Zettelmeyer (2011), who develop a theoretical model to show why coordination failures have been rare in the recent decade.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| LC T-bills held domestically | Aug-98 | Aug-98 | Aug-98 | Sep-1998 | n.a. | 2 | 2 | no |
| LC T-bills held by non-residents | Aug-98 | Sep-98 | Sep-98 | Sep-1998 | n.a. | 2 | 2 | no |
| FC Chase-Manhattan loan | Aug-98 | Aug-98 | Sep-98 | Oct-1998 | 1 | 3 | 3 | no |
| FC ING bond and Merrill Lynch bond | May-99 | May-99 | Jul-99 | Aug-1999 | 12 | 4 | 4 | yes |
| FC Eurobonds | Jan-00 | Jan-00 | Feb-00 | Mar-2000 | 19 | 3 | 3 | yes |
| Eurobonds | Jan-99 | Nov-99 | Nov-99 | Dec-1999 | n.a. | 12 | 1 | no |
| External debt | Aug-99 | Jun-00 | Jul-00 | Aug-2000 | 13 | 13 | 3 | yes |
| FC domestic bonds | Sep-99 | Aug-00 | Aug-00 | Aug-2000 | 13 | 12 | 1 | yes |
| Brady bonds | Apr-08 | Apr-08 | Sep-09 | Apr-2010 | 122 | 25 | 25 | yes |
| Domestic debt | Nov-01 | Nov-01 | Nov-01 | Nov-2001 | 1 | 1 | 1 | no |
| External debt | Nov-01 | Sep-03 | Jan-05 | Feb-2005 | 40 | 40 | 18 | yes |
| Eurobond | Jun-02 | Jun-02 | Aug-02 | Oct-2002 | 5 | 5 | 5 | yes |
| Domestic debt due in 2003-06 | Oct-03 | Oct-03 | Nov-03 | Jul-2004 | 19 | 10 | 10 | yes |
| LT FC bonds (external and domestic) | Mar-03 | Mar-03 | Apr-03 | May-2003 | n.a. | 3 | 3 | no |
| CENI bonds FC-denom. payable in LC | Jun-03 | Jun-03 | Jul-03 | Jul-2003 | n.a. | 2 | 2 | no |
| CENI bonds FC-denom. payable in LC | Apr-08 | Apr-08 | Jun-08 | Jun-2008 | 60 | 3 | 3 | (yes) [1] |
| LC bonds (domestic and external) | Dec-03 | Dec-03 | Apr-04 | Jun-2004 | 12 | 7 | 7 | (yes) [2] |
| Domestic debt | | | | H1-2005 | 12 | | | yes |
| Global bond and domestic debt | Oct-04 | Dec-04 | Sep-05 | Nov-2005 | 12 | 14 | 12 | yes |
| International bonds | Apr-04 | Apr-04 | Apr-05 | May-2005 | 1 | 14 | 14 | no [3] |
| Private external debt | Aug-06 | Aug-06 | Dec-06 | Feb-2007 | 3 | 7 | 7 | no |
| External debt | Oct-08 | Mar-09 | Dec-09 | Jan-2010 | 19 | 16 | 11 | yes |
| Global bonds | Nov-08 | no neg. | Apr-09 | May-2009 | 6 | 7 | no neg. | yes |
| Domestic debt | Jan-10 | Jan-10 | Jan-10 | Feb-2010 | n.a. | 2 | 2 | no |
| Treasury bills (short-term) | Jan-11 | Oct-11 | Oct-11 | Dec-2011 | 12 | 12 | 3 | yes |
| Eurobond coupon | Jan-11 | Oct-12 | Nov-12 | Nov-12 | 23 | 23 | 1 | yes |
| Domestic bonds and external debt | Jun-11 | Jul-11 | Feb-12 | Mar-2012 | 5 | 10 | 9 | yes |
| Domestic loans (debt-land swap) | Jun-11 | Jul-11 | Apr-12 | Apr-2012 | 6 | 11 | 10 | yes |
| Greek and foreign law bonds | Jul-11 | Jul-11 | Feb-12 | Mar-2012 | n.a. | 9 | 9 | no |
| 2029 Superbond | Aug-12 | Aug-12 | Feb-13 | Mar-13 | 7 | 8 | 8 | yes |
| Domestic debt | Feb-13 | Feb-13 | Feb-13 | Feb-13 | n.a. | 1 | 1 | no |
| | | | | | 18 | 10 | 7 | |

egger and Zettelmeyer (2005), and Diaz-Cassou, Erce-Dominguez and Vazquez-Zamora (2008).

ments suspended due to legal investigation. [2] Bonds under legal dispute. [3] In default on loans.

Further, Exhibit 2 plots the distribution of the time it took to close debt exchanges. We see that 30% of debt exchanges were closed within 2 months of the start of negotiations and over half of exchanges were closed within 4 months. Over 80% of debt restructurings were negotiated in 10 months or less.

EXHIBIT 2
**Time from Start of Negotiations with Creditors to Closing of the Exchange**



Source: Moody's
Note: Based on the data in Exhibit 1.

Delays were related to parallel restructurings of official debt and commercial loans

Only 4 out of the 34 debt exchanges since 1997 took longer than a year to negotiate: the Dominican Republic's international bonds exchange of 2005 took 14 months, the Russian 2000 foreign debt exchange took 16 months, the Argentinean external debt exchange of 2005 took 18 months, and the Cote d'Ivoire's Brady bonds exchange of 2010 took 25 months. Apart from the case of Argentina, these delays had to do with the restructuring strategy and the parallel restructuring of official sector and commercial loan debt along with the restructuring of the bond instruments.

The delays in the restructuring of Cote d'Ivoire's Brady bonds were related to the country's emergence from war, the parallel restructuring of Paris Club debt, and the need for the country to reach milestones for the enhanced HIPC Initiative that unlocked the forgiveness of official sector debt.

Argentina's debt restructuring was somewhat unique in its unilateral and coercive approach. Russia, on the other hand, took an approach of conducting a specific debt workout for each defaulted type of debt, in effect conducting three consecutive rounds of debt exchanges between May 1999 and August 2000. Both Argentina's 2005 debt exchange and Russia's August 2000 debt exchanges involved very large losses for investors – 71% and 90% respectively, as measured by trading prices.

The Dominican Republic's 2005 exchange of its international bonds proceeded in parallel with the country's restructuring of its official debt and commercial loans. Thus, between April 2004 and October 2005, the Dominican Republic renegotiated its bilateral official debt with Paris Club creditors (involving two agreements), two series of international bonds, and its commercial loans debt with the London Club. The authorities' approach to the debt restructuring was considered transparent and cooperative.

Restructurings in default took longer to negotiate

As Exhibit 3 shows, the majority of sovereign bond exchanges, 65%, followed a payment default – that is, there was a missed interest or principal payment before or during the debt negotiations. Only in 35% of exchanges was the sovereign current on its debt repayments.

Those debt exchanges accompanied by default took twice as long to negotiate as those not accompanied by default. On average, the time from the start of negotiations with creditors to the closing of the debt exchange was 8 months for exchanges in default and 4 months for exchanges without a payment default.[5]

Limiting the sample to the events of default, on average debt exchanges took 18 months from the initial default event to closing of the exchange.

EXHIBIT 3
**Was the Debt Instrument in Default During the Negotiations of the Debt Exchange?**



Source: Moody's.
Note: Based on the data in Exhibit 1

Creditor structure appears weakly correlated with the length of negotiations

The vast majority of sovereign bond exchanges were negotiated relatively quickly, despite the fact that half of debt exchanges involved dispersed creditor structures. The vast majority of sovereign bond exchanges included consultations with bondholders and, in most cases, a bondholder committee was formed within a reasonably short timeframe and negotiations over the restructuring were concluded relatively quickly.

In fact, creditor structure appears weakly correlated with the length of negotiations: as Exhibit 4 shows, conditional on creditor structure, debt negotiations took on average 7 months (with standard deviation of 5.5) for exchanges with a dispersed creditor structure and 6 months (with standard deviation of 5.9) for exchanges involving a concentrated creditor structure. Moreover, there were a number of debt exchanges that involved dispersed creditor structure but still closed within 3 months of the start of negotiations.

The number of debt instruments involved in the exchange does not appear to have been decisive either; in fact, the average length of exchanges involving 6 or fewer debt instruments was 8 months, while the average length of exchanges involving multiple debt instruments (from 16 to over 300) was 6 months (Exhibit 4). Sovereign bond exchanges generally aimed to consolidate the number of outstanding instruments, which improved the instruments' trading liquidity.

[5]   This result is consistent with findings in Schumacher, Trebesch and Enderlein (2012) that preemptive restructurings without a payment moratorium are associated with a lower risk of litigation.

EXHIBIT 4

**The Average Length of Debt Negotiations Conditional on Creditor Structure and on the Number of Debt Instruments Being Exchanged**



Source: Moody's.

Note: Based on the data in Exhibits 1 and 8 and the Appendix. Equal number of observations in each category of creditor structure. 15 exchanges involved 6 or fewer debt instruments and 19 exchanges involved multiple debt instruments.

The length of negotiations was related to the losses imposed on investors

About half of debt exchanges in our sample involved domestic law bonds and half involved bonds issued under foreign law. Domestic debt exchanges seem on average to have been negotiated more quickly than exchanges involving bonds issued under foreign law. As Exhibit 5 shows, the average length of negotiations for domestic debt exchanges was 5 months (with standard deviation of 3.9), while the average length of negotiations for bonds issued under foreign law was almost 9 months (standard deviation of 6.9).

EXHIBIT 5

**The Average Length of Debt Negotiations Conditional on the Governing Law of the Majority of Bond Instruments**

EXHIBIT 6

**The Time to Negotiate vs. the Loss Imposed on Investors**



Source: Moody's.

Note: Based on the data in Exhibits 1 and 8 and the Appendix. 18 exchanges involved local law instruments and 17 exchanges involved instruments issued under foreign law.

Finally, as Exhibit 6 illustrates, there is about 40% correlation between the time it took to negotiate a debt exchange and the losses imposed on investors.[6] Further, there appears to be also some correlation between the size of the debt exchange and the time it took to negotiate the restructuring, but this correlation is much weaker at only about 16% (when the size of the debt exchange is measured in terms of percent of country's GDP).

## II. Holdouts have not presented significant problems

Our analysis of the 34 sovereign bond restructurings over the past decade and a half shows that concerns about free rider problems prove exaggerated as well.

### The average creditor participation rate was 95%

Exhibits 7 and 8 show the creditor participation rates realized in each of the sovereign bond exchanges since 1997. The average participation rate was 95% (including the recent 2013 debt exchanges of Belize and Jamaica).

Further, Exhibit 7 plots a histogram of the distribution of participation rates achieved in the various sovereign debt exchanges. We see that all cases but two had a participation rate of 90% or higher. Moreover, 74% of exchanges had a creditor participation rate of 95% or higher.



EXHIBIT 7
**The Distribution of Participation Rates in Sovereign Bond Exchanges Since 1997**



Source: Moody's.
Note: Based on the data in Exhibit 8.

In only two cases did holdout creditors represent more than 10% of the value of outstanding bonds. Dominica's debt exchange of June 2004 achieved a 72% participation rate and the exchange offer had to be extended several times because of low participation. Dominica's two bonds had a highly complex structure and were stripped and sold as derivative zero coupon bonds to a wide variety of regional investors. However, discussions with non-participating creditors continued while interest payments at terms of the restructuring were deposited in an escrow account. By 2012, the participation rate in the exchange was close to 100%.

---

[6] This result is consistent with evidence presented in Schumacher, Trebesch and Enderlein (2012) that larger creditor losses are associated with higher likelihood of litigation against sovereign debtors in US and UK courts.

| Date | Governing law | Structure | Participation | | | | |
|---|---|---|---|---|---|---|---|
| Sep-1998 | Local law | Dispersed | | | no | | no |
| Sep-1998 | Local law | Dispersed | | | no | | no |
| Oct-1998 | | Concentrated | 100% | | no | | no |
| Aug-1999 | | Conc. for ING bond; Disp. for other | 100% (ING bond) and 50% (other) | | no | | |
| Mar-2000 | Luxembourg and German law | Concentrated for majority of bonds | 99% | partly | yes | yes | no |
| Dec-1999 | English law | Concentrated | 99% | yes | no | yes | no |
| Aug-2000 | NY law | Concentrated | 97% | no | no | no | yes |
| Aug-2000 | Local law | | very high | | no | | no |
| Apr-2010 | NY law | Concentrated | 99.98% | | no | yes | yes |
| Nov-2001 | Local law | Dispersed | very high | no | no | no | no |
| Feb-2005 | 8 governing laws | Dispersed | 76.2% in 2005, plus 69.5% in 2010, totaling 92.6% (96% for domestic bondholders) | partly | no | yes | no |
| Oct-2002 | English law | Concentrated | 100% | yes | yes | yes | n.a. |
| Jul-2004 | Local law | Dispersed | 96% | | | | |
| May-2003 | Local law most, NY law, English law, and Japanese law | Dispersed | 93% (98.8% domestic and 89.2% non-resident) | partly | yes | yes | yes, voluntary |
| Jul-2003 | Local law | Concentrated | very high | | | | |
| Jun-2008 | Local law | Concentrated | very high | | | | |
| Jun-2004 | English law | Dispersed | 72% (by 2012, reached close to 100%) | partly (external bonds) | no | yes | no [1] |
| H1-2005 | Local law | Dispersed | | | no | | |
| Nov-2005 | NY law and local law | Concentrated | 94% for external | no | no | yes | no |
| May-2005 | NY law | | 97% | no | no | yes | yes |
| Feb-2007 | NY law | Concentrated | 98.1% | yes | yes | yes | no |
| Jan-2010 | English law | Dispersed | 100% | yes | yes | yes | no |
| May-2009 | NY law | | 91% | no | no | n.a. | n.a. |
| Feb-2010 | Local law | Concentrated | 99% | no | no | no | no [2] |
| Dec-2011 | Local law | Concentrated | 96% | | | | |
| Nov-12 | NY law | | 100% | yes | yes | n.a. | no |
| Mar-2012 | Local law | Concentrated | 100% | yes | yes | | no |
| Apr-2012 | Local law | Concentrated | almost universal | n.a. | n.a. | n.a. | n.a. |
| Mar-2012 | Local law and some Foreign law | Dispersed | 96.9% (100% for domestic) | retroactively inserted | yes | yes | no |
| Mar-13 | NY law | Concentrated | 100% (CAC triggered after 86.2% part.) | yes | yes | yes | no |
| Feb-13 | Local law | Concentrated | 99% | no | no | no | no |
| | | | **95%** | | | | |

...igger and Zettelmeyer (2005), Díaz-Cassou, Erce-Dominguez and Vazquez-Zamora (2008), and Andritzky (2006).

...mandatory debt management" feature that required Dominica to retire from the market a specified percentage of the original principal amount of that series in each year. [2] Early redemption clause triggered.

SOVEREIGN DEFAULTS SERIES: THE 2000s DEBT CRISIS: CREDITORS AND CACs IN SOVEREIGN DEBT RESTRUCTURINGS

The Argentinean debt exchange of February 2005 also garnered a low participation rate initially, of 76.2%. The debt exchange was later re-opened in June 2010 and with the additional participation by investors in 2010, the overall participation rate reached 92.6%.

Further, in August 1999 Ukraine's restructuring of the ING bond gathered full participation but the restructuring of the Merrill Lynch bond drew about 50% participation. However, the remaining part of the Merrill Lynch bond was later restructured as part of the subsequent March 2000 debt exchange, so the cumulative participation rate was higher.

Across all debt exchanges, there appears to be no systematic difference in the creditor participation rates in domestic law versus foreign law exchanges.

### Only one of the 34 sovereign debt exchanges resulted in persistent litigation

From the 34 sovereign bond exchanges, only one case – that of Argentina – resulted in persistent litigation.[7] However, the case of Argentina was and remains unique in its unilateral and coercive approach to the debt restructuring. Only a few other court cases have been filed over the years and they have generally not represented an obstacle to the conclusion of debt exchanges.

In a comprehensive study of creditor litigation, Schumacher, Trebesch and Enderlein (2012) surveyed lawsuits filed against debtor governments in US and UK courts between 1976 and 2010. For our sample of bond defaults since 1997, the survey finds lawsuits filed by 47 different plaintiffs in the case of Argentina after the 2002 default, 1 lawsuit filed in the case of Dominica in 2005, 1 lawsuit filed in the case of Ecuador in 2001 and 1 lawsuit filed in the case of Grenada in 2006, by a commercial bank in the case of Ecuador and by the Export-Import Bank of Taiwan in the case of Dominica and Grenada.

Further, within the broader sample of foreign *bond and loan* defaults since 1976, the survey finds that "runs to the courthouse" are the exception rather than the rule in sovereign debt crises. Apart from Argentina and Peru (whose default involved commercial loans), each of which led to more than 10 lawsuits, the large majority of debt exchanges were implemented without a single legal conflict.[8]

### Approaches to holdout creditors have varied

Sovereigns have taken several approaches to deal with holdout creditors:

» Holdout creditors have been paid in full, as in the cases of Russia, Greece and Ecuador (in 1999).

» Holdout bonds have been exchanged at prevailing market value, as in the case of Cote d'Ivoire in 2011.

» Debts which have not been restructured were no longer serviced, as in the cases of Argentina and Grenada.

» In a few cases, for example in Dominica, holdout bonds were not serviced but as a sign of good faith, the government paid all interest falling due into an escrow account held at the central bank.

---

[7] See Legal Ruling Raises Questions About Argentina's Debt Payments and US Court Ruling on Argentina's Debt Could Have Limited Implications for Sovereign Debt Restructurings.

[8] Conclusions are also supported in Trebesch (2008). Additionally, IIF/EMTA (2009) reviews the experience with litigation in low-income countries, in the context of HIPC and MDRI debt relief initiatives. The review finds that incidents of litigation have been relatively few in number and covered a small share of the outstanding value of restructured sovereign debt. Further, the vast majority of lawsuits were brought by trade creditors, private creditors and state-owned enterprises from non-Paris-Club creditors, not by distressed debt funds.

Thus, countries have dealt with holdout investors in several different ways. Pakistan, for example, remained current on all original obligations up to the debt exchange in order to avoid litigation. Uruguay announced from the beginning that debt service on the old bonds would be continued. Ecuador managed threats of holdouts by settling accelerated claims and continuing to pay debt service. As we discuss below, in a number cases, for example Ukraine and Moldova, a holdout minority was bound into the agreement through majority voting legal clauses.

## III. CACs and Exit Consents Have Played a Significant Role in Bond Exchanges

One of the ways countries have achieved high participation rates in sovereign bond exchanges has been to use CACs and exit consents embedded in the bond contracts.

### CACs

CACs allow a supermajority of creditors to amend the instrument's payment terms and other essential provisions. Thus, CACs allow a supermajority of bondholders to agree to a debt restructuring that is legally binding on all holders of the bond, including those who vote against the restructuring.

In New York law bonds, CACs became popular after 2003, as an alternative to the top-down administered mechanism for sovereign debt restructuring (SDRM) proposed by the IMF at the time.[9] Currently, CACs are commonly included in almost all New York law issuances. The typical threshold for modification of payment terms is a supermajority of 75% of bondholders. CACs originated in English law bonds in 1879.[10] English law bonds at least since the 1990s typically contain "modification clauses", which enable bondholders to approve a restructuring in a vote that binds even dissenting bondholders. Modification clauses in English law bonds require between 18.75% and 75% voting thresholds.[11] Further, bonds issued under domestic law can be restructured by retroactively inserting CACs into the bonds by an act of legislation, as was done in Greece in early 2012.[12]

CACs do have a limitation as they apply to individual bond series. Thus, it is possible for non-participating investors to take blocking positions on individual bond series while a high overall participation rate in the restructuring process is still achieved. Aggregate CACs could address this problem in the future, but they are not yet widely used. Nevertheless, aggregate CAC was first introduced during the restructuring of Uruguay in 2003,[13] and subsequently was adopted by the Dominican Republic, Argentina, and Slovenia (in November 2012).

### Exit consents

An alternative way to impose a debt exchange offer on non-participating investors involves using exit consents.

[9]  For more details, see Weidemaier and Gulati (2012) and Bradley and Gulati (2012).
[10]  See Buchheit and Gulati (2002).
[11]  The 18.75% threshold could be reached in the case where a bondholder meeting does not reach a quorum and after a second meeting the quorum is ratcheted down. As Bradley and Gulati (2012) show, most English law bonds issued prior to 2003 have 18.75% voting threshold. Since 2003, while New York law bonds decreased the percentage requirement from 100% to 75%, English law bonds increased the percentage requirement from 18.75% to a range between 18.75% and 75%. The reasons for the change have not been explained.
[12]  See Greece's Successful Bond Exchange Removes Key Uncertainty, but Risk of Default Post-Exchange Remains High. Detailed studies of the Greek debt exchange include Zettelmeyer, Trebesch and Gulati (2012) and Georgakopoulos (2012).
[13]  For more details, see Buchheit and Pam (2004).

Exit consents use the modification clauses in the bond contract that allow a majority group of creditors to change the non-financial terms of the old bonds in an exchange, in a way that impairs the value of the old bonds. While amendments to financial terms may require unanimity, other terms may normally be amended by a majority or supermajority of creditors. Indeed, exit consents can be used in restructurings to create an incentive to all creditors to participate in the exchange through modifying bond provisions such as the waiver of sovereign immunity, financial covenants or listing requirements, or more generally by altering legal features that affect the bond's liquidity or the holder's ability to litigate.[14]

In other words, exit consent is the technique, by which bondholders grant their consent to amend certain terms of the bonds, at the moment of accepting the exchange offer. Because of these amendments, the defaulted bonds subject to the exchange become less attractive in legal and financial terms, forcing a greater number of bondholders to accept the exchange offer. Otherwise, bondholders not accepting the offer are left with bonds which are impaired and not featuring some of the original contractual enhancements.

### Use of CACs in past sovereign restructurings

As Exhibit 8 shows, over 35% of sovereign bond exchanges have used either CACs and/or exit consents as part of the debt exchange process. CACs have been triggered in nine restructurings and exit consents have been used in four exchanges.

CACs were used for the first time during Ukraine's Eurobonds exchange in 2000, then in Moldova in 2002, Uruguay in 2003, and in Belize in 2007. Pakistan did not use the CAC in its English law bonds during the 1999 restructuring. Ukraine took a hybrid approach to the March 2000 debt restructuring: it first invited investors – mainly investment banks and hedge funds – to tender their bonds by granting an irrevocable proxy vote for the restructuring offer; it then called a bondholder meeting, where the proxy votes were automatically cast in favor of modifying the terms of the old bonds.

Moldova used the CACs to amend the terms of payment according to the restructuring offer after an agreement was reached with its major bondholder, who held 78% of the outstanding bonds against a required 75% majority vote threshold in the CACs. Uruguay used the CACs contained in its Samurai bonds, the first use of CACs in Japan. Finally, Belize's government used the CAC embedded in one of its bonds to bind 1.3% of non-complying or non-responding creditors to accept the terms of the exchange, increasing the acceptance rate to 98%. Belize was the first country to use CACs in a debt restructuring under NY law in more than 70 years.[15] (Grenada did not use CACs in its 2005 exchange.)

Since 2007, CACs have been triggered in most bond exchanges that involved bonds with embedded CACs, including the restructurings of the Seychelles, Cote d'Ivoire and St. Kitts. Greece's March 2012 debt exchange incorporated a novel feature as an Act of Parliament retroactively inserted CACs into domestic law bonds prior to the announcement of the debt exchange offer. These CACs were subsequently triggered to achieve a 100% participation rate for domestic law bonds. More recently, Belize's February 2013 debt exchange triggered the CAC in the old bond instrument as 86% majority participation was reached.[16]

---

[14] For more details, see Buchheit and Gulati (2000).

[15] For more details, see Buchheit and Karpinski (2007).

[16] See Belize Debt Restructuring Fails to Resolve Credit Challenges.

Use of exit consents in sovereign restructurings

Exit consents were used for the first time in Ecuador's restructuring of external debt in August 2000, then in Uruguay in May 2003, the Dominican Republic in May 2005, and the Core d'Ivoire in April 2010. They have most commonly been used to remove the cross-default and cross-acceleration clauses from the old bonds and to lift the listing requirement.

For example, the use of exit consents in Ecuador's 2000 exchange involved an exchange offer that required participating bondholders to also agree to a number of amendments to non-payment terms. These amendments included the deletion of the cross-acceleration clause, the provision that restricted Ecuador from purchasing any of the Brady bonds while a payment default was in progress, the covenant prohibiting Ecuador to seek a further restructuring of Brady bonds, the negative pledge covenant, and the covenant to maintain listing of the defaulted bond on the Luxembourg Stock Exchange.[17]

The scope of exit consents in Uruguay's 2003 exchange was narrower than in Ecuador. Uruguay's exit consents were mainly aimed at avoiding litigation and limiting the possibility of attaching future payments on the new bonds via a court ruling (waiver of sovereign immunity), while also deleting the cross-default and cross-acceleration provisions. Unlike in Ecuador, in Uruguay the participating bondholders could opt out of the exit consents. Argentina's 2005 debt exchange did not use exit consents.[18]

Exit consents have often been used to remove cross-acceleration and cross-default clauses from the old bond contracts because once these clauses are removed, any non-payments or disputes related to the old bonds will no longer trigger default and acceleration on the new bonds. Thus, new bondholders are protected from legal remedies by non-participating creditors. Exit consents have generally withstood legal challenges under New York law as US courts have refused to invalidate exit consents that removed important bondholder rights and protections, including financial covenants, in several corporate restructurings.[19]

## IV. Conclusion

Our findings indicate that creditor coordination and holdouts have been less of a problem in sovereign bond restructurings than commonly believed. Sovereign bond restructurings have generally been resolved quickly, without severe creditor coordination problems and with little litigation, except for Argentina. Holdouts have not presented significant problems and very high levels of participation have been the norm outcome in sovereign bond restructuring offers.

---

[17]  See IMF (2001).

[18]  For more details, see Das, Papaioannou and Trebesch (2012) and Buchheit and Pam (2004).

[19]  Ibid.

## References

Andritzky, Jochen, 2006, Sovereign Default Risk Valuation, Springer, Berlin.

Benjamin, David and Mark L.J. Wright, 2009, Recovery Before Redemption: A Theory of Delays in Sovereign Debt Renegotiations, *State University of New York, Buffalo and University of California, Los Angeles, mimeo*, 8 April 2009.

Bi, Ran, Marcos Chamon and Jeromin Zettelmeyer, 2011, The Problem that Wasn't: Coordination Failures in Sovereign Debt Restructurings, *IMF Working Paper 11/265*, November 2011.

Bradley, Michael H., James D. Cox and Mitu Gulati, 2008, The Market Reaction to Legal Shocks and Their Antidotes: Lessons from the Sovereign Debt Market, *Duke Law School Faculty Scholarship Series*, Paper 120.

Bradley, Michael and Mitu Gulati, 2012, Collective Action Clauses for the Eurozone: An Empirical Analysis, *Duke Law School Working Paper*, 7 May 2012.

Buchheit, Lee C. and Mitu Gulati, 2000, Exit Consents in Sovereign Bond Exchanges, *UCLA Law Review, vol. 48*, October 2000.

Buchheit, Lee C. and Mitu Gulati, 2002, Sovereign Bonds and the Collective Will, *Emory Law Journal, vol. 51, issue 4*, Fall 2002.

Buchheit, Lee C. and Elizabeth Karpinski, 2007, Belize's Innovations, *Butterworths Journal of International Banking and Financial Law*, May 2007.

Buchheit, Lee C. and Jeremiah S. Pam, 2004, Uruguay's Innovations, *Journal of International Banking Law and Regulation, vol. 19, issue 1*.

Das, Udaibir, Michael Papaioannou and Christoph Trebesch, 2012, Sovereign Debt Restructurings 1950–2010: Literature Survey, Data, and Stylized Facts, *IMF Working Paper 12/203*, August 2012.

Diaz-Cassou, Javier, Aitor Erce-Dominguez and Juan J. Vazquez-Zamora, 2008, Recent Episodes of Sovereign Debt Restructurings. A Case-Study Approach, *Banco de Espana Occasional Paper 0804*.

Georgakopoulos, Nicholas L., 2012, Pyres, Haircuts, and CACs: Lessons from Greco-Multilateralism for Creditors, *Indiana University, Robert H. McKinney School of Law, mimeo*, 16 May 2012.

International Monetary Fund, 2001, Involving the Private Sector in the Resolution of Financial Crises - Restructuring International Sovereign Bonds, Washington, DC, available at http://www.imf.org/external/pubs/ft/series/03/IPS.pdf, p. 8 and 35.

Institute of International Finance (IIF) / Emerging Markets Trading Association (EMTA), 2009, Creditor Litigation in Low-Income Countries Benefiting from the Enhanced-HIPC and MDRI, June 2009, *Preliminary Analysis*.

Olivares-Caminal, Rodrigo, 2009. Legal Aspects of Sovereign Debt Restructuring, Sweet & Maxwell, London.

Schumacher, Julian, Christoph Trebesch and Henrik Enderlein, 2012, Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010, *mimeo*, 11 December 2012.

Sturzenegger, Federico and Jeromin Zettelmeyer, 2005, Haircuts: Estimating Investor Losses in Sovereign Debt Restructurings, 1998-2005, *IMF Working Paper 05/137*, July 2005.

Trebesch, Christoph, 2008, Delays in Sovereign Debt Restructurings. Should We Really Blame the Creditors?, *Free University of Berlin, mimeo*, July 2008.

Weidemaier, Mark C. and Gulati, Mitu, 2012, A People's History of Collective Action Clauses, *University of North Carolina Legal Studies Research Paper No. 2172302, 7 November 2012.*

Zettelmeyer, Jeromin, Trebesch, Christoph and Gulati, Mitu, 2012, The Greek Debt Exchange: An Autopsy, *EBRD and CERP, University of Munich and CESIfo, and Duke University, mimeo*, 11 September 2012.

## Moody's Related Research

Special Comments:

»   US Court Ruling on Argentina's Debt Could Have Limited Implications for Sovereign Debt Restructurings, December 2012 (147881)

»   Legal Ruling Raises Questions About Argentina's Debt Payments, November 2012 (147437)

»   Sovereign Defaults Series: Sovereign Debt Restructurings Provide Liquidity Relief But Often Do Not Reduce Debt Levels, November 2012 (146909)

»   Sovereign Defaults Series: Investor Losses in Modern-Era Sovereign Bond Restructurings, August 2012 (144129)

»   Sovereign Default and Recovery Rates, 1983-2012H1, July 2012 (144320)

»   The Causes of Sovereign Defaults: Ability to Manage Crises Not Merely Determined by Debt Levels, November 2010 (127952)

»   Market Use of Sovereign Ratings, September 2010 (127353)

»   Sovereign Defaults and Interference: Perspectives on Government Risks, August 2008 (110114)

»   How To Sue A Sovereign: The Case Of Peru, November 2000 (61737)

»   Sovereign Debt: What Happens If A Sovereign Defaults, July 2000 (57753)

Recent Sovereign Restructurings:

»   Belize Debt Restructuring Fails to Resolve Credit Challenges, March 2013 (151586)

»   Belize debt restructuring: 2007 vs 2012, October 2012 (145828)

»   Moody's downgrades Jamaica's government debt rating to Caa3, outlook stable, March 2013

»   Greece's Successful Bond Exchange Removes Key Uncertainty, but Risk of Default Post-Exchange Remains High, March 2012 (140541)

To access any of these reports, click on the entry above. Note that these references are current as of the date of publication of this report and that more recent reports may be available. All research may not be available to all clients.


Rate this Research  »

Case 1:14-cv-08601-TPG   Document 27-34   Filed 08/14/15   Page 18 of 19

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| FC debt (PARV and BAN) | 2 | 2 | 29.1 | 16.4 | 16.5 | 30 | 90 |
| LC T-bills held domestically | multiple | multiple | 4.5 | 30.0 | 9.0 | 34 | 18* |
| LC T-bills held by non-residents | multiple | multiple | | | 4.8 | | 90 |
| FC Chase-Manhattan loan | 1 | 1 | 0.1 | 0.7 | 0.2 | | 31* |
| FC ING bond and Merrill Lynch bond | 2 | 1 | 0.4 | 2.0 | 1.0 | | 38* |
| FC Eurobonds | 4 | 2 | 1.6 | 8.3 | 5.1 | 5 | 31 |
| Eurobonds | 3 | 1 | 0.6 | 1.2 | 0.9 | | 48 |
| External debt | 6 | 2 | 7.0 | 49.5 | 41.5 | 40 | 56 |
| FC domestic bonds | multiple | multiple | | | | | 9* |
| Brady bonds | 6 | 1 | 2.8 | 18.7 | 12.4 | 20 | 82 |
| Domestic debt | 50 | multiple | 64.4 | 49.6 | 22.6 | | 83 |
| External debt | 152 | 11 | 79.7 | 41.7 | 52.0 | 66 | 71 |
| Eurobond | 1 | 1 | 0.04 | 3.2 | 2.7 | | 40 |
| Domestic debt due in 2003-06 | multiple | 5 | 0.1 | 6.5 | 2.6 | | 8* |
| LT FC bonds (external and domestic) | 65 | 73 | 5.4 | 56.8 | 39.6 | | 34 |
| CENI bonds FC-denom. payable in LC | multiple | multiple | 0.3 | 6.1 | 8.2 | | n.a. |
| CENI bonds FC-denom. payable in LC | multiple | multiple | 0.3 | 12.5 | 5.4 | | 51* |
| LC bonds (domestic and external) | multiple, 2 external bonds | 3 | 0.1 | 44.5 | 42.4 | 30 | 53* |
| Domestic debt | multiple | multiple | 1.0 | 10.5 | 6.5 | | n.a. |
| Global bond and domestic debt | 16 bonds | 2 | 0.3 | 65.1 | 48.9 | | 35 |
| International bonds | 2 | 2 | 1.1 | 16.7 | 5.1 | | 5 |
| Private external debt | 6 | 1 | 0.5 | 51.6 | 45.8 | | 24 |
| External debt | 2 | 1 | 0.3 | 29.6 | 36.8 | 50 | 70 |
| Global bonds | 2 | n.a. (cash buyback) | 3.2 | 25.3 | 5.9 | 65 | 72 |
| Domestic debt | 350 | 23 | 7.9 | 56.5 | 63.7 | | 10 |
| Treasury bills (short-term) | multiple | 3 | 1.3 | 8.5 | 5.4 | | 5* |
| Eurobond coupon | 1 | n.a. (cash repayments) | 0.1 | 0.6 | 0.4 | | 25 |
| Domestic bonds and external debt | multiple | 2 | 0.1 | 12.8 | 19.7 | 50 | 62* |
| Domestic loans (debt-land swap) | multiple | n.a. (debt-land swap) | 0.3 | 30.3 | 46.6 | | n.a. |
| Greek and foreign law bonds | multiple | 23 | 273.4 | 55.2 | 94.2 | 54 | 76 |
| 2029 Superbond | 1 | 1 | 0.5 | 47.3 | 35.3 | 10 | 35 |
| Domestic debt | multiple | multiple | 9.1 | 53.8 | 63.0 | | 12 |
| | | | **15** | **25** | **23** | | **44** |

...rzenegger and Zettelmeyer (2005).

...w instruments had different haircuts. [2] Holders of GKOs or OFZs had their scheduled payments discounted to 19 August 1998 at the rate of 50% per annum. Based on the resulting adjusted nominal claims, they ...rities

Report Number: 150162

Author
Elena Duggar

Editor
Robert Cox

Production Specialist
Wing Chan

© 2013 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for retail clients to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.

