# EXHIBIT A

## PRE-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Case (Plaintiff(s)) | Docket # | Date of Complaint | Amount of Pre-Judgment Principal Claimed - 1994 FAA Bonds |
|---|---|---|---|
| *NML Capital, Ltd. v.* *Republic of Argentina* (NML Capital, Ltd.) | 14 Civ. 8988 | 11/25/2014 (amended) | $2,694,745 |
| *Foglia, et al. v.* *Republic of Argentina* (Virgiolio Luis Foglia; Maria Cristina Argentina Barna and Ricardo Aurelio Triay) | 14 Civ. 8243 | 10/15/2014 | $297,000 |
| *Pons, et al. v.* *Republic of Argentina* (Ricardo Pons and Ofelia Nelida Garcia; NW Global Strategy) | 13 Civ. 8887 | 12/16/2013 | $211,000 |
| *Guibelalde, et al. v.* *Republic of Argentina* (Horacio Guibelalde and Marta Mabel Folgado) | 11 Civ. 4908 | 2/23/2014 (motion for leave to amend) | $115,000 |
| *Dorra, et al. v.* *Republic of Argentina* (Maximo Dorra and Olga Dorra de Dorra; Raul Rennella and Sandra Elizabeth Schuler; Angel Emilio Molinos) | 14 Civ. 10141 | 12/29/2014 | $574,585 |
| *Beloqui, et al. v.* *Republic of Argentina* (Miguel Angel Beloqui and Ana Josefa Zemborain) | 14 Civ. 5963 | 7/31/2014 | $114,000 |
| *Tortus Capital Master Fund, LP v.* *Republic of Argentina ("Tortus II")* (Tortus Capital Master Fund, LP) | 14 Civ. 1109 | 2/21/2014 | $210,000 |
| *Tortus Capital Master Fund, LP v.* *Republic of Argentina ("Tortus III")* (Tortus Capital Master Fund, LP) | 14 Civ. 3127 | 5/23/2014 (amended) | $77,000 |
| *Trinity Investments Limited v.* *Republic of Argentina* (Trinity Investments Limited) | 14 Civ. 10016 | 12/18/2014 | $6,338,000 |

## PRE-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Case<br>(Plaintiff(s)) | Docket # | Date of Complaint | Amount of Pre-Judgment Principal Claimed - 1994 FAA Bonds |
|---|---|---|---|
| *MCHA Holdings, LLC  v.*<br>*Republic of Argentina*<br>(MCHA Holdings, LLC) | 14 Civ. 7637 | 9/19/2014 | $6,819,000 |
| *MCHA Holdings, LLC  v.*<br>*Republic of Argentina*<br>(MCHA Holdings, LLC) | 14 Civ. 10064 | 12/22/2014 | $15,657,000 |
| *ARAG-A Limited, et al. v.*<br>*Republic of Argentina*<br>(ARAG-A Limited; ARAG-O Limited; ARAG-T Limited; ARAG-V Limited) | 14 Civ. 9855 | 12/12/2014 | $1,449,000 |
| *Attestor Master Value Fund LP v.*<br>*Republic of Argentina*<br>(Attestor Master Value Fund) | 14 Civ. 5849 | 8/19/2014<br>(amended) | $25,595,696 |
| *Claridae Ltd, et al. v.*<br>*Republic of Argentina*<br>(Claridae, Ltd.; Maria del Pilar de Wenetz Ferrer) | 14 Civ. 10201 | 12/30/2014 | $214,705 +<br>€491,000 |
| *Lambertini, et al. v.*<br>*Republic of Argentina*<br>(Egar Ramon Lambertini; Ana Doratelli and Juana Bonaiuti; Tito Siena; Scoggin Capital Management II LLC; Scoggin International Fund Ltd.; Scoggin Worldwide Fund Ltd.) | 15 Civ. 1471 | 2/27/2015 | $3,992,000 |
| *Trinity Investments Limited  v.*<br>*Republic of Argentina*<br>(Trinity Investments Limited) | 15 Civ. 1588 | 3/4/2015 | $5,467,077 |
| *Trinity Investments Limited  v.*<br>*Republic of Argentina*<br>(Trinity Investments Limited) | 15 Civ. 2611* | 4/3/2015 | $8,175,000 |

## PRE-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Case (Plaintiff(s)) | Docket # | Date of Complaint | Amount of Pre-Judgment Principal Claimed - 1994 FAA Bonds |
|---|---|---|---|
| *Trinity Investments Limited  v. Republic of Argentina* (Trinity Investments Limited) | 15 Civ. 5886* | 7/27/2015 | $28,506,000 |
| *MCHA Holdings, LLC  v. Republic of Argentina* (MCHA Holdings, LLC) | 15 Civ. 2577* | 4/3/2015 | $47,021,000 |
| *MCHA Holdings, LLC  v. Republic of Argentina* (MCHA Holdings, LLC) | 15 Civ. 5190* | 7/2/2015 | $19,356,000 |
| *White Hawthorne, LLC  v. Republic of Argentina* (White Hawthorne, LLC) | 15 Civ. 4767* | 6/18/2015 | $11,621,000 |
| *Stonehill Institutional Partners, L.P., et al. v. Republic of Argentina* (Stonehill Institutional Partners, L.P.; Stonehill Master Fund Ltd.) | 15 Civ. 4284* | 6/3/2015 | $3,227,000 |
| *VR Global Partners, LP v. Republic of Argentina* (VR Global Partners, LP) | 11 Civ. 8817* | 9/4/2012 (amended) | $8,800,837 + €1,759,000 |
| *Procella Holdings, L.P. v. Republic of Argentina* (Procella Holdings, L.P.) | 15 Civ. 3932* | 5/21/2015 | $943,000 + €4,304,000 |

*Not included in June
5 Order

# EXHIBIT B

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Allan Applestein TTEE FBO D.C.A. Grantor Trust | Allan Applestein TTEE FBO D.C.A. Grantor Trust, et al. , 02 Civ. 4124 | 5/31/2002 | 12/30/2003 | $285,981 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Carla Marini Arcangeli de Felicis | Bettoni, et al. , 05 Civ. 4299 | 4/28/2005 | 1/17/2007 | $1,378,736 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Pier Luigi Lucibello Piani;  Franco Trentin and Stefania Trentin | Beyer, et al. , 07 Civ. 0098 | 1/5/2007 | 12/26/2007 | $374,615 € 113,826 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Marco Borgra; Sergio Borgra; Donatella Fragonara Zanotti | Borgra, et al. , 07 Civ. 5807 | 6/19/2007 | 4/8/2008 | $223,315 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Alberto Baciucco; Otello Baciucco; Emanuele Botti | Botti, et al. , 05 Civ. 8687 | 10/11/2005 | 1/19/2007 | $764,335 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Renata Boscariol; Giampaolo Montino; Maurizio Sergi; Simona Staccioli | Cilli, et al. ,  04 Civ. 6594 | 8/13/2004 | 8/23/2006 | $239,930 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Agostino Consolini; Cesarino Consolini; Mario Giacometti; Verna Guialandi; Hilda Rupprecht | Consolini, et al. , 05 Civ. 0177 | 1/7/2005 | 4/2/2007 | $596,047 |
| Adami, et al. v. Republic of Argentina , 14 Civ. 7739 (9/24/2014) | Carifin S.A.; Diego Castagna and Eufrosina De Stefano | Fedecostante, et al. , 05 Civ. 4466 | 5/6/2005 | 1/11/2007 | $1,957,584 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Gianfranco Agostini; Sara Bartolozzi; Roberto Berardocco; Carlo Bretti; Susanna Bretti; Maria Robbiati; Anna Ferri; Giovanni Giardina and Vincenza Sabatelli; Franco Pezze | *Ferri, et al.* , 05 Civ. 2943 | 3/17/2005 | 1/25/2007 | $1,027,020 € 15,010 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Carlotta Giovanni; Raimondo Iallonardo | *Franceschi, et al.* , 03 Civ. 4693 | 6/25/2003 | 1/11/2007 | $738,780 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Adriano Bettinelli; Ruggero Rossini and Antonietta Giuseppina Brioschi | *Klein, et al.* , 05 Civ. 6599 | 7/18/2005 | 6/1/2007 | $1,816,510 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Graziano Adami; Monica Crozzoletto; Celestino Goglia; Paolo Lisi; Elide Margnelli; Amato Mori | *Lisi, et al.* , 05 Civ. 6002 | 6/27/2005 | 1/19/2007 | $545,236 € 39,189 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Sergio Lovati | *Lovati* , 05 Civ. 8195 | 9/20/2005 | 1/11/2007 | $40,058,222 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Valerio Piacenza | *Mazzini, et al.* , 03 Civ. 8120 | 10/14/2003 | 5/22/2006 | $100,251 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Graziella Bonadiman; Italia Camato; Giovanna Ferro; Salvatore Melchionda; Tiziano Sasselli | *Moldes, et al.* , 04 Civ. 6137 | 8/6/2004 | 8/18/2006 | $1,294,042 |
| *Adami, et al. v. Republic of Argentina* , 14 Civ. 7739 (9/24/2014) | Milena Ampalla; Antonella Bacchiocchi; and 65 additional plaintiffs | *Morata, et al.* , 04 Civ. 3314 | 4/27/2004 | 1/18/2007 | $31,803,222 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Adami, et al. v. Republic of Argentina*, 14 Civ. 7739 (9/24/2014) | Serenella Belleggia and Carlo Farioli | *Pasquali, et al.*, 05 Civ. 10636 | 12/19/2005 | 1/18/2007 | $41,880 |
| *Adami, et al. v. Republic of Argentina*, 14 Civ. 7739 (9/24/2014) | Angelo Cottoni; Bruna Mattioli; Allessandra Regoli; Silvia Regoli; Ines Rota; Vito Zancaner; Matteo Zanichelli; Giovanni Zanichelli | *Rigueiro, et al.*, 05 Civ. 3089 | 3/18/2005 | 1/17/2007 | $10,026,667 |
| *Adami, et al. v. Republic of Argentina*, 14 Civ. 7739 (9/24/2014) | Augusto Arcangeli De Felicis; Alberto Compare; and 10 additional plaintiffs | *Rosa, et al.*, 04 Civ. 7504 | 9/22/2004 | 5/29/2007 | $2,418,845 |
| *Adami, et al. v. Republic of Argentina*, 14 Civ. 7739 (9/24/2014) | Ruggero Rossini; Antonietta Giuseppina Brioschi; Raffaele Rossini; Simonetta Montanari; Claudio Mori; Alfredo Pelli; Graziella Berchi; Giuseppe Silvio Rossinni; Marinella Scalvi | *Rossini, et al.*, 05 Civ. 6200 | 6/30/2005 | 1/19/2007 | $1,891,725 € 154,537 |
| *Andrarex Ltd. v. Republic of Argentina*, 14 Civ. 9093 (11/14/2014) | Andrarex, Ltd. | *Andrarex, Ltd.*, 07 Civ. 5593 | 6/12/2007 | 10/2/2008 | $5,276,390 |
| *Angulo, Jose Pedro et al v. Republic of Argentina*, 15 Civ. 1470 (2/27/2015) | Jose Perdro Angulo; Pedro Timoteo Angulo | *Angulo, et al.*, 06 Civ. 1590 | 2/28/2006 | 12/26/2007 | $680,352 |
| *Angulo, Jose Pedro et al v. Republic of Argentina*, 15 Civ. 1470 (2/27/2015) | Claren Corp. | *Claren Corp.*, 06 Civ. 13675 | 12/1/2006 | 12/13/2007 | $7,507,089 |
| *Angulo, Jose Pedro et al v. Republic of Argentina*, 15 Civ. 1470 (2/27/2015) | Fernando Crostelli; Juan Carlos Crostelli; Martina Crostelli; Viviana Crostelli | *Crostelli, et al.*, 06 Civ. 15300 | 12/19/2006 | 11/19/2007 | $10,636,731 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Angulo, Jose Pedro et al v. Republic of Argentina* , 15 Civ. 1470  (2/27/2015) | Patricio Hansen | *Hansen* , 06 Civ. 15293 | 12/19/2006 | 8/10/2009 | $510,262 |
| *Aurelius Capital Partners, LP, et al. v. Republic of Argentina* , 14 Civ. 8946 (11/10/2014) | Aurelius Capital Partners, LP; Aurelius Capital Master, Ltd | *Aurelius Capital Partners, LP, et al.* , 07 Civ. 2715 | 4/3/2007 | 4/29/2008 | $195,794,206 |
| *Aurelius Capital Partners, LP, et al. v. Republic of Argentina* , 14 Civ. 8946 (11/10/2014) | Aurelius Capital Partners, LP; Aurelius Capital Master, Ltd | *Aurelius Capital Partners, LP, et al.* , 07 Civ. 11327 | 12/17/2007 | 6/13/2008 | $128,540,595 |
| *Banca Arner, S.A., et al. v. Republic of Argentina* , 15 Civ. 1508  (3/2/2015) | Banca Arner, S.A. | *Banca Arner, S.A.* , 05 Civ. 277 | 1/12/2005 | 1/11/2007 | $37,371,622 |
| *Banca Arner S.A., et al. v. Republic of Argentina* , 15 Civ. 1508  (3/2/2015) | Brantford Holding S.A. | *Beltramo, et al.* , 06 Civ. 7151 | 9/18/2006 | 1/14/2014 | $7,266,560 |
| *Blue Angel Capital I LLC v. Republic of Argentina* , 14 Civ. 8947 (11/20/2014) | Blue Angel Capital I LLC | *Blue Angel Capital I LLC* , 07 Civ. 2693 | 4/2/2007 | 4/28/2008 | $229,654,415 |
| *Capital Markets Financial Services Inc., et al. v. Republic of Argentina* , 15 Civ. 710  (1/30/2015) | Clarex Ltd. | *Capital Markets Financial Services Inc., et al.* , 06 Civ. 15301 | 12/19/2006 | 11/9/2010 | $136,623,446 |
| *Capital Ventures International v. Republic of Argentina* , 14 Civ. 7258 (9/8/2014) | Capital Ventures International | *Capital Ventures International* , 05 Civ. 4085 | 4/25/2005 | 3/16/2007 | $52,116,640 |
| *Capital Ventures International v. Republic of Argentina* , 14 Civ. 7258 (9/8/2014) | Capital Ventures International | *Capital Ventures International* , 06 Civ. 207 | 1/11/2006 | 6/8/2007 | $104,450,284 €4,435,589 |

EXHIBIT B
9/25/15

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Cordoba Capital v. Republic of Argentina*, 14 Civ. 7164 (9/5/2014) | Cordoba Capital | *Cordoba Capital*, 06 Civ. 5887 | 8/3/2006 | 6/1/2009 | $100,033,967 |
| *EM Ltd. v. Republic of Argentina*, 14 Civ. 8303 (10/16/2014) | EM Ltd. | *EM Ltd.*, 03 Civ. 2507 | 4/10/2003 | 10/27/2003 | $724,801,663 |
| *FFI Fund, Ltd. and FYI Ltd. v. Republic of Argentina*, 14 Civ. 8630 (10/29/2014) | FFI Fund Ltd. | *FFI Fund Ltd., et al.*, 05 Civ. 3328 | 3/29/2005 | 5/28/2009 | $673,669,080 |
| *FFI Fund, Ltd. and FYI Ltd. v. Republic of Argentina*, 14 Civ. 8630 (10/29/2014) | FYI Ltd. | *FFI Fund Ltd., et al.*, 05 Civ. 3328 | 3/29/2005 | 1/27/2010 | $448,302,340 |
| *Lightwater Corp. Ltd. v. Republic of Argentina*, 14 Civ. 4092 (9/30/2014 - amended) | Lightwater Corp. Ltd. | *Lightwater Corp. Ltd.*, 02 Civ. 3804 | 5/17/2002 | 5/27/2003 | $8,353,625 |
| *Los Angeles Capital v. Republic of Argentina*, 14 Civ. 7169 (9/5/2014) | Los Angeles Capital | *Los Angeles Capital*, 05 Civ. 10201 | 12/5/2005 | 6/1/2009 | $82,160,690 |
| *Los Angeles Capital v. Republic of Argentina*, 14 Civ. 7169 (9/5/2014) | Los Angeles Capital | *Los Angeles Capital*, 07 Civ. 2349 | 3/21/2007 | 6/1/2009 | $75,139,739 |
| *Montreux Partners, L.P. v. Republic of Argentina*, 14 Civ. 7171 (9/5/2014) | Montreux Partners, L.P. | *Montreux Partners, L.P.*, 05 Civ. 4239 | 4/28/2005 | 6/1/2009 | $48,621,544 |
| *NML Capital, Ltd. v. Republic of Argentina*, 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.*, 03 Civ. 8845 | 11/7/2003 | 12/18/2006 | $284,184,632 |

EXHIBIT B
9/25/15

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 05 Civ. 2434 | 2/28/2005 | 6/16/2009 | $311,177,898 |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital Ltd.* , 06 Civ. 6466 | 8/25/2006 | 6/16/2009 | $533,378,361 |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 07 Civ. 1910 | 3/5/2007 | 4/10/2008 (date of summary judgment order) | $71,598,000 (principal only) |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 07 Civ. 2690 | 4/2/2007 | 6/16/2009 | $148,781,936 |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 07 Civ. 6563 | 7/20/2007 | 4/10/2008 (date of summary judgment order) | $300,000 (principal only) |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 08 Civ. 2541 | 3/13/2008 | 3/4/2009 (date of summary judgment order) | $16,719,628 (principal only) |
| *NML Capital, Ltd. v. Republic of Argentina* , 14 Civ. 8601 (10/28/2014) | NML Capital, Ltd. | *NML Capital, Ltd.* , 08 Civ. 3302 | 4/2/2008 | 6/16/2009 | $290,270,631 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Old Castle Holdings, Ltd. v. Republic of Argentina* , 14 Civ. 4091 (9/30/2014 - amended) | Old Castle Holdings, Ltd. | *Old Castle Holdings, Ltd.* , 02 Civ. 3808 | 5/17/2002 | 5/30/2003 | $835,363 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Roberto Claudio Pitronaci; Alberto Guillermo Hillcoat; Enrique Sebastian Palacio Minetti; Casimiro Kornas; Miguel Alberto Balestrini; Lidia Florinda Pioli | *Heeb, et al.* , 07 Civ. 10656 | 11/28/2007 | 2/7/2009 | $2,491,144 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Pedro Kalbermann | *Allan Applestein TTEE FBO D.C.A. Grantor Trust, et al.* , 02 Civ. 4124 | 5/30/2003 | 05/12/2004 | $1,396,976 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Consultora Kilser S.A. | *Amber Reed Corp., et al.* , 08 Civ. 440 | 1/17/2008 | 10/16/2008 | $1,781,728 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Andrea Paleari; Gamatown Corp.; Abel Amoroso; Norfolk Investment Trade Co.; Eduardo Raul Garrido | *Amoroso, et al.* , 06 Civ. 3197 | 4/25/2006 | 6/26/2007 | $1,552,690 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Roberto Bautista Franco Baccanelli | *Baccanelli* , 07 Civ. 2788 | 4/6/2007 | 4/22/2008 | $10,200,678 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Ramon Eduardo Nebhen; Bruno Italia; Angela Busi; Maria Lucrecia Quiroga; Nicolas Carlos Amador Farinola; Nicolas Carlos Amador Farinola; Renate Arnold; Irma Haydee Redondo de Negri | *Bettoni, et al.* , 05 Civ. 4299 | 5/2/2005 | 1/17/2007 | $3,207,003 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Antonio Juan Pauletich; Franco Peruz; Norberto Dario Casella; Guido Scanavino; Giancarlo Grassi; Hendrik Beyer; Edgardo Gerardo A. Sclafani; Lucia Rafaela Tasso; Alexia Brandes | *Beyer, et al.* , 07 Civ. 98 | 1/30/2007 | 12/26/2007 | $5,012,061 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Bliway International S.A. | *Bliway International S.A.* , 06 Civ. 3198 | 4/25/2006 | 6/26/2007 | $2,348,974 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Hartmut Peters; Wolfgang Bolland; Wege Zu Mozart Veranstaltungsgesellschaft m.b.H. | *Bolland, et al.* , 06 Civ. 3196 | 4/25/2006 | 4/2/2007 | $4,992,843 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Alfredo Carlos Alzaga; Miguel Alberto Balestrini; Mariana Noemi Tauss; Atilio Luis Pocosgnich; Beatriz Marti Reta | *Borgra, et al.* , 07 Civ. 5807 | 6/19/2007 | 4/8/2008 | $1,042,429 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Silvio Eduardo Schuster; Miguel Kaufmann; Edgardo A. Ramos; Elena Pasquali; Portico Capital Inc.; Corleis Sociedad Anonima; Graciela Candida Saenz; Jorg Zahn | *Botti, et al.* , 05 Civ. 8687 | 10/12/2005 | 1/19/2007 | $4,834,121 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Crista Irene Brandes | *Brandes, et al.* , 08 Civ. 6625 | 7/25/2008 | 2/7/2009 | $4,785,792 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Delfin A. Rabinovich; Oscar Secco; Alejandro Fernandez Barbeito; Elvira Dagmar Buzcat; Mercedes Calvo | *Buczat, et al.* , 04 Civ. 7056 | 9/2/2004 | 9/19/2006 | $2,065,067 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Oscar Reinaldo Carabajal; Rosa Delfina Castro; Gamatown Corporation S.A. | *Carabajal, et al.* , 09 Civ. 8257 | 9/29/2009 | 2/25/2011 | $2,084,294 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Colombo Masi; Luis Pedro Bivort; Maria Fausta Cilli; Fiorenzo Faccioni; Leonardo Hilario Simone; Carlos Arturo Jose Ulla; Decio Carlos Francisco Ulla | *Cilli, et al.* , 04 Civ. 6594 | 8/13/2004 | 8/23/2006 | $2,777,303 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Michelle Colella | *Colella, et al.* , 04 Civ. 2710 | 4/9/2004 | 6/1/2006 | $6,787,965 |
| *Perez, et al. v. Republic of Argentin* a, 14 Civ. 8242 (10/15/2014) | Fiseico - Financing Services International Corporation; Edith Elvira Nicolas; Lerinerco S.A.; Lorenzo Bianchi | *Consolini, et al.* , 05 Civ. 177 | 1/7/2005 | 4/2/2007 | $895,390 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Carlo Cigolini; Juan Eduardo Colombo; Carla Nanni; Maurizio Petroni; Roberto Akman; Gabriele Dolcetti; Gabriele Dolcetti; Marcella Dolcetti; Luca Mulazzani | *Dolcetti, et al.* , 07 Civ. 2607 | 3/29/2007 | 1/31/2009 | $4,120,232 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | HWB Alexandra Strategies Portfolio; HWB Dachfonds - Venividivici; HWB Gold & Silber Plus; Victoria Strategies Portfolio Ltd.; Drawrah Limited | *Drawrah, et al.* , 09 Civ. 8299 | 9/30/2009 | 2/25/2011 | $48,443,925 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Cesare de Juliis; Rudolf Erb; Silvia Beatriz Ovejero; Jose L. Peluso | *Erb, et al.* , 07 Civ. 11495 | 12/21/2007 | 9/26/2008 | $2,193,608 |

EXHIBIT B
9/25/15

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Alejandro Alberto Etcheto | *Etcheto, et al.* , 08 Civ. 4902 | 5/28/2008 | 2/7/2009 | $360,550 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Hector Perez; Marland International S.A.; Lis Carina Medina; and 10 additional plaintiffs | *Etevob, et al.* , 03 Civ. 1680 | 3/11/2003 | 1/16/2007 | $7,645,902 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Vanina Andrea Exposito | *Exposito* , 04 Civ. 3639 | 5/12/2004 | 7/13/2007 | $198,222 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Massimo Baldari; Alberto Ancieto Gonzalez; Roberto Fedecostante; Brigida Elvira Denis; Nelida Amelia Giusti de Behar; Alexander Stern; Maria Marta de Luca | *Fedecostante, et al.* , 05 Civ. 4466 | 5/6/2005 | 01/11/2007 | $1,847,043 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Eduardo Argentieri; Carlos Adolfo Escati; Armando Eduardo Valerio; Mirta Antonia Portela; Gabriel Federico Leimgruber; Laura Victoria Demidovich | *Ferri, et al.* , 05 Civ. 2943 | 3/17/2005 | 1/25/2007 | $1,011,406 |
| *Perez, et al. v. Republic of Argentin* a, 14 Civ. 8242 (10/15/2014) | Livio Mazzola; Bradford Promotions S.A.; Hamburg Consulting Inc.; Pierino Garrafa; Carlos Jesus Sendin; and 10 additional plaintiffs | *Franceschi, et al.* , 03 Civ. 4693 | 6/25/2003 | 1/11/2007 | $5,373,301 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Helmut Hagemann | *Hagemann* , 08 Civ. 5436 | 6/16/2008 | 4/3/2009 | € 954,390 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | HWB Renten Portfolio Plus; HWB Alexandra Strategies Portfolio; Victoria Strategies Porfolio Ltd.; HWB Victoria Strategies Portfolio; HWB Portfolio Plus | *HWB Securities II, et al.* , 07 Civ. 11382 | 12/19/2007 | 2/7/2009 | $12,374,663 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Gunther Braun; HWB Renten Portfolio Plus; HWB Alexandra Strategies Portfolio; NW Global Strategy; Victoria Strategies Portfolio Ltd.; HWB Victoria Strategies Portfolio; HWB Portfolio Plus | *HWB Victoria, et al.* , 07 Civ. 10657 | 11/28/2007 | 2/7/2009 | $115,950,470 |
| *Perez, et al. v. Republic of Argentin* a, 14 Civ. 8242 (10/15/2014) | Fersimar Corp., S.A.; Carlos A. Rial Coto; Diana Klein; Ghibli Investments Ltd.; County Bay Investments Ltd. | *Klein, et al.* , 05 Civ. 6599 | 7/21/2005 | 6/1/2007 | $5,970,827 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Giordano Allievi; Ambrogio Stucchi; Moreno Legnaro; Mario Dal Toe; Davide Ciallella; Bramante Dal Toe; Aldo Naj Oleari; Ada Dal Trozzo; Luis Garcia Tobio | *Legnaro, et al.* , 05 Civ. 178 | 1/13/2005 | 1/19/2007 | $809,020 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Sergio Rodolfo Berri; Malcolm Gerald Berri; Franco Maria Conte; Francesco Massoletti | *Lisi, et al.* , 05 Civ. 6002 | 6/28/2005 | 1/19/2007 | $1,473,539 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Luigi Giacomazzi; Agostino Scocchera; Kazimierz Kornas; Nora Raquel Lopez; Marcos Vanni; Carlos Alberto Martinez; Sidney Sutter | *Martinez, et al.* , 05 Civ. 2521 | 3/3/2005 | 1/11/2007 | $3,361,182 |

EXHIBIT B
9/25/15

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Mazoral S.A. | *Mazoral S.A.* , 04 Civ. 3313 | 4/30/2004 | 8/16/2006 | $10,800,595 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Jorge Marcelo Mazzini; Compania Calitecno S.A.; Ana Valeria Baravalle; Jose Alberto Landi; Hernan Taboada; Susana Frasca de Lauria; and 15 additional plaintiffs | *Mazzini, et al.* , 03 Civ. 8120 | 3/25/2004 | 5/22/2006 | $9,821,523 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Luciana Ceredi; Alesia Milanesi; Peng Zeying; Raul Alejandro Gonzalez Martin; Gustavo Carlos Ferreira; Jose Emilio Cartana; Raul Horacio Mendez | *Milanesi, et al* ., 07 Civ. 7248 | 8/14/2007 | 9/25/2008 | $2,857,971 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Nelson Dante Luciano; Oscar Raul Clavijo; Carlos Alberto Bruzzone; Pedro Kalbermann | *Moldes, et al.* , 04 Civ. 6137 | 8/9/2004 | 8/18/2006 | $2,836,189 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Ansgar Neuenhofer; First City S.A.; Alberto Silvio Bursztyn; Claudio Oscar Mazza; Lydia Haydee Gigaglia; Rodolfo Burul; and 20 additional plaintiffs | *Morata, et al.* , 04 Civ. 3314 | 12/9/2004 | 1/18/2007 | $5,076,540 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (NW Global Strategy, et al.) (10/15/2014) | Gamatown Corporation S.A.; HWB Gold & Silber Plus; NW Global Strategy | *NW Global Strategy, et al.* , 10 Civ. 4656 | 6/15/2010 | 4/1/2011 | $8,836,012 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Mara Cavana; Maurizio Dalla; and 10 additional plaintiffs | *Palladini, et al.* , 07 Civ. 689 | 1/29/2007 | 12/26/2007 | $10,705,217 |

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentin* a, 14 Civ. 8242 (10/15/2014) | Ricardo Kaufmann; Miguel Angel Bitto; Eugenio Quatrini; Pedro Marcelo Sexe; Telincor S.A.; Socrate Pasquali | *Pasquali, et al.*, 05 Civ. 10636 | 12/19/2005 | 1/18/2007 | $4,752,422 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Diego Pedro Peluffo; Juan Omar Giovachini; Guillermo Almanza; Graciela Adriana Gamito; and 30 additional plaintiffs | *Prima, et al.*, 04 Civ. 1077 | 2/10/2004 | 8/17/2006 | $59,860,601 € 105,380 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Marcelo Ruben Rigueiro; Alfredo Enrique Zucchini; Nestor de Nicola; Santiago Rocca; Dussault in Colella, Denise Marie Laurette; Josef Schwald; Susana Leonor Gatti | *Rigueiro, et al.*, 05 Civ. 3089 | 3/22/2005 | 1/17/2007 | $3,827,276 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Manuel Calvo; Alcira Noemi Arditi; Fernando Barbeito Fernandez; Sandro Concettini; Maria Asuncion Inmaculada Castelli; Roberto Carlos Parada; Alicia G. de Sondermann | *Rosa, et al.*, 04 Civ. 7504 | 8/16/2005 | 5/29/2007 | $1,830,341 €105,974 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Ines Delia Eidelman; Modern Group S.A.; Lucabras S.A.; Cesar Civetta | *Rossini, et al.*, 05 Civ. 6200 | 7/5/2005 | 1/19/2007 | $603,141 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Anye Salinovich | *Salinovich, et al.*, 11 Civ. 4223 | 6/21/2011 | 6/7/2012 | $47,448 |
| *Perez, et al. v. Republic of Argentina*, 14 Civ. 8242 (10/15/2014) | Griselda Teresa Dulevich; Maria Augustina Sauco | *Sauco, et al.*, 05 Civ. 3955 | 4/19/2005 | 8/18/2006 | $2,256,961 |

EXHIBIT B
9/25/15

## POST-JUDGMENT PLAINTIFFS SEEKING SPECIFIC PERFORMANCE

| "Me Too" Pari Passu Cases | Plaintiffs with 1994 FAA Bonds in Pari Passu Cases Who Brought Previous Litigation | Names of Original Cases in Which Judgment Obtained | Date of First Complaint | Date of Judgment | Final Judgment Amount - 1994 FAA Bonds |
|---|---|---|---|---|---|
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Sabine Zahn; Josef Schwald; Stefano Spanicciati; Nestor Alberto Rubin; Andreas Wilfried Schwald | *Schwald, et al.* , 06 Civ. 6032 | 8/8/2006 | 5/2/2007 | $1,675,345 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | U.V.A. Vaduz; Klaus Bohrer | *U.V.A. Vaduz, et al.* , 07 Civ. 11497 | 8/13/2008 | 10/22/2008 | $5,580,919 |
| *Perez, et al. v. Republic of Argentina* , 14 Civ. 8242 (10/15/2014) | Zylberberg Fein LLC | *Zylberberg Fein LLC* , 07 Civ. 11496 | 12/21/2007 | 9/23/2008 | $7,891,737 |
| *Settin v. Republic of Argentina* , 14 Civ. 8739 (10/31/2014) | Rafael Settin | *Settin, et al.* , 06 Civ. 3068 | 4/21/2006 | 2/21/2008 | $3,936,228 |
| *Wilton Capital, Ltd. v. Republic of Argentina* , 14 Civ. 7166 (9/5/2014) | Wilton Capital, Ltd. | *Wilton Capital, Ltd.* , 07 Civ. 1797 | 3/1/2007 | 6/1/2009 | $39,869,672 |
| *Wilton Capital, Ltd. v. Republic of Argentina* , 14 Civ. 7166 (9/5/2014) | Wilton Capital, Ltd. | *Wilton Capital, Ltd.* , 09 Civ. 401 | 1/14/2009 | 6/26/2009 | $66,125,303 |
| *Ercolani, et al. v. Republic of Argentina* , 15 Civ. 4654 (6/16/2015)* | Paolo Ercolani and Paola Aiello | *Beltramo, et al.* , 06 Civ. 7151 | 9/18/2006 | 1/14/2014 | $1,237,952 |
| *Fazzolari, et al. v. Republic of Argentina* , 15 Civ. 3523 (5/5/2015)* | Armando Ruben Fazzolari; Julio Roberto Perez | *Fazzolari, et al.* , 05 Civ. 9072 | 10/25/2005 | 6/3/2008 | $320,888 |

*Not included in June 5 Order

# EXHIBIT C

EXHIBIT C
9/25/15

## COMPARISON OF PROPOSED ORDER ¶ 2(c) WITH
## AMENDED INJUNCTION ¶ 2(c)

c.   The balance of the equities strongly supports this Order in light of the clear text of
Paragraph 1(c) of the FAA and ~~the Republic~~Argentina's repeated failures to make required
payments to ~~NML~~Plaintiff. In the absence of the equitable relief provided by this Order, ~~the
Republic~~Argentina will continue to violate Paragraph 1(c) with impunity, thus subjecting
~~NML~~Plaintiff to harm. On the other hand, the Order requires of ~~the Republic~~Argentina only
that which it promised ~~NML~~Plaintiff and similarly situated creditors to induce those
creditors to purchase ~~the Republic~~Argentina's bonds~~. Because the Republic has the financial
wherewithal to meet its commitment of providing equal treatment to both NML (and
similarly situated creditors) and those owed under the terms of the Exchange Bonds, it is
equitable to require it to do so~~. Indeed, equitable relief is particularly appropriate here,
given that ~~the Republic~~Argentina has engaged in an unprecedented, systematic scheme of
making payments on other external indebtedness, after repudiating its payment obligations
to ~~NML~~Plaintiff, in direct violation of its contractual commitment set forth in Paragraph 1(c)
of the FAA.

# EXHIBIT D

EDITION:  UK

SIGN IN | REGISTER                    Search Reuters

HOME    BUSINESS    MARKETS    WORLD    UK    TECH    MONEY    OPINION    BREAKINGVIEWS    SPORT    LIFE    PICTURES    VIDEO

LIVE BLOG: Scotland v Japan in the Rugby World Cup »

World | Thu Sep 10, 2015 9:47pm BST                                    Related: WORLD

# U.N. nations approve principles for sovereign debt restructuring

UNITED NATIONS | BY LOUIS CHARBONNEAU

The United Nations General Assembly on Thursday approved what it described as global "basic principles" for sovereign debt restructuring processes to improve the global financial system, an initiative that was inspired by Argentina's debt crisis.

There were 136 votes in favour, six against and 41 abstentions in the vote on the resolution, which was submitted to the 193-nation General Assembly by South Africa.

Unlike the Security Council, which has the power to issue legally binding resolutions, General Assembly resolutions are non-binding. But they carry political weight.

The resolution urges debtors and creditors "to act in good faith and with a cooperative spirit to reach a consensual rearrangement" of sovereign debt.

"A sovereign state has the right ... to design its macroeconomic policy, including restructuring its sovereign debt, which should not be frustrated or impeded by any abusive measures," it added.

The vote came one year and a day after the General Assembly agreed to negotiate and adopt a multilateral legal framework for sovereign debt restructuring processes.

It added that states should be immune from domestic court decisions related to sovereign debt restructuring, adding that any exceptions should be limited.

The resolution also says that debt restructuring should lead to a stable debt situation that preserves creditors' rights while supporting economic growth.

Argentina welcomed the adoption of the resolution.

"It is a resolution in favour of economic stability, social peace and development," Argentina Foreign Minister Hector Timerman told the Assembly. "Today, debt is a cause of violence, of inequality, of situations whereby the powerful take advantage of less developed countries needing funds."

Countries like the United States, which voted against the resolution, say a statutory mechanism for debt restructurings would sow uncertainty in financial markets.

A U.S. delegate told the assembly the resolution's language was "problematic" and that countries do not have any "sovereign right" to debt restructuring. The delegate added that the United Nations was not the appropriate venue for such issues.

Argentina has long supported U.N. action on debt restructuring principles. It defaulted on $100 billion in bonds in a 2002 crisis that thrust millions of middle-class Argentines into poverty.

## PHOTOS OF THE DAY



Our top photos from the last 24 hours.  Slideshow »

## TRENDING ON REUTERS

Volkswagen board to decide CEO's fate amid diesel scandal | ▶ VIDEO    **1**

Volkswagen says 11 million cars hit by scandal, probes multiply | ▶ VIDEO    **2**

Insight - Orban mobilises Hungary's troops, prisoners, jobless to fence out migrants    **3**

Germany's Bosch makes VW's U.S. diesel components - spokesman    **4**

London leapfrogs New York as world's leading financial hub - survey    **5**

## RECOMMENDED VIDEO

Turkish police block hundreds of Greece-bo...

Iran, Russia will work to help end Syria crisis

Breakingviews: VW's turbocharged dieselgate

Tsipras to back Greek bailout

That crisis is still plaguing the country's finances. Top Argentine officials regularly blast bondholders who have sued the country over the debt it failed to pay 13 years ago.

Argentina defaulted again last year when a U.S. judge barred it from honoring its restructured debt without reaching a deal with the funds, which the president denounces as "vultures."

(Reporting by Louis Charbonneau; Editing by David Gregorio)

## More From Reuters

- Factbox - Diesel engines and how VW's 'defeat device' worked | 21 Sep
- Bulgaria sends troops to guard border with Turkey | 17 Sep
- Insight - Refugee crisis shows the changing soul of Germany | 13 Sep
- In egalitarian Sweden, richer regions reluctant to share refugee burden | 17 Sep
- Wary of Russia, Estonian volunteers rush to join militia | 14 Sep

## Sponsored Financial Content

- How to keep clients invested through volatility  *J.P. Morgan Funds*
- 7 Outrageous Credit Cards For Those Of Us That Have Excellent Credit  *Next Advisor*
- Top 4 Credit Cards For Consolidating Your Debt  *NerdWallet*
- [SPECIAL REPORT] Tiny stocks, huge (safe) gains?  *Wall Street Daily*
- Boost your retirement income with these Social Security benefits today  *The Fool*

**Watch your top stories**

Deep rift widening in EU over refugee crisis

ALSO | Politics and religion mix at th...

**Your five minute news show of today's top stories**

For more visit Reuters.tv

**From The Web**

Sponsored Links by Taboola



How Unified Communications Is Changing the Way Global Com...
*ShoreTel*



Drivers Surprised They Never Knew This Rule
*Provide-Savings Insurance Quotes*



3 Banks Introduce New Cards Paying Unusually High Miles P...
*LendingTree*



There's Trouble Brewing for America's Most Hated Compan...
*The Motley Fool*



The Golden Age is Over: Billionaires Dumping American...
*Money Morning Report Subscription*



New Grammar App Can Help You Succeed at Work
*Grammarly*

Back to top

**Reuters.com**  Business | Markets | World | Politics | Technology | Opinion | Money | Pictures | Videos | Site Index | Mobile | Reuters Toolbar

**More from Reuters**  Reuters News Agency | Brand Attribution Guidelines | Delivery Options

**Support & Contact**  Support | Corrections

**Account Information**  Register | Sign In

**Connect with Reuters**  Twitter    Facebook    Linkedin    RSS    Newsletters

**About**                    Privacy Policy  |  Terms of Use  |  Copyright

Thomson Reuters is the world's leading source of intelligent information for businesses and professionals.

Our Flagship financial information platform incorporating Reuters Insider

An ultra-low latency infrastructure for electronic trading and data distribution

A connected approach to governance, risk and compliance

Our next generation legal research platform

Our global tax workstation

Thomsonreuters.com

About Thomson Reuters

Investor Relations

Careers

Contact Us

Thomson Reuters is the world's largest international multimedia news agency, providing investing news, world news, business news, technology news, headline news, small business news, news alerts, personal finance, stock market, and mutual funds information available on Reuters.com, video, mobile, and interactive television platforms. Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

NYSE and AMEX quotes delayed by at least 20 minutes. Nasdaq delayed by at least 15 minutes. For a complete list of exchanges and delays, please click here.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

NML CAPITAL, LTD.,                               :

                                          :

                       Plaintiff,            :

                                            :

              - against -            :     14 Civ. 8601 (TPG)

                                            :

THE REPUBLIC OF ARGENTINA,         :

                                            :

                      Defendant.       :

-------------------------------------------------------- X

NML CAPITAL, LTD.,                               :

                                            :

                       Plaintiff,            :

                                            :

              - against -            :     14 Civ. 8988 (TPG)

                                            :

THE REPUBLIC OF ARGENTINA,         :

                                            :

                      Defendant.       :

-------------------------------------------------------- X

## [PROPOSED] ORDER

WHEREAS, in an Order dated December 7, 2011 entered in related cases *NML Capital, Ltd. v. Republic of Argentina*, Nos. 08 Civ. 6978 (TPG), 09 Civ. 1707 (TPG), 09 Civ. 1708 (TPG) (the "Related Cases"), this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement (the "FAA"), the Republic of Argentina ("Argentina") is "required . . . at all times to rank its payment obligations pursuant to Plaintiff's Bonds at least equally with all Argentina's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in an Order dated February 23, 2012 in the Related Cases, this Court granted Plaintiff NML Capital, Ltd.'s ("Plaintiff") motion for equitable relief as a remedy for such violations of the FAA pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

WHEREAS, in an Order dated March 5, 2012 in the Related Cases, this Court stayed the February 23 Order pending appeal and also prohibited Argentina from taking any action to evade the directives of the February 23, 2012 Order.

WHEREAS, the Court resolved certain issues remanded by the Second Circuit in the Related Cases in an opinion, dated November 21, 2012, and an "Amended February 23 Order," dated November 21, 2012.

WHEREAS, in an opinion dated August 23, 2013, the Second Circuit affirmed the Amended February 23 Order in the Related Cases, but stayed enforcement of the Amended February 23 Order pending the resolution of a petition for a writ of certiorari.

WHEREAS, in an Order in the Related Cases dated October 3, 2013, the Court clarified that the anti-evasion provisions of the March 5 Order remains in full force and effect and further ordered that Argentina was barred from taking "any action to attempt to evade the purposes and directives of the Amended February 23 Order, attempt to render those Orders ineffective, to attempt to diminish the Court's ability to supervise compliance with the Amended February 23 Orders, including without limitation, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds without prior approval of the Court."

WHEREAS, on February 18, 2014, Argentina filed with the Supreme Court of the United States a petition for a writ of certiorari with respect to the judgment of the United States Court of Appeals for the Second Circuit affirming the Amended February 23 Order in the Related Cases.

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

WHEREAS, on June 16, 2014, the Supreme Court of the United States denied Argentina's petition for a writ of certiorari to review the judgment of the United States Court of Appeals for the Second Circuit affirming the Amended February 23 Order in the Related Cases.

WHEREAS, in an Order dated June 5, 2015, this Court granted partial summary judgment to Plaintiff on its claims that Argentina repeatedly has breached, and continues to breach, its obligations under paragraph 1(c) of the FAA finding:

> By issuing the Exchange Bonds and passing legislation prohibiting payment on the FAA bonds, the Republic has created a superior class of debt to that held by plaintiff[]. By making payments on this superior class of debt, the Republic has violated its promise to rank plaintiff['s] bonds equally with its later-issued external indebtedness. Thus, the court holds, in light of the Republic's entire and continuing course of conduct, that it has breached the pari passu clause of the FAA.

And WHEREAS Plaintiff has filed a motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of Plaintiff's motion, the response of Argentina thereto, Plaintiff's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.      It is DECLARED, ADJUDGED, and DECREED that Plaintiff is irreparably harmed by and has no adequate remedy at law for Argentina's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent Argentina from further violating Paragraph 1(c) of the FAA, in that:

      a.      Absent equitable relief, Plaintiff would suffer irreparable harm because Argentina's payment obligations to Plaintiff would remain debased of their contractually-guaranteed status, and Plaintiff would never be restored to the

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

position it was promised that it would hold relative to other creditors in the event of default.

   b.  There is no adequate remedy at law for Argentina's ongoing violations of Paragraph 1(c) of the FAA because Argentina has made clear—indeed, it has codified in Law 26,017, Law 26,547, Law 26,984 and Law 26,886—its intention to defy any money judgment issued by this Court.

   c.  The balance of the equities strongly supports this Order in light of the clear text of Paragraph 1(c) of the FAA and Argentina's repeated failures to make required payments to Plaintiff.  In the absence of the equitable relief provided by this Order, Argentina will continue to violate Paragraph 1(c) with impunity, thus subjecting Plaintiff to harm.  On the other hand, the Order requires of Argentina only that which it promised Plaintiff and similarly situated creditors to induce those creditors to purchase Argentina's bonds.  Indeed, equitable relief is particularly appropriate here, given that Argentina has engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to Plaintiff, in direct violation of its contractual commitment set forth in Paragraph 1(c) of the FAA.

   d.  The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order, particularly here, where creditors of Argentina have no recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises.  No less than any other entity entering into a commercial transaction, there is a strong public interest in holding Argentina to its contractual obligations.

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

2.      Argentina accordingly is permanently ORDERED to specifically perform its obligations to Plaintiff under Paragraph 1(c) of the FAA as follows:

a.      Whenever Argentina pays any amount due under terms of the bonds or other obligations issued pursuant to Argentina's 2005 or 2010 Exchange Offers, or any subsequent exchange of, or substitution for, the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), Argentina shall concurrently or in advance make a "Ratable Payment" to Plaintiff (as defined below and as further defined in the Court's Opinion of November 21, 2012 in the Related Cases (Docket No. 424)).

b.      Such "Ratable Payment" that Argentina is ORDERED to make to Plaintiff shall be an amount that is equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to Plaintiff in respect of the bonds at issue in these cases (14 Civ. 8601 (TPG) and 14 Civ. 8988 (TPG)), including pre-and post-judgment interest.

c.      Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which Argentina intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d.      Argentina is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to Plaintiff.

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

       e.      Within three (3) days of the issuance of this ORDER, Argentina shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by Argentina of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to Plaintiff.

       f.      "Participants" refer to those persons and entities who act in active concert or participation with Argentina, to assist Argentina in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York); (2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees; (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System); (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London)); and (5) attorneys and other agents

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

engaged by any of the foregoing or Argentina in connection with their obligations under the Exchange Bonds.

g.    Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h.    Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to its duties, if any, under this ORDER may make an application to this Court, with notice to Argentina and Plaintiff.  Such clarification will be promptly provided.

i.    Concurrently or in advance of making a payment on the Exchange Bonds, Argentina shall certify to the Court and give notice of this certification to its Participants, and to counsel for Plaintiff, that Argentina has satisfied its obligations under this ORDER to make a Ratable Payment to Plaintiff.

3.    Plaintiff shall be entitled to discovery to confirm the timing and amounts of Argentina's payments under the terms of the Exchange Bonds; the amounts Argentina owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.    Argentina is permanently PROHIBITED from—either directly or through any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of Argentina—taking any action to or attempting to evade the purposes and directives of this ORDER, render it ineffective, or  attempt to diminish the Court's ability to supervise compliance with this ORDER, including, without limitation, by altering or amending the

[Dechert Draft 8/7/2015]
PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without prior approval of the Court. This paragraph shall remain in effect during the pendency of any appeal, any petition to the United States Supreme Court for a writ of certiorari, any proceeding on the merits in the United States Supreme Court, and any proceedings on remand unless a further order of the Court states otherwise.

5.    ORDERED that with respect to any plan or proposal that may have the purpose, effect or intent, either directly or indirectly, of violating this ORDER, or which may be deemed by a reasonable person to have such purpose, effect or intent, Argentina shall disclose to Plaintiff, within five business days of the entry of this ORDER, the existence and content of any communications between Argentina (or any representative, agent, instrumentality, political subdivision, or other person or entity acting on behalf of Argentina) and:  (i) any holders of beneficial interest in Exchange Bonds or any registered owners of the Exchange Bonds; (ii) any trustee, indenture trustee, paying agent, trustee paying agent, transfer agent, or any agent under the relevant indenture and global notes for the Exchange Bonds; (iii) any registrar, clearing corporations and systems, operators of clearing systems, settlement agents, depositary, depositary participant or custodian for the Exchange Bonds; (iv) any banking, financial, trust or custodial institution and any coordinator, manager, solicitation agent, tender or exchange agent, or financial advisor; (v) any United States or international regulator or government entity; or (vi) any agent, representative, or other person acting on behalf of the persons identified in parts (i), (ii), (iii), (iv), or (v) of this paragraph.  For the avoidance of doubt, this disclosure shall include the identity of all parties to the communication, the date and nature of the communication, a detailed description of the content of the communication, and any documents or records constituting or associated with the communication (including without limitation any e-mails,

[Dechert Draft 8/7/2015]
**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY WORK PRODUCT**

attachments, facsimile transmissions, or other written materials).  To the extent that any such communications come into existence after the date of this ORDER, such communications shall be disclosed to the Court and to Plaintiff's counsel within five business days of the sending or receipt of such communications.

6.　　This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

SO ORDERED

Dated: New York, New York
　　　　_____, 2015

_____
Thomas P. Griesa
United States District Judge

# EXHIBIT F

United Nations

A/69/L.84



# General Assembly

Distr.: Limited
29 July 2015

Original: English

**Sixty-ninth session**
Agenda item 13 (a)
**Integrated and coordinated implementation of and follow-up
to the outcomes of the major United Nations conferences and
summits in the economic, social and related fields**

**South Africa:\* draft resolution**

## Basic Principles on Sovereign Debt Restructuring Processes

*The General Assembly*,

*Recalling* its resolutions 68/304 of 9 September 2014 and 69/247 of 29 December 2014 concerning sovereign debt restructuring processes,

*Welcoming* the work carried out by the Ad Hoc Committee established under resolution 69/247, throughout its working sessions in New York from 3 to 5 February, from 28 to 30 April, and on 27 and 28 July 2015,

*Stressing* the importance of a clear set of principles for the management and resolution of financial crises that take into account the obligation of sovereign debtors and their creditors to act in good faith and with a cooperative spirit to reach a consensual rearrangement of the debt of sovereign States,

*Considering* the desirability of the wide dissemination and implementation of the principles, in accordance with national policies and circumstances,

1.    *Declares* that sovereign debt restructuring processes should be guided by the following Basic Principles, as included in the report of the Ad Hoc Committee:

1.    A Sovereign State has the right, in the exercise of its discretion, to design its macroeconomic policy, including restructuring its sovereign debt, which should not be frustrated or impeded by any abusive measures. Restructuring should be done as the last resort and preserving at the outset creditors' rights.

2.    Good faith by both the sovereign debtor and all its creditors would entail their engagement in constructive sovereign debt restructuring workout negotiations and other stages of the process with the aim of a prompt and durable re-establishment of debt sustainability and debt servicing, as well as

---

\* On behalf of the States Members of the United Nations that are members of the Group of 77 and China.





Please recycle 

achieving the support of a critical mass of creditors through a constructive dialogue regarding the restructuring terms.

3.      Transparency should be promoted in order to enhance the accountability of the actors concerned, which can be achieved through the timely sharing of both data and processes related to sovereign debt workouts.

4.      Impartiality requires that all institutions and actors involved in sovereign debt restructuring workouts, including at the regional level, in accordance with their respective mandates, enjoy independence and refrain from exercising any undue influence over the process and other stakeholders or engaging in actions that would give rise to conflicts of interest or corruption or both.

5.      Equitable treatment imposes on States the duty to refrain from arbitrarily discriminating among creditors, unless a different treatment is justified under the law, is reasonable, and is correlated to the characteristics of the credit, guaranteeing inter-creditor equality, discussed among all creditors. Creditors have the right to receive the same proportionate treatment in accordance with their credit and its characteristics. No creditors or creditor groups should be excluded ex ante from the sovereign debt restructuring process.

6.      Sovereign immunity from jurisdiction and execution regarding sovereign debt restructurings is a right of States before foreign domestic courts and exceptions should be restrictively interpreted.

7.      Legitimacy entails that the establishment of institutions and the operations related to sovereign debt restructuring workouts respect requirements of inclusiveness and the rule of law, at all levels. The terms and conditions of the original contracts should remain valid until such time as they are modified by a restructuring agreement.

8.      Sustainability implies that sovereign debt restructuring workouts are completed in a timely and efficient manner and lead to a stable debt situation in the debtor State, preserving at the outset creditors' rights while promoting sustained and inclusive economic growth and sustainable development, minimizing economic and social costs, warranting the stability of the international financial system and respecting human rights.

9.      Majority restructuring implies that sovereign debt restructuring agreements that are approved by a qualified majority of the creditors of a State are not to be affected, jeopardized or otherwise impeded by other States or a non-representative minority of creditors, who must respect the decisions adopted by the majority of the creditors. States should be encouraged to include collective action clauses in their sovereign debt to be issued;

2.      *Invites* all Member and observer States, competent international organizations, entities and other relevant stakeholders to support and promote the Basic Principles set out above, and requests the Secretary-General to make all efforts so that the Principles become generally known;

3.      *Decides* to continue to consider improved approaches to restructuring sovereign debt, taking into account the Basic Principles set out above and work carried out by the international financial institutions, in accordance with their respective mandates, and to this effect decides further to define the modalities for such consideration at its seventieth session.

_____

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x
NML CAPITAL, LTD.,                             :
                                               :
                              Plaintiff,        :
                                               :
            - against -                        :      14 Civ. 8601 (TPG)
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                              Defendant.        :
-------------------------------------------------- x
NML CAPITAL, LTD.,                             :
                                               :
                              Plaintiffs,       :
                                               :
            - against -                        :      14 Civ. 8988 (TPG)
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :
                              Defendant.        :
-------------------------------------------------- x
FFI FUND, LTD. and FYI LTD.,                   :
                                               :
                              Plaintiffs,       :
                                               :
            - against -                        :      14 Civ. 8630 (TPG)
                                               :
THE REPUBLIC OF ARGENTINA,                     :
                                               :      *(captions continue on following
                              Defendant.        :      pages)*
-------------------------------------------------- x

## **OPINION AND ORDER**

```
-------------------------------------------------- x
PEREZ, et al.,                                     :
                                                   :
                          Plaintiffs,              :
                                                   :
                - against -                        :   14 Civ. 8242 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
-------------------------------------------------- x
AURELIUS CAPITAL PARTNERS, LP, et al.,             :
                                                   :
                          Plaintiffs,              :
                                                   :
                - against -                        :
                                                   :   14 Civ. 8946 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
-------------------------------------------------- x
BLUE ANGEL CAPITAL I LLC,                          :
                                                   :
                          Plaintiff,               :
                                                   :
                - against -                        :
                                                   :   14 Civ. 8947 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
-------------------------------------------------- x
EM LTD.,                                           :
                                                   :
                          Plaintiff,               :
                                                   :
                - against -                        :
                                                   :   14 Civ. 8303 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
-------------------------------------------------- x
```

```
----------------------------------------------------  x
LIGHTWATER CORP. LTD.,                                :
                                                      :
                        Plaintiff,                    :
                                                      :
                - against -                           :    14 Civ. 4092 (TPG)
                                                      :
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                        Defendant.                    :
----------------------------------------------------  x
OLD CASTLE HOLDINGS, LTD.,                            :
                                                      :
                        Plaintiff,                    :
                                                      :
                - against -                           :    14 Civ. 4091 (TPG)
                                                      :
THE REPUBLIC OF ARGEN7258TINA,                        :
                                                      :
                        Defendant.                    :
----------------------------------------------------  x
SETTIN,                                               :
                                                      :
                        Plaintiff,                    :
                                                      :
                - against -                           :    14 Civ. 8739 (TPG)
                                                      :
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                        Defendant.                    :
----------------------------------------------------  x
CAPITAL VENTURES INTERNATIONAL,                       :
                                                      :
                        Plaintiff,                    :
                                                      :
                - against -                           :    14 Civ. 7258 (TPG)
                                                      :
THE REPUBLIC OF ARGENTINA,                            :
                                                      :
                        Defendant.                    :
----------------------------------------------------  x
```

3

```
------------------------------------------------- x
ADAMI, et al.,                                     :
                                                   :
                         Plaintiffs,               :
                                                   :
                - against -                        :    14 Civ. 7739 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                         Defendant.                :
------------------------------------------------- x
CAPITAL MARKETS FINANCIAL SERVICES                 :
INC., et al.,                                      :
                                                   :
                         Plaintiffs,               :
                                                   :
                - against -                        :    15 Civ. 0710 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                         Defendant.                :
------------------------------------------------- x
FOGLIA, et al.,                                    :
                                                   :
                         Plaintiffs,               :
                                                   :
                - against -                        :    14 Civ. 8243 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                         Defendant.                :
------------------------------------------------- x
PONS, et al.,                                      :
                                                   :
                         Plaintiffs,               :
                                                   :
                - against -                        :    13 Civ. 8887 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                         Defendant.                :
------------------------------------------------- x
```

```
------------------------------------------------- x
GUIBELALDE, et al.,                                :
                                                   :
                              Plaintiffs,          :
                                                   :
                    - against -                    :   11 Civ. 4908 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                              Defendant.           :
------------------------------------------------- x
DORRA, et al.,                                     :
                                                   :
                              Plaintiffs,          :
                                                   :
                    - against -                    :   14 Civ. 10141 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                              Defendant.           :
                                                   :
------------------------------------------------- x
BELOQUI, et al.,                                   :
                                                   :
                              Plaintiffs,          :
                                                   :
                    - against -                    :
                                                   :   14 Civ. 5963 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                              Defendant.           :
------------------------------------------------- x
TORTUS CAPITAL MASTER FUND, LP,                    :
                                                   :
                              Plaintiff,           :
                                                   :
                    - against -                    :
                                                   :   14 Civ. 1109 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                              Defendant.           :
------------------------------------------------- x
```

```
------------------------------------------------  x
TORTUS CAPITAL MASTER FUND, LP,                   :
                                                  :
                         Plaintiff,               :
                                                  :
                  - against -                     :    14 Civ. 3127 (TPG)
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
                         Defendant.               :
------------------------------------------------  x
TRINITY INVESTMENTS LIMITED,                      :
                                                  :
                         Plaintiff,               :
                                                  :
                  - against -                     :    14 Civ. 10016 (TPG)
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
                         Defendant.               :
------------------------------------------------  x
MONTREUX PARTNERS, L.P.,                          :
                                                  :
                         Plaintiff,               :
                                                  :
                  - against -                     :    14 Civ. 7171 (TPG)
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
                         Defendant.               :
------------------------------------------------  x
LOS ANGELES CAPITAL,                              :
                                                  :
                         Plaintiff,               :
                                                  :
                  - against -                     :    14 Civ. 7169 (TPG)
                                                  :
THE REPUBLIC OF ARGENTINA,                        :
                                                  :
                         Defendant.               :
------------------------------------------------  x
```

```
------------------------------------------------- x
CORDOBA CAPITAL,                                   :
                                                   :
                          Plaintiff,               :
                                                   :
                  - against -                      :   14 Civ. 7164 (TPG)
                                                   :
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
                                                   :
------------------------------------------------- x
WILTON CAPITAL,                                    :
                                                   :
                          Plaintiff,               :
                                                   :
                  - against -                      :
                                                   :   14 Civ. 7166 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
                                                   :
------------------------------------------------- x
MCHA HOLDINGS, LLC,                                :
                                                   :
                          Plaintiff,               :
                                                   :
                  - against -                      :
                                                   :   14 Civ. 7637 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
                                                   :
------------------------------------------------- x
MCHA HOLDINGS, LLC,                                :
                                                   :
                          Plaintiff,               :
                                                   :
                  - against -                      :
                                                   :   14 Civ. 10064 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                          Defendant.               :
                                                   :
------------------------------------------------- x
```

```
----------------------------------------------------  x
ANDRAREX LTD.,                                         :
                                                       :
                              Plaintiff,               :
                                                       :
                    - against -                        :    14 Civ. 9093 (TPG)
                                                       :
THE REPUBLIC OF ARGENTINA,                             :
                                                       :
                              Defendant.               :
----------------------------------------------------  x
CLARIDAE, et al.,                                      :
                                                       :
                              Plaintiffs,              :
                                                       :
                    - against -                        :
                                                       :    14 Civ. 10201 (TPG)
THE REPUBLIC OF ARGENTINA,                             :
                                                       :
                              Defendant.               :
                                                       :
----------------------------------------------------  x
ARAG-A LIMITED, et al.,                                :
                                                       :
                              Plaintiffs,              :
                                                       :
                    - against -                        :
                                                       :    14 Civ. 9855 (TPG)
THE REPUBLIC OF ARGENTINA,                             :
                                                       :
                              Defendant.               :
----------------------------------------------------  x
ATTESTOR MASTER VALUE FUND LP,                         :
                                                       :
                              Plaintiff,               :
                                                       :
                    - against -                        :
                                                       :    14 Civ. 5849 (TPG)
THE REPUBLIC OF ARGENTINA,                             :
                                                       :
                              Defendant.               :
----------------------------------------------------  x
```

8

```
-----------------------------------------  x
ANGULO, et al.,                            :
                                           :
                         Plaintiffs,       :
                                           :
                   - against -             :    15 Civ. 1470 (TPG)
                                           :
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                         Defendant.        :
-----------------------------------------  x
LAMBERTINI, et al.,                        :
                                           :
                         Plaintiffs,       :
                                           :
                   - against -             :
                                           :    15 Civ. 1471 (TPG)
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                         Defendant.        :
                                           :
-----------------------------------------  x
HONERO FUND I, LLC,                        :
                                           :
                         Plaintiff,        :
                                           :
                   - against -             :
                                           :    15 Civ. 01553 (TPG)
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                         Defendant.        :
-----------------------------------------  x
TRINITY INVESTMENTS LIMITED,               :
                                           :
                         Plaintiff,        :
                                           :
                   - against -             :
                                           :    15 Civ. 1588 (TPG)
THE REPUBLIC OF ARGENTINA,                 :
                                           :
                         Defendant.        :
-----------------------------------------  x
```

```
-------------------------------------------------- x
BANCA ARNER S.A., et al.,                          :
                                                   :
                              Plaintiffs,          :
                                                   :
                  - against -                      :
                                                   :    15 Civ. 1508 (TPG)
THE REPUBLIC OF ARGENTINA,                         :
                                                   :
                              Defendant.           :
                                                   :
-------------------------------------------------- x
```

Plaintiffs in these thirty-six actions hold defaulted bonds issued by defendant, the Republic of Argentina. Plaintiffs move for partial summary judgment, asking the court to rule that the Republic violated and continues to violate the *pari passu* clause of the underlying bond agreement. For the following reasons, the court grants plaintiffs' motions for partial summary judgment.

<u>Facts</u>

In 1994, the Republic began issuing bonds pursuant to a Fiscal Agency Agreement ("FAA"). The FAA contains a provision, the *pari passu* clause, which reads:

> The Securities will constitute (except as provided in Section 11 below) direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement)."

FAA ¶ 1(c). The FAA also contained provisions whereby, in the event litigation arose regarding the bonds, the Republic consented to the jurisdiction of any state or federal court in New York City. *Id.* ¶¶ 22–23.

Plaintiffs hold bonds issued by the Republic pursuant to the FAA. Until 2001, the Republic made regular payments on the FAA bonds. That year, however, the Republic experienced an economic crisis and defaulted on its public debts, including the FAA bonds. Each year since 2002, the Republic has passed legislation prohibiting payment on the FAA bonds. As a result, many FAA bondholders began filing actions against the Republic in this court.

**1. The 2005 and 2010 Exchange Offers**

In 2005, the Republic issued an exchange offer (the "2005 Exchange") inviting creditors, including FAA bondholders, to exchange their old bonds for newly issued bonds worth 25% to 29% of the original bonds' value. The Republic took certain steps to encourage participation in the 2005 Exchange Offer, and to discourage "holdouts" from pursuing better terms. First, the Republic enacted Law 26,017 (the "Lock Law"), prohibiting settlement with those who declined the exchange. *See* Law 26,017 art. 4. Second, the Republic included in the 2005 Exchange Offer a Rights Upon Future Offers ("RUFO") clause. *See* 2005 Prospectus Supplement at S-18. The RUFO clause guaranteed that if the Republic were to reach agreement with the holdouts, it would have to offer the same terms to those who had accepted the 2005 Exchange Offer. *Id.* In all, an estimated 72% to 76% of the Republic's creditors accepted the 2005 Exchange Offer.

In 2010, the Republic made another exchange offer (the "2010 Exchange"). In order to conduct the 2010 Exchange, the Republic enacted Law 26,547, temporarily suspending the Lock Law. *See* Law 26,547 art. 1. Law 26,547 made

it illegal for the Republic to offer to new exchangers equal or better terms than what was offered in 2005. *Id.* art. 3. Moreover, Law 26,547 prohibited the Executive from offering holdouts who had sued the Republic terms more favorable than those who did not sue the Republic. *Id.* art. 5.

In all, an estimated 93% of the Republic's creditors accepted the 2005 and 2010 exchange offers. After each exchange, the Republic made regular payments on the Exchange Bonds. However, the Republic continued in its refusal to pay on the FAA bonds.

## 2. The Lead Plaintiffs and the *Pari Passu* Injunction

As discussed, upon the Republic's refusal to honor their bonds, many of the FAA bondholders filed actions against the Republic in this court. Some of these bondholders obtained money judgments from this court, *i.e.*, judgments that the Republic owes them principal and interest on their FAA bonds. *See, e.g.*, Judgment, *Old Castle Holdings, Ltd. v. Republic of Argentina*, No. 02-CV-3808 (Mar. 27, 2003). However, these bondholders found it impossible to collect on their money judgments.

In 2010, a group of plaintiffs led by NML Capital, Ltd. (the "Lead Plaintiffs") filed motions seeking a different kind of judgment. These plaintiffs, by motion for partial summary judgment, asked the court to declare that the Republic had violated a portion of the *pari passu* clause, the "Equal Treatment Provision," by "creating a class of creditors who are guaranteed payment while formally condemning NML to a lower rank that is barred from receiving any payment at all." *See* Mem. L. Supp. Mot. Part. Summary J. at 2, *NML Ltd. v. Republic of*

*Argentina*, No. 08-CV-6978 (Oct. 20, 2010). After extensive briefing, the court agreed with the Lead Plaintiffs and adjudged that the Republic had violated the *pari passu* clause of the FAA when it "lowered the rank of NML's bonds . . . [and] when it made payments currently due under the Exchange Bonds[] while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds." Order 4–5, *NML Ltd. v. Republic of Argentina*, No. 08-CV-6978 (Dec. 7, 2011).

On February 23, 2012, the court fashioned an injunction to enforce its judgment that the Republic had violated the *pari passu* clause. *See* Order, *NML Ltd. v. Republic of Argentina*, No. 08-CV-6978 (Feb. 23, 2012). The Court of Appeals for the Second Circuit affirmed the injunction, but remanded it to this court "to clarify precisely how it intends this injunction to operate." *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 255 (2d Cir. 2012). On remand, the court issued an order clarifying that:

> a. Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML.

> b. Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

Order at ¶ 2 (a)–(b), *NML Ltd. v. Republic of Argentina*, No. 08-CV-6978 (Nov. 21, 2012). This order has become known as "the Amended Injunction."

The Republic appealed the Amended Injunction to the Court of Appeals. The Second Circuit affirmed the Amended Injunction in its entirety. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013). Nonetheless, it stayed the Amended Injunction to allow the Republic to file a petition for a writ of *certiorari*. *Id.* The Republic filed its petition, and the Supreme Court denied it on June 16, 2014. *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (2014). Soon thereafter, the Court of Appeals lifted the stay of the Amended Injunction.

### 3. The Republic's Post-Injunction Conduct

Less than a month after the Court of Appeals affirmed the Amended Injunction, the Republic passed Law 26,886, reopening the exchanges but again prohibiting those who wished to participate from receiving terms more favorable than had already been offered. *See* Law 26,886 art. 2. Moreover, the Republic continued to forbid settlement with the holdouts who had filed lawsuits unless those holdouts accepted the same terms given in 2005 and 2010. *Id.* art 4.

The day after the Supreme Court denied the Republic's petition for a writ of *certiorari*, the Republic announced a plan to pay on the Exchange Bonds without making a payment to the FAA bondholders. *See* Statement of the Minister of the Economy at 4 (June 17, 2014) ("We are initiating steps to initiate a debt exchange that would permit us to pay in Argentina under Argentine law."). Six days later, the Republic attempted to make a payment of $832 million on the Exchange Bonds without making a ratable payment to the Lead Plaintiffs. Cohen Decl. ¶ 29. It has attempted to make two additional payments since then. *Id.* ¶¶

14

41–42.

On September 11, 2014, the Republic enacted legislation with the stated purpose of paying on the Exchange Bonds without observing this court's judgments in the Lead Cases. *See* Law 26,984 art. 2. The legislation purports to appoint an Argentine entity as trustee of the Exchange Bonds, *id.* art 3, and to establish a process for Exchange Bondholders to swap their Exchange Bonds for securities governed by French Law. *Id.* art. 7. Law 26,984 also declares this court's orders as "illegitimate and illegal obstruction" of the payment process on the Exchange Bonds. *Id.* art 2.

### 4. The "Me Too" Plaintiffs and the Instant Motions for Partial Summary Judgment

As discussed, in 2011 the Lead Plaintiffs obtained judgments from this court that the Republic violated the *pari passu* clause of the FAA when it lowered the rank of their FAA bonds. Plaintiffs in the instant thirty-six cases now seek a similar ruling. Plaintiffs in nineteen of these cases[1] already have money judgments against the Republic (collectively, the "Post Money Judgment Plaintiffs.") Plaintiffs in the remaining sixteen cases[2] do not have money judgments (collectively, the "Pre-Judgment Plaintiffs").

Together, plaintiffs in all of the instant cases now move for partial summary judgment, asking the court to rule that the Republic violated and

---

[1] The nineteen Post Money Judgment cases are: 11-CV-4908; 14-CV-4091; 14-CV-4092; 14-CV-7164; 14-CV-7166; 14-CV-7169; 14-CV-7171; 14-CV-7258; 14-CV-7739; 14-CV-8242; 14-CV-8303; 14-CV-8601; 14-CV-8630; 14-CV-8946; 14-CV-8947; 14-CV-9093; 15-CV-00710; 15-CV-01470; and 15-CV-1508.
[2] The sixteen Pre-Judgment cases are: 13-CV-8887; 14-CV-10016; 14-CV-10064; 14-CV-10141; 14-CV-10201; 14-CV-1109; 14-CV-3127; 14-CV-5849; 14-CV-5963; 14-CV-7637; 14-CV-8243; 14-CV-8988; 14-CV-9855; 15-CV-1471; 15-CV-1553; and 15-CV-1588.

continues to violate the *pari passu* clause of the FAA. The court heard oral argument on the motions on May 29, 2015.

<u>Discussion</u>

The standard for summary judgment is well settled. The court may grant summary judgment only where the movant shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986).

The Republic raises three arguments in opposition to plaintiffs' motions for partial summary judgment: (1) the Post Money Judgment Plaintiffs' claims are barred by the doctrines of *res judicata* and merger; (2) the Pre-Judgment Plaintiffs have not adequately demonstrated that they own the bond interests they purport to hold; and (3) the Republic has not breached the *pari passu* clause of the FAA.

**1. Whether the Doctrines of *Res Judicata* and Merger Bar the Post Money Judgment Plaintiffs' *Pari Passu* Claim.**

The Republic argues that the doctrines of *res judicata* and merger require the court to deny the *pari passu* claim in the nineteen cases where plaintiffs have already obtained money judgments.

The doctrine of *res judicata* "provides that a final judgment on the merits of an action precludes the parties from relitigating issues that were or could have been raised in that action." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) (internal marks omitted). *Res judicata* will

preclude successive claims if the earlier decision was: "(1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985). A cause of action is the same if it stems from the same or connected transactions, the same proof is needed to support it as in the prior suit, and if the facts essential to the second were present in the first. *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000); *N.L.R.B. v. United Technologies Corp.*, 706 F.2d 1254, 1260 (2d Cir. 1983).

The doctrine of merger provides that "a debt created by contract merges with a judgment entered on that contract, so that the contract debt is extinguished and only the judgment debt survives." *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 102 (2d Cir. 2004). The "merger" of the contract debt with the judgment debt does not extinguish the underlying contract itself. *See Exp.- Imp. Bank of the Republic of China v. Grenada*, No. 13 CIV. 1450 HB, 2013 WL 4414875, at *3 (S.D.N.Y. Aug. 19, 2013). This would inappropriately "weaken rights or destroy identities which the prevailing party had in his original cause." *Jay's Stores, Inc. v. Ann Lewis Shops, Inc.*, 15 N.Y.2d 141, 147 (1965). Rather than extinguish the *contract*, merger merely extinguishes the *claim* that was adjudicated from that contract, and replaces that claim with the final judgment. *See Orix Credit Alliance, Inc. v. Horten*, 965 F. Supp. 481, 485 (S.D.N.Y. 1997).

Merger, then, is functionally similar to the doctrine of claim preclusion, which itself is a component of *res judicata. Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984). Thus, courts have become increasingly wary

of using the terminology of "merger," favoring instead the language of *res judicata*. *See NML Capital, Ltd. v. Banco Cent. de la Republica Argentina*, 652 F.3d 172, 185 (2d Cir. 2011) (noting that merger and bar are "the terminology of the common law that federal courts have supposedly retired."). Consequently, this court will apply the doctrine of *res judicata* in determining whether plaintiffs' claims are precluded.

This is exactly the approach employed in *Export-Import Bank of the Republic of China v. Grenada*. In 2006, the Export-Import Bank obtained a $21.6 million judgment against Grenada for its default on four loans. *Exp.-Imp. Bank of the Republic of China v. Grenada*, No. 13-CV-1450 (HB), 2013 WL 4414875, at *1 (S.D.N.Y. Aug. 19, 2013). Six years later, the Export-Import Bank filed a new action against Grenada, alleging breach of the *pari passu* clause of the loan agreements. *Id.* Granada argued that principles of *res judicata* and merger barred the second action. *Id.* Judge Baer of this court disagreed, and upon applying *res judicata* principles, held that the second action was not precluded because its factual basis, the conduct establishing violation of the pari passu clause, involved a "different set of wrongs" not litigated in the first action. *Id.* at *2–3.

Just as in *Export-Import Bank*, the instant *pari passu* claim is not precluded because it is different from, and involves a different set of wrongs, than what was adjudicated previously. Between 2002 and 2011, the Post Money Judgment plaintiffs filed actions against the Republic for its failure to pay principal and interest on their FAA bonds. *See, e.g.*, Complaint ¶¶ 1, 4–7, *Drawrah Limited, et al., v. The Republic of Argentina*, No. 09-CV-8299 (Sep. 30,

2009). The court awarded these plaintiffs judgments of principal and interest on those bonds. *See, e.g.*, Judgment, *Drawrah Limited, et al., v. The Republic of Argentina*, No. 09-CV-8299 (Feb. 24, 2011). These plaintiffs have now filed new actions asserting that the Republic breached the *pari passu* clause of the FAA by ranking their securities below the securities of the Exchange Bondholders. *See, e.g.*, Complaint ¶¶ 3–4, *Perez, et al., v. Republic of Argentina*, No. 14-CV-8242 (Oct. 15, 2014).

The claim for failure to pay principal and interest is fundamentally different from the *pari passu* claim. The Republic's failure to pay principal and interest violates the FAA because the FAA requires the payment of principal and interest. *See* FAA ¶ 12(a). The sole "wrong" committed in this regard, and the sole matter litigated to final judgment, was the failure to pay principal and interest.

The claim for failure to honor the *pari passu* clause involves a wholly different set of wrongs. The *pari passu* clause of the FAA, more specifically the equal treatment provision, provides that the "The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness." FAA ¶ 1(c). The Republic violates this provision not simply by its refusal to pay plaintiffs, but by its creation of and payment on a superior class of securities and by subordinating its obligation to plaintiffs.

The Republic argues that preclusion applies because the facts giving rise to the *pari passu* claim occurred before the money judgments were awarded, and

19

thus the claim should have been asserted in the previous actions. *See* Mem. L. Opp. at 18–19. The Republic notes that the passage of the "Lock Law," which prohibits settlement with the holdouts, was passed in 2005, and suggests that this event gave plaintiffs sufficient basis to bring the *pari passu* claim earlier. *Id.* Notwithstanding the fact that a significant number of these plaintiffs filed their first actions before 2005,[3] the Lock Law was simply one early example of an ongoing series of events giving rise to plaintiffs' *pari passu* claim.

First, the Republic passed the Lock Law and conducted the 2005 and 2010 Exchanges. Each year since then, the Republic has reauthorized a moratorium on payments on the FAA bonds. At the same time, the Republic has made scores of payments to the Exchange Bondholders. In 2011 and 2012, the court construed the *pari passu* clause in the Lead Cases. In 2013, the Republic passed Law 26,886 reopening the exchanges but again prohibiting repayment on the plaintiffs' bonds. In June of 2014, the Supreme Court denied the Republic's petition for a writ of *certiorari* in the Lead Cases. Then, between 2014 and 2015, the Republic made three illegal transfers to financial entities with the intention of paying on the Exchange Bonds without making a ratable payment to the Lead Plaintiffs. It also passed Law 26,984, offering to pay Exchange Bondholders under French law and purporting to replace the indenture trustee of the Exchange Bonds.

This lengthy and ongoing series of events is what provides the factual basis

---

[3] *See, e.g.,* 02-CV-3808; 02-CV-4124; 03-CV-8120; 04-CV-7056; 04-CV-6594; 04-CV-2710; 04-CV-3314; 04-CV-6137; 04-CV-7504; and 04-CV-1077.

for the instant *pari passu* claim. This pattern of activity, as a whole, was not known and could not have been known to these plaintiffs when they filed their first actions. Simply put, it is the Republic's *ongoing* conduct that, in the language of *res judicata*, is essential to the instant *pari passu* claim. Because this essential conduct occurred, and continues to occur, long after the first actions were filed, *res judicata* does not apply.

The court rejects the Republic's *res judicata* and merger arguments because the Post Money Judgment Plaintiff's *pari passu* claim is fundamentally different from, and involves a wholly different set of wrongs, than the claim for payment of interest and principal. Moreover, the factual basis for the new claim, *i.e.* the Republic's conduct in subordinating its payment obligation to plaintiffs, is ongoing. Thus, the court concludes that the *pari passu* claim is different from what was previously litigated, and not precluded by principles of *res judicata* or merger.

### 2. Whether The Pre-Judgment Plaintiffs Have Submitted Adequate Proof of Ownership of Their Bonds.

The Republic argues that some of the Pre-Judgment Plaintiffs have failed to provide sufficient evidence of their ownership interest in the FAA bonds, meriting denial of summary judgment.

Proof of bond ownership has been a recurring issue in the long-history of these cases. Generally speaking, a party may establish a fact by citing to declarations or affidavits evidencing that fact. *See* Fed. R. Civ. P. 56(c)(1). But this court has consistently required more before granting summary judgment. It

has required some documentary proof of current ownership of the bonds. *See, e.g.*, *Colella v. Republic of Argentina*, No. 04 CIV. 2710 (TPG), 2006 WL 399449, at *3 (S.D.N.Y. Feb. 21, 2006). In most cases, the court has been satisfied where the plaintiff supplements its sworn declarations with a recent account statement from the bank holding the bonds. *Mazzini v. Republic of Argentina*, No. 03-CV-8120(TPG), 2005 WL 743090, at *4 (S.D.N.Y. Mar. 31, 2005), *aff'd*, 282 F. App'x 907 (2d Cir. 2008).

In the instant cases, many of the Pre-Judgment Plaintiffs had initially relied on declarations as evidence of their ownership of the bonds. However, in response to the Republic's opposition papers, all of these plaintiffs have now submitted account statements to the court. *See, e.g.*, Reply Mem. at 29 ("Although it is not required, Plaintiff now attaches additional evidence of ownership.") The court has reviewed these plaintiffs' declarations and account statements and concludes that they are sufficient to prove plaintiffs' ownership of interests in the FAA bonds. *See* Table 1.

| Table 1: Evidence of Ownership in Pre-Judgment "Me Too" Cases | | | |
|---|---|---|---|
| Case # | Plaintiff | Status | Evidence of Ownership of Interest |
| 13CV8887 | Pons | prejudgment | Hauk and Aufhause Act. St. & sworn declaration |
| 14CV10016 | Trinity | prejudgment | Wilmington Trust Acct. Statement & sworn declaration |
| 14CV10064 | MCHA Hldgs | prejudgment | Morgan Stanley Acct. Statement & sworn declaration |
| 14CV10141 | Dorra | prejudgment | Sabadell Acct. Statement & sworn declaration |
| 14CV10201 | Claridae | prejudgment | Morgan Stanley Acct. Statement & sworn declaration |
| 14CV1109 | Tortus II | prejudgment | Goldman Sachs Acct. Statement & sworn declaration (indicating that some of the bonds have been sold, |

| | | | but that ownership continues on the remaining bonds) |
|---|---|---|---|
| 14CV3127 | Tortus I | prejudgment | Goldman Sachs Acct. Statement & sworn declaration (indicating that some of the bonds have been sold, but that ownership continues on the remaining bonds) |
| 14CV5849 | Attestor | prejudgment | Deutsche Bank Acct. Statement & sworn declaration |
| 14CV5963 | Beloqui | prejudgment | Citibank Acct. Statement & sworn declaration |
| 14CV7637 | MCHA Hldgs | prejudgment | Morgan Stanley Acct. Statement & sworn declaration |
| 14CV8243 | Foglia | prejudgment | Citibank Acct. Statement & sworn declaration |
| 14CV8988 | NML | prejudgment | JP Morgan Acct. Statement & sworn declaration |
| 14CV9855 | ARAG | prejudgment | Daily Portfolio Appraisal & sworn declaration |
| 15CV1471 | Lambertini | prejudgment | *Caja de Valores* Acct Statement & sworn declaration |
| 15CV1553 | Honero | prejudgment | Daily Portfolio Appraisal & sworn declaration |
| 15CV1588 | Trinity | prejudgment | Wilmington Trust Acct. Statement & sworn declaration |

### 3. Whether the Republic Has Breached the *Pari Passu* Clause of the FAA.

The Republic argues that it has not breached the *pari passu* clause of the

FAA. The *pari passu* clause provides that:

> The Securities will constitute (except as provided in Section 11 below) direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank pari passu and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness (as defined in this Agreement).

FAA ¶ 1(c). The Republic argues that this clause "prohibits only a creditor's

involuntary legal subordination of debt that is subject to the clause to certain of

23

the creditor's other indebtedness," and that it does not apply where a creditor "elected voluntarily not to participate" in a debt restructuring. Mem. L. Opp. at 33–34.

This argument is unavailing. The Second Circuit interpreted this clause in its opinion of October 26, 2012. *See NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 259 (2d Cir. 2012). The court explained that the first sentence of the *pari passu* clause "prohibits Argentina, as bond issuer, from formally subordinating the bonds by issuing superior debt." *Id.* The second sentence "prohibits Argentina, as bond payor, from paying on other bonds without paying on the FAA Bonds." *Id.*

The Republic argues that Court of Appeals' construction of the *pari passu* clause "runs contrary to New York Law and market understanding" and is "unsupported by [the] plain language" thereof. *See* Mem. L. Opp. Mots. Summary J. at 33–34. But this merely attempts to relitigate issues long decided. The Court of Appeals has construed the meaning of the *pari passu* clause, and this court cannot, nor would it, upset that interpretation. The court need merely determine whether plaintiffs have proven that the Republic breached the *pari passu* clause, as it has been construed, in the instant cases.

Between 2005 and 2014, the Republic made regular and uninterrupted payments to one class of its creditors, the Exchange Bondholders, without paying the FAA bondholders. The Republic passed at least four discrete pieces of legislation to avoid paying on the FAA bonds. *See* Law 26,017, Law 26,547, Law 26,886, and Law 26,984. And, each year since 2002, the Republic has

included in its budget a moratorium prohibiting payment on the FAA bonds. Furthermore, from 2014 through 2015, after the Amended Injunction in the Lead Cases took effect, the Republic made three illegal transfers to financial intermediaries in an attempt to pay on the Exchange Bonds without also paying on the FAA bonds. Finally, the Republic has attempted to remove the indenture trustee of the Exchange Bonds and to replace it with an Argentine entity in an attempt to continue making payments on the Exchange Bonds without making payments on the FAA bonds.

This long course of conduct makes clear that the Republic no longer considers the FAA bonds "direct, unconditional, unsecured and unsubordinated obligations of the Republic." FAA ¶1(c). By issuing the Exchange Bonds and passing legislation prohibiting payment on the FAA bonds, the Republic has created a superior class of debt to that held by plaintiffs. By making payments on this superior class of debt, the Republic has violated its promise to rank plaintiffs' bonds equally with its later-issued external indebtedness. Thus, the court holds, in light of the Republic's entire and continuing course of conduct, that it has breached the *pari passu* clause of the FAA.

Conclusion

For the reasons given above, the court concludes that plaintiffs in these thirty-six actions have satisfied their burden for obtaining summary judgment. The motions for partial summary judgment are hereby granted.

It is hereby declared, adjudged, and decreed that the Republic has violated, and continues to violate, Paragraph (1)(c) of the 1994 Fiscal Agency Agreement.

SO ORDERED.

Dated: New York, New York
        June 5, 2015

Thomas P. Griesa
United States District Judge

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/5/15

26

# EXHIBIT H



european network on
debt and development

# Why a United Nations sovereign debt restructuring framework is key to implementing the post-2015 sustainable development agenda

By Tiago Stichelmans

## Executive summary

In September, the United Nations will agree on the sustainable development goals (SDGs), a new set of targets that will shape the international development agenda for the next 15 years. The restructuring of sovereign debt has been identified  by the United Nations Open Working Group (OWG) as something the world must get right if it is to successfully implement these goals. Yet crippling national debt crises persist, and no system exists to restructure these debts in a speedy and effective manner.

A new opportunity to tackle this situation emerged in September last year, when the UN General Assembly voted in favour of a new debt restructuring mechanism. An ad hoc committee was set up and began meeting in February 2015.

Success now depends on the constructive engagement of all nations and the subsequent implementation of a new way to restructure debt that takes development needs into account. Yet several powerful nations are so far refusing to take part in this crucial process.

This briefing looks at how vulnerable many developed and developing countries remain to debt crises. It explores the impact of these crises and of long-term unsustainable debt; and it examines the deficiencies of existing mechanisms to deal with debt, while recommending a way forward.

This briefing finds that:

- **Developed and developing countries are facing an increasing risk of sovereign debt crises.** Public debt levels in several developed countries are historically high and austerity policies have not improved the situation. Meanwhile, developing countries are borrowing from increasingly risky and more expensive sources.

- **Acute debt crises and the economic recessions they have caused have devastating effects on the implementation of development goals**, and can even undo past progress.

- **There are currently no institutions to manage debt crises effectively.** Existing forums are fragmented, which makes negotiations difficult. Many, such as the International Monetary Fund (IMF), are dominated by creditors so cannot make impartial decisions and lack legitimacy.

- **Current UN-led negotiations about a multilateral framework to restructure these debts offer a unique opportunity.** It would be inclusive and could mitigate the negative social and economic consequences of debt crises.

Eurodad recommends that the international community seizes the opportunity created by the current negotiations at the UN to develop an international debt restructuring mechanism along criteria presented in this briefing. The UN General Assembly should adopt those criteria and organise negotiations at the UN to set up the multilateral mechanism.

**2**

# Introduction

In the development community, 2015 is and will be dominated by three major processes. First, the third International Conference on Financing for Development (FfD), which will be held in Addis Ababa, Ethiopia, in July. Its outcome should support and contribute to the implementation of the Sustainable Development Goals (SDGs), and to a more effective and democratic international financial architecture. Second, the United Nations General Assembly (UNGA) will adopt the new SDGs, which will succeed the current Millennium Development Goals (MDGs), in September. Third, the United Nations Climate Change Conference (COP21) will take place in Paris in December. The aim of the conference is to adopt a legally binding and universal agreement on climate.

At the first FfD Conference, in Monterrey in 2002, developed and developing countries made a series of agreements. The Monterrey Consensus[1] called for the creation of an "international debt workout mechanism [...] that will engage debtors and creditors to come together to restructure unsustainable debts in a timely and efficient manner".

Due to the fact that this agreed action was not implemented, however, the question remains open in the international development agenda. The Open Working Group on Sustainable Development Goals (OWG) has, during a session discussing the implementation means of the SDGs, stated that "developed and developing countries alike would benefit from a permanent and effective sovereign debt workout mechanism to resolve their debt problems".[2] This implies that the implementation of the agreement made in Monterrey regarding the sovereign debt workout mechanism is clearly part of the discussion around the post-2015 agenda and its means of implementation.

In September 2014, the United Nations (UN) adopted a resolution that aimed to establish a "multilateral legal framework for sovereign debt restructuring processes".[3] In this resolution, the UNGA notes two different problems. First, debt crises are recurring and have significant political, economic and social consequences, provoking frequent restructuring processes. Second, there are a number of low- and middle-income countries that suffer from the burden of their external debts, which in turn impacts on their capacity to develop in a sustainable way. In consequence, and through this resolution, the UNGA decided to establish a multilateral framework for sovereign debt restructuring processes.

This resolution means that the UNGA has a mandate to develop and eventually adopt a proposal that would implement the international commitment made at the Monterrey Consensus. This is a unique opportunity that should be recognised by the international community.

This Eurodad briefing presents the main reasons why we need to fill the 'gaping hole' in the international financial architecture through a multilateral framework for sovereign debt restructuring – a framework that is fair, effective, and finds sustainable solutions to debt crises.

The first chapter describes how debt vulnerabilities around the world are increasing, and a new wave of debt crises is imminent – a wave for which the international community is currently not well prepared. The second chapter points out the harmful impact of debt crises, their negative development impact, the economic disruption they cause, and also the humanitarian crises that affect the poorest and most vulnerable people most. Debt crises could be avoided, or at least mitigated, if better institutions were in place. The third chapter analyses the shortcomings of the current non-regime that should be addressed by the UN's regime-building process. The fourth chapter outlines the key features that a new development-friendly debt workout mechanism should have through a series of recommendations.

The UNGA process is a key opportunity for the international community to implement the necessary reforms. Its successful conclusion, which also depends on the constructive participation of all UN Member States, is fundamental for the successful implementation of the whole post-2015 development agenda.

# 1 Debt vulnerabilities[4]

`3`

In recent years, the focus on sovereign debt vulnerabilities has shifted from developing to advanced economies where, according to the IMF World Economic Outlook Database, the ratio of public debt to Gross Domestic Product (GDP) averaged 105% in 2013. Although the financial crisis of 2007 has not led to major debt defaults and restructurings, with the exception of Greece and a number of mostly small island states, sovereign debt levels in many developed and developing countries should be considered as unsustainable. A rise in interest rates may provoke a new cycle of defaults and restructurings.

## Debt vulnerabilities in some developed countries

This is particularly the case in high-income countries where the combination of several factors makes their debt sustainability questionable. Public debt levels have surged dramatically. In particular, the bailout of private banks in advanced economies has been extremely costly for the public purse, leading to the massive socialisation of private debts and surging sovereign debt levels. The European Commission reports that between 1 October 2008 and 1 October 2011, it approved state aid from EU Member States for a total amount of €4.5 trillion (36.7% of EU GDP).[5]

European countries have decided to adopt austerity policies to reduce their public debts. However, this strategy has been ineffective. By weakening economic growth, austerity policies have not improved the debt ratio of European countries (see Figure 1). The consequences of these policies on the economic output in Europe has actually had negative results for their debt sustainability. Greece illustrates this failure very well. Since 2010 and the beginning of a drastic austerity policy, GDP continued to considerably decrease and the public debt to GDP ratio to increase (from 130% in 2009 to 175% in 2013, despite the 2012 restructuring).[6] Economic recessions and low inflation rates have also perpetuated the high ratios of debt in the private sector, which have become a main constraining factor for financing new investments that could trigger an economic recovery.[7]

The combination of private sector bailouts and austerity policies has brought the public debt of some advanced economies to levels rarely seen in recent history (Figure 2). These levels could rise even further in the near future. Contingent liabilities, particularly from the financial sector, could further affect public debt levels. Contingent liabilities are

private debts that affect public finances through explicit or implicit public guarantees, as in the recent example of bank bailouts. In this context, European countries have offered guarantees to failed banks that may be used in the future as the European financial sector has still not fully recovered from the crisis.

When some members of the Eurozone started to suffer from distress on debt markets, their creditors were bailout. However, bailouts in Cyprus, Greece, Ireland and Portugal cannot be reproduced in larger economies, as existing EU and IMF bailout instruments do not have the capacity to cope with a debt crisis in a major European economy. Considering this, if debt becomes considered as unsustainable, policy-makers will have few options but debt restructurings with private sector involvement. This would be a significant development since restructuring debt has so far been the exception in the Eurozone, debt-refinancing through bailouts being privileged over debt-solving through restructuring.

## Debt in developing countries

### Debt sustainability

Compared to advanced economies, the level of sovereign debt to Gross National Income (GNI) in middle- and low-income countries appear low. The World Bank database *International Debt Statistics* reveals that debt to GNI ratio in developing countries averaged 22% in 2012. However, the situation differs among countries, notably regarding external debt. Low-income countries are far more dependent on external debts than middle-income countries (Figure 3).



**Figure 1: Eurozone average public debt (% to GDP, 2006-2013)**

% to GDP

Source: IMF, World Economic Outlook Database



**Figure 2: Advanced economies' average public debt (% to GDP, 2001-2014)**

Source: IMF, World Economic Outlook Database



**Figure 3: External public debt stock (% to GNI, 2012)**

% to GNI

Source: World Bank International Debt Statistics

These aggregates do not reflect important differences between individual countries. Figure 4 (overleaf) illustrates this. Two of the biggest emerging countries (India and China) have very low external debt stocks (compared with GNI) driving down the aggregate level of middle income countries. At the same time, smaller countries (high and middle income) like Zimbabwe and Nicaragua continue to suffer from high debt burdens. Nicaragua and Zimbabwe are just two examples of developing countries that far exceed the levels seen as sustainable by the IMF and World Bank's Debt Sustainability Framework.

**4**



**Figure 4: Selected countries' total external debt stocks (in % of GNI, 2013)**

% of GNI

Source: World Bank International Debt Statistics

**Figure 5: Current account balance – Latin America selected countries (2006-2013)**

■ Latin America and Caribbean ■ Argentina
■ Brazil ■ Colombia ■ Peru

Source: IMF, World Economic Outlook Database

**Figure 6: Current account imbalances – Euro Area (2001-2013)**

% of Euro Area GDP

■ Italy ■ Other surplus ■ Spain ■ Germany
■ Other deficit ■ Euro area, corrected for intra-area reporting discrepancies □ Sum of individual balances

Source: IMF, World Economic Outlook Database

## Debt cost in low-income countries

Developing countries often have higher borrowing costs, and need to mobilise foreign currency to pay off external debt, which is why the costs of debt servicing are crucial to analysing their debt sustainability. Some countries are already dedicating a very large share of government revenues towards debt servicing (Jamaica: 28.2%; Panama: 17.7%; Tunisia: 15%; Ivory Coast: 18%; Sri Lanka: 21.9%).[8]

Debt servicing costs are expected to rise further. Jubilee UK has recently produced research analysing 43 developing countries.[9] This research shows that the proportion of government revenues dedicated to debt repayments will grow in the coming years. The study shows that 11 to 29 countries, according to the economic growth scenario, will face significant increases in debt payments. The average debt payment as a percentage of government revenues in the

43 countries will increase between 85% and 250%, depending on economic growth and frequency and extent of economic shock.

Following these trends, debt service will absorb more and more public resources in developing countries, reducing the funds available for the new SDGs. This is why debt restructuring is part of the discussion of the SDGs' means of implementation.

## Current account balance: persistent imbalance

As well as the increasing risk of sovereign debt crises, there are also risks for balance of payment crises that arise from persistent trade imbalances, meaning that deficit countries need to attract foreign capital through investments or external borrowing, increasing their external debt. Recently, the US, India and Euro-area deficit countries have narrowed down their trade deficits (Spain and Italy are now running a trade surplus),

while China and Japan have reduced their surplus. On the other hand, some other countries have widened their surplus (Germany, the Netherlands and Korea) or their deficits (Brazil, Mexico and UK).

Some developing countries are suffering from the effects of falling commodity prices. This is particularly the case in Latin America, where the drop of commodity prices[10] created trade gaps in important commodity exporters like Colombia, Peru, Argentina and Brazil.

In the absence of an efficient mechanism to correct trade imbalances, surplus countries have little incentive to adjust by increasing their imports. This is particularly notable in the context of the Eurozone. Demand compression and price adjustments in the zone's periphery reduced their deficits while countries like Germany and the Netherlands have continued to increase their surpluses.

**Figure 7: Current account balance (2006-2013)**

% of GDP



■ 2006 ■ 2007 ■ 2008 ■ 2009 ■ 2010 ■ 2011 ■ 2012 ■ 2013

Source: IMF

**Figure 8: Interest payments by lower and upper middle-income countries (In million USD, 2006-2013)**

Lower-middle income countries



Upper-middle income countries



■ Public creditors  ■ Private creditors (INT, current US$)  ■ Concessional as a %

Source: World Bank International Debt Statistics

**Figure 9: Fiscal costs of banking crises**

% of GDP



Source: World Bank[11]

5

Consequently, the Eurozone now collectively runs a trade surplus that is negatively affecting the EU's trade partners.

**Composition of sovereign debt: increasing share of private sector**

Another trend that affects the debt sustainability of developing countries is the composition of sovereign debt, particularly in middle-income countries. From this perspective, it is noticeable that, in parallel to the decreasing rate of concessional loans, lower middle-income countries are contracting an increasing share of their debt from private creditors. In upper middle-income countries, the share of private sector credit already makes up by far the majority of public debt.

The increasing share of borrowing from private sources in lower-middle income countries has financial implications. Table 1 shows that the cost of private borrowing increases as the average loan's interest becomes higher. The average maturity of private loans is smaller, which is riskier for

**Table 1: Average terms of new commitments of lower-middle income countries (2010-2013), World Bank**

|  | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|
| **Interest (%)** | | | | |
| Official creditors | 1.9 | 1.6 | 1.7 | 1.4 |
| Private creditors | 4.6 | 4.6 | 4.6 | 2.9 |
| **Maturity (years)** | | | | |
| Official creditors | 45.0 | 25.5 | 20.5 | 22.8 |
| Private creditors | 11.5 | 11.3 | 12.4 | 8.6 |

countries that will need to refinance their debt.

Given the exceptionally low levels of interest rates in recent times, the consequences of increased borrowing from the private sector

have not been properly taken into account. On the contrary, middle-income countries have used this particular context to increase their borrowing. However, interest rates will not stay that low forever. Their eventual increase will have dramatic costs for many countries. Concretely, middle-income countries will need to generate and use more income to pay off similar large nominal debts. Their debt sustainability will therefore be affected as they turn to private sources of lending.

**Contingent liabilities**

Finally, sovereign debt sustainability could be eroded through contingent liabilities (see definition above). Recently, many European countries have been affected by contingent liabilities when bailing out private banks (see above). However, this is also the case in developing countries, which have been deeply affected in the past by contingent liabilities arising from banking crises. Figure 9 shows that, overall, governments spend a significant share of GDP on cleaning up financial systems when facing a banking crisis. On average, the countries in Figure 9 have spent 12.8% of GDP to avoid the collapse of their banking systems. Costs of bank bailouts can reach up to 50% of GDP.

Although developing countries may also be affected by contingent liabilities from the banking sector, an additional concern currently comes from public-private partnerships (PPPs). PPPs are increasingly used across all regions of the world and most notably in middle-income countries. PPPs may play an even bigger role in the future as their promotion plays a key role in ongoing discussions on Financing for Development.[12] Pushed mainly by developed

**6**

countries,[13] PPPs are also playing an increasing role in the development agenda. They are viewed as a key feature of SDG implementation. This is particularly the case for infrastructure where many countries see PPPs as the best way to finance the huge needs faced by the developing world.

Although increasing globally, investments through PPPs are unevenly distributed. Latin America and South Asia are the regions where most PPPs are taking place. However, considering the increasing focus on the private sector's role in development finance and in particular PPPs, other regions may well follow this trend over the coming years.

PPPs are a source of concern for debt sustainability because of typical unbalanced risks sharing that often includes revenue guarantees for the private investors, guaranteed by the public partner, with potentially high costs for the public purse over long periods of time.[15]

**Figure 10: Investment commitments through PPPs and number of projects in the developing world (2003-2013)[14]**



■ Amount invested (2013 billion US$)
■ Number of projects

Source: Private participation in Infrastructure Projects Database (* Adjusted by US CPI)

**Figure 11: Investment commitments through PPPs by region, $billion USD (2003-2013)**



■ Latin America and Carribean   ■ South Asia
■ East Asia and Pacific   ■ Europe and Central Asia
■ Middle East and North Africa   ■ Sub Saharan Africa

Source: Private participation in Infrastructure Projects Database (*adjusted by US CPI)

# 2 The impact of debt crises and unsustainable debt on social and economic development

Sovereign debt can undermine the sustainable development of a country in two different ways. First, debt crises can provoke economic recessions and humanitarian crises. Second, debt overhang – when the debt stock of a country exceeds its future capacity to repay it, making its debt unsustainable – can force goverments to dedicate a very large share of their revenues to debt services at the expense of public investments in favour of development.

**Figure 12: Quarterly GDP developments before and after twelve public debt defaults or restructurings during the past 15 years (quarter of restructuring = 100, at constant prices)**



Argentina, 04 2001   Dominican Rep, 02 2005
Ecuador, 03 1999   Ecuador, 03 1999
Indonesia, 02 1998   Moldova, 02 2002
------- Average of the 12 cases



Pakistan, 03 1999   Peru, 03 2000
Russia, 03 2000   Ukraine, 01 2000
Uruguay, 02 2003   Venezuela, 03, 1998
------- Average of the 12 cases

Source: These figures are reproductions from Zsolt Darvas (Bruegel) (2011) Debt Restructuring in the euro area: A necessary but manageable evil?

Figure 12 shows 12 countries that restructured their debt and managed to overcome economic slowdown and return to high growth rates. This figure, produced by Bruegel,[16] shows that GDP was on average 17% higher three years after the default and restructuring. According to Bruegel, several factors explain these positive results and in particular the return of domestic confidence.

Due to the absence of an efficient, fair and transparent debt workout mechanism, countries tend to restructure their unsustainable debts too late, which implies they undergo several years of recession before the unavoidable debt restructuring process is conducted. A better mechanism that allows for timely and speedy debt restructurings would prevent the social and economic disasters created by both debt crises and unsustainable debt.

## Debt crises, bailouts and austerity policies

A sovereign debt crisis occurs when a country faces significant difficulties in repaying its debts as a result of difficult access to capital markets. Unable to pay back its creditors, the government must choose between the default of its debt, its restructuring or receiving a mostly

IMF-funded bailout and the austerity conditionalities that the IMF attaches to bailout loans in order to free up public resources or debt repayments in borrower countries.[17]

In the absence of efficient debt restructuring mechanisms, and given the reluctance of governments to default on their debt, the latter option is the most commonly used. However, in this situation, debt crises last longer, are economically more disruptive, and are more costly for all parties involved. Moreover, countries that have been bailed out are forced to adopt austerity measures and economic reforms through conditionalities. Their objective is to reduce their public debt by cutting their public expenses and raising their taxes. Austerity policies have been a feature of International Financial Institutions' (IFIs) lending programmes for a long time in developing countries. Since 2010, however, developed countries have also been affected by these policies.

Austerity policies have a negative impact on economic recovery, as the reduction of public expenses and tax increases reduce the economic output and therefore lower tax revenues and increase spending on benefits. The result is slower economic

### Box 1: Greece[20]

The adoption of the Euro led to credit-driven growth in Greece in the early 2000s, thanks to massive lending by European banks. The government borrowed heavily to finance its defence budget and the organisation of the Olympic Games in 2004. Lending increased after 2008, with European governments lending massively to the government seeking to cope with lower tax revenues. Creditors began to lose confidence in Greece's ability to pay back those loans in 2010. Interest rates then started to increase and Greece was eventually bailed out in 2010 by the Troika of the EU, the European Central Bank (ECB) and the IMF. This bailout served to pay back the banks and increased the country's public debt. In addition, severe austerity measures were imposed in exchange for the €110 billion bailout. Economic recession and employment increased to levels that creditors did not predict. Greece has lost around 29% of its GDP between 2008 and 2014. Unemployment rose from 10% in 2009 to 25.7% in 2014 and has almost reached 50% for people

under the age of 25.[21] Unemployment benefit allowances have been reduced by 22% and benefits are payable for one year only, after which recipients also lose access to free health care.

The situation in Greece has led to an increase in the number of homeless people, depression and suicides. Many people have lost access to health services. A report prepared by *Médecins du Monde* explains that, since October 2010, public hospitals have been imposing entrance fees and further examinations also need to be paid for. This excludes many people, despite the theoretical universal nature of the Greek public healthcare system. In addition, many hospitals lack staff, basic equipment and supplies. Pharmacies also lack supplies and require their patients to pay upfront. Children are losing access to vaccinations. The situation is worse for vulnerable groups such as asylum seekers, undocumented migrants, drug users, sex workers and homeless people. The report states that austerity policies seem likely to "exacerbate the general collapse of the health system".[22]

**8**

growth (or recession) and higher public deficit. Economic recession affects the level of employment, which in turn creates new conditions of poverty. Greece is a good example of this scenario, as its economy lost around 29% of its GDP since the beginning of the debt crisis. 25% of its population is unemployed (see Box 1).

Reduction of public expenses usually forces countries to undertake cuts in social services, affecting the poor who rely on free or subsidised social services more than others. In the absence of debt restructuring mechanisms, debt distressed countries are usually forced to make such cuts to avoid default.

In addition to the decrease in public expenditure, bailout loans often come with the conditionality of undertaking tax reforms. Eurodad found that the IMF often pushes countries to introduce or increase regressive taxes such as consumer taxes, and most notably their VAT[18]. As a flat tax, this puts relatively more burden on the poor, aggravating their situation even further.[19]

Finally, the conditions attached to bailout programmes often include privatisation programmes. Typically, the ownership or management of public utilities or services in sectors such as water, electricity, health care and education are privatised as a result of bailout programmes. This turns formerly public services such as health or education into user-fee-financed private services, often with the end result of excluding poor people from access.

**Debt overhang**

Debt overhang describes a situation in which a country has not lost access to capital markets and is still able to face its obligations. However, to do so requires resources so vast that its capacity to invest in its development is dramatically reduced. This is why we speak of unsustainable debt. The UN Independent Expert on the effect of foreign debt on human rights reports, for example, that in 2005 Lebanon spent 52% of its budget on debt service and only

23.1% on health and education.[23] Because of their very negative impacts on the ability to finance sustainable development, debt overhangs are a problem that also need to be addressed by new debt restructuring mechanisms, despite the absence of any immediate risk of default. The financing needs of the sustainable development agenda need to be taken into account in the definition of debt sustainability, and in the design of debt restructuring mechanisms.

---

### Box 2: Pakistan[24]

With 180 million inhabitants – 57% of whom live on less than $2 a day[25] – Pakistan is facing a severe debt overhang. This situation has led to the adoption of regressive tax reform, privatisation, unemployment, pay freezes, as well as cuts and disinvestment from public services. In 2008-2010, the IMF imposed a series of conditions attached to its loans (Stand-By Arrangement), which included cuts in public spending, tax reform and phasing out of energy subsidies. Pakistan's economic performance continued to deteriorate. Pakistan now pays out more than half of what it spends on health and education combined on debt service. As a result, the public health system has deteriorated, leaving few options to those who cannot afford private health

care. According to the study, around half the population now do not have access to sufficient food.

**Figure 13: GDP growth in Pakistan (2004-2014, constant prices, %)**



Source: IMF, World Economic Outlook Database

---

# 3 Problems with current mechanisms to deal with sovereign debt crises and unsustainable debt

Debt crises and debt overhang are frequent and have disastrous social, political and economic impacts. However, there is no international mechanism that is able to solve those situations efficiently. The development of a mechanism allowing timely, efficient and comprehensive treatment of sovereign debt restructurings is crucial to prevent future crises and their disastrous social and economic impacts.

## Debt crisis

The global financial crisis and the resulting debt crises in developed countries, as well as the recent legal disputes between Argentina and hedge funds, have highlighted the gaps in international architecture to deal with these issues. In particular, we have seen how the current architecture is fragmented, lacks legitimacy and is ineffective. The situation in Argentina (see Box 3) is far from unique, however. There are dozens of lawsuits intended by vulture funds against sovereign states. Some of those cases are still pending but many have reached a conclusion, often

at the expense of the sovereign state. The Republic of Congo, Nicaragua, Peru and Zambia are some examples of poor countries that have fallen victim to the absence of an international framework to deal with debt restructuring.[26]

## Fragmentation

Institutions like the Paris Club - an informal group of officials from creditor countries whose role is to find solutions to the payment difficulties experienced by debtor countries - only address specific shares of loans and are therefore unable to proceed to comprehensive debt restructurings. The fragmentation of fora that organise debt restructurings hinders fair and coherent debt workouts. In particular, it is more difficult to establish comparable treatment of creditors if the debtors have to negotiate with them separately. This facilitates the behaviour of holdouts (see Box 3 on vulture funds). Consequently, debtors have more difficulty in convincing their creditors to agree on a debt restructuring.

Table 2 illustrates the fragmentation of fora that are currently charged with negotiating sovereign debt. It also shows that for several debt instruments, forums are nonexistent or creditor-driven.

This situation is advantageous to some creditors. There is currently no impartial institution that would be in a position to force creditors to accept a debt restructuring. In those conditions, creditors maintain a strong position reinforced by IMF bailouts that limit risks of default. This brings us to the question of legitimacy.

## Legitimacy

Creditor institutions, and in particular the IMF, have a crucial role to play when dealing with debt crises. They are, however, not impartial in their decisions, since they are judges and creditors at the same time, looking to get reimbursements from debtor states. That is why the IMF is not in a good position to deal fairly with debt workouts. The Paris Club is another example of a mechanism that lacks

**Table 2: Fragmentation of fora organising debt restructurings**

| Creditor | Private | | Public | | | | |
|---|---|---|---|---|---|---|---|
| **Instrument** | Credits | Bonds | Bilateral ODA , Member of Club | Bilateral ODA, not Member of Club | Bilateral Commercial, Member of Club | Bilateral Commercial, not Member of Club | Multilateral |
| **Forum of negotiation** | London Club | Exchange Offer | Paris Club | No forum | Paris Club | No forum | No forum |

## Box 3: Vulture funds

The shortcomings of the current international architecture to deal with debt crises was recently highlighted by a decision of a US-based judge that may jeopardise the recent restructuring of Argentina's debt. In 2012, Judge Griesa from the New York Second Circuit Court decided to freeze funds transferred from Argentina to its creditors unless creditors who refused the debt restructuring – known as holdouts – were paid as well. This decision may jeopardise the restructuring of Argentina's public debt, started in 2005 after its 2001 default.[27]

This is the latest decision with international implications with regards to the strategy of so-called 'vulture funds'. Vulture funds are speculative investment funds. They are called 'vultures' because of their practice of buying the debt of

distressed countries that are in default – or likely to default soon – at a very low price and then forcing the countries, through lawsuits, to repay the original debt with interest, penalties and legal fees. When the courts rule in their favour, vulture funds use measures to recover the debt, such as political pressure and the seizure of overseas assets. Vulture funds usually wait for a process of debt restructuring before starting their actions, taking advantage of the improving financial state of a country or company following the restructure to claim the full value of their bond in addition to interests and possibly delay penalties.

This strategy tends to pay dividends. From Peru, which had to pay US$58 million on a US$11 million debt to the Republic of Congo, which had to pay US$118 million on a US$31 million debt,

many countries lost millions of dollars against vulture funds.[28]

The fact that vulture funds seem to win their cases against sovereign debtors will incentivise creditors to refuse to take part in debt restructuring initiatives in future, as holdouts usually make more profits than the creditors that accept a financial haircut. In the absence of a comprehensive framework for debt restructuring negotiations that would bind all creditors, each one of them has an incentive to refuse to participate, hoping to receive a higher pay-out. This problem has recently also been highlighted by the IMF.[29] With the incentive for creditors to holdout, debt restructuring will be more complex and take more time, provoking longer debt crises, leading to more economic hardship and long-term harm.

**10**

legitimacy. It represents creditor countries organising debt restructurings under their conditions.

**Inefficiency**

There are several factors that make current mechanisms ineffective. Their fragmentation creates some unpredictability in the outcome of the process. Their illegitimacy makes them politically difficult to justify. This is particularly the case when it comes to the IMF, which has a negative reputation in many countries where it has engaged during a debt crisis.

In September 2014 the UNGA decided to create a multilateral framework for sovereign debt restructurings (see Box 5). This situation discourages policy-makers from undertaking debt restructuring processes, which often delays urgently needed debt workouts. Delaying a debt workout during a debt crisis makes the workout more painful and in the meantime the crisis usually intensifies and more money is lost. In addition, the lack of effectiveness of debt restructurings is characterised by insufficient changes towards achieving debt sustainability. Given the unbalanced situation of debtors and creditors during a restructuring, creditors are usually in a position to make their interests prevail. This leads them to force through insufficient restructuring, although this may have negative implications in the long term. When a restructuring is insufficient to bring back debt sustainability, the debtor often has to operate repetitive restructurings.

The delayed restructurings and their insufficient scale is often described as 'too little, too late'. The restructuring of Greek debt in 2012 is a good example of this, as the IMF outlined it. In a report published in 2013, the IMF explains that Greece's access to official financing and the authorities' willingness to adopt a programme of fiscal adjustment delayed the restructuring. When it finally took place, the restructuring was not deep enough to bring back debt sustainability to Greece.[30]

**Unsustainable debt**

The current international architecture, with the IMF in the centre, consequently does not have any instrument to organise debt restructuring in the context of a debt overhang that undermines the achievement of SDGs. This is the result of the absence of consideration of the development impact of debt. The IMF Debt Sustainability Analysis (DSA) is a good example of an international instrument that lacks consideration for development and poverty indicators.

The achievement of SDGs, however, will require that the debt burden faced by sovereign states does not stop them from investing in their development. This is why the future multilateral framework on debt restructurings should consider a debt unsustainable when it undermines a country's development.

**Benefits of a UN process towards a new sovereign debt restructuring framework**

Negotiations on sovereign debt restructuring proposals have usually taken place at the IMF, most prominently in 2002 when IMF management proposed the inclusion of a Sovereign Debt Restructuring Mechanism (SDRM). In the absence of efficient and fair mechanisms to organise debt restructurings, in September 2014 the UNGA decided to create a multilateral framework for sovereign debt restructurings (see Box 5). The new UNGA process is the first time that the General Assembly has discussed this important pillar of the international financial architecture. The shift to the UN makes a lot of sense. The UNGA is the world's most inclusive regime-building body. All 193 UN Member States and other relevant stakeholders – which range from civil society organisations (CSOs) to the IMF – can participate in negotiations taking place at the UNGA. Moreover, UNGA negotiations are transparent, to the extent that sessions are even broadcast live online via the Internet. Only such an inclusive and transparent process can ensure that the new debt restructuring framework reflects common sense, is legitimate and universally applicable, and is broadly accepted.

Given its development and human rights promotion mandate, the UN is also the right place to embed the new sovereign debt restructuring framework as part of the sustainable development agenda.

---

**Box 4: The IMF proposition to deal with debt crises**

The IMF has recently developed some initiatives to create mechanisms for dealing with debt crises. In June 2014, the IMF released a proposal[31] to update the exceptional access framework allowing large-scale financing when debt is considered sustainable but requiring a debt restructuring when it is not.

This proposal suggests extending the maturities of governments' bonds in countries facing temporary liquidity problems but whose debt is considered sustainable. The extension of maturities – so-called 're-profiling' – would reduce the fiscal burden for distressed countries and allow them to manage temporary liquidity problems. In that sense, it would reduce the cost of debt crises.

However, a number of shortcomings in this proposal suggest that it might not be the appropriate answer to debt crises. First, the proposition is based on a voluntary approach. Concretely,

creditors would have to volunteer to extend the maturities of the debtors, and their participation would be difficult to ensure. This means that the instrument would also lack comprehensiveness. Second, the decision to activate the re-profiling would depend on the IMF Board, which makes decisions on the basis of political considerations. Third, if it turns out that the debt re-profiling was insufficient, there would still be the need to restructure the debts, for which no effective framework exists.

When it comes to problems with debt restructurings as such, recent IMF proposals[32] address only one of the many problems – those related to collective action problems and vulture funds lawsuits. The IMF suggests that debtor countries should add improved collective action clauses (CACs) to their future bond issues, in order to make sure that a predatory minority of bondholders – the vulture funds – cannot undermine a debt restructuring process. This new action could indeed help to make the

way vulture funds operate more difficult in future. However, even if all countries start to introduce these new clauses now, it will take many decades until all outstanding bonds are updated and safeguarded. Moreover, these CACs would only solve holdout problems for part of the debt that is bonds. It cannot avoid a holdout by bilateral Paris Club creditors, for example, or by the IMF itself. Only the introduction of a multilateral legal framework for sovereign debt restructurings is immediately effective, and can ensure the comprehensive treatment a country's total outstanding debt in one single and comprehensive process.

Another gap is that the financing needs for sustainable development play no role in the IMF's debt restructuring framework. A debt restructuring is triggered by the loss of market access, and the aim is simply to restore market access. Development or human rights criteria play no role.

---

11

## Box 5: UN process key milestones

- In 2002, at the first International Conference on Financing for Development, the international community agreed, in what is now called the Monterrey Consensus, to create a debt workout mechanism to deal with unsustainable debts.[33]

- Following the Monterrey Consensus, the IMF organised a conference in 2003 to discuss its proposal[34] to create a Sovereign Debt Restructuring Mechanism. The process did not achieve any tangible results as the result of strong opposition from the US.[35]

- In April 2013, the IMF published a paper[36] setting the tone for a more fundamental overhaul of sovereign debt restructuring mechanisms. However, Board and governors instructed the staff to focus more on technical improvements within existing policies.

- UNGA's landmark Resolution 68/304,[37] adopted in September 2014, recognised "the sovereign right of any State to restructure its sovereign debt, which should not be frustrated or impeded by any measure emanating from another State", and noted "with concern that the international financial system does not have a sound legal framework for the orderly and predictable restructuring of sovereign debt". This resolution launched a process to adopt "a multilateral legal framework for sovereign debt restructuring processes".

- The first meeting of the new UNGA Committee for the creation of a new sovereign debt restructuring framework[38] took place in New York from 2 to 5 February 2015. During this meeting, it was clear that UN Member States were divided on this issue. Although the process received support from emerging economies, as well as civil society groups, rich nations holding strong positions at the IMF stayed away from the negotiations. This meeting will be followed by at least two other sessions to negotiate the framework.

- During this meeting, the G77 made a joint statement emphasising that "the lack of a structured mechanism is a major failure of the current international architecture, which leads, among other issues, to long delays in debt restructuring, unfair outcomes and loss of value for both debtors and creditors". Facing opposition from some countries to engage in this UN-led process instead of the IMF, Brazil emphasised that the UN is a forum with the most legitimacy to set the rules of a future debt restructuring framework, reminding observers that this mechanism is part of the 'means of implementation' for the post-2015 development agenda. During the session, Argentina presented a proposal[39] outlining how the future multilateral framework should be designed and should work.

- The second meeting took place in New York from from 20-30 April. Rich nations continued to be absent from the discussions while developing countries made new statements in favour of the UN framework.[40]

**12** # Conclusion and recommendations

Borrowing and lending are supposed to improve the allocation of resources and thus contribute to development. In practice, however, we see that debt often hinders rather than helps development. The successful implementation of the new sustainable development agenda requires a reform in borrowing and lending relations so that these become an enabler rather than a constraining factor in terms of development.

Resolving current problems with sovereign debt requires adherence to a set of principles for each step of a sovereign debt workout. Such principles include impartiality, legitimacy, transparency, good faith and sustainability.

A fair and development-friendly solution to sovereign debt problems requires an international debt restructuring mechanism that:

- Prevents debt crises by promoting compliance with responsible lending and borrowing principles, and is mandated to monitor such compliance and sanction non-compliance.

- Deals with the whole sovereign debt stock of a country in one single and comprehensive process, and ensures fair burden sharing among different creditor categories.

- Can invoke an automatic standstill on debt payments in times of crises or overhangs, and ensure that sufficient legal protection from vulture funds litigation is in place.

- Assesses sovereign debt sustainability from the perspective of SDG financing needs, and ensures that SDG-based debt sustainability analyses guide decision-making throughout the whole debt restructuring process.

- Acts in a transparent and accountable manner, makes all relevant information public, and gives all relevant stakeholders the right to be heard.

- The UN Committee should also set up a standing Debt Workout Institution, independent of creditors and debtors, to facilitate the debt restructuring processes.

- We hope that the international community will seize the opportunity created by the current negotiations at the UN to develop an international debt restructuring mechanism along the above-mentioned criteria. The UN General Assembly should adopt those criteria and organise negotiations at the UN to set up the multilateral mechanism.

# Endnotes

1 Monterrey Consensus (2002) http://www.un.org/esa/ffd/wp-content/up-loads/2014/09/MonterreyConsensus.pdf

2 UN Technical Support Team issues brief for the OWG on SDGs: https://sustainabledevelopment.un.org/content/documents/2079Issues%20Brief%20Means%20of%20Implementation%20Final_TST_141013.pdf

3 United Nations General Assembly, Resolution 68/304: Towards the establishment of a multilateral legal framework for sovereign debt restructuring processes: http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/68/304

4 More information on debt vulnerabilities can be found in Eurodad's report (2013) The new debt vulnerabilities. 10 reasons why the debt crisis is not over, http://eurodad.org/files/pdf/528109fd22bc3.pdf

5 Tackling the financial crisis in European Commission; DG Competition website: http://ec.europa.eu/competition/recovery/financial_sector.html

6 IMF (2014) World Economic Outlook Database.

7 Mody, A. (2013) Sovereign debt and its Restructuring Framework in the Euro area; Bruegel Working Paper 2013/05; http://www.bruegel.org/publications/publication-detail/publication/788-sovereign-debt-and-its-restructuring-framework-in-the-euro-area/

8 Government payment on foreign debt (% of revenue-2012), http://jubileedebt.org.uk/countries

9 Jubilee debt campaign, Don't turn the clock back: analysing the risks of the lending boom to impoverished countries (2014), http://jubileedebt.org.uk/wp-content/uploads/2014/10/Lending-boom-research_10.14.pdf

10 World Bank, Commodity Markets Outlook (January 2015), http://www.worldbank.org/content/dam/Worldbank/GEP/GEPcommodities/GEP2015a_commodity_Jan2015.pdf

11 The World Bank, Controlling fiscal costs of banking crises, http://elibrary.worldbank.org/doi/pdf/10.1596/1813-9450-2441

12 http://www.un.org/esa/ffd/wp-content/uploads/2015/03/1ds-zero-draft-outcome.pdf

13 http://www.iisd.ca/ffd/icffd3/fds2/

14 The three graphs below come from the upcoming Eurodad report on public-private partnerships.

15 Colin, S. and Romero, M.J. (2013) Public-private partnerships (PPPs): are they the right tools for

development?; http://www.eurodad.org/Entries/view/1545270/2013/05/10/Public-private-partnerships-PPPs-are-they-the-right-tools-for-development

16 Zsolt Darvas (Bruegel) (2011) Debt Restructuring in the euro area: A necessary but manageable evil? http://www.bruegel.org/publications/publication-detail/publication/567-debt-restructuring-in-the-euro-area-a-necessary-but-manageable-evil/

17 Eurodad (2014) Conditionality yours, An analysis of the policy conditions attached to IMF loans: http://www.eurodad.org/files/pdf/53466a66139aa.pdf

18 ibid

19 Oxfam Research Report (2011) Owning Development, Taxation to fight poverty: https://www.oxfam.org/sites/www.oxfam.org/files/rr-owning-development-domestic-resources-tax-260911-en.pdf

20 This case study was developed on the basis of the work of the 2013 Jubilee Debt Campaign: Life and Debt: Global studies of debt and resistance, http://jubileedebt.org.uk/wp-content/uploads/2013/10/Life-and-debt_Final-version_10.13.pdf

21 Hellenic Statistical Authority, Labour Force Survey, 2014, http://www.statistics.gr/portal/page/portal/ESYE/BUCKET/A0101/PressReleases/A0101_SJO02_DT_MM_09_2014_01_F_EN.pdf

22 Médecins du Monde (2013) Access to Healthcare in Europe in Times of Crisis and Rising Xenophobia, http://www.medecinsdumonde.org/content/download/13839/165082/file/MdM+Report+access+healthcare+times+crisis+and+rising+xenophobia.pdf

23 Dr Cephas Lumina (2008) Foreign Debt and Poverty: exploring the linkages in the context of human rights, Social Forum of the Human Rights Council, http://www2.ohchr.org/english/issues/poverty/docs/sforum/spresentations/Lumina.pdf

24 This case study was developed on the basis of the work of the 2013 Jubilee Debt Campaign: Life and Debt: Global studies of debt and resistance, http://jubileedebt.org.uk/wp-content/uploads/2013/10/Life-and-debt_Final-version_10.13.pdf

25 UNDP Human Development Report 2014, http://hdr.undp.org/en/countries/profiles/PAK

26 CNCD 11.11.11/Plate-forme Dette et développement. Un vautour peut en cacher un autre (2009) http://www.cncd.be/IMG/pdf/RAPPORT_FONDS_VAUTOURS_2009.pdf

27 See Eurodad briefing, September 2014, Tackling the Vultures. http://eurodad.org/files/pdf/550a92e698c26.pdf

28 CNCD (2011) Un vautour peut en cacher un autre, http://www.cncd.be/IMG/pdf/RAPPORT_FONDS_VAUTOURS_2009.pdf

29 http://www.imf.org/external/np/pp/eng/2014/052214.pdf

30 IMF, April 2013, Sovereign debt restructurings – recent developments and implications for the Fund's legal and policy framework, https://www.imf.org/external/np/pp/eng/2013/042613.pdf

31 IMF, June 2014, The Fund's Lending Framework and Sovereign Debt-Preliminary Considerations, http://www.imf.org/external/np/pp/eng/2014/052214.pdf

32 IMF, October 2014, Strengthening the Contractual Framework to Address Collective Action Problems in Sovereign Debt Restructuring, http://www.imf.org/external/np/pp/eng/2014/090214.pdf

33 Monterrey Consensus (2002) http://www.un.org/esa/ffd/wp-content/up-loads/2014/09/MonterreyConsensus.pdf

34 IMF (2002) A New Approach to Sovereign Debt Restructuring, https://www.imf.org/external/pubs/ft/exrp/sdrm/eng/sdrm.pdf

35 Setser, Brad, The Political Economy of the SDRM, http://www.cfr.org/content/publications/attachments/Setser_IPD_Debt_SDRM.pdf

36 IMF (2013) Sovereign Debt Restructuring – Recent Developments and Implications for the Fund's Legal and Policy Framework: https://www.imf.org/external/np/pp/eng/2013/042613.pdf

37 United Nations General Assembly, Resolution 68/304: http://www.un.org/en/ga/search/view_doc.asp?symbol=A/RES/68/304

38 UNCTAD: http://www.unctad.info/en/Debt-Portal/Events/Our-events/GAG77-events-on-Legal-Framework-for-Debt-Restructuring-Processes/Ad-hoc-committee-and-informal-substantive-sessions/First-ad-hoc-committee-session-3-5-February-2015/

39 UNCTAD: http://www.unctad.info/upload/Debt%20Portal/GA%20Ad%20hoc%20committee%20statements/Permanent%20Mission%20of%20Argentina.pdf

40 UN Ad hoc committee on sovereign debt restructuring processes, Second Working Session. https://papersmart.unmeetings.org/ga/ad-hoc-committee-on-sovereign-debt-restructuring-processes/second-working-session/

## Eurodad

The European Network on Debt and Development is a specialist network analysing and advocating on official development finance policies. It has 48 member groups in 19 countries. Its roles are to:

- research complex development finance policy issues

- synthesise and exchange NGO and official information and intelligence

- facilitate meetings and processes which improve concerted advocacy action by NGOs across Europe and in the South.

Eurodad pushes for policies that support pro-poor and democratically-defined sustainable development strategies. We support the empowerment of Southern people to chart their own path towards development and ending poverty. We seek appropriate development financing, a lasting and sustainable solution to the debt crisis and a stable international financial system conducive to development.

**www.eurodad.org**



This briefing has been produced with the financial assistance of the European Union. The contents of this publication are the sole responsibility of Eurodad and can in no way be taken to reflect the views of the European Union.

# Contact

**Eurodad**

Rue d'Edimbourg 18-26
1050 Brussels
Belgium

Tel: +32 (0) 2 894 4640
www.eurodad.org

www.facebook.com/Eurodad
twitter.com/eurodad





# EXHIBIT I



# Sovereign Debt Workouts: Going Forward

# Roadmap and Guide



UNITED NATIONS
U N C T A D

**April 2015**

# Roadmap towards Sustainable Sovereign Debt Workouts

## Overview

Following the 2008 global financial crisis, the socialization of losses from private debts and the subsequent emergence of sovereign debt crises in developing and developed countries, UNCTAD decided to make a proposal to improve the coherence, fairness and efficiency of sovereign debt workouts. For this purpose, it established an ad hoc Working Group on a Debt Workout Mechanism in 2013 composed of stakeholders and independent experts. This roadmap contains six sections:

- A concise summary of the key problems of current practice (A);

- A set of five principles for sovereign debt workouts (B);

- Global reforms recommended for smoothing debt workouts (C);

- Steps to be taken by debtor states prior to debt workouts (D);

- Recommendations for a reformed debt workout process (E);

- Recommendations for courts deciding sovereign debt cases (F).

The Roadmap is accompanied by a Guide, which provides an in-depth explanation of the principles and recommendations contained in this Roadmap.

## A. Key Problems of Current Practice

Current restructuring practice suffers from a number of problems known to most stakeholders in the field:

- *Fragmentation and lack of coordination*. The absence of an international forum dealing with the resolution of sovereign debt problems has led to decisions being made across a wide range of institutional settings at the local level and at the expense of global coherence. The multiplicity of tribunals and adjudication bodies dealing with debt issues not only permits a variety of legal procedures, which can be used for forum shopping. It also creates legal incoherence due to variations in legal interpretations. While it may be argued that some degree of variation enhances flexibility and encourages wider participation, the lack of clear, universally applicable rules and principles creates uncertainty and seriously disrupts creditor coordination in sovereign debt restructuring processes.

- *Fairness*. Current practice does not guarantee a fair workout to debtors and creditors. The aforementioned state of fragmentation heightens the possibilities of

3

bad faith conduct on the part of some creditors who purchase distressed sovereign debt at a steep discount in order to holdout and litigate until they extract the nominal value of their assets. The negotiating structure for sovereign debt workouts does not always respect the need for transparency and due process. Debtors might be exposed to decisions lacking accountability and independence. In addition, creditors might suffer from unilateral conduct of debtor states, which is not justified by economic or political exigency.

- *Efficiency deficit ("Too little too late")*. Restructurings often come too late. Debtor states might delay the decision to restructure their debt for various reasons: uncertainty, lack of information, electoral cycles, and fear of contagion, among others. Deficits in creditor coordination or creditors' fear of moral hazard or unwillingness to accept losses might also lead to delays. In addition, restructurings are often insufficient as a result of uncertainty, over-optimistic growth expectations or the fear of moral hazard. This lack of a 'fresh start' is often the cause of repeated restructuring episodes and may lead to additional costs to all parties.

## B. Sovereign Debt Workout Principles (SDWP)

Improved debt workout practices would result from adherence to a set of commonly shared principles. Such principles would provide an orientation for stakeholders when negotiating debt workouts or when adjudicating cases related to sovereign debt workouts. They translate into more specific recommendations for each step of a sovereign debt workout, set out below and in more detail in the Guide. The principles include:

- *Legitimacy* requires that the establishment, operation, and outcomes of mechanisms and procedures for sovereign debt workouts observe the requirements of ownership, comprehensiveness, inclusiveness, predictability, and other aspects of the rule of law.

- *Impartiality* requires that actors, institutions, and information involved in debt workouts are free from bias and undue influence. While it is natural for creditors and debtors to pursue their self-interest, debt workouts require a neutral perspective, particularly with regard to sustainability assessments and decisions about restructuring terms.

- *Transparency* requires that information on debt workout institutions, processes, and the underlying data is available to the public.

- *Good Faith* requires that debt workout procedures and their legal and economic outcomes meet basic expectations of fairness.

- *Sustainability* requires that sovereign debt workouts are completed in a timely and efficient manner and lead to a stable debt situation while minimizing costs for economic and social rights and development in the debtor state.

4

## C. Global Reforms Recommended for Smoothening Future Workouts

In light of the deficiencies inherent in existing practices and accepting the above principles, the following reforms could be considered for discussion at the multilateral level:

1. A Sovereign Debt Workout Institution (DWI) should be established with a mandate to support individual debtor states seeking a workout mainly through the facilitation of an inclusive dialogue with the entirety of its creditors, of mediation and arbitration, and to provide the technical and logistical support for sovereign debt workouts, including a public repository for the complete records of past workouts. The establishment of an institution like the DWI is considered as the preferred option. However, the steps defined in this Roadmap also work independently from its existence.

2. States, creditors, NGOs and international organizations should formulate early warning indicators and indicator benchmarks, beyond which debtor states are actively encouraged to discuss a pre-default restructuring.

3. In the main jurisdictions that host the issuance of sovereign bonds or whose law governs other sovereign debt instruments, specific legislation to protect the outcome of consensual negotiation processes could be adopted.[1] Where necessary, legislation should ensure the consistent application of sovereign immunities against enforcement.

4. States and international organizations might introduce soft measures that discourage uncooperative creditor behavior. One option would be a public list of uncooperative creditors and their parent companies, which could be managed by the DWI (or an appropriate independent body).

## D. Steps to be Taken by the Debtor State Prior to a Workout

1. Debtor states, following outreach to market participants, should routinely include robust [aka single-tier] aggregated majority votes on workouts, and any other clauses aimed at making the decision to restructure more predictable.[2]

2. Debtor states, following outreach to market participants, may include in the terms of their debt instruments clauses allowing for mediation and arbitration, in case debt workout negotiations remain unsuccessful.

3. Debtor states, following outreach to market participants, may include contract provisions enabling a standstill of payments and a stay on litigation and enforcement in case of a debt crisis as long as good faith negotiations continue.

---

[1]    Examples include the UK Debt Relief (Developing Countries) Act 2010.

[2]    The new type of Collective Action Clauses proposed by ICMA is the current benchmark for bond issuance. Additional options may be available for other debt instruments.

5

4.   Debtor states, following outreach to market participants, should routinely include contract provisions clarifying that applicable *pari passu* clauses do not amount to a duty of ratable payment.

5.   Debtor states should put in place a central debt management office (DMO) that analyses and manages the risks of its sovereign debts. An independent debt stability report relying on early warning debt crisis indicators identifying risks should be regularly published.

## E. A Reformed Debt Workout Process

Debtor states that suffer from an acute sovereign debt problem, or that are uncertain about the sustainability of their debt, should seek to find a fair and comprehensive solution through a process involving impartial institutions for the provision of information, for mediation, arbitration and review. The following is a stylized process, which could lead to the desired outcome.

1.   The debtor state should first carry out a realistic assessment of the sustainability of its sovereign debt, normally through the expertise of its Debt Management Office.

2.   If the assessment reveals that the debtor state faces a liquidity gap only, appropriate multilateral, bilateral or private creditors should be approached for liquidity support. However, liquidity support must not be used to delay a debt workout.

3.   A debt workout is necessary if the provision of liquidity support fails to mitigate the risk of a protracted period of inability to service debt. Debtor states should not delay necessary workouts for fear of the political, economic or social consequences. Delays are likely to make things worse.

4.   Debt workouts might imply an immediate standstill of debt service, which would last for the duration of the debt workout, provided that the debtor state makes good faith efforts to negotiate a restructuring with its creditors. Standstill is essential in order to ensure a relatively stable economic environment and the fair treatment of all creditors. Debtor states should ensure that sufficient legal protections are in place.[3] Pre-emptive restructurings before a standstill can reduce market turmoil and the overall costs of the crisis.

---

[3]      While considerations of good faith provide a legal basis for a stay of litigation (see F2 below), legal protection may best be sought through contractual clauses (see D3 above), domestic legislation (see C3 above), or a multilateral treaty.

6

5.  In the case that the debtor state chooses to invoke a standstill, it contacts the DWI, provided that the DWI has already been established (see C1 above), and obtains its endorsement for a standstill of payments for the period of the debt workout. The debtor state notifies all creditors – either directly or through the DWI – of the general standstill of payments. The debtor state immediately ceases to make any payment to any of the country's long-term creditors.

6.  The debtor state may also impose restrictions on the convertibility of bank deposits or impose capital controls to limit the effects of sovereign debt restructuring on the broader economy, including its banking sector.

7.  The debtor state communicates the decision to restructure to creditors immediately and invites them to an initial roundtable. An effective communication strategy will reduce market turmoil. The DWI would support the debtor state in its outreach to creditors and in the design of the negotiation process. It may moderate the initial roundtable. The initial roundtable should review the debtor state's assessment of its debt sustainability (see E1 above). Unless it reaches consensus that a workout is not necessary, it should seek consensus on a negotiating framework, including mechanisms facilitating the coordination of different groups of creditors. Options include the following:

    • direct negotiations, facilitated by the DWI;

    • a mediation process under a mediator suggested by the DWI and agreed-upon by the parties;

    • a formal arbitration process governed by internationally accepted standards for legitimate and transparent procedures, whether in an ad-hoc manner, through an agreed-upon arbitration institution, or a tribunal hosted by the DWI.

    In principle, the process should start in the most informal way, i.e. direct negotiations. It can be elevated to more formal and immediately binding formats if no agreement is reached on the more informal level. The initial roundtable may set deadlines for each step.

8.  Stakeholders should carefully document the initial roundtable as it provides evidence of good faith negotiations.

9.  The debtor state needs to be prepared to cover the costs of the negotiation process, as far as this is not already covered by the normal functioning of the DWI. If necessary, the debtor state may ask donors for support.

10. Negotiations under the format agreed upon by the parties begin with a verification of claims. The debtor state verifies the validity of the claims submitted in the restructuring through a transparent process. While claims presented in due form should be presumed to be valid, this process gives all stakeholders, including civil society and competing creditors, the opportunity to question the validity of individual

claims. Claims are declared invalid either by agreement of the parties or by an impartial third-party arbiter.

11. The debtor state secures interim financing for the period until the workout is completed. Interim financing provided after the announcement of the restructuring (cut-off date) is exempt from the restructuring process, irrespective of the creditor providing it.

12. Either the debtor state or — if already in existence — the DWI suggests an institution that could undertake an impartial assessment of the debtor state's debt sustainability with a view to the negotiations. Upon agreement among the parties, the institution provides an assessment of the debtor state's debt situation, including suggestions for restructuring terms.

13. In line with the debt sustainability assessment, the debtor state defines an economic and social recovery program with the full involvement of domestic stakeholders.

14. Negotiations normally take place in the debtor state's capital city. Alternatively, a venue can be chosen on the basis of convenience for creditors or for the facilitator/mediator/arbitrators.

15. The restructuring process will conclude through either of three options:

   - Direct negotiation leading to an agreement accepted by a supermajority of creditors, based on which old debt instruments are exchanged for new instruments according to applicable contractual or legislative provisions.

   - A mediator suggests a solution to the parties, which the debtor and a supermajority of creditors accept and which is directly binding upon the parties (see D2 above), or based on which old debt instruments are exchanged for new instruments according to applicable contractual or legislative provisions.

   - An arbitration panel gives its final award, which is directly binding upon the parties (see D2 above), or based on which old debt instruments are exchanged for new instruments according to applicable contractual or legislative provisions.

16. Further to the implementation of the above debt restructuring terms, including any special treatment accorded to some creditors or groups of creditors (e.g. those providing interim financing), the debtor state resumes payments.

17. Promptly upon completion of the restructuring, the debtor is required to file with the DWI, or an alternative public repository in the absence of DWI, a complete record of the financial and legal terms of the restructuring, a reasoned explanation of the treatment accorded to all creditor groups, a description of the economic and social reform program undertaken in conjunction with the restructuring, and the economic,

financial, and other assumptions supporting the restructuring. Any other stakeholder or observer may file statements and documentation concerning the restructuring with the same repository. This information should be publicly available and searchable in the official language(s) of the debtor state, and in English.

## F. Recommendations for Courts Deciding Sovereign Debt Cases

1.  If the SDWP have been generally observed in a workout, courts should presume that the negotiations and their outcome respect good faith.

2.  Domestic or international courts or tribunals, which have jurisdiction for sovereign debt matters, could not recognize claims of uncooperative creditors to the extent that their enforcement contravenes good faith. This includes claims of abusive creditors, which purchased such claims or sued debtor states debt with the intention to extract a preferential treatment.

# Guide For Sovereign Debt Workouts

## Table of Contents

**Roadmap towards Sustainable Sovereign Debt Workouts**............................... **2**
    Overview.......................................................................................................... 2
    A. Key Problems of Current Practice ........................................................... 2
    B. Sovereign Debt Workout Principles (SDWP).......................................... 3
    C. Global Reforms Recommended for Smoothening Future Workouts........ 3
    D. Steps to be Taken by the Debtor State Prior to a Workout.................... 4
    E. A Reformed Debt Workout Process ......................................................... 5
    F. Recommendations for Courts Deciding Sovereign Debt Cases............... 7

**Table of Contents**........................................................................................ **8**

**I. BACKGROUND**.......................................................................................... **10**
    **1. Key Problems in Current Debt Workout Practice**............................... **10**
    **2. Role and Mandate of UNCTAD** ......................................................... **12**
    **3. Guide for Sovereign Debt Workouts** ................................................. **13**

**II. SOVEREIGN DEBT WORKOUT PRINCIPLES**........................................... **16**
    **1. Overview**............................................................................................ **16**
    **2. Legal Character and Formation of Principles for Debt Workouts**............... **16**
    **3. The Sovereign Debt Workout Principles**............................................ **17**
        Principle 1: Legitimacy........................................................................ 17
        Principle 2: Impartiality ...................................................................... 19
        Principle 3: Transparency.................................................................... 19
        Principle 4: Good Faith ...................................................................... 20
        Principle 5: Sustainability .................................................................... 22

**III. DEBT WORKOUT STAGES IN LINE WITH THE SOVEREIGN DEBT WORKOUT PRINCIPLES** .................................................................... **23**
    **1. The Decision to Restructure** ............................................................ **23**
        **1.1 Overview** .................................................................................... **23**
        **1.2 Decision to Restructure** ............................................................ **23**
            Current Practice ...................................................................... 23
            Recommendations in line with the SDWP ............................... 25
        **1.3 Comprehensive Identification of Claims and Creditors**............ **27**
            Current Practice ...................................................................... 27
            Recommendations in line with the SDWP ............................... 27
        **1.4 Standstill and Capital Controls**................................................. **27**
            Current Practice ...................................................................... 27
            Recommendations in line with the SDWP ............................... 28
    **2. Preparing for Debt Restructuring Negotiations** ............................... **30**
        **2.1 Overview** .................................................................................... **30**
        **2.2 Choice of Forum and Procedure** ............................................... **30**
            Current Practice ...................................................................... 30

Recommendations in line with the SDWP...................................................... 32
2.3 Claim Verification ............................................................................................. 36
Current Practice ......................................................................................... 36
Recommendations in line with the SDWP...................................................... 36
2.4 Interim Financing and Cut-Off Date Concept ................................................... 37
Current Practice ......................................................................................... 37
Recommendations in line with the SDWP...................................................... 37
2.5 Economic and Social Recovery Program Design................................................ 38
Current Practice ......................................................................................... 38
Recommendations in line with the SDWP...................................................... 39
3. Negotiations .......................................................................................................... 40
3.1 Overview .......................................................................................................... 40
Current Practice ......................................................................................... 40
Recommendations in line with the SDWP...................................................... 40
3.2 Official Bilateral Debt....................................................................................... 40
Current Practice ......................................................................................... 40
Recommendations in line with the SDWP...................................................... 41
3.3 Multilateral Debt .............................................................................................. 42
Current Practice ......................................................................................... 42
Recommendations in line with the SDWP...................................................... 42
3.4 Foreign Bonds.................................................................................................. 43
Current Practice ......................................................................................... 43
Recommendations in line with the SDWP...................................................... 45
3.5 Bank Loans ...................................................................................................... 46
Current Practice ......................................................................................... 46
Recommendations in line with the SDWP...................................................... 47
3.6 Domestic Debt and Other Credits .................................................................... 47
Current Practice ......................................................................................... 47
Recommendations in line with the SDWP...................................................... 48
4. Restructuring Terms and Post-Restructuring Issues ............................................. 50
4.1 Overview .......................................................................................................... 50
4.2 Determination of Restructuring Terms .............................................................. 50
Current Practice ......................................................................................... 50
Recommendations in line with the SDWP...................................................... 52
4.3 Concluding Debt Workouts............................................................................... 53
Current Practice ......................................................................................... 53
Recommendations in line with the SDWP...................................................... 54
4.4 Holdout Litigation and Stay of Enforcement .................................................... 55
Current Practice ......................................................................................... 55
Recommendations in line with the SDWP...................................................... 56

IV. IMPLEMENTATION ............................................................................................. 59
Reforming the Present System .................................................................................. 59
An Incremental Approach .......................................................................................... 59
Towards a Debt Workout Institution .......................................................................... 60

Appendix.................................................................................................................. 62

# I. BACKGROUND

## 1. Key Problems in Current Debt Workout Practice

The international debate on the need for a sovereign debt workout mechanism to resolve sovereign debt crises has reignited since the onset of the global financial and economic crisis. The aspiration of having a well-established procedure and effective institutional set up to encourage timely, fair, and consistent treatment of sovereign debt restructurings has been considered as vital for maintaining financial stability at both the national and international levels and as a missing link in the international financial architecture. In addition, the development agenda establishes the need to counter the negative effects of debt difficulties on economic growth.[4]

No government in the world can rule out the possibility that it may one day need to restructure its debt. Debt crises are not necessarily the consequence of irresponsible borrowing. They might also result from natural disasters or external shocks such as commodity price volatility or unexpected changes in capital flows. Or they might emerge as a consequence of irresponsible lending decisions, especially in times when liquidity is abundant and sound investment opportunities are lacking. Even the best efforts to prevent debt from spiralling out of control can fail. Orderly debt workouts are therefore necessary. Only when debt crises find no proper or timely response can they become catastrophes. By contrast, there is no strong empirical evidence that the possibility of an orderly debt workout would lead to any serious problem of debt or moral hazard. Most workouts have been, and will be, politically and economically costly for the debtor state.

The 2008 global financial crisis and the resulting debt crises in several developed economies, as well as prolonged legal disputes between hedge funds and debtor states, have revealed fundamental gaps underlying debt restructuring processes and have promoted surprising new legal interpretations and processes. In particular, these include its fragmented nature, its lack of fairness and certainty, and the failure to achieve debt sustainability through debt restructurings.

- **Fragmentation.** Absent a single, comprehensive, and compulsory debt workout mechanism, current workout practice does not provide the means for effective creditor coordination and hinders fair and coherent debt workouts. This is partly due to the variety of creditors, representing various categories of debt and requesting different processes, generating obstacles to the speedy and successful conclusion of debt workout processes.[5] In the past, the Paris Club has tried to ensure coherence and creditor equality by imposing on the debtor the duty of obtaining comparable treatment from all creditors. However, imposing the burden of ensuring comparable treatment on the debtor state not only requires the latter to juggle the diverging

---

[4]      UN GA Resolution 68/304 referring to the MDGs, the SDGs, and the post-2015 Development Agenda.
[5]      U. S. Das, M. G. Papaioannou and C. Trebesch, "Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts", IMF Working Paper No. 203 (2012), pp. 26-7.

12

demands of different groups of creditors, it increasingly faces legal limits. The 2014 US Court decisions in the litigation against Argentina, which might facilitate collection by non-cooperative creditors, has highlighted these limits. It is likely that more creditors will systematically buy distressed sovereign debt at a discount and engage in litigation in order to collect the full nominal value of the debt. Consequently, sovereign debtors might find it increasingly difficult to convince their creditors to agree on a debt restructuring. The costs will ultimately have to be shouldered by the taxpayers of the debtor state.

- **Lack of Fairness**. Current workout practice often gives creditors an upper hand over the most vulnerable debtor states, even though the latter are responsible under international law for the welfare of their people. No impartial institution has the power to 'cram down' a sovereign debt workout, i.e., to compel creditors to accept a restructuring. Recent court decisions and changes in contractual practice make future restructurings difficult to predict. In addition, current practice may enable creditors to unduly interfere in the debtor state's domestic economy. In order to obtain interim finance from multilateral financial institutions and other regional financial arrangements, the debtor state usually needs to commit itself to far-reaching economic adjustment and structural reform policies. These policies should be designed and implemented in transparent ways. International financial institutions play a key role in policy design, although they may not be fully representative of all countries' interests. IFIs are simultaneously creditors and technical experts, which may also affect their decision making. Although formally these commitments are voluntary in nature, pressure from creditors or international institutions often does not leave the debtor state an effective choice. It is in everyone's interest to ensure that the borrowing country recovers from debt problems and grows strongly in a sustainable fashion; policy reforms should be focused on this objective rather than on more short term measures designed simply to ensure creditors' full repayment. The need to agree on such a program should be balanced with the borrowing country's primary duty to determine its own domestic policies in the public interest.[6] Economic downturns caused by policy reform have impaired their acceptance and sometimes sparked social unrest.[7]

- **Lack of Efficiency**. Debt workouts are often insufficient for achieving debt sustainability. As a consequence, debtor states might require repeated restructurings. Debt workouts also often come too late as a result of a lack of creditor coordination, or because governments of debtor states wish to avoid a process that is politically costly for them, lacks fairness, and is unpredictable due to its highly fragmented nature. Borrowers may also be tempted to take excessive risks in order to avoid a restructuring, which, if unsuccessful, makes the eventual restructuring even more costly. As a consequence, the debt crisis intensifies and much time and money is lost. Deferring the social damage a debt restructuring might cause only brings about more social damage and unnecessary hardship for the people of the debtor state, without improving the prospects of increasing creditors' return on their investment.[8]

---

[6]    Principle 1-8 of the UN Principles on Responsible Sovereign Lending and Borrowing.
[7]    J. Ponticelli and H. J. Voth, "Austerity and Anarchy: Budget Cuts and Social Unrest in Europe 1919- 2019", CEPR Discussion Paper No. 8513 (2011); T. Chapman and E. Reinhardt, "International Finance, Predatory States, and Civil Conflict" (2009); G. Giovannetti et al., "Overcoming Fragility in Africa", European Report on Development (2009), p. 47.
[8]    "Sovereign Debt Restructuring - Recent Developments and Implications for the Fund's Legal and Policy Framework", IMF Policy Paper (2013), p. 15; Lee C. Buchheit, Anna Gelpern, G. Mitu Gulati, Ugo Panizza, Beatrice Weder

There is no readily apparent quick fix for these problems. Although **Collective Action Clauses** (CACs) in sovereign bonds can facilitate creditor coordination, well-resourced and sophisticated creditors can circumvent their operation by acquiring, via the secondary market, debt that does not contain them, or a blocking minority in bond issues not bound by a stock-wide vote. More advanced CACs with aggregation clauses might reduce the opportunities for creditor holdouts.[9] But, in any case, CACs do not address challenges such as debtor procrastination and insufficient debt relief. Nor do they provide a solution for the legitimacy deficits of the current framework.

In light of these gaps, there seems to be momentum for change among stakeholders. Such evolution is witnessed by the recent work undertaken in various international fora, including UNCTAD, the IMF, UN DESA, the Commonwealth Secretariat, NGOs, think tanks, and academia, which have been organizing meetings and conducting research to explore the feasibility and configuration of a potential debt workout mechanism.

## 2. Role and Mandate of UNCTAD

The United Nations Conference on Trade and Development (UNCTAD) has been working on this issue since the 1970s. In 1977, it called for explicit principles for debt rescheduling.[10] In 1980, UNCTAD's Trade and Development Board endorsed a set of Detailed Features for Future Operations Relating to the Debt Problems of Interested Developing Countries. The 1986 Trade and Development Report, UNCTAD's flagship annual report, included a detailed proposal for establishing a procedure for sovereign debt restructuring based on Chapter 11 of the United States Bankruptcy Code. The issue was further discussed in the 1998, 2001, and 2009 issues of the Trade and Development Report. The annual United Nations General Assembly (GA) report on the external debt of developing countries, prepared by the UNCTAD secretariat, has repeatedly highlighted the need for such a mechanism. Many GA debt resolutions adopted unanimously by the Member States of the United Nations have also called for examining the issue.

The ambition to establish ground rules for sovereign debt restructurings was also promoted by a series of institutions and renowned academics with voice at the international level, including the International Monetary Fund, an important stakeholder due to its role as a crisis lender. Following the IMF's unsuccessful proposal for a Sovereign Debt Restructuring Mechanism (SDRM), CACs have come to be used widely in debt contracts to facilitate creditor coordination and reduce the number of holdouts. However, as noted earlier, even the most robust CACs do not address the substantive challenges of sovereign debt restructuring, notably the problem of "too little, too late."

United Nations General Assembly resolutions on the external debt problems of developing countries have repeatedly recognized debt restructuring as a tool for debt crisis resolution and called for enhanced approaches to sovereign debt restructuring and debt resolution

---

di Mauro, and Jeromin Zettelmeyer, "Revisiting Sovereign Bankruptcy", Brookings Committee on International Economic Policy and Reform (2013), pp. 10-11.

[9]      Cf. International Capital Markets Association, Standard Aggregated Collective Action Clauses ("CACs") for the Terms and Conditions of Sovereign Notes (2014), http://www.icmagroup.org/resources/Sovereign-Debt-Information. For a discussion of this proposal, see Section III.3.5 below.

[10]      TD/AC 2/9.

mechanisms.[11] The United Nations has been encouraged to continue to study and examine the need and feasibility of a DWM through a process that ensures the participation of all relevant stakeholders. This policy is also in line with Millennium Development Goal 8, which includes the target to "deal comprehensively with the debt problems of developing countries through national and international measures in order to make debt sustainable in the long term."

Based on these resolutions and general mandate, as focal point for debt issues in the UN system, UNCTAD undertook to work on principles applicable to all debt workouts with the objective of making them comprehensive, efficient, and fair. Following the work carried out with a view to reducing the advent of debt crises through the formulation of the Principles on Responsible Sovereign Lending and Borrowing (released for endorsement in 2012), UNCTAD decided to build on its experience and expertise in advising nations and actors involved in sovereign debt workouts to formulate a globally applicable normative framework. Under the aforementioned Principles 7 and 15, the path indicating the need for creditors and sovereign debtors to adopt responsible behaviour in regard to debt restructuring events is clearly established. The repeated recognition in various international fora of the need to observe such principles constitutes the basis of UNCTAD's project on Principles for Sovereign Debt Workouts and the recommendations contained in this Guide.


## 3. Guide for Sovereign Debt Workouts

The **purpose** of this Guide is to reflect at both practical and theoretical levels on the extent to which sovereign debt workouts actually integrate, or should integrate, a set of principles and rules promoting a coherent, legitimate framework for efficient and effective sustainable debt workouts that are able to restore debt sustainability. Such a holistic approach should, where properly applied, mitigate the problems of fragmentation, unfairness, and inefficiency.

As regards **legal status**, the Guide relies on principles relating to debt workouts at the national and international levels and contextualizes them. Their status in international law might differ. Some of the principles already constitute general principles of international law, while others could be considered as emerging general principles or customary international law. Recommendations are flagged as such.

The Guide addresses the following categories of **stakeholders.** First, *governments* may wish to be guided by this instrument when facing a debt restructuring. The Guide provides indications as to what is desirable and acceptable in a debt workout and what can be considered irresponsible or in bad faith. It suggests practical steps for designing workouts in fairer and more efficient ways than current practice. Second, *legal and judicial practitioners* may use the Guide as an instrument to support their legal opinions and judicial reasoning when called upon to resolve issues related to sovereign debt restructurings. Third, *the parties to sovereign debt contracts,* whether sovereigns or private actors, may wish to draw on the Guide to anticipate what is considered internationally acceptable in a restructuring situation. Ultimately, this instrument proposes universally applicable principles.

---

[11]     UN GA Resolutions A/RES/65/144, A/RES/66/189, and A/67/198.

The **scope** of the Guide for Sovereign Debt Workouts necessarily covers all types of sovereign debt, ranging from official sector debt (bilateral and multilateral) to public bond issuances and loans or other investments by the private sector. Debt sustainability cannot be defined with regard to individual types of debt, but only comprehensively with regard to the entire debt stock. This instrument may be applied to all sovereign debt workouts.[12] This includes workouts involving debt issued by subnational entities in domestic or international financial markets. Although the outcome of a restructuring is strongly influenced by the terms of the debt contract, a detailed discussion of these terms and their impact on debt workouts is considered outside the scope of the Guide, with the exception of clauses enabling restructurings (e.g., CACs).

The **drafting** of the Guide was preceded by more than a year of consultations and discussions. This process began with a brainstorming meeting convened by UNCTAD in February 2013 in which the decision to work on a debt workout mechanism was taken and a preliminary list of issues was identified. Following this brainstorming meeting, an ad hoc Working Group was created. The ad-hoc Working Group was composed of widely recognised academics and professionals from the field of sovereign debt, including staff members of international organisations, members of civil society, and the private sector. The members of the Working Group were selected to ensure that all interests were taken into account and reflected in the development of the Sovereign Debt Workout Principles and the recommendations included in the Guide (see appendix for more details).[13]

The ad-hoc Working Group first identified the main problems in current practice and the aspects in need of clarification and improvement. One by one, the ad-hoc Working Group reviewed the legal, institutional, and economic elements of these aspects. The review was guided by a set of **principles** which constituted the axis of the ad-hoc Working Group's deliberations. This process led to the refinement of the initial formulation of the principles reflected in the present instrument. The complexity of the issues at stake as well as the abstract and general character of the principles entail that each principle should not be considered individually but rather as an interacting element to be studied in relation to other principles. The Guide therefore provides a holistic set of principles applicable to sovereign debt workouts.

The Guide further sets out the implications of the principles for each of the main **debt workout stages**: the decision to restructure; the stage before debt restructuring negotiations; the negotiations; and the stage at which negotiations are concluded and the post-restructuring phase begins. The Guide, including the Sovereign Debt Workout Principles, should ultimately be considered as a normative instrument supporting the capacities and legitimacy of actors willing to undergo more timely, sustainable, and fairer sovereign debt workouts.

The deliberations of the ad-hoc Working Group were supported by a series of **background papers**. There was an explicit effort to reflect a balance between the concerns of creditors

---

[12]        The terms external and domestic debt refer to the applicable law. There is no uniform definition of domestic and external debt. Statistical compilations usually refer to the nationality of the creditor. Although this makes sense for the purpose of measuring the balance of payments, the distinction is not meaningful when it comes to a debt workout, since nationals and non-nationals increasingly own the same debt. For similar reasons, a distinction based on the currency in which the debt is denominated seems problematic. Instead, for debt workouts, the law applicable to a certain debt instrument is of major relevance since it determines the conditions of a potential workout. See U. Panizza, Domestic and External Debt in Developing Countries", UNCTAD Working Paper No. 188 (2008).

[13]        The list of members is available at http://www.unctad.info/en/Debt-Portal/.

and debtors in line with the concept of co-responsibility between creditors and debtors promoted by the United Nations. The papers have been made available on the UNCTAD website.[14] Consideration for the public interest constituted an important part of this balancing exercise.

---

[14]     http://www.unctad.info/en/Debt-Portal/Project-Promoting-Responsible-Sovereign-Lending-and-Borrowing/About-the-Project/Debt-Workout-Mechanism/

# II. SOVEREIGN DEBT WORKOUT PRINCIPLES

## 1. Overview

For a fragmented process that operates in a legislative vacuum in multiple fora, sovereign debt restructuring has developed a remarkable degree of regularity. Its patterns are readily apparent and predictable to the small community of repeat players—finance officials, restructuring professionals, specialized investors, and observers—even if they are nonbinding and not always observed. Yet they are obscure to its principal constituents—citizens in borrowing and lending countries and ordinary investors directly or indirectly exposed to sovereign debt distress.

The following set of principles may guide the operation of sovereign debt workouts and provide a basis for its critique. On the one hand, the principles highlight positive developments in sovereign debt workout practice over the last decades. For example, intergovernmental conferences have recognized the need for debt reduction[15] and bilateral and multilateral initiatives such as the Heavily Indebted Poor Countries (HIPC) Initiative have led to considerable debt relief. Also, there is a growing recognition that debt workouts must safeguard the economic, social, and cultural rights of the affected population. These developments are echoed in the 2012 UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing.[16]

On the other hand, the principles provide a tool for the identification of problems in current practice. Present arrangements for sovereign debt restructurings suffer from a *legitimacy* deficit as they lack a comprehensive forum where all kinds of debt are negotiated and all stakeholders are included. The backroom-deal character of sovereign debt restructurings impinges on their *transparency*, while the dominant role of official creditors in setting negotiation parameters and structuring the process undermines *impartiality*. A lack of good faith could compromise the successful conclusion and implementation of sovereign debt restructurings and lead to litigation by non-cooperative creditors, which a robust standstill rule would prevent. Past restructurings have not always been successful in reducing debt levels swiftly and sufficiently in order to attain a *sustainable* debt level for a reasonable period of time.[17]

## 2. Legal Character and Formation of Principles for Debt Workouts

In every sophisticated legal order, the application of the law is guided by principles. Principles serve as frames that narrow down the interpretative leeway inherent in any abstract legal rules, or that provide orientation for filling loopholes in the written law and unwritten rules. By doing so, principles connect specific legal or policy decisions with broad,

---

[15]   E.g., Monterrey Consensus of the International Conference on Financing for Development, 18-22 March 2002.
[16]   http://www.unctad.info/upload/Debt%20Portal/Principles%20drafts/SLB_Principles_English_Doha_22-04-2012.pdf.
[17]   Cf. note 8.

general considerations characterizing the corresponding legal and economic orders as well as the institutional setup.

The legal character of principles may differ from one principle to another. Some of the principles, or certain aspects thereof, may constitute "general principles of law" in the sense of Art. 38(1)(c) of the Statute of the International Court of Justice. As a source of international law proper, general principles of law are binding. Other principles, or aspects thereof, may reflect customary international law, another source of binding international law. A third type of principle, or aspects thereof, may have a recommendatory character (soft law). A fourth type of principle does not represent a source of proper international law, but results from an interpretation of existing international legal rules that express one common underlying principle.

At least in their abstract and general form, most of the Sovereign Debt Workout Principles correspond to the first type and can be considered general principles of law, or at least emerging forms thereof. This does not exclude the possibility that some of the more concrete and specific ramifications of the Principles set out in the Guide may (or may not) independently be considered general principles of law. A general principle of law usually requires (1) an unwritten rule of behaviour (2) recognized in most, though not all, domestic legal systems, (3) which may be meaningfully applied in the context of international law. General principles of law thus originate in domestic legal practice. Usually, they find some degree of confirmation in international practice. General principles are not entirely static, as they can evolve over time. Thus, especially in a transitional phase, opinions on the legal character of a principle might be divided.

## 3. The Sovereign Debt Workout Principles

The present Guide reflects the following five principles: legitimacy, impartiality, transparency, good faith, and sustainability. Most of these principles are interrelated and partly overlap. This does not dilute the significance of each principle, but rather reinforces the overall message.

## Principle 1: Legitimacy

Definition: Legitimacy is the property of a legal rule or a legal regime which makes it acceptable to its addressees, thereby inducing compliance. One might describe legitimacy as the good reasons why one should follow a specific rule or regime. Given the broad and inclusive nature of this concept, legitimacy overlaps with most of the other principles. Legitimacy is mostly a matter of degree, not a categorical distinction. However, every legal regime needs to meet basic legitimacy requirements.

Foundation: Legitimacy should not be understood as a general principle of law. Rather, it represents the fourth type of principle listed above. It expresses an idea that underlies every modern legal order, including international law. An act which lacks legitimacy is illegitimate but not necessarily illegal. Illegitimacy might lead to disobedience and call into question the effectiveness of the respective act. However, the specific conditions and requirements of legitimacy might very well reach the status of general principles of law.

They vary from one legal order to another and change over time. As regards sovereign debt workouts, a contemporary understanding of their legitimacy needs to take into account that states have been less and less protected by sovereign immunities and more and more subject to the decisions of international organizations and other structures like creditor committees. This links sovereign debt workouts to the recent global debate about the conditions under which international organizations may adopt decisions affecting states or individuals. In this respect, issues such as inclusive decision-making, respect for the rule of law, and human rights have emerged as crucial requirements of legitimacy.[18] While human rights are firmly established in international law, inclusiveness and the rule of law might constitute emerging general principles.[19]

<u>Content</u>: At present, one might identify three different dimensions of legitimacy that sovereign debt workouts need to respect:[20]

- *Source legitimacy* requires that the establishment of international institutions and rules, such as a debt workout institution, respect requirements of inclusiveness and the rule of law. State consent is an important, but not necessarily sufficient, component of source legitimacy. Source legitimacy might also benefit from the inclusion of all relevant stakeholders. Another element is transparency, which is treated below in further detail.

- *Process legitimacy* demands that the operation of a debt workout mechanism respect requirements of inclusiveness and the rule of law. It comprises the following aspects:

    o *Ownership*, i.e., the requirement that the people of the debtor state maintain control over their lives to the fullest extent possible.
    o *Comprehensiveness*, i.e., the requirement that a debt workout involve the entire outstanding debt in order to achieve creditor equality and fair treatment.
    o *Inclusiveness*, i.e., the requirement that a debtor negotiating a debt workout seek to involve all stakeholders in order to maximize the acceptance of the outcome.
    o *Predictability*, i.e., the requirement that the results of a debt workout follow recognized procedures. Predictability is enhanced by transparency, which the present Guide treats as a separate principle (see below).
    o *Reasoned decisions*, i.e., the requirement that decisions be justified, especially those taken by non-representative bodies (bureaucracies, experts, courts, and tribunals). This requirement presupposes impartiality in decision-making (see below).
    o *Legal review*, i.e., the requirement that the preconditions, procedures, or outcomes of sovereign debt workouts be challengeable before competent and impartial courts or tribunals (compare below, under impartiality).

---

[18]    B. Kingsbury, N. Krisch, and R. Stewart, "The Emergence of Global Administrative Law," 68 *Law and Contemporary Problems* (2005), pp. 15-62; with a view to sovereign debt workouts: O. Lienau, *Rethinking Sovereign Debt* (2014), pp. 41-43; A. von Bogdandy and M. Goldmann, "Sovereign Debt Restructurings as Exercises of Public Authority: Towards a Decentralized Sovereign Insolvency Law", in C. Esposito, J. P. Bohoslavsky, and Y. Li (eds.), *Responsible Sovereign Lending and Borrowing: The Search for Common Principles* (2013), pp. 39-70.
[19]    Cf. UN GA Resolution A/RES/66/102 on the rule of law at the national and international levels (2012).
[20]    Cf. O. Lienau, "Legitimacy and Impartiality in a Sovereign Debt Workout Mechanism", http://www.unctad.info/en/Debt-Portal/Project-Promoting-Responsible-Sovereign-Lending-and-Borrowing/About-the-Project/Debt-Workout-Mechanism/.

## Principle 2: Impartiality

Definition: Impartiality may be defined as the absence of bias. As such, it fosters the acceptance of decisions by generating or reconfirming trust in actors and institutions. It is closely related to the principle of legitimacy.

Foundation: The idea of impartiality is inherent in the idea of the rule of law and therefore familiar to any legal order respectful of the latter. The precise content and scope of impartiality might vary from one jurisdiction to another and from one institution to another. In the abstract, one might characterize impartiality as a general principle of law.

Content: In the context of sovereign debt workouts, the principle of impartiality has three different dimensions:[21]

- *Institutional impartiality*. Institutions involved in debt workouts which do not represent the debtor or creditors should enjoy independence in order to ensure impartiality. This ideally includes their financial situation, decision-making process including the choice of their personnel, and their physical independence.

- *Actor impartiality*. Actors other than the parties charged with the examination or review of debt situations must not receive instructions from debtors, creditors, or third parties and should abide by codes of conduct against corruption and other forms of improper practice. Note that actor impartiality does not apply to actors with representative functions, who may receive instructions from those represented. By contrast, actor impartiality is particularly important for judges, arbitrators, and officials with responsibilities for coordination between and activities involving both debtors and creditors. Measures ensuring their independence such as open appointment processes strengthen their impartiality.

- *Informational impartiality*. Institutions charged with sovereign debt workouts should seek to obtain information which is untainted by the interests of any of the parties involved. This aspect of the independence principle is particularly relevant for the use of indicators, for example, during debt sustainability assessments. One way of ensuring informational impartiality is by soliciting information from multiple sources, or by relying on high-quality, state-of-the art indicators.

## Principle 3: Transparency

Definition: Transparency addresses the availability of information about the exercise of public authority to the general public or at least to interested stakeholders. It is closely related to the rule of law and the idea of legitimacy (process legitimacy).

Foundation: Transparency is a principle of relatively recent origin. With some exceptions, in

---

[21]     Ibid.

the past most public administrations were dominated by a tradition of secrecy. This includes international organizations. Only during the last few decades has the idea of transparency gained ground both among domestic administrations and in international organizations. It is currently an open question whether transparency has become an established general principle of law. One might also classify it as an emerging one.

<u>Content:</u> The principle of transparency has two dimensions which are of particular relevance for sovereign debt workouts:[22]

- *Data transparency*.

    - *Data on debt sustainability*. The transparency principle requires that the debtor state make available accurate information demonstrating the unsustainability of its debt. This not only applies in the event of a debt crisis but at all times, in particular in order to prevent delayed restructurings.[23]
    - *Data on projections underlying proposed restructurings*. The transparency principle requires that the debtor and any other stakeholder share information on the economic, financial, and social projections underlying a proposed restructuring, based on impartial assessments of economic fundamentals.
    - *Indicators*. Any indicator used in the context of debt restructurings should be made transparent.
    - *Creditor data*. Creditors need to provide information about their debt holdings and potential conflicts of interest.

- *Institutional and process transparency*.

    - Transparent institutions and processes allow stakeholders to determine whether their functioning is in line with their goals and likely to result in positive outcomes, as opposed to the backroom character of some past debt workout negotiations.
    - Institutional and process transparency might have to be balanced against legitimate needs for confidentiality, especially in situations where transparency would jeopardize the success of a measure. Limitations placed on transparency should follow rules and ex-post transparency should be considered.

## Principle 4: Good Faith

<u>Definition:</u> Good faith is a principle which encompasses basic requirements of fairness, honesty, and trustworthiness.

---

[22]     Cf. M. Goldmann, "Good Faith and Transparency in Sovereign Debt Workouts", http://www.unctad.info/en/Debt-Portal/Project-Promoting-Responsible-Sovereign-Lending-and-Borrowing/About-the-Project/Debt-Workout-Mechanism/.

[23]     Cf. Principle 10, UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing.

<u>Foundation:</u> Good faith is widely accepted as a general principle of law. The core content of good faith, which arguably includes the idea of *pacta sunt servanda*, enjoys virtually universal recognition. Outside its core content, the scope and significance of the good faith principle might vary from one jurisdiction to another. Traditionally, its significance has been larger in continental legal systems. Nevertheless, in recent decades, good faith has gained importance for the interpretation of contractual obligations in common law jurisdictions.

<u>Content:</u> Generally, the principle of good faith protects legitimate expectations in the interpretation and application of the law. It has a bearing upon both the substance and the process of sovereign debt workouts.[24]

- *Substantively* good faith implies that the legal and economic outcomes of sovereign debt workouts meet legitimate expectations. In this respect, good faith overlaps with the principles of legitimacy (see above) and sustainability (see below).

- *Process-wise* the good faith principle has at least the following implications:

  - *Equality.* Good faith requires inter-creditor equality at all stages of the debt workout process. Debtors need to treat creditors fairly and may not discriminate against them arbitrarily.[25]
  - *Standstill on payments.* Good faith requires a standstill, i.e., a temporary suspension of debt service where the continuation of debt service would put equal and fair treatment of creditors at risk.
  - *Stay on litigation.* Good faith also foresees a stay of enforcement litigation by non-cooperative creditors. This ensures creditor equality and also contributes to legitimate and sustainable outcomes.[26]
  - *Duty to negotiate.* Good faith comprises a duty for both creditors and debtors to enter into negotiations in case of an unsustainable debt burden.[27]
  - *Negotiations.* Good faith has a bearing upon the structures and procedures for debt workout negotiations. For example, the unjustified exclusion of certain creditors from creditor committees or their absence from scheduled negotiations without valid cause might violate good faith.
  - *Conflicts of interest.* Good faith bars conflicts of interest both among creditors and among debtors that might lead to irregularities in negotiations or voting.
  - *Abusive creditor holdouts.* Good faith requires that only legitimate expectations be afforded legal protection. While this does not override contractual clauses, it might have a bearing upon the freedom of the parties to accept or reject a negotiated outcome. Abusive creditor holdouts are therefore incompatible with the good faith principle.[28]

---

[24]     Cf. Goldmann (note 22)
[25]     Cf. Principle 15, UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing.
[26]     See Section III.2.2 below.
[27]     Cf. Principles 7 and 15, UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing; IMF, The Acting Chair's Summing Up—Fund Policy on Lending into Arrears to Private Creditors—Further Consideration of the Good Faith Criterion, Executive Board Meeting 02/92, September 4, 2002.
[28]     Cf. Principle 15, 4th implication, UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing; see also Section III.4.4 below.

## Principle 5: Sustainability

<u>Definition:</u> Sovereign debt is sustainable if it can be serviced without impairing the social and economic development of society.

<u>Foundation:</u> Sustainability constitutes an (at least emerging) general principle of law. Over the last decades, the concept of sustainability has spread from environmental regulation to other policy fields, including political economy. It now characterizes large parts of domestic policy and has received recognition in many international documents.

<u>Content:</u> The principle of sustainability has implications for the procedure as well as for the substantive outcomes of sovereign debt workouts.

- *Procedural sustainability:* Sustainability constitutes a standard for the debt workout process:

  - *Timeliness.* Debt workouts need to be initiated as soon as debt levels are perceived to be above the debt servicing capacity of debtor countries. For this purpose, debtors and other stakeholders should use early warning indicators.
  - *Efficiency.* This requires both creditors and debtors to structure debt workouts efficiently with a view to achieving their timely resolution.[29] The need to be expedient has to be balanced against requirements of legitimacy.

- *Substantive sustainability:* Sustainability constitutes a standard for the outcomes of debt workouts, including restructuring terms, the design and application of indicators, and structural adjustment programs.

  - *Debt sustainability in the narrow sense.* Commonly, debt sustainability requires that debt workouts bring states into a financial situation that allows them, with high probability, to roll over or reduce their debt in the foreseeable future without a major correction in the balance of income and expenditure.[30]
  - *Debt sustainability that includes economic and social sustainability.* Debt sustainability is not just a financial category. Rather, full debt sustainability is only achieved when debt service does not entail intolerable sacrifices for the well-being of society. Debt workouts must not lead to violations of economic or social rights or prevent the attainment of internationally agreed development goals.[31]

---

[29]      Cf. Principles 7 and 15, UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing.
[30]      Cf. IMF, "Assessing Sustainability" (2002), p. 5; IMF and IDA, "Debt Sustainability in Low-Income Countries—Proposal for an Operational Framework and Policy Implications" (2004), p. 8; IMF, "Modernizing the Framework for Fiscal Policy and Public Debt Sustainability Analysis" (2011), p. 6.
[31]      Cf. Principle 8, Guiding Principles on Foreign Debt and Human Rights, UN Doc. A/HCR/20/23 of 10 April 2011, adopted by the Human Rights Council under Resolution A/HCR/RES/20/10 of 18 July 2012.

# III. DEBT WORKOUT STAGES IN LINE WITH THE SOVEREIGN DEBT WORKOUT PRINCIPLES

## 1. The Decision to Restructure

### 1.1 Overview

The following section discusses the debt workout process at various stages from the moment where the potential need for a debt workout is realized to the resumption of debt servicing on the basis of a mutually consented restructuring agreement. In this way, the Roadmap and this Guide intend to help sovereign debtors and their creditors find their way out of an unsustainable debt situation. They are meant to be as practical and applicable as possible, using all options available under the current framework. However, they also highlight key loopholes in the current framework and make suggestions on how to close them in line with the Principles set out above.

The first phase begins with the decision of the debtor state to restructure. It is closely related to two further issues, namely, the comprehensive identification of debts and stakeholders and the question of a standstill.

### 1.2 Decision to Restructure

#### Current Practice

The first step towards a sovereign debt workout is the government's decision to restructure once it realizes that its debt might be unsustainable. This is never an easy decision. One major issue with the current system is the lack of political will to make that decision in due time. This leads to an accumulation of debts, which is very harmful for the debtor country and which ultimately results in major losses for creditors.

There are several important reasons why governments may be hesitant in deciding to engage in restructurings:

- *Political costs of debt workouts.* Electoral cycles push governments to think on a short-term basis when in fact they should think long-term for the benefit of their constituencies.
- *Fear of loss of access to international capital markets.* Debtor states risk losing access to international capital markets once it is revealed that their debt is unsustainable and requires restructuring. Without a swift restructuring, this worsens their financial situation.
- *Lack of information.* Governments might delay a necessary workout because they lack information on whether their situation is one of insolvency as opposed to one of

illiquidity.[32] The decision to restructure therefore requires sound information about debt sustainability risks in a context where the line between insolvency and illiquidity is not clear, while the temptation to fight market expectations by showing commitment to repay the debt is high.

- *Fear of contagion.* Stakeholders might fear a spread of the crisis to the private sector of the debtor country and to other countries in fragile financial situations.
- *Access to liquidity support.* Individual lenders might feel that a bailout would provide them with a better deal than a restructuring. Consequently, they may offer liquidity support in order to keep the debt service flowing. International and supranational institutions like the IMF or the EU, or the host government of important banks with high exposure to the debtor, might also offer financial support, although IMF and EU financing requires structural adjustment.[33] Such injections can be a tempting option for the debtor state's government, as they preserve it from the political costs of restructuring. The option is all the more tempting when there are upcoming elections. And it may ultimately be successful. Bail-outs with new money do not necessarily deserve the negative reputation they acquired during the recent European sovereign debt crisis. In the event of an incipient crisis, as long as debt is not clearly unsustainable, they could under certain circumstances prevent a downward spiral. In cases of systemic crises, they could prevent contagion. However, the injection of liquidity necessarily shifts the costs of the crisis to those providing fresh money and burdens future generations in the debtor state, unless the terms of the new funds are not more favourable than those of the old debt. And the stakes are high: in cases where liquidity failed to safeguard debt sustainability, the result of the operation was a crisis that was far more costly to resolve than the one the new money was meant to tackle.

Current practice partly addresses these problems. In particular, the IMF carries out Debt Sustainability Assessments (DSAs), which aim to provide succinct information about a country's debt situation. However, such DSAs face a number of challenges:

- DSAs necessarily involve projections about expected growth and other macroeconomic figures that are difficult to predict;
- DSAs have at times focused on new money rather than on debt restructuring;
- DSAs have at times been based on weak empirical assumptions. In particular, they have overestimated the potential to reduce public expenditure without jeopardizing economic recovery.[34]

Other information having an influence over a sovereign debtor's decision to restructure comes from credit rating agencies. However:

- in the past, credit rating agencies have frequently failed to recognize debt crises in time;
- credit rating agencies might suffer from conflicts of interest, given that debtor states pay for their ratings. International standards and domestic regulations adopted in the aftermath of the 2008 financial crisis have attempted to mitigate this risk, but it may still exist.

---

[32]   IMF, "Assessing Sustainability" (2002), pp. 4-5.
[33]   See Section III.2.5 below.
[34]   On related problems with structural adjustment programs, see Section III.2.5 below.

**Recommendations in line with the SDWP**

### General Considerations

- *Sustainability*. The conviction is now well established that debt restructurings might be unavoidable in order to achieve debt sustainability. However, past practice has more often than not failed to recognize the need for restructuring (e.g. Greece 2010) or even taken on additional risks in an attempt to avoid restructuring (e.g. Argentina 2001). The provision of liquidity support and the continuation of debt service might preserve debt sustainability if it prevents a bad situation from turning worse, especially in case of systemic risks, and does not unnecessarily delay a restructuring. Other purposes, such as the government's desire to stay in office, do not justify the provision of liquidity support.

- *Timely action*. The sustainability principle requires that the debtor state not ignore an imminent debt crisis or postpone an inevitable restructuring. Action should be timely and decisive.

- *Debtor options*. Debtors should consider all options available to maintain or regain debt sustainability, including pre-emptive restructurings, which do not include a standstill, and debt liability management operations.

- *Debtor communication strategy*. Should the debtor state decide to restructure, past practice (e.g., Jamaica 2010, 2013) shows that a clear communication strategy helps manage stakeholder expectations. It presupposes that the debtor state has a realistic idea about the restructuring required and the procedure to be followed.

### DSAs and Other Assessments

- *Legitimacy*: DSAs are carried out by IMF staff in a technical, standardized process. While the collection and assessment of data necessitates technical capacity, current practice does not always take fully into account the policy choices inherent in DSAs.

- *Impartiality*: While the IMF Staff carries out DSAs independently of the member states, the IMF has a Board of Directors whose state-appointed directors report to their various capitals. In the present arrangement, the role of independent expert is commonly assigned to the IMF and the World Bank. In reality, no creditor can play an independent role in a debt workout.

- *Transparency*: DSAs have not always been fully transparent.

- *Independent expertise*: To establish whether debt is unsustainable, an independent expert assessment should be conducted by an institution which meets three essential requirements: Technical expertise, transparency, and complete independence to avoid conflicts of interest. Institutions which fulfil these requirements may include:
  - Private entities, such as consultancy firms that are paid by and respond to independent actors, provided that safeguards to ensure their independence and transparency are taken.
  - International organizations, provided that their staff act on an independent basis and are not unduly influenced by political views of important member countries or by other reasons (i.e., they are not involved as a creditor or

governed by either party's interests). Since the IMF is usually the institution with the best data, its databases certainly need to be used together with data from debtor governments and other sources; however their interpretation must be in the hands of an independent entity.
  ○ Non-governmental institutions, such as specialized NGOs and competent think tanks.
- The terms of reference for the expertise requested should be as standardized as possible, in order to avoid any bias that might impair the whole process. In addition, validation of data should precede decision.
- *Debtor's assessment.* While debt sustainability analyses conducted by international organizations or independent experts are important to ensure sound debt management practices, they do not replace the need for each sovereign state to undertake its own assessment of the sustainability of its debt based on indicators that are most relevant to its circumstances. Debtor states should carry out a realistic assessment of the sustainability of their sovereign debt before deciding to restructure.
- *Early warning indicators.* The process dimension of the sustainability principle urges debtor states to put in place indicators of risks to the sustainability of their debt. Debtor states, creditors, civil society, and international organizations should formulate indicator benchmarks, beyond which debtor states are actively encouraged to discuss a pre-default restructuring. When using debt-to-GDP projections for early warning, debtor states should take into account:
  ○ the possibility of exogenous shocks to growth;
  ○ the country's historic track record of fiscal reactions to changes in growth;
  ○ currency risks if debt is denominated in foreign currency;
  ○ contingent government liabilities emanating from the banking sector.[35]
- *DMO.* The debtor state puts in place a central debt management office (DMO) that analyses and manages the risks of its sovereign debts. An independent debt stability report relying on early warning debt crisis indicators and identifying risks is regularly published.
- *Creditors' perspective.* Good faith and legitimacy require giving creditors the opportunity to comment on debt sustainability analyses carried out by the debtor, e.g., at an initial roundtable.[36]

**Liquidity Support**

It may often be difficult to predict whether the provision of liquidity support will prevent debt sustainability problems. Both debtors and creditors need to keep in mind the problem of uncertainty. Creditors and debtor states are well advised to consider the following before granting or soliciting liquidity injections in the event debt service becomes difficult:

- Creditors and debtor states should consider the provision of new liquidity as an option for stabilizing an overall sustainable debt situation without (or with only a

---

[35]    For an innovative proposal for early warning indicators, see J. Lukkezen and H. Rojas-Romagosa, "Early warning indicators in a debt restructuring mechanism", available at http://www.unctad.info/upload/Debt%20Portal/Lukkezen_Romagossa_%20debtindicatorsFinal_29apr2014.pdf.
[36]    See Section III.2.2 below.

minor) restructuring as long as most indicators for debt sustainability stay below agreed thresholds.

- Liquidity support should be distinguished from interim financing.[37] In contrast to liquidity support, interim financing and debt restructuring do not rule each other out. Interim finance serves to keep essential services running during workouts, or to finance growth-enhancing investment, not to keep debt payments on track.
- As a matter of good faith, the continuation of debt service with liquidity injections should not discriminate against creditors who choose not to provide new liquidity.

## 1.3 Comprehensive Identification of Claims and Creditors

### Current Practice

When debtor states decide to restructure they need to gain an overview of their debts and who holds them as soon as possible. For this purpose, the government hires legal and financial advisors and determines the scope of the debts to be restructured and the creditors holding them. While holders of government-to-government and bank loans are usually known to the debtor and operate in non-public markets, sovereign bonds are publicly tradable securities. Debtors might therefore find it difficult to identify their creditors.

### Recommendations in line with the SDWP

- Difficulties in the identification of bondholders might delay debt workouts and compromise debt sustainability. In order to identify their creditors as quickly as possible with a view to achieving a timely and sustainable restructuring, the sovereign debtor should seek to track the holders of their debt, including foreign residents holding domestic debt.
- In cases of widely dispersed bondholders, the terms of issuance might authorize trustees to act for bondholders.

## 1.4 Standstill and Capital Controls

### Current Practice

Debt crises may start with a disorderly cessation of payments to some creditors, while others continue to be serviced partly or in full. Different from such disorderly defaults, a "standstill" refers to the full or partial cessation of debt service in the event of a debt crisis as part of an orderly workout procedure. In the past, disorderly cessation of payments has been practiced in many sovereign debt crises. In recent years, pre-emptive restructurings, which do not include standstills have become more common.[38] Debtors and creditors might also

---

37      See Section III.2.4 below.
38      Das et al. (note 5), p. 8.

continue debt service for fear of contagion spreading to their financial industry or to other states, as demonstrated by the case of Greece in 2010-2011.

The purpose of an orderly standstill is to provide the leeway for a restructuring during a predefined and limited time. To be effective, standstills require a stay on litigation or enforcement actions against the debtor state. Although much of the creditor litigation in recent years seeks to free-ride on completed restructurings, in several cases—notably in Argentina in 2005 and in Grenada in 2012—litigation has interfered with the restructuring process itself. Litigation risks might influence future practice. The Guide addresses holdout litigation comprehensively below.[39]

The imposition of capital controls or the suspension of the convertibility of bank deposits have been common features of sovereign debt crises in emerging and developing economies alike, with mixed success.[40] Sovereign debt crises will often give rise to fears concerning the stability of the banking sector. Alternatively, a banking crisis might be at the root of a sovereign debt crisis. Either situation might trigger capital flight that could further deepen the crisis, turning fears into a self-fulfilling prophecy. This could justify the imposition of capital controls or convertibility suspensions. Capital controls alone do not prevent a bank run to claim foreign currency in cash, which is just as damaging as a run to foreign bank accounts. Whether capital controls or convertibility suspensions are necessary also depends on the country's specific situation. Factors include the currency in which domestic private debt is denominated, dependence on crucial imports, and the pass-through rate of currency fluctuations to the domestic economy. The effectiveness of convertibility suspensions and capital controls is subject to debate. Sometimes they can do more harm than good. For example, they present obstacles to investments and distort the efficient allocation of resources. Their prolonged use might make market participants create evasion strategies that render them less effective and fuel inflation. To mitigate negative effects of capital controls, a timely restructuring is essential.

## Recommendations in line with the SDWP

- In the interest of *debt sustainability*, the debtor state should consider an immediate standstill of all debt-related payments to individual creditors when deciding to restructure its debt. It is also an essential demonstration of *good faith* on the part of the debtor to refrain from any bilateral payments to individual creditors, which are not mandated by (domestic) law. Creditors must be able to have confidence that the overall substance of the debtor's assets, based upon which the quotas are later calculated, will not be diminished by payments to competing creditors. This applies to all creditors, including multilateral institutions.

- However, there might be situations in which the debtor state may legitimately choose to continue servicing its debt. As a rule debtor states should consider the option of a pre-emptive restructuring which does not include a standstill. In case of pre-emptive restructurings, it is crucial that the decision of the debtor state respect good faith and refrain from unjustifiably discriminating against some creditors.

---

[39]       Section III.4.4.

[40]       C. Reinhardt and K. Rogoff, "Financial and Sovereign Debt Crises: Some Lessons Learned and Those Forgotten", IMF Working Paper No. 13/266 (2013).

- To enhance the *legitimacy* of a standstill, the debtor state should seek approval by an independent institution, such as the DWI. Further, the conditions of a standstill require clarification.
  - ○ Trigger. Ideally a standstill should be declared by the debtor state with the backing of an impartial, competent institution.
  - ○ Duration. Standstills need to be limited in time and related to the restructuring process.
- Any exceptions from the standstill need to be narrowly construed and geared towards the objective of debt sustainability.
  - ○ An exception may be made for short term debt (i.e., with a maturity of less than one year). In most cases this would refer to claims stemming from trade credits, which should not be interrupted in order to keep basic state functions intact.
  - ○ Another exception should apply to interim financing provided after a specified cut-off date.[41]
- The debtor state notifies all creditors – either directly or through the DWI – of the general standstill of payments. The debtor state immediately ceases to make any payment to any of the country's long-term creditors.
- The suspension of the convertibility of bank deposits or capital controls should only be imposed after careful consideration and for paramount reasons of debt sustainability, for example, to prevent an impending collapse of the banking sector. Once such measures have been introduced, a swift restructuring is essential in order to mitigate any potential negative consequences.
- Good faith obliges creditors to refrain from asset grabbing in case of a standstill that respects the SDWP. Debtor states should ensure that sufficient legal protections are in place for that purpose.[42]

---

[41]   Section III.2.4 below.
[42]   See Section III.4.4 below.

# 2. Preparing for Debt Restructuring Negotiations

## 2.1 Overview

This section addresses issues that the debtor state needs to consider, together with creditors and other stakeholders, after deciding to restructure and before entering into negotiations. Once the debtor government has acknowledged that a debt restructuring is in its best interest, it should decide on the desired setup for the negotiation process, verify claims, consider interim financing, and work on an economic and social recovery program. Each step involves different stakeholders.

## 2.2 Choice of Forum and Procedure

**Current Practice**

Once the debtor state has decided to restructure, debtors and creditors need to find an institutional and procedural framework for the debt workout. Under current practice, there is no comprehensive forum in which all sovereign debts may be restructured. Six different categories of debt exist, each of which receives a restructuring in a different setting.

- ***Bilateral debt.*** For debt owed to other states, whether concessional or not, the Paris Club has been established as the chosen forum for negotiations during the past decades. The Club has fairly well-defined standard terms for restructurings, which vary according to the economic situation of the debtor state. However, it only comprises 19 members, who are also members of the OECD. The IMF and multilateral development banks participate in the Paris Club as observers. While in the past Paris Club members have been the most important bilateral creditors, this has changed considerably in the last fifteen years. New sovereign creditors with considerable weight include China, Brazil, Venezuela, and Taiwan, Province of China, along with several oil-rich states from the Middle East. The Paris Club has invited some of these new lenders to become members of the Club, but they have not joined. The Paris Club has attempted to establish its restructurings as a standard for other bilateral creditors through the "comparability of treatment" clause contained in its Agreed Minutes. The clause obliges the debtor state to seek restructurings from other creditors on terms that are comparable to the concessions of the Paris Club.[43] However, non-members of the Paris Club are reluctant to follow the terms set by the Paris Club. Some of these creditors have so far cancelled significant amounts of debt bilaterally at their own pace.

- ***Multilateral debts.*** Debts owed to international institutions are usually excluded from restructurings on the basis of an assumed "preferred" or even "exempt" creditor status. However, as the HIPC initiative evolved, it became clear that multilateral debts were so dominant for some countries that debt sustainability would be impossible without restructuring them. Starting in 2005, the Multilateral Debt Relief

---

[43]    See Section III.3.2 below.

Initiative officially brought relief from some multilateral financial institutions to the HIPCs and later to some other heavily indebted countries. This led to a successful restoration of debt sustainability in many, but not all, of the affected countries. The initiatives, however, have been closed in the meantime. The situation is different for states with a significant quantity of bonded debt. For them, IFIs sometimes play a critical role in providing confidence to avoid a catastrophic refusal to roll over such debt. In these circumstances, the preferred status of multilateral debt is tied to the fact that they provide crucial funding after a restructuring has been initiated.[44] In some very specific cases, however, where a debt crisis has continued for many years, a country that once had a significant amount of commercial debt may find itself with a very large share of multilateral debt. If this country requires further debt reduction, possibly as a result of a failure of a sequence of IFI managed programs, multilateral lenders should consider debt reduction. This does not apply if IFI programs are successful.

- *Bank loans.* Commercial banks traditionally rely on the informal processes collectively referred to as the London Club. In the 1980s debt crisis, for example, when bank loans were the most common debt instrument from the private sector, Bank Advisory Committees (BACs) were established to represent creditors and engage with sovereign borrowers. Those committees could be quite efficient in negotiating a workout with the sovereign debtor, though some agreements took a significant amount of time. The limited number of BAC members involved in each case tended to contribute to the capacity for efficiency in London Club restructurings. However, smaller banks sometimes were not adequately represented and holdouts persisted in this context as BACs attempted to convince non-BAC banks to agree to negotiated terms. In the 2012 Greek Private Sector Involvement, the Institute of International Finance negotiated on behalf of international bank lenders.

- *External bonds.* Today, bonded debt is the prevalent form of private finance. Around the turn of the twenty-first century, sovereign bonds had grown so much in relative weight that, in a few cases, the restoration of debt sustainability was not imaginable any longer if they were not part of the package. Overall, bond restructurings have proceeded swiftly since the late 1990s, contrary to the early predictions of extreme coordination problems. In some cases, particularly involving small countries with a small number of closely-held bond issues, substantial negotiations are possible. In those and selected other cases, creditors' committees might represent groups of bondholders in negotiations that resemble bank loan renegotiation. Normally, though, bond restructurings involve a much larger set of creditors than syndicated bank loans. Debtors and creditors have therefore tended to eschew the committee negotiation model. Constituting a representative committee and maintaining confidentiality within it becomes extremely challenging in a complex restructuring. Also, while it may be argued that debt trading during negotiations provides liquidity and a way out for those who are willing to accept a haircut, it creates deeply disruptive opportunities for abuse of good faith and violations of securities regulations, such as insider trading. Reflecting these and other concerns, the prevailing process for bond restructuring looks more like a new bond offering than a loan renegotiation. The choice of institution and procedure may be contained in the terms applicable to the debt instrument.

---

[44]   See Section III.2.4 below on interim financing and cut-off dates.

- **Domestic bonds and other credits:** Sovereign bonds issued domestically, under the sovereign's own law, often far eclipse its external bonds. These bonds may be denominated in domestic or foreign currency and held by domestic or foreign residents. Governing law accounts for significant differences in the debtor's restructuring options. For example, under some circumstances the debtor government may unilaterally and retroactively change the terms of domestic debt, or otherwise affect its value with trading restraints, withholding taxes, etc. Although such actions may be challenged before domestic and international courts, enforcement is considerably more difficult when debt is governed by the debtor's own law. On the other hand, domestic debt is often the base asset in the national financial system and public and private pension funds. Restructuring such debt can have dramatic political consequences for the debtor state and may not bring the desired relief, for example, if banks and pension funds must be supported out of the state's strained fiscal resources.

- **Other credits** like short term[45] trade credits have often been excluded from restructuring owing to widespread recognition of the importance of trade financing for the debtor state's recovery. Nevertheless, in some cases, notably Iraq, trade credits—many of them decades old and in default for a long time—were a large part of the debt stock and participated in the restructuring.

As a result of the highly fragmented institutional structure, there are strong incentives for creditors not to make concessions, because they have to fear that other, less compromising groups of creditors will benefit. The debtor faces the challenge of coordinating potentially conflicting requirements of the various fora involved. For example, the Paris Club usually requires that the debtor state obtain comparable debt relief from all other bilateral creditors. However, it does not provide any procedure for the debtor to actually reach such arrangements with other creditors, who have not been consulted in the context of Paris Club negotiations. This is why such debts often remain in place, without being serviced or restructured. As a result, they provide inroads for holdouts and distressed debt fund litigation.

In order to juggle the diverging demands of the different fora involved, important parts of debt workouts often take place in informal, non-public channels. This has the consequence that *non-creditor stakeholders, such as the local population, trade unions, pensioners, or entities representing a certain public interest (e.g., climate preservation or regional health initiatives), which can be heavily impacted by a debt workout and which one might consider in a non-legal sense as indirect claimants, do not have an institutionalized opportunity for direct participation in debt workout negotiations.*

## Recommendations in line with the SDWP

Current practice falls dramatically short of the Principles due to its lack of comprehensiveness, an important aspect of the principle of legitimacy. Current practice is noncomprehensive in two respects: across the different categories of debt, because there is no single type of debt and no overarching forum for debt restructuring; and within each

---

[45]    "Short term" refers to loans with maturities below one year.

category of debt, because of heavily fragmented creditor and negotiating structures.[46] The legitimacy of debt restructurings is further compromised by a lack of inclusiveness. Inclusiveness requires a process and an institution in which all stakeholders have a fair chance to make their voices heard. Finally, the fragmented nature of current debt workout practice seriously undermines its transparency. Choosing transparent institutions and processes would enhance comprehensiveness and inclusion.

To improve the comprehensiveness, inclusiveness, and transparency of debt workouts, debtors and creditors may contractually determine a forum and a procedure ahead of a crisis. In the absence of such determination, the debtor state should convene an initial roundtable for deciding on institutions and procedures for the workout (a). Options include mediation and arbitration (b). The debtor state needs to be prepared to cover the costs of the negotiation process.[47]

### (a) Initial Roundtable

For purposes of comprehensiveness, the debtor should take the initiative and invite all its creditors, either directly or through proper representatives, to an initial roundtable in order to set the stage and agree on institutions, principles, and procedures for the debt workout. Consideration should be given to holding this event in the debtor state's capital city in order to facilitate the participation of key domestic constituencies and encourage country ownership of the process. The open "roundtable" format is appropriate for the start of the negotiation process, because it allows creditors to organize themselves either as a whole or in different asset classes, including for their representation on an arbitration panel or in the nomination of a mediator.[48] The principle of legitimacy implies that every creditor needs to have a place in (or at least access to) the roundtable. In the event of dispersed creditors, the debtor state or any other independent institution may facilitate creditor representation. Creditors who voluntarily refrain from participating directly or indirectly might lose their right to vote on any outcomes.

The principle of legitimacy further requires opening the initial roundtable to all stakeholders concerned in the restructuring, including civil society. The roundtable should decide on mechanisms to enable the participation of these groups in the subsequent process. This may include notice-and-comment procedures and amicus curiae briefs.

As a matter of good faith, debtors should spare no efforts to inform creditors and other stakeholders about the upcoming roundtable and the possibility of participating, whether directly or through representatives. It should be publicized as widely as possible. This includes publications in important newspapers and on the internet. Creditors as well as other stakeholders might also be approached through existing networks and institutions (e.g., industry associations, trade unions). Creditors and stakeholders should be required to react within a reasonable period of time. A DWI, once established, could support the debtor state in its outreach to creditors. It may moderate the initial roundtable.

---

[46]   For an analysis of specific comprehensiveness problems persisting within certain categories of debt, see Section III.3 below.
[47]   See Section III.1.2 above.
[48]   See below on a Debt Workout Institution.

At the initial roundtable, stakeholders should review the debtor state's assessment of its debt sustainability, on which it based its decision to restructure, and compare it with their own assessments. Unless the initial roundtable reaches a consensus that a workout is not necessary, it should proceed with the preparation of a negotiating framework.

The debtor state, perhaps supported by the DWI, should propose an impartial negotiation framework to the creditors. It should also make transparent how it intends to guarantee equal treatment to all creditors. One way of doing so consists in setting up a comprehensive negotiating format including all classes of creditors. In contrast to the times when bank lending was prevalently on the private creditors' side, the atomized bondholder community will not be able to be part of such a process in its entirety. Therefore the debtor may wish to agree on a representation scheme with relevant bondholder associations, thus allowing for the highest possible degree of transparency and participation. In some debtor countries, these associations are already in existence from earlier debt restructurings; in others they could be set up under the guidance of associations such as EMTA, ICMA, or the IIF.[49] The Institute of International Finance has demonstrated its ability to co-ordinate private creditors in the difficult Greek restructuring in 2012. Should stakeholders consider a comprehensive, all-encompassing negotiating format inadequate, different classes of creditors may negotiate in different venues. In this case, the initial roundtable should find a procedure for creditor coordination across different creditor classes in order to ensure that no creditor class objects to the outcomes for other classes.

It is very important that debtor states carefully document their efforts to set up a comprehensive, inclusive, and transparent initial roundtable. If uncooperative creditors try to enforce their claims through litigation, the documentation might help the debtor to prove their good faith attempts to reach a consensual workout.

### (b) Mediation and Arbitration

The initial roundtable should agree on a framework for the debt workout. In principle, an informal negotiation format is easier to handle, less expensive, and most flexible. However, parties should agree from the outset on a more formal institutional and procedural framework for dispute settlement in the event of disagreements over the debt sustainability diagnosis, the required restructuring terms, or other political or economic issues that cannot be solved within a defined time period. Provided that the expediency of the process does not suffer disproportionately, it is also possible to start an informal process first and then to decide to move on to a more binding mechanism – either because no informal agreement could be reached and some form of cram-down turns out to be necessary or because the parties agree that even an informally reached consensus should be supported by a legally binding decision. The initial roundtable may set deadlines for each step.

Options for dispute resolution range from highly formal court-ordered arbitration to informal policy dialogue.[50] The debtor should have a clear preference when entering into dialogue with its creditors during an initial roundtable regarding institutional options and

---

[49]        Emerging Markets Traders Association: http://www.emta.org/template.aspx?id=32; International Capital Market Association: www.icmagroup.org; International Institute for Finance: https://www.iif.com/.
[50]        F. Orrego Vicuña, "Arbitration in a New International Alternative Dispute Resolution System" 18(2) *ICSID-News* (2001).

individuals whom it would prefer to have playing a role in the process. Creditors should organize promptly and decide on what is acceptable to them ahead of the initial roundtable.

Two options have particular potential for the smooth resolution of distressed debt:

- **Mediation.** Parties might attempt to reach a conciliatory solution by taking recourse to mediation based on independent expertise upon request of the sovereign. This can be implemented through a single mediator or a group of mediators, possibly chosen upon nomination by the proposed Debt Workout Institution.[51]

- **Arbitration.** Choosing arbitration requires selecting arbitrators, a procedural framework, and substantive rules. Each aspect needs to take into account potential challenges to the *legitimacy* of arbitral proceedings.[52]

  Arbitrators: Arbitrators would be selected in equal numbers by the parties. Arbitrators thus selected would identify an additional person in order to have an uneven number of arbitrators. Decisions would require a simple majority. In contrast to BIT-based arbitration, no restrictions would apply with regard to the selection of arbitrators. The parties would be free to select persons whom they trust.[53]

  Procedure: Arbitration could be based on internationally accepted standards for arbitration. Such standards might need to be modified in order to take into account the public character of sovereign debtors. The Principles provide guidance for that purpose. In particular, to the extent that the efficiency of proceedings is not compromised, such proceedings require a maximum of transparency and legitimacy. Hearings should in principle be public. All documents should in principle be publicly accessible.

  Substantive law: Arbitration should apply the law governing the debt instruments in question. However, this must not lead to legal fragmentation and defeat the purpose of a comprehensive mechanism. Therefore, arbitrators should give strong consideration to the Principles, in particular sustainability and good faith. This includes respect for the debtor state's responsibilities towards its people, for its ownership of its domestic policy, and for creditor equality within all categories of debt.

Debtor states, following outreach to market participants, may include in the terms of their debt instruments clauses that facilitate mediation and arbitral proceedings in case debt workout negotiations remain unsuccessful.

---

[51]     An example of a successful mediation in a fairly complicated debt situation is the agreement reached on Indonesia's external debt in 1969/1970. See A. Hoffert, "The 1970 Indonesian Debt Accord", Ruhr-Universität Bochum, Economics Department Discussion Paper No. 05-01 (2001); a short summary is provided in J. Kaiser, "Resolving Sovereign Debt Crises", *Friedrich Ebert Foundation Dialogue on Globalization* (2013), pp. 26-27 (Box 3).

[52]     For specific proposals, see A. von Bogdandy and I. Venzke, *In Whose Name?: A Public Law Theory of International Adjudication* (2014), pp. 156 et seq.

[53]     For a more detailed description of a debt arbitration process, see K. Raffer, "What's Good for the United States Must Be Good for the World. Advocating an International Chapter 9 Insolvency", in *From Cancún to Vienna. International Development in a New World*, Bruno Kreisky Forum for International Dialogue, Vienna (1993), pp. 64-74.

## 2.3 Claim Verification

**Current Practice**

*Claim verification:* In general, the debtor and its legal and financial advisers determine the validity of creditor claims. The current framework already provides for some opportunities for claim verification. The Paris Club normally starts its negotiations with a "verification of claims". This serves the harmonization of debt data from various sources in order to agree on restructuring terms. In the complex case of Iraq, where the debt stock was very heterogeneous and many trade credits poorly documented, an arbitration procedure was established, devoted entirely to claim verification.

*Claim legitimacy verification:* An individual loan may have been contracted in violation of recognized standards of responsible behaviour on the part of the creditor.[54] Current practice does not provide for a systematic review of claims for such violations. Nevertheless, in individual cases, debt has been cancelled for this reason. In 2007, Norway cancelled USD 80m in debt owed to it by five countries, establishing that it had extended loans primarily in order to support its ailing ship manufacturing industry, even though the loans were not beneficial for the development of the recipient states.

**Recommendations in line with the SDWP**

- Claims presented in due form should be presumed to be valid and legitimate.
- In case of doubt, claim verification increases the transparency of debt restructurings and reduces contestations of their legitimacy. The UNCTAD Principles on Promoting Responsible Lending and Borrowing along with the SDWP set out above provide a solid legal basis to consider the claims in question to be a legitimate part of the debt stock.
- Creditors and debtors should maintain accurate records of claims and transfers, including all relevant contracts and other documentation.
- A central verification procedure should be established before debt workouts. This process gives all stakeholders, including civil society and competing creditors the opportunity to question the validity of individual claims. This information should be freely available to the public.
- The debtor state may collect evidence about potential challenges against the validity or legitimacy of individual claims. After carefully scrutinizing evidence, it should set in action the claim verification procedure to remove invalid or illegitimate claims from the country's debt stock.
- Claim verification needs to be legitimate. Claims are declared invalid either by agreement of the parties, or by the decision of an impartial third-party reviewer, such as auditors, mediators, or arbitrators who possess the necessary qualification.

---

[54] See Principles 1 to 7, UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing.

## 2.4 Interim Financing and Cut-Off Date Concept

### Current Practice

The announcement of a restructuring and the imposition of a standstill usually have the consequence that the debtor state loses access to capital markets. It therefore needs to look for alternative sources of finance in order to pay for its current account deficit or trade credits until it regains access to capital markets, normally after restructuring is completed. The IMF through its various lending programs, along with other multilateral institutions, provide such interim financing (or "debtor-in-possession financing"). It is regularly conditional upon the implementation of an economic and social recovery program.[55] International Financial Institutions also require preferred creditor status.

In principle, the IMF only lends to states with a high probability of medium-term debt sustainability. Otherwise, debtor states need to restructure until they reach that point. Exceptions have been made in cases of systemic crises.[56] The IMF used to lend only to states not in default towards their private creditors. Otherwise, debtor states had to restructure before they could tap into the Fund's resources. Since 1989, the IMF has pursued a policy of lending into arrears, providing interim financing to states in default towards their private creditors if they make a good faith effort to obtain a restructuring.

### Recommendations in line with the SDWP

- *Cut-off date concept*. Interim financing should be exempt from comprehensive restructurings, provided that it serves the sustainability goal of debt workouts. The exemption should apply to debt incurred after a cut-off date, ideally the date on which the government decides to restructure.[57] The principle of good faith does not oppose cut-off dates. It allows for a different treatment of creditors for pertinent reasons. Interim financing is one of them. This does not only apply to interim financing provided by International Financial Institutions.
- *Sustainability*. The provision of interim finance is necessary for keeping the country afloat during restructuring. However, interim finance must not delay an unavoidable debt restructuring or lead to insufficient restructurings. Therefore, unlike liquidity injections,[58] interim financing should not be used for debt service, with the exception of short term trade credits, but for allowing the country a fresh start. The intermediate period covered by the new financing must be realistic and the volume generous enough not to further compromise debt sustainability and growth. This goal can sometimes be achieved by bonds with GDP-indexed interest rates.
- *Transparency*. The exemption of interim financing from restructurings should always be transparent. Creditors have a right to know and question the actions of debtor states. Impartial review might be necessary in the event of contestation.

---

[55]     See Section III.2.5.
[56]     IMF, Sovereign Debt Restructuring–Recent Developments and Implications for the Fund's Legal and Policy Framework, 26 April 2013, p. 19.
[57]     See Section III.1.2 above.
[58]     See Section III.1.2 above.

## 2.5 Economic and Social Recovery Program Design

### Current Practice

When debtor states decide to restructure, they usually need to participate in a structural adjustment program governed by the IMF as part of its lending activities. This is an explicit requirement for Paris Club restructurings[59] and a de facto requirement for restructurings of privately-held debt since such a program lends credibility to the debtor state's exchange offers.

Structural adjustment programs are a regular part of IMF lending conditionality, in accordance with Art. I(v) of the IMF's Articles of Agreement. Conditionality is based on the idea of ownership, according to which structural adjustment programs should be in the debtor state's best interest in order to ensure compliance.[60] Structural adjustment programs are set out in letters of intent of the debtor state addressed to the IMF, comprising memoranda of understanding detailing the projected measures. They are preceded by negotiations with the IMF. Only if the program is accepted by the IMF Executive Board will the Fund grant a loan. Payment of each tranche is preceded by an assessment of progress in adjustment and structural reform.[61] Hence, although structural adjustment programs are non-binding from a legal point of view, they effectively commit the debtor state, since financing from the IMF, and with that its reputation with other creditors, depends on program compliance.

In substance, structural adjustment programs stipulate macroeconomic benchmarks and structural reform measures. They build on assumptions from the DSA[62] and recommendations which were part of bilateral surveillance. Structural adjustment often touches upon sensitive issues of economic and social policy, such as privatizations and public service. It tends to follow the IMF's view of economic development.

The success of structural adjustment has been mixed. Certain elements of these programs have been criticized as not really taking into full consideration the economic conditions of debtor countries and have led to negative results, notably in case of the Asian financial crisis. They have often been based on unrealistic growth expectations,[63] not taking into consideration that expenditure cuts beyond a critical threshold might stall growth. The experience of Greece since 2010 has shown how deteriorating growth rates have obliterated debt reduction efforts and thus aggravated the debt problem.[64] This has caused avoidable economic and social hardship for the people of the debtor state.

One of the reasons for the limited success of structural adjustment might be that the problem of debtor moral hazard has been overstated. In reality, policymakers on the debtor side tend to avoid confrontations with their creditors as much as possible. Such confrontations can often bear a higher political risk than extracting further resources out of the country.

---

[59]     For exceptions see Section III.3.2 below.
[60]     Cf. Principle 3, IMF Guidelines on Conditionality (2002).
[61]     IMF, Guidelines on Conditionality (2002), No. 11. However, benchmarks for structural reform have been discontinued.
[62]     See Section III.1.2 above.
[63]     O. Blanchard and D. Leigh, "Growth Forecast Errors and Fiscal Multipliers", IMF Working Paper No. 13/1 (2013).
[64]     IMF, Greece 2013 Article IV Consultation (CR 13/154).

**Recommendations in line with the SDWP**

- *Ownership*. The principle of ownership as an aspect of legitimacy is meant to ensure that structural adjustment programs respect the sovereignty of the debtor state and its domestic decision-making processes. However, ownership has been difficult to secure. The voluntary nature of letters of intent alone does not ensure effective ownership. Ownership is best served if there is a direct link between structural reform proposals and growth. It is in everyone's interest for the borrower to attain a strong level of sustainable and inclusive growth. Moreover, where programs are developed, they should protect poor and vulnerable groups. In order to attain this goal, the debtor state should seek consensus about feasible expenditure cuts, for example, through open round-tables and other procedures allowed by the constitution. This should provide a guideline for the structural adjustment program and subsequent debt restructuring proposal.

- *Sustainability*. Structural adjustment has not always met its objective of enabling medium-term debt sustainability. Also, it has caused serious hardship for the people in the debtor state. In line with the principle of sustainability, debtor states need a comprehensive, holistic economic and social recovery program. Economic and social recovery should not be geared towards the short-term refinancing needs of the debtor state or the commercial interests of its creditors alone.

- *Human rights*. Sustainable economic and social recovery requires that debtor states, creditor states, and international organizations respect the human rights, especially the socio-economic rights, of people in the debtor state, in accordance with international legal obligations.

- *Non-discrimination*. Any measure provided for in an economic and social recovery program that directly affects the economic and social rights of the population concerned must be non-discriminatory and proportionate. Particular attention should be paid to the effects of such measures on marginalized groups.

- *Impartiality*. There is no impartial review of structural adjustment programs and their effects on the socio-economic rights of people in the debtor state. The impartiality principle creates the need for economic and social recovery programs to be based on impartial assessments of the debtor state's debt.[65] Also, individuals and groups need to have access to independent institutions, including international or supranational courts, tribunals, and committees, competent to review measures provided for in the economic and social recovery program to detect possible discriminatory or disproportionate effects.

- *Transparency:* The IMF has made significant progress on transparency over the past two decades. Its transparency policy follows clearly stated rules.[66] Nevertheless, increasing transparency with regard to negotiations on structural adjustment programs might improve their acceptance.

---

[65]     On the need for an impartial assessment, see Section III.4.2 below.
[66]     Cf. IMF, Review of the Fund's Transparency Policy, 14 May 2013.

41

# 3. Negotiations

## 3.1 Overview

### Current Practice

Currently, negotiations between sovereign debtors and their creditors proceed in a fragmented way intelligible only to a limited group of insiders and experts. Debtor states need to negotiate with five distinct groups of creditors. Three of these groups restructure as a result of an international, fully negotiated process: holders of external commercial bank loans, bilateral official credit, and, where applicable, multilateral credit. Domestic sovereign debt tends to be treated idiosyncratically, sometimes in line with foreign debt workouts, sometimes separately. The source legitimacy of negotiations is diffuse—grounded in a mix of contracts, market norms, and state practice. Wide variation in legal and economic leverage for the debtor and its creditors creates opportunities for differential treatment and abuse of good faith. Process legitimacy suffers from lack of transparency and inclusion, leading to accusations of bias. This continues notwithstanding the fact that some participants, such as the Paris Club, have made an effort in recent years to improve public understanding of their role, and others, such as the IMF, have made their work more accessible to the public.

### Recommendations in line with the SDWP

These observations corroborate the recommendation that a comprehensive negotiating format would be advantageous. It would end the practice of individual creditor groups dealing with the debtor in dispersed fora and would organize creditors in various asset classes into one single process.[67] Comprehensive negotiations would normally start in the debtor state's capital city. Alternatively, a venue can be chosen on the basis of convenience for creditors or for the facilitator/mediator/arbitrators. If negotiations take place in different fora for different creditors, comprehensiveness could be achieved by conducting negotiations simultaneously and ensuring that creditors in each forum do not object to the outcomes of negotiations in other fora.

## 3.2 Official Bilateral Debt

### Current Practice

The Paris Club typically negotiates with the debtor country after the state has agreed on an IMF loan and related structural adjustment program but before it has restructured debt to private creditors. As a result, by the time the debtor engages with the Paris Club, the scope for negotiation is limited. The IMF program supplies financing and conditionality, which forms the underlying economic assumptions for the workout. In at least two recent cases—Nigeria and Argentina—the Paris Club reached an agreement with sovereigns without insisting on a

---

[67]   See Section III.2.2 above.

disbursing IMF program. In these and several other cases, notably Ecuador, the debtor had reached a settlement with most of its private creditors before the Paris Club.

Debt workouts ("treatments") in the Paris Club cover medium-term export credits and development assistance. Debt with maturity under one year is excluded. New debt incurred after the country approached the Paris Club for the first time—the cut-off date[68]—is also excluded from treatment.

A Paris Club negotiation ends in "Agreed Minutes." This is not a binding legal document, and does not specify all the terms with precision. It must be implemented by individual creditors in bilateral government-to-government agreements. Notably the bilateral agreements may set different interest rates, consistent with the guidelines in the Agreed Minutes.

The Paris Club insists on "comparability of treatment" in its agreements with sovereign debtors. This is a device to reduce free-riding on taxpayer concessions. Combined with the IMF program, the Paris Club terms effectively set the scope and terms of the overall workout, albeit in a rather general and flexible way. Debtor states agree to seek debt restructuring terms comparable to those they obtained from the Paris Club from all its other private creditors and official bilateral creditors that are not part of the Paris Club. Comparability runs one way: the Paris Club itself does not consider itself to be bound in any way by private creditor concessions that precede a Paris Club agreement. Requests for "reverse comparability" have been consistently rejected. Nor does the Club provide the debtor with any hint of how it should enforce comparable treatment against third parties.

It is important to note that comparable treatment does not mean identical treatment. It is based on a methodology that is not made public. Moreover, the requirement of comparability does not cover all claims against the sovereign. Domestic and multilateral debts are excluded. In theory, the sanction for breaching the comparability undertaking is the dissolution of the Paris Club's agreement with the debtor. In practice, it has never happened – not least because it would not make much sense for Club members to insist on payments which they have previously renounced because they were considered unrecoverable.

Through much of its history, the Paris Club has been understood as a forum for negotiating debt problems. In reality, creditors set the terms, mostly in accordance with predefined standards. In the context of a more comprehensive process, which is being advocated here, the Club should continue to exist as the representation of an important asset class, if possible with the inclusion of the broader official creditor community.


## Recommendations in line with the SDWP

- *Sustainability*. The Paris Club's case-by-case approach ("Evian Terms") to individual cases is more efficient in reaching sustainable workouts than the earlier formulaic approach. Nevertheless, the case-by-case approach creates new challenges under the principles of transparency and good faith. Similarly-situated countries can be treated differently for reasons that are difficult to discern from the outside, which

---

[68]    See Section III.2.4 above.

leads constituents to call the process into question.

- *Transparency*. The Paris Club is presently more *transparent* than it was for most of its history. Nevertheless, transparency would be enhanced by disclosing restructuring methodology *ex ante* and publishing reasoned decisions *ex post*. This could marginally diminish the forum's capacity to deal with diverse debtor and creditor country circumstances in a flexible way. However, it would assure constituents that the outcomes of a workout are not arbitrary. It would also enable outside monitoring, potentially also improving process efficiency.

- *Good faith*. Although the Paris Club principle of comparability is designed to promote equal treatment and good faith, it is applied unilaterally and thus inequitably. The *good faith* character of Paris Club restructurings would benefit from more comprehensive workouts as explained above.

## 3.3 Multilateral Debt

### Current Practice

Multilateral debt restructurings, like the ones carried out in the frame of the HIPC initiative, did not involve substantial negotiations between multilateral creditors and their debtors, but rather followed a more standardized approach. The IMF and the World Bank first defined a debt sustainability level which constituted the basis of the whole process. In the next step, the Paris Club waived 90% of bilateral debts under its Cologne terms, with some of its members waiving the entire debt altogether. Applying the comparability of treatment clause, it urged other creditors, public and private, to provide equivalent relief. Subsequently, the IMF, the World Bank, and multilateral development banks waived as much of their claims as was necessary to reach debt sustainability. While the standard approach was to reduce the stock of multilateral debt, it seems that individual countries involved in specific crisis situations benefited from the larger frontloading effects of an extension of maturities and reduced interest rates. The Multilateral Debt Relief Initiative (MDRI) waived all concessional loans from the soft loan windows of four important multilateral institutions.

### Recommendations in line with the SDWP

- *Sustainability:* The experience of the MDRI demonstrates that, in specific cases, multilateral debt might need to be restructured or cancelled in order to reach long-term sustainability. This depends on the debt structure of the affected state. All stakeholders should regularly consider whether multinational creditors should participate in a workout. This does not necessarily mean that multilateral claims should be restructured under the same terms as bilateral claims. Interim financing granted after a defined cut-off date should usually be exempt.[69] Other multilateral financing may be related to anti-poverty programs and other specific programs that assist vulnerable groups or may be a priority action to boost growth. These programs should, wherever possible, be protected.

---

[69]     See Section III.4.3 below.

- *Good faith:* Restructuring multilateral debt under the conditions set out in the previous paragraph can enhance creditor equity. Multilateral creditors should participate in negotiations on equal terms.
- *Impartiality:* Given that multilateral institutions are regularly involved in debt workouts simultaneously as creditors and as providers of expertise, conflicts of interest might arise and need to be addressed. The creation of a Debt Workout Institution, as proposed in Part IV, could be an option for addressing this issue.

## 3.4 Foreign Bonds

### Current Practice

For some governments, particularly those with a small number of outstanding bonds, the creditor coordination challenge is limited, much less daunting than bank loan restructurings in former decades. Others governments with more outstanding and more widely dispersed bonds need to convince thousands of bondholders with very different interests, legal entitlements, and economic and regulatory constraints. There are several ways to ensure that debtors obtain adequate relief and minimise free-riding among creditors. Below we address collective action clauses (CACs), minimum participation thresholds, and exit consents, which have been important in restructuring foreign-law sovereign bonds. We then address domestic-law bonds separately.

Depending on the sovereign's bond contracts, the debtor may be able to use majority amendment CACs to bind dissenting creditors to the terms agreed by the majority. Three versions of majority amendment CACs exist. The most basic and prevalent version operates bond series by bond series. If a requisite majority (e.g., 2/3 or 3/4) of the series votes in favour of the restructuring, the remaining bonds are bound. However, any given series where a holdout creditor could buy a blocking minority can stay outside the restructuring and demand payment in full. In practice, majority amendment clauses have been used relatively rarely, even where the debtor had them in its debt. With the possible exception of foreign-law debt in the 2012 Greek debt restructuring, where more than half of the series that voted under CACs held out, traditional series-by-series collective action clauses have helped facilitate restructurings.

Besides euro area member states, a few other states have recently introduced two-tier aggregated majority amendment clauses; however, none has used them to date. Such clauses gives more power to the overall bondholder majority, stock-wide, and lower the threshold needed to secure the participation of any given series. Thus, for example, a restructuring that has secured the backing of 75% of the creditor body as a whole and a simple majority of each individual series can bind the lot. This reduces the scope for holdout behaviour, but does not eliminate it.

A single-tier aggregated voting mechanism was introduced by statute in Greece in 2012. It dispensed with per-series voting altogether, reducing or eliminating the risk of holdout behaviour. Thus if 75% of the stock voted in favour of the restructuring, the full bond stock is bound, even if an entire small series votes against. The International Capital Market

Association recently put forward a contractual model of a single-tier aggregation mechanism.[70] As a condition for using single-tier aggregation, the sovereign debtor must make an identical offer to all affected bondholders. This might raise issues of inter-creditor equity, since all affected creditors will be offered exactly the same instrument, even though they might incur significantly different economic losses—the presumption is that all creditors face the same high likelihood of imminent default. Where this is not the case, one might resort to single-series or two-tier aggregated votes, or "sub-aggregate" the outstanding bonds in single-tier votes, each one comprising only part of the outstanding bond issuances. But this would resurrect internal fragmentation, and with it the possibility that financially powerful actors could gain a blocking minority. The design and application of CACs always faces a difficult tradeoff between equality and effectiveness. Moreover, the inclusion of single-tier voting procedures in the terms of sovereign bonds remains voluntary and will only apply to future issuances. It might take up to a decade from the point where a debtor begins to include them in its terms until they become effective.

Like CACs, exit consents are a contractual majority voting mechanism. They do not change the financial terms of the old bonds, sometimes because they cannot secure the unanimous or high majority vote to do so. Instead, they change other bond terms to make them unattractive to potential holdouts in a restructuring. Thus, for example, a debtor state might ask bondholders that agree to participate in a debt exchange, when they "exit" the old bonds, to vote to remove submission to jurisdiction terms in their old bonds. Once a majority votes to amend the entire stock in this way, the old bonds become illiquid and lose value. Although the technique has been challenged in extreme cases—for example, when the non-participating bonds were stripped of substantially all value, rather than reduced in line with the participating bonds—it remains valid within a more constrained set of parameters under English law and New York law. Creditors tend to view exit consents as coercive and inequitable. As a result, the same contracting practices that have introduced series-by-series CACs have also removed the scope for the most robust exit consent tactics, such as those stripping status and jurisdiction provisions in the old bonds.

Before CACs were widely adopted, debtors used a combination of minimum participation thresholds and exit consents to sharpen the choice for voting bondholders. For example, a debtor might announce that it would not proceed with the restructuring unless a minimum of 90% of its bondholders voted in favour. With or without CACs, a bondholder facing a minimum participation threshold must contend with the possibility that the entire restructuring would fail without their vote—and the alternative of a prolonged default. Minimum participation thresholds, along with exit consents, have been credited with supporting multiple restructurings in recent years. Because they promote equal treatment among all affected bondholders, minimum participation thresholds are not generally viewed as coercive by private creditors. However, they do raise the risk of a restructuring failing and may prompt the debtor to offer more favourable terms that imply less relief.

---

[70]      See note 9 above.

**Recommendations in line with the SDWP**

*Sustainability:*

- Contractual creditor coordination techniques can promote sustainable debt workouts to the extent that they prevent creditor holdouts. Debtor states should include CACs in the terms of their bonds. Currently, CACs with single-tier voting appear to be the most effective solution, offering at the same time a high degree of creditor equality.
- However, the limitations of CACs might compromise swift and sustainable workouts. This creates risks for human rights, including socio-economic rights.

*Good Faith:*

- Inter-creditor equity is partial at best. Contractual clauses limit free-riding, promoting good faith and creditor equality. However, in the event they lead to the exclusion of one or several series of bonds from a restructuring, they can exacerbate inequality among creditors, raising concerns with debtor and creditor good faith.
- Paradoxically, single-series and two-tier aggregated CACs potentially create a greater disparity among creditors than either contracts with no majority voting provisions at all or contracts with single-tier aggregated CACs. This is because only bondholders with the capacity to buy blocking positions in a series can hold out and secure preferential treatment. This creates opportunities for abuse of good faith. By contrast, where any bondholder can hold out, all creditors have the same opportunity to free-ride. Where all bondholders are bound by a single aggregated vote, all obtain the same restructuring outcome.
- Similarly, exit consents that go beyond equalizing the treatment of participating and non-participating creditors contribute to disparities among similarly situated creditors, raising further concerns with respect to good faith.
- Creditors buying debt with the purpose of extracting a preferential treatment in the restructuring act abusively. Creditors should therefore not attempt to buy distressed debt with the intention of withholding from the negotiation process.[71]
- Following outreach to market participants, Debtor states should routinely include clauses that clarify that *pari passu* does not give the right to ratable payments.

*Legitimacy:*

- Bond restructurings do not give voice to all stakeholders. The assumption is that bond restructurings are only a matter to be dealt with between government and creditors. They therefore leave much power in the hands of private actors, in particular large ones. However, in many cases the welfare of the people in the debtor state, including social entitlements, heavily depend on the bond restructuring, which is intrinsically related to the economic and social recovery program. Negotiating formats which do not take this into account compromise the acceptance of a debt

---

[71]     The issue of abusive creditors is explored below in further detail. See Section III.4.5.

workout and related economic and social recovery programs and compromise the effectiveness of the workout. Comprehensive negotiation formats are therefore preferable.

*Transparency:*

- Sovereign bonded debt to private creditors is restructured for the most part without negotiation, following informal outreach to disparate groups of bondholders, sometime giving rise to a situation of "take it or leave it." Most of the process is invisible to the public.

## 3.5 Bank Loans

### Current Practice

Since the late 1970s, commercial bank loans to sovereigns have been renegotiated in Bank Advisory Committees (BACs, or the "London Club" process). A lead bank, usually with the largest exposure to the sovereign, would coordinate the creditors. Subcommittees addressed particular issues, such as data and surveillance, relations with multilateral creditors, new financing, and special debt categories (e.g., trade credits). The BAC would hire legal and other advisors, sometimes—but not always—paid by the sovereign. It would reach an umbrella agreement with the debtor government, and endeavour to convince all other bank creditors to sign on, including those that were not members of the BAC.

However, BACs had no separate legal personality or capacity to bind their members, much less other groups of creditors. There is no voting mechanism to bind all bank creditors to the outcome agreed by the debtor and the majority of its creditors. Thus, even when bank lending dominated foreign sovereign finance, the London Club process was riddled with free-rider problems. Negotiation and coordination could take years. Participants reported that many smaller and some large banks defected. When bank debt began to be traded in the late 1980s and early 1990s, defecting creditors were able to sell their claims to speculative investors, including those inclined to hold out and sue for full repayment. However, syndicated bank loan contracts typically contained clauses that required litigating syndicate banks to share the proceeds with the rest.

Until the late 1980s, London Club restructurings did not take debt reduction into consideration, only refinancing or maturity extension. The Brady Plan, announced in 1989, first broached the topic of principal reduction. Special regulatory and accounting concessions in creditors' countries created incentives for banks to write off the debt.

The London Club process has been on the wane since the 1990s, when tradable bonds re-emerged as the dominant means of private financing to sovereigns. Although banks are often the dominant holders of sovereign bonds, they tend to participate in bond exchanges along with other bondholders. In the 2012 Greek private sector involvement, the Institute of International Finance represented the banking industry. The current relevance of the London Club is primarily that of a model for workout institutions, especially creditor committees, which has yet to be adapted to a large scale.

In negotiations with banks, regulatory issues might come up. Banks that hold distressed sovereign loans or bonds may be particularly vulnerable to runs, although they are frequently held alive by their respective central banks' liquidity windows. When they are thinly capitalized, a restructuring can cause insolvency or require capital injections or even a public bail-out. On the other hand, banks also tend to be susceptible to regulatory incentives and pressure from their supervisory authorities, which might ensure their persuasion.

## Recommendations in line with the SDWP

### Sustainability and Good Faith:

- Creditor committees following the London Club model are a coordination device that can help limit free-rider problems. In that sense, they can contribute to the sustainability of the process, and reduce the opportunity for unequal treatment, provided that they represent all creditors of one class.
- On the other hand, because BAC-style committees only coordinate discrete subsets of creditors and do so by diminishing the scope for outside monitoring, their contribution to sustainability and good faith may be very limited in all but the simplest cases.

### Legitimacy:

- BAC-style committees also come at a cost to legitimacy. Even in its heyday, the London Club process was neither inclusive nor transparent. BACs generally accounted for 25-35% of the government's bank creditors.[72] Other creditors, including smaller banks, and stakeholders had no access to the process and limited insight into it.
- Ideally, the composition of BAC-style committees should give equal weight to adequate creditor representation, thus enhancing legitimacy, and the need to keep their size manageable.

### Transparency:

- To the extent possible, creditor committees should ensure transparency. This might require specific standards, which are yet to be developed.

## 3.6 Domestic Debt and Other Credits

### Current Practice

*Domestic loans and bonds.*[73] In addition to its distinct advantage in workouts, i.e., the ability of the debtor state to change the terms of debt instruments by legislation or other domestic economic and monetary measures, domestic sovereign debt also presents special challenges. Domestic debt (especially debt sold at auctions) generally lacks elaborate contract terms. As

---

[72]       Das et al. (note 5), citing Reed 1987.
[73]       For a definition of domestic debt, see note 12 above.

a result, creditor rights, inter-creditor rights and duties, and amendment procedures are not specified, creating considerable uncertainty about the workout and recovery values. Creditors might sue before domestic and international courts and tribunals.[74]

Domestic holders of sovereign bonds (foreign or domestic) tend to behave unlike foreign holders. Pension funds, insurance firms, and banks might be subject to legal mandates or at least be more susceptible to suasion by the sovereign debtor government. Where the domestic creditors are banks or other effectively insured institutions, their concessions do not solve the debt problem—the government may end up using the freed-up funds to recapitalize the domestic financial system.

Central bank holdings of sovereign debt present a special challenge. Sovereign bonds are used in monetary policy operations and as collateral for the lender of last resort, by definition exposing central banks to risk of loss from default and restructuring. While central banks are of primordial importance for the debtor state's economy, the bankruptcy of Lehman Brothers demonstrated their capacity to absorb losses.

*Trade credits. Short-term trade credits are usually exempt from workouts in order to keep the debtor state's economy operational.* In the case of Iraq after 2003, poor and heterogeneous documentation and limited international experience with restructuring trade credits created room for innovations, including the aforementioned arbitration procedure for claim verification. The Security Council supported this in a binding resolution.[75]


## Recommendations in line with the SDWP

### *Domestic Debt*

- In principle, domestic debt should be included in debt workouts in order to:
  - achieve a *sustainable* debt burden;
  - ensure inter-creditor equality in line with the principle of *good faith*; and
  - make debt workouts comprehensive and therefore more *legitimate*. In this respect, the exemption of central bank holdings faces particular challenges. Policy design should account for the unavoidable risks ensuing from their monetary policy operations up front. It is inadvisable for central banks or any other creditors to pre-commit to particular positions in advance of a hypothetical restructuring. Any such pre-commitment distorts incentives and is unlikely to be credible.

- However, when deciding whether to include domestic debt in workouts, stakeholders should consider the following:
  - the effects of domestic debt restructurings on the economy must not compromise the goal of *sustainability*, especially by endangering systemically important institutions;
  - the inclusion of domestic debt creates opportunities for unjustified discrimination among different creditor groups and other claimants thus

---

74    See Section III.4.5 below.
75    UN Security Council Resolution 1483 (2003), 22 May 2003, para. 15.

> contravening *good faith*;
> ○ the *legitimacy* of unilateral actions to restructure domestic debt might face challenges, both on a political level and before courts.

### Other Credits

- The principle of *legitimacy* supports comprehensive restructurings. *Good faith* requires in principle that all creditors receive equal treatment. However, the exclusion of short-term trade creditors is justified to the extent that it enhances the *sustainability* of the debtor state's financial situation by leaving its trade relations unaffected.

### All Domestic Debt

- *Transparency* on the part of the debtor is critical at this stage, in respect of both data disclosure of its financial status and disclosure of its proposed treatment of different creditor groups. Creditors can condition their participation in restructuring on such disclosure. Nevertheless, the contractual nature of the bond restructuring process, as well as securities law constraints, by definition limit process transparency. Debtor states should seek to make the success of their exchange offers and the restructuring process transparent.

- Should creditors have reason to believe that the debtor state falls short on its disclosure obligations, an *impartial* review process might be appropriate, whether in the form of an audit or arbitral proceedings.

51

# 4. Restructuring Terms and Post-Restructuring Issues

## 4.1 Overview

As noted in the preceding section, sovereign debt workouts are currently disjointed and loosely-sequenced enterprises. As a result, there is no "magic moment" when all the creditors have come on board and the debtor gets a fresh start. There is no publicly visible moment of closure for the debtor or the creditors. Each forum decides separately on the restructuring and its terms. It also determines the scope of debt covered and defines cut-off dates. But this does not mean that the workout is over. Holdout litigation might threaten its success.

## 4.2 Determination of Restructuring Terms

### Current Practice

In theory, the terms of a sovereign bond restructuring are determined by the mix of IMF program and Paris Club comparability requirements, as well as interim financing, if any, from other multilateral and bilateral sources. Unlike bank loan restructuring, bond restructuring does not generally contemplate new money, but rather aspires to achieve debt stock and service reduction and restore the debtor's access to the capital markets in the future. Within these parameters, outcomes vary case by case, depending to a critical extent on the number and composition of bondholders and on the bond contracts involved, as well as the geopolitical importance of debtor countries.

In most but not all cases, restructuring parameters are determined by the debtor state's IMF program. The program indicates, first, the external financing needs for the coming three to five years, and, second, the amount of debt relief required to return the debtor state to debt sustainability. The figures derive from the IMF's DSA.[76] They are based on expectations of economic performance, taking into account domestic policy changes (macroeconomic adjustment and structural reform) and expected external financing. Both can vary widely. For example, a poorly-performing country cut off from new private financing may not be advised to restructure if it gets large-scale transfers from other governments; on the other hand, a country that undertakes painful reforms but does not receive additional official support may have to ask its private creditors for substantial debt relief.

Until the mid-1990s, the Paris Club generally treated only the debt coming due during the IMF program period, using pre-set formulae. It began granting "stock" relief to low-income countries in 1994 under the "Naples Terms." In these operations as well as in standardized terms established for a group of debtor states, static debt indicators have been used in order to identify the need for debt relief and its extent. For example, the Paris Club's debt reduction ratios under its various frameworks for low-income countries amount to 33%, 50%,

---

[76]   See Section III.1.2 above.

or 67% of eligible debt.[77] The assumption behind these fixed ratios is that identical ratios would be sufficient for similarly situated over-indebted states. However, due to ever-insufficient relief some debtor states ended in serial restructurings.

When the G7 acknowledged the need for the reduction of multilateral debt, it established debt sustainability targets defined as debt/export earnings or debt/revenue ratios. This brought sustainability targets in line with the individual debtor state's situation. Nevertheless, in the interest of equal treatment and predictability, creditors continued applying fixed sustainability thresholds in the framework of the HIPC initiative, established in 1996. As thresholds turned out to be too high, HIPC 1996 had to be reformed in 1999 and 2002. The MDRI established in 2005 returned to a debt reduction ratio—although an extremely ambitious one, namely, the almost complete cancellation of all debt owed to four important multilateral creditors.[78]

Beginning in 2003, the Paris Club opened the possibility of stock relief for middle-income countries. With the implementation of its Evian Terms in 2004, the Paris Club sacrificed equal treatment for flexibility.[79] Briefly put, the Evian Terms allow for Club members to, once they have invoked this particular framework, treat the debtor however they like. So far, the Evian Terms have allowed speedy and significant debt relief in some cases. Some therefore consider it very successful. Others criticize the lack of consistency.

The IMF and World Bank's Debt Sustainability Framework (DSF)[80] has been designed to assess the borrowing needs of low-income countries. While traditional debt sustainability analyses compared common debt indicators with some benchmarks defined by the Fund itself, two important qualitative elements have been added in the revisions of the framework:

- The calculation of stress scenarios has become far more sophisticated, and their results form part of the final decision.[81] Although some elements of stress tests could be more transparent, the assumptions underlying each of the scenarios as well as the baseline have been made transparent.

- Some threats to debt sustainability, such as political uncertainty or the likelihood of natural disasters, are being considered and assessed in heat maps. While they are not fully transparent, this method constitutes a huge step forward in the Fund's methodology.

On the whole, sustainability has been recognized as a goal for debt workouts. Nevertheless, restructuring terms still deliver unsustainable results that bring the debtor back for more relief in just a few short years. This detracts from efficiency.

[77] Toronto, London, and Naples Terms, respectively. Some of them are not operational any more. See www.clubdeparis.org.
[78] IDA, PRGF, AdDF, and FSO, belonging to the World Bank, the IMF, the African Development Bank, and the Inter-American Development Bank, respectively.
[79] http://www.clubdeparis.org/sections/types-traitement/reechelonnement/approche-d-evian. Evian Terms were defined ahead of the Paris Club's dealing with the huge and complex case of Iraq's post-Saddam debt, which would have escaped any of its existing frameworks.
[80] For an overview of the IMF/WB scheme for low income countries, see IMF, *The Joint World Bank/IMF Debt Sustainability Framework for Low Income Countries. A Factsheet*, 18 March 2014, https://www.imf.org/external/np/exr/facts/jdsf.htm. For Market Access Countries, see IMF, *Modernizing the Framework for Fiscal Policy and Public Debt Sustainability Analysis*, 5 August 2011.
[81] By declaring the sovereign to be at "low," "moderate," or "high" risk of debt distress.

53

**Recommendations in line with the SDWP**

- *Debt Sustainability as an Objective*

  o Restructuring terms need to lead to debt sustainability. This requires a financial situation of the debtor state that allows it, with high probability, to roll over or reduce its debt in the foreseeable future without a major correction in the balance of income and expenditure.[82] Consecutive restructurings should be avoided.

  o As a holistic concept, sustainability requires going beyond merely economic considerations in debt restructurings. Respect for human rights, particularly socio-economic rights, and political risks need to be taken into consideration.

- *Restructuring Terms for Achieving Debt Sustainability*

  o Restructuring terms should be tailored to the specific situation of the debtor country, as well as to the potential effects of the restructuring on financial markets and other states. Although some degree of standardization might be unavoidable, it should only provide rough guidance.

  o Stakeholders should refrain from establishing any predefined, inflexible quantitative benchmarks, which rigorously bind the decision-making body. Over-reliance on econometric data would be ill-advised. It tends to suffer from historical biases, as in the case of DSF stress tests.

  o The restructuring terms might provide for certain differentiations, such as the exemption of post-cut-off-date debt, different treatments of concessional and non-concessional debt, preferred status for debt incurred to finance disaster relief, or benefits to creditors who commit to provide new financing. In the end, this may not be very different from the "preferred creditor" arrangements common for some International Financial Institutions. The difference is that it would apply to all creditors contributing to interim financing.

- *Impartial assessment*. Experience with delayed debt relief underlines the need for an impartial assessment providing debt and economic information on the debtor country as a basis for restructuring terms, guided by the principle of sustainability. The role of assessments should be that of rebuttable presumptions about the required debt relief, rather than strictly binding criteria. The indicators used for such assessment should meet the same requirements as indicators used for the decision to restructure.[83] Either the debtor state or, if available, the DWI would be able to suggest an institution that could undertake such impartial assessments.

---

[82]     Cf. IMF, "Assessing Sustainability" (2002), p. 5; IMF and IDA, "Debt Sustainability in Low-Income Countries—Proposal for an Operational Framework and Policy Implications" (2004), p. 8; IMF, "Modernizing the Framework for Fiscal Policy and Public Debt Sustainability Analysis" (2011), p. 6.

[83]     See Section III.1.2 above.

- *Legitimacy and good faith.* It is in the interest of the debtor to maximize participation; however, the simplest way to reach this goal might be by treating different creditor groups differently, raising concerns regarding good faith and legitimacy.

- *Transparency.* To avoid conflicts arising from unequal treatment, data transparency and restructuring terms based on transparent and consistent criteria are essential. The DSF of the IMF provides important insights as it includes stress tests and political risks, although its transparency could be improved and it is tailored to low-income countries. Also, it continues to reflect a creditor's perspective. Comprehensive restructuring terms, including the legal and financial terms of all successor agreements, could be made public by the debtor, for example, on the finance ministry website.

## 4.3 Concluding Debt Workouts

### Current Practice

There is a large variation in the duration of debt workouts. Some debt workouts extend for over a decade, with creditor groups coming on board piecemeal, and multiple rounds of restructuring blurring together in a protracted crisis spell.[84] This includes the debt relief initiatives in heavily indebted poor countries, where staged debt reduction mounted successive rounds of policy conditionality, delaying relief by years or even decades. In other cases, however, debt workouts take only months to conclude. This is particularly true for pre-emptive restructurings which occur prior to a payment default. In the full sample of 1978-2010 debt crises, pre-emptive restructurings took only one year to conclude, while post-default restructurings took five years.[85]

Delays can occur due to coordination problems on the debtor side or on the creditor side. Moreover, both the sovereign and creditors can have an incentive to delay a restructuring, if the country has not yet recovered and default risk remains elevated.[86]

Among creditor coordination problems, holdout strategies and creditor litigation have become increasingly relevant, given recent developments in Argentina and beyond. Litigation can seriously disrupt a restructuring process, even many years after it was understood to be concluded. In theory and in practice, holdout creditors can chase the debtor's assets and make its life difficult for an extended time and at great cost to its citizens.

The absence of a template for concluding a sovereign debt workout has had several negative consequences:

- It creates uncertainty, undermining economic recovery and thus debt *sustainability*.

---

[84]     See C. Reinhart and C. Trebesch, "A Distant Mirror of Debt, Default and Relief", NBER Working Paper No. 20577 (2014).
[85]     See T. Asonuma and C. Trebesch, "Sovereign Debt Restructurings: Preemptive or Post-Default", forthcoming IMF Working Paper (2015).
[86]     See R. Bi, "'Beneficial' Delays in Debt Restructuring Negotiations", IMF Working Paper No. 08/38 (2008).

55

- The absence of a comprehensive restructuring agreement that has the direct or indirect consent of all the relevant constituents opens the outcome to *legitimacy* challenges.
- Inasmuch as the overall debt restructuring parameters are rarely certain or intelligible from the outside, lack of closure also contributes to lack of transparency. Implementation of debt restructuring is impossible to monitor if it is never concluded. The piecemeal and sequenced nature of debt restructuring is inequitable for the creditors and for the citizens of debtor countries. It creates constant opportunities for burden-shifting and abuse of *good faith*.

## Recommendations in line with the SDWP

### *Procedure for the Conclusion of Workouts*

A clear procedure to mark the conclusion of the debt restructuring process as a whole, rather than any individual sub-component, would go a long way to remedying the identified shortcomings and enhancing the legitimacy of the process and outcome.

- The procedure for conclusion should be determined at the initial roundtable.
- The procedure could define a deadline by which negotiations with all groups of creditors need to be concluded.
- Voting should require a supermajority of creditors (e.g., 75% of all outstanding debt), without prejudice to applicable contractual or legislative provisions.
- If the deadline is missed, parties should seek a solution through mediation or arbitration within a defined period of time. The timeline should be tailored to the complexity of the case.
- The procedure should ideally provide for public approval of the restructuring terms within the debtor country within a defined period of time, whether through *ex ante* legislative authorization of a negotiating mandate, *ex post* ratification, or other publicly accountable means. This would contribute to debt workout legitimacy.
- Relevant creditor and other stakeholder approvals should be publicly disclosed. Any constituents objecting to the outcome would be required to do so within a defined period of time (for example, three months). If no objection is raised within this period, courts may take it as tacit consent, provided that the applicable law allows such conclusion.
- The procedure should provide for an act that marks the successful conclusion of the workout. This would send a signal to the market. Also, it should encourage stakeholders to make the result binding through the execution of contracts or any other legal means, including legislation.
- After implementation of the restructuring agreement, the debtor state resumes payments.

### *Voting*

- Negotiations conclude with a vote on the proposed restructuring agreement. Approval requires the consent of the debtor state and a supermajority of creditors (e.g., 75% of all outstanding debt), without prejudice to applicable contractual or

legislative provisions.

- The exercise of voting rights needs to respect good faith. No party should reject debt workouts for reasons which it could have articulated during negotiations but failed to do so.
- Debtor states should refrain from exercising voting rights if they own debt instruments issued by themselves, either directly, or through intermediaries controlled by them.
- Based on the approved restructuring, old debt instruments are exchanged for new debt instruments according to applicable contractual or legislative provisions.

### Mediation and Arbitration

- A mediator suggests a solution to the parties, which the debtor and a supermajority of creditors (e.g., 75% of all outstanding debt) accept, being directly binding upon the parties pursuant to specific contractual clauses on mediation, or based on which old debt instruments are exchanged for new instruments according to applicable contractual or legislative provisions concerning restructurings.
- An arbitration panel issues its final award, which is directly binding upon the parties pursuant to specific contractual clauses on arbitration, or based on which old debt instruments are exchanged for new instruments according to applicable contractual or legislative provisions concerning restructurings.

### Information and Documentation

- The transparency principle requires that, promptly upon completion of the restructuring, the debtor state file with the DWI, or an alternative public repository in the absence of a DWI, a complete record of the financial and legal terms of the restructuring, a reasoned explanation of the treatment accorded to all creditor groups, a description of the economic reform program undertaken in conjunction with the restructuring, and the economic, financial, and other assumptions supporting the restructuring.
- Any other stakeholders, including but not limited to creditors, civil society groups, and international organizations, may, if they wish, file with the DWI or an alternative repository, additional statements and documentation concerning the restructuring.
- This information should be publicly available and searchable in the official language(s) of the debtor state and in English.

## 4.4 Holdout Litigation and Stay of Enforcement

### Current Practice

Workouts can be disrupted by holdout litigation both before and after the conclusion of negotiations. Where the restructuring process comports with the principles for debt restructuring, incentives to disrupt the restructuring should be minimal. Nevertheless, in the absence of bankruptcy discharge and comprehensive enforcement, opportunities for disruption would remain.

For example, creditors that refuse to go along with the majority, and are not bound by CACs or similar mechanisms, can free-ride on participating creditors by interfering with the payments due to them on restructured debt. Where courts grant expansive injunctions to support the contractual claims of holdouts, a country might be effectively cut off from external financial dealings and suffer another economic crisis.

Going forward, creditors who might otherwise agree to reduce their claims in exchange for the certainty of receiving lower amounts face the prospect of never receiving such lower amounts, which would be blocked by holdouts. Moreover, if holdouts are able to recover disproportionate amounts, more creditors have incentives to hold out, which would stall restructurings. Holdout litigation can threaten payment and clearing infrastructure, and a wide range of financial intermediaries. Damage to third parties is likely to reduce the willingness of service providers to deal with distressed sovereigns, which would complicate crisis resolution considerably.

Holdout litigation seems to be on the rise rather than declining.[87] This should not come as a surprise given the increasing significance of bonded debt held by dispersed creditors. Courts have scarcely recognized a stay on litigation and enforcement for the benefit of a debtor state. This contrasts with the fact that a stay on enforcement is enshrined in practically all domestic insolvency laws. Hence, one might argue that it constitutes a general principle of law in relation to insolvency issues.[88] Unaffected by such considerations, a series of conflicts among jurisdictions, including the United States, the United Kingdom, and the European Union, threatens to undermine the predictability of both restructuring and enforcement. Conflicting judicial and administrative orders and court orders directed against financial institutions caught in the crosshairs of holdout litigation can contribute to financial instability. On the other hand, courts have refrained from enforcement because of concerns related to foreign sovereign immunities.[89]

## Recommendations in line with the SDWP

### Stay on Litigation and Enforcement

- *Good faith* enables a stay on litigation and enforcement during the restructuring once a defaulting debtor state has decided to restructure and stays its debt service.[90] The stay begins as soon as the decision to restructure is announced. The stay ceases to apply once the restructuring has been completed. In case of uncooperative, bad faith behaviour on the part of the debtor state, there may be reason to lift the stay.
- In the interest of *sustainability* and inter-creditor equity, creditors should refrain from bringing lawsuits, seizing property, interrupting the financial flows to or from the sovereign debtor, and entering into any arrangements with the debtor that would give any creditor or group of creditors a preference over the others, for the duration

---

[87]  J. Schumacher, H. Enderlein, and C. Trebesch, "Sovereign Defaults in Courts", SSRN (2014), http://ssrn.com/abstract=2189997.
[88]  M. Goldmann, "Responsible Sovereign Lending and Borrowing: the View from Domestic Jurisdictions" (2012), http://www.unctad.info/upload/Debt%20Portal/RSLB_MGoldmann_02-2012.pdf.
[89]  Corte di Cassazione, Sezione Unite Civile, n. 11225, 27 May 2005, see 88 *Rivista di diritto internazionale* (2005) 856; similarly, Landgericht Konstanz, Case 2 O 132/13 B, 19 November 2014, The issue is currently pending before the European Court of Justice, case C-226/13 et al. (*Fahnenbrock et al. v. Hellenic Republic*).
[90]  Cf. IMF (note 27).

of the restructuring process.

- Decisions on a stay and its removal should be made by *impartial institutions*, such as competent courts. At present, there is no central institution for the determination of a stay. It might be advisable to charge one institution with this task and to give legal effect to its decisions by means of contractual clauses, legislation, or treaty.

**Holdout litigation.**

- *Debt sustainability* requires that decision-makers not grant uncooperative creditors full remedies where this would violate the economic and social rights of citizens in the debtor state. Also, free-riding distorts restructuring incentives in the future.

- *Good faith as a defence.* If a workout was generally conducted in accordance with the SDWP, good faith requires that courts refrain from granting a minority of uncooperative creditors full contractual remedies at the expense of the vast majority of creditors who accept the restructuring. Consequently, uncooperative creditors who are not legally bound by the restructuring may only sue for, or enforce, a fraction of their claims, which affords them comparable treatment. When determining whether creditors are uncooperative, courts should take into account the following considerations:

  o Creditors that purchase debt or sue debtor states for the purpose of extracting a preferential treatment are uncooperative ("abusive creditors").[91] In establishing whether a creditor intends to extract a preferential treatment, courts or other competent institutions should take into account:

    ▪ whether the creditor has made good faith efforts to negotiate a debt workout in line with the SDWP;
    ▪ whether other creditors or multilateral institutions like the DWI have made a call for a voluntary debt moratorium before the purchase of the debt at issue or the filing of the suit;
    ▪ the difference between the nominal and market price at the time of the acquisition of the debt;
    ▪ the time of the acquisition;
    ▪ the volume acquired, especially whether the creditor acquired a blocking minority under the applicable collective action clause.

    In no case should the provision of legitimate liquidity support or interim financing in line with the SDWP be considered abusive.

  o Creditors who had the opportunity but refused to actively participate in good faith negotiations conducted in accordance with these principles are uncooperative.

- *Prevent asset grabbing.* In order to ensure good faith and equitable treatment of all stakeholders, the debtor's assets outside its borders should be immunized against seizure to satisfy claims of abusive creditors. Service providers and institutions engaged in clearing, settlement, and payment processing with respect to restructured debt should be absolutely insulated from creditor enforcement and related actions throughout the length of the payment chain. Where necessary, legislative

---

91      Cf. Principle 7 of the UNCTAD Principles on Promoting Responsible Sovereign Lending and Borrowing.

amendments should ensure the consistent application of sovereign immunities against enforcement. In the US context, such legislation would prevent injunctions that affect assets immune from attachment.

- *Preventive contract clauses*. Debtor states, following outreach to market participants, may include in the terms of their debt instruments the possibility of a standstill of payments and enforcement in case of a debt crisis, as long as good faith negotiations continue. An example is the ISDA 2014 Resolution Stay Protocol. It provides for the contractual recognition of cross-border resolution regimes for systemically important financial institutions.

- *Preventive legislation*. States, especially the main jurisdictions which host the issuance of sovereign bonds or whose law is governing other sovereign debt instruments, should consider adopting legislation that bars litigation by uncooperative creditors to the extent that their claims exceed what they would have received had they participated in a workout.[92] Such legislation should protect the outcomes of negotiated debt workouts respecting good faith. Alternatively, states may choose to adopt a multilateral treaty.

- *List of uncooperative creditors*. To deter holdout litigation, states or international organizations may consider the introduction of a public list of uncooperative creditors and their parent companies. The list would have to be managed by an impartial institution and according to transparent criteria with full respect for due process rights. Investors or states may commit to refrain from engaging in business with listed uncooperative creditors.

- *Disclaimer*. These recommendations are without prejudice to the exceptions applicable to the provision of interim finance or in case of serious risks for systemic stability.

---

[92]     Recent example of such legislation includes the UK Debt Relief (Developing Countries) Act 2010.

# IV. IMPLEMENTATION

## Reforming the Present System

This Guide has amply documented the shortcomings of current debt workouts from the perspective of the Sovereign Debt Workout Principles that have been identified in Part II. It has also suggested recommendations for debtors, creditors, and other stakeholders to improve sovereign debt workouts in line with such Principles. The gradual adoption and implementation of the Principles and recommendations by the stakeholders and institutions involved in debt restructurings should ultimately mitigate the key problems of fragmentation, lack of fairness, and inefficiency, which impair current restructuring practice. The Sovereign Debt Workout Principles and the recommendations are not designed to reform the current system in an abrupt fashion; rather, they aim to provide the basis for a gradual reconciliation of practices that have been identified as disruptive, inefficient, or unfair.

## An Incremental Approach

The implementation of the suggestions made in this document on the basis of the Sovereign Debt Workout Principles builds on other instruments, with the shared goal of making sovereign debt governance more comprehensive, fair, and efficient. These additional instruments include the Monterrey Consensus, the Financing for Development process, and the Principles on Promoting Responsible Sovereign Lending and Borrowing. Stakeholders have the opportunity to use these instruments as guides on their journey through the complexity of a sovereign debt workout. In doing so, they will set a precedent that will lead to an incremental recognition of the Principles.

Domestic and international courts and tribunals may also use the SDWP and the recommendations when called upon to decide cases related to sovereign debt restructurings. This might be especially valuable when the resolution of a case leads them into legally uncharted territory. Reference to the SDWP and the recommendations may reinforce the legitimacy of their decisions, particularly in politically sensitive cases that courts, but especially private dispute settlement bodies, might feel uncomfortable to resolve on their own.

Many of the recommendations set out in the Guide can be implemented by progress in contractual terms. The potential for innovation comprises clauses enabling single-limb majority vote restructurings, standstill during workouts, and mediation or arbitration. In addition, legislators may choose to deny recognition to claims by uncooperative creditors, provided that the workout respected the Principles.

States and international institutions, fora, and conferences dealing with sovereign debt may endorse the SDWP and the recommendations contained in the Roadmap and this Guide. This would enhance the legal status of the SDWP and also encourage the observation of the SDWP and the recommendations in practice.

## Towards a Debt Workout Institution

The Guide has been designed to also contain the elements that could be used to set up a more ambitious institutional solution facilitating debt workouts at the international level, which would bolster the incremental approach advocated here. States and international organizations could therefore consider the establishment of a Debt Workout Institution (DWI) in line with the Sovereign Debt Workout Principles. The mandate, institutional framework, and legal basis of such an institution deserve careful consideration.

The mandate of any Debt Workout Institution may range from very informal, technical tasks to more formal, binding measures. The assignment of tasks must not compromise the impartiality of the DWI. Possible tasks include the following:

- Technical Support. As an impartial body, the DWI would not act as advocate of the debtor state, but would rather lend its support to the debtor, which is usually in charge of organizing the restructuring. For this purpose, the Debt Workout Institution could establish an inventory of best practices, rules, and regulations on debt sustainability and for creditor aggregation. It should also host a public repository for the complete records of past workouts.

- Facilitation of initial roundtables and negotiations. The DWI would advise the government on the organization of an initial roundtable and negotiations, which meet the requirements of good faith, transparency, and legitimacy.

- Commissioning of debt sustainability analyses, or support for the search for expertise in this respect.

- Assistance in the establishment and implementation of a procedure for the conclusion of debt workouts. For example, the DWI could publicly determine the successful conclusion of a restructuring.

- Mediation for conciliatory workouts, or debt arbitration if more informal mechanisms have not led to a consensual restructuring.[93] Mediation and arbitration could address issues such as the examination of restructuring terms proposed by the debtor state, debt sustainability assessments, and economic and social recovery programs.

- Maintaining a list of abusive creditors and their parent companies, and possibly hosting a mechanism ensuring due process and an opportunity of review for those listed.

Regarding the **institutional framework**, a Debt Workout Institution would need only a very small permanent staff. In case of a debt crisis, it could lead the selection of experts, facilitators, mediators, and arbitrators in line with pre-agreed criteria. The selection process should be transparent and uphold the highest standards of integrity and good faith. It would also cooperate with existing fora and institutions in the field. This would follow the 2001 IMF proposal for a Sovereign Debt Restructuring Mechanism (SDRM), for which Anne Krueger suggested that the Paris Club could continue to function as the well-established

---

[93]     On the role of mediation and arbitration in debt workouts, see Section III.2.2 above.

representation of bilateral official creditors within the frame of the SDRM.[94]

At a later stage and after accumulating experience with the more informal mechanisms for which it would originally be designed, the Debt Workout Institution could host a non-permanent **sovereign *debt restructuring tribunal***. The tribunal would be composed of judges or arbitrators elected by the member states in a transparent procedure and solely on the basis of their qualifications. Each sovereign debt case would be handled by a panel of judges or arbitrators including a national of the debtor state, if necessary on an *ad hoc* basis. Respect for the perspective of creditors needs to be ensured both in the election of judges or arbitrators and in the composition of panels. For example, institutions representing the industry could be allowed to nominate candidates for election and creditors could nominate a number of judges and arbitrators hearing a particular case. The procedural and substantive law applied by the tribunal would be the same as in the case of arbitration.[95] Compared to arbitration, the tribunal option would have the advantage of possessing greater legitimacy, an important asset given the economic, political, and social implications of its decisions. Also, it would probably cost less.

Regarding the **legal basis** of a Debt Workout Institution, there are several options. Broadly speaking, the more effective an option, the more difficult is its establishment:

- A treaty-based international organization. Generally speaking, an international treaty would increase the effectiveness of a Debt Workout Institution because awards rendered as a result of an arbitration process would bind its member states. This would effectively discourage holdout litigation. Also, a treaty-based organization could host a tribunal. However, ratification of an international treaty might be politically costly and take a significant amount of time to be made operational.

- A subsidiary body of the UN General Assembly. The political costs might be lower compared to a treaty-based institution. But the effectiveness and comprehensiveness of such an institution would be limited since its awards would only be legally binding if the parties agree, either by a provision in the terms of the debt instrument or by special agreement. Effectiveness and comprehensiveness would increase if states enact legislation giving legal force to the decisions of such an institution. Also, the institution could host a tribunal.

- An independent institution, which could be established as a non-profit organization governed by private law, whose members would be states only, along the lines of the Bank of International Settlements. The UN could express its support by a resolution of the General Assembly, urging Member States to cooperate. On a technical level, the institution could be run by representatives of domestic Debt Management Offices. Their decisions would thus be subject to political override. This would be the least costly option, but also the least effective in preventing holdout litigation insofar as it is not supported by specific legislation in major legislatures, such as the UK 2010 Debt Restructuring (Developing Countries) Act, which is applicable to HIPCs.[96]

---

[94]     IMF, *The Design of the Sovereign Debt Restructuring Mechanism - Further Considerations*, 27 November 2002, pp. 23 et seq.

[95]     See Section III.2.2 above, recommendation (b).

[96]     UK Debt Relief (Developing Countries) Act 2010. See M. Waibel, "Debt relief to poor countries: Rules v.

# Appendix

This document was coordinated and finalized by UNCTAD under the Globalization and Development Strategies Division. The members of the ad-hoc Working Group were selected on the basis of their expertise as well as the sectors they represent, thereby forming a group of widely diverse interests.

The drafting process was guided by Ms. Yuefen Li and Ms. Marie Sudreau. UNCTAD is grateful to the drafting committee members for their work. The drafting committee members included Anna Gelpern (Georgetown University); Matthias Goldmann (Max Planck Institute for Comparative Public Law and International Law); and Jürgen Kaiser (Erlassjahr Jubilee Germany). UNCTAD would also like to extend its warm thanks to the members and observers of the ad-hoc Working Group on a Debt Workout Mechanism who actively participated in the design and content of this document by sharing their comments during Working Group meetings. The ad-hoc Working Group is formed by the drafting committee members and: Yilmaz Akyuz (South Center); Peter Bakvis (ITUC Global Unions); Reza Baqir (International Monetary Fund), observer; Juan Pablo Bohoslavsky (Independent Expert on the effects of foreign debt on human rights); Aldo Caliari (Center of Concern); Bodo Ellmers (Eurodad); Kalidou Gadio (African Development Bank); Sudarshan Gooptu (World Bank), observer; Leland Goss (ICMA), observer; Mitu Gulati (Duke University); Robert Howse (NYU School of Law); Olav Jones (European Committee of Insurers); Clotilde l'Angevin (Paris Club), observer; Jason Lee (Asian Development Bank); Eric LeCompte (Jubilee USA Network); Odette Lienau (Cornell University); Travis Mitchell (Commonwealth Secretariat); Raphael Otieno (Macro-Economic and Financial Management Institute of Eastern and Southern Africa); Andrew Powell (Inter-American Development Bank); Christoph Trebesh (University of Munich); Michael Waibel (Cambridge University); and Jeromin Zettelmeyer (European Bank for Reconstruction and Development). This document represents a compromise among the members of the Working Group.

# EXHIBIT J

United Nations

A/RES/68/304



**General Assembly**

Distr.: General
17 September 2014

**Sixty-eighth session**
Agenda item 14

# Resolution adopted by the General Assembly on 9 September 2014

[*without reference to a Main Committee (A/68/L.57/Rev.1)*]

### 68/304.   Towards the establishment of a multilateral legal framework for sovereign debt restructuring processes

*The General Assembly*,

*Recalling* the United Nations Millennium Declaration, adopted on 8 September 2000,[1] and the high-level plenary meeting of the General Assembly on the Millennium Development Goals and its outcome document,[2]

*Recalling also* the 2005 World Summit Outcome[3] and the follow-up to the development outcome of the 2005 World Summit, including the Millennium Development Goals and the other internationally agreed development goals,[4]

*Recalling further* the International Conference on Financing for Development and its outcome document,[5] in which sustainable debt financing is recognized as an important element for mobilizing resources for public and private investment, and the Follow-up International Conference on Financing for Development to Review the Implementation of the Monterrey Consensus and its outcome document, the Doha Declaration on Financing for Development,[6] as well as General Assembly resolution 68/204 of 20 December 2013,

*Recalling* its resolution 68/279 of 30 June 2014 on the convening of the third International Conference on Financing for Development to assess the progress made in the implementation of the Monterrey Consensus and the Doha Declaration, reinvigorate and strengthen the financing for development follow-up process, identify obstacles and constraints encountered in the achievement of the goals and objectives agreed therein, as well as actions and initiatives to overcome these constraints, and address new and emerging issues, including in the context of the recent multilateral efforts to promote international development cooperation, taking into account the current evolving development cooperation landscape, the

---

[1] Resolution 55/2.

[2] Resolution 65/1.

[3] Resolution 60/1.

[4] Resolution 60/265.

[5] *Report of the International Conference on Financing for Development, Monterrey, Mexico, 18–22 March 2002* (United Nations publication, Sales No. E.02.II.A.7), chap. I, resolution 1, annex.

[6] Resolution 63/239, annex.



**Please recycle** ♻



interrelationship of all sources of development finance and the synergies among financing objectives across the three dimensions of sustainable development, as well as the need to support the United Nations development agenda beyond 2015,

*Recalling also* the United Nations Conference on Sustainable Development, held in Rio de Janeiro, Brazil, from 20 to 22 June 2012, and its outcome document, entitled "The future we want",[7]

*Recalling further* its resolution 63/303 of 9 July 2009, in which it endorsed the Outcome of the Conference on the World Financial and Economic Crisis and Its Impact on Development, held in New York from 24 to 30 June 2009,

*Stressing* the need to reinforce coherence and coordination and to avoid duplication of efforts with regard to the financing for development process,

*Taking note* of the report of the Commission of Experts on Reform of the International Monetary and Financial System, convened by the President of the General Assembly at its sixty-third session,[8]

*Recalling* its resolutions 58/203 of 23 December 2003, 59/223 of 22 December 2004, 60/187 of 22 December 2005, 61/188 of 20 December 2006, 62/186 of 19 December 2007, 63/206 of 19 December 2008, 64/191 of 21 December 2009, 65/144 of 20 December 2010, 66/189 of 22 December 2011, 67/198 of 21 December 2012 and 68/202 of 20 December 2013,

*Noting* that sovereign debt crises are a recurring problem that involves very serious political, economic and social consequences and that the restructuring processes of sovereign debt are a frequent phenomenon in the international financial system,

*Noting with concern* that there remain a number of low- and middle-income developing countries that are still facing difficulties in finding a durable solution to their external debt problems, which could adversely affect their sustainable development,

*Recognizing* that addressing the sovereign debt problems of developing countries is an important part of international cooperation,

*Stressing* the importance for developing countries, on a case-by-case basis, of debt relief, including debt cancellation, as appropriate, and debt restructuring as debt crisis prevention and management tools,

*Stressing also* the need to work towards the establishment of responsible and preventive financial crisis policies to enhance transparent and sustainable national financial systems,

*Recognizing* the sovereign right of any State to restructure its sovereign debt, which should not be frustrated or impeded by any measure emanating from another State,

*Recognizing also* that the efforts of a State to restructure its sovereign debt should not be frustrated or impeded by commercial creditors, including specialized investor funds such as hedge funds, which seek to undertake speculative purchases

---

[7] Resolution 66/288, annex.
[8] A/63/838.

of its distressed debt at deeply discounted rates on secondary markets in order to pursue full payment via litigation,

*Noting* that private creditors of sovereign debt are increasingly numerous, anonymous and difficult to coordinate and that there are a variety of debt instruments and a wide range of jurisdictions in which debt is issued, thus complicating the restructuring of sovereign debt,

*Noting also* the concern expressed in the declaration of the Summit of Heads of State and Government of the Group of 77 and China on the theme "For a New World Order for Living Well", held in Santa Cruz de la Sierra, Plurinational State of Bolivia, on 14 and 15 June 2014,[9] concerning the so-called "vulture funds" and their actions of a highly speculative nature, which pose a risk to all future debt restructuring processes, for both developing and developed countries,

*Taking into account* the initiatives studied in the framework of the International Development Association of the World Bank and the International Monetary Fund to address the activities of the so-called "vulture funds", with the objective of, inter alia, preventing such funds from benefiting from litigation initiated against indebted countries, which are forced to divert many of their resources to handle such litigation, thereby undermining the purpose of the debt restructuring processes,

*Recalling*, among other things, the work carried out by the International Monetary Fund in 2003, with the support of the International Monetary and Financial Committee, to formulate a proposal for a sovereign debt restructuring mechanism,

*Stressing* the importance of the Principles on Promoting Responsible Sovereign Lending and Borrowing issued by the United Nations Conference on Trade and Development on 4 May 2011, which aim to reduce the prevalence of sovereign debt crises, prevent unsustainable debt situations, maintain steady economic growth and help achieve the Millennium Development Goals, encouraging to that end responsible sovereign borrowing,

*Stressing also* the need to continue to address systemic fragilities and imbalances and the need for continuing efforts to reform and strengthen the international financial system,

*Noting with concern* that the international financial system does not have a sound legal framework for the orderly and predictable restructuring of sovereign debt, which further increases the cost of non-compliance,

*Recognizing* the need to create a legal framework that facilitates the orderly restructuring of sovereign debts, allows the re-establishment of viability and growth without creating incentives that inadvertently increase the risk of non-compliance and acts as a deterrent to disruptive litigation that creditors could engage in during negotiations to restructure sovereign debts,

*Stressing*, in this context, the importance of establishing a clear set of principles for the management and resolution of financial crises that take into account the obligation of sovereign creditors to act in good faith and with a cooperative spirit to reach a consensual rearrangement of the debt of sovereign States,

---

[9] A/68/948, annex.

*Recognizing* that debt-restructuring processes should have as their core element a determination of real payment capacity so that they do not adversely affect economic growth and the fulfilment of the unfinished business of the Millennium Development Goals, the sustainable development goals and the post-2015 development agenda,

*Stressing* that, in the restructuring of sovereign debt, the progressive development and codification of international law are necessary in order to make it a more effective means to implement the purposes and principles of the Charter of the United Nations and to give greater importance to its role in the relations among States,

1. *Emphasizes* the special importance of a timely, effective, comprehensive and durable solution to the debt problems of developing countries in order to promote their inclusive economic growth and development;

2. *Calls for* the intensification of efforts to prevent debt crises by enhancing international financial mechanisms for crisis prevention and resolution, in cooperation with the private sector, with a view to finding solutions acceptable to all;

3. *Calls upon* all Member States and the United Nations system, and invites the Bretton Woods institutions and the private sector, to take appropriate measures and actions for the implementation of the commitments, agreements and decisions of the major United Nations conferences and summits, in particular those related to the question of the external debt sustainability of developing countries;

4. *Recognizes* the roles of the United Nations and the international financial institutions in accordance with their respective mandates, and encourages them to continue to support global efforts towards sustainable development and a durable solution to the problem of the debt of developing countries;

5. *Decides* to elaborate and adopt through a process of intergovernmental negotiations, as a matter of priority during its sixty-ninth session, a multilateral legal framework for sovereign debt restructuring processes with a view, inter alia, to increasing the efficiency, stability and predictability of the international financial system and achieving sustained, inclusive and equitable economic growth and sustainable development, in accordance with national circumstances and priorities;

6. *Also decides* to define the modalities for the intergovernmental negotiations and the adoption of the text of the multilateral legal framework at the main part of its sixty-ninth session, before the end of 2014.

*107th plenary meeting*
*9 September 2014*

———————

# EXHIBIT K



## Economists Call on Congress to Mitigate Fallout from Ruling on Argentine Debt



July 31, 2014

***Decision "could cause unnecessary economic damage to the international financial system"***

**For Immediate Release:** July 31, 2014
**Contact:** Dan Beeton, 202-239-1460

**Washington, D.C.**- Over 100 economists, including Nobel laureate Robert Solow, Branko Milanovic and Dani Rodrik called on Congress today to take action to mitigate the harmful fallout from the recent ruling by Judge Griesa of the U.S. District Court for the Southern District of New York that requires Argentina to pay holdout creditors at the same time as the majority of creditors. The letter warns that "The District Court's decision -- and especially its injunction that is currently blocking Argentina from making payments to 93 percent of its foreign bondholders -- could cause unnecessary economic damage to the international financial system, as well as to U.S. economic interests, Argentina, and fifteen years of U.S. bi-partisan debt relief policy."

"It's a widely shared opinion among economists that the court's attempt to force Argentina into a default that nobody – not the debtor nor more than 90 percent of creditors – wants, is wrong and damaging," said Mark Weisbrot, economist and Co-Director of the Center for Economic and Policy Research, who helped circulate the letter.

The letter warns that Griesa's decision could "torpedo an existing agreement with those bondholders who chose to negotiate." It also cautions that, since sovereign governments do not have the option of declaring bankruptcy, "the court's ruling would severely hamper the ability of creditors and debtors to conclude an orderly restructuring should a sovereign debt crisis occur. This could have a significant negative impact on the functioning of international financial markets, as the International Monetary Fund has repeatedly warned."

The court's decision "creates a moral hazard," the economists write, since investors will be allowed "to obtain full repayment, no matter how risky the initial investment."

The full letter appears below:

July 31, 2014

Dear Member of Congress,

We note with concern the recent developments in the court case of Argentina vs. NML Capital, etc. The Dist
Court's decision – and especially its injunction that is currently blocking Argentina from making payments to
93 percent of its foreign bondholders -- could cause unnecessary economic damage to the international
financial system, as well as to U.S. economic interests, Argentina, and fifteen years of U.S. bi-partisan debt
relief policy. We urge you to act now and seek legislative solutions to mitigate the harmful impact of the
court's ruling.

For various reasons, governments sometimes find themselves in situations where they cannot continue to
service their sovereign debt. This was Argentina's situation at the end of 2001. After years of negotiations,
Argentina reached a restructuring agreement with 93 percent of the defaulted bondholders, and has made a
agreed-upon payments to them.

The court's decision that Argentina cannot continue to pay the holders of the restructured bonds unless it fir
pays the plaintiffs mean that any "holdout" creditor can torpedo an existing agreement with those bondhold
who chose to negotiate. While individuals and corporations are granted the protection of bankruptcy law, no
such mechanism exists for sovereign governments. As such, the court's ruling would severely hamper the
ability of creditors and debtors to conclude an orderly restructuring should a sovereign debt crisis occur. Thi
could have a significant negative impact on the functioning of international financial markets, as the
International Monetary Fund has repeatedly warned.

Those who invested in Argentine bonds were compensated with high interest rates, to mitigate the risk of
default. There are inherent risks when investing in sovereign bonds, but the court's ruling creates a moral
hazard, by allowing investors to obtain full repayment, no matter how risky the initial investment.

The plaintiffs in the case purchased Argentine bonds on the secondary market after default, often for less th
20 cents on the dollar. While these actors could have accepted the restructuring and still made a very large
profit, they instead have fought a decade-long legal battle, seeking exorbitant profits in excess of 1,000
percent and creating financial uncertainty along the way.

The recent developments will also directly impact the United States and its status as a financial center of th
world economy. While much of the developing world's debt is issued under the jurisdiction of New York law
and utilizing New York-based financial institutions, the court's ruling will make it more likely for sovereign
governments to seek alternate locations to issue debt. Britain and Belgium, for example, have already passe
legislation aimed at preventing this type of behavior from "holdout" creditors.

In addition, the court has put restrictions on New York banks, preventing them from distributing regularly
scheduled interest payments to holders of the restructured bonds. Already, banks have faced lawsuits from
investors, creating greater uncertainty for U.S.-based financial institutions.

Argentina has expressed a willingness to negotiate, and has recently reached agreements with the Paris Clu
as well as claims by international investors.

We hope that you will look for legislative solutions to prevent this court decision, or similar rulings, from
causing unnecessary harm.

Sincerely,

Robert Solow, Nobel laureate in Economics, 1987, MIT Professor of Economics, emeritus

Dani Rodrik, Albert O. Hirschman Professor in the school of Social Sciences at the Institute for Advanced St
in Princeton, New Jersey

Branko Milanovic, Luxembourg Income Study Center, the Graduate Center CUNY,  former Lead Economist in
the World Bank's research department


Andrew Allimadi, United Nations, Department of Economics and Social Affairs

Gar Alperovitz, University of Maryland

Eileen Applebaum, Center for Economic and Policy Research

Mariano Arana, Universidad Nacional de General Sarmiento

Leonardo Asta, Università degli Studi di Padova

Venkatesh Athreya, Bharathidasan University

Dean Baker, Center for Economic and Policy Research

William Barclay, Chicago Political Economy Group

Jairo Alonso Bautista, Universidad Santo Tomas

Gunseli Berik, University of Utah

Alexandra Bernasek, Colorado State University

Cyrus Bina, University of Minnesota (Morris Campus)

Josh Bivens, Economic Policy Institute

Peter Bohmer, The Evergreen State College

Korkut Boratav, Turkish Social Science Association

Elissa Braunstein, Colorado State University

Jorge BUZAGLO, University of Goteburg

Jim Campen, Americans for Fairness in Lending

Carlos A. Carrasco, University of the Basque Country

Sergio Cesaratto, University of Siena

Kyung-Sup Chang, Seoul National University

Kimberly Christensen, SUNY/Purchase College

Michael Cohen, New School for Social Research

Brendan Cushing - Daniels, Gettysburg College

Omar Dahi, Hampshire College

Carlo D'Ippoliti, University of Rome

Peter Dorman, Evergreen State College

Amitava Dutt, University of Notre Dame

Dirk Ehnts, University of Oldenburg

Gerald Epstein, University of Massachusetts, Amherst

Susan Ettner, University of California, Los Angeles

Jeffrey Faux, Economic Policy Institute

Massoud Fazeli, Hofstra University

Andrew Fischer, International Institute of Social Studies

Jeffrey Frankel, Harvard Kennedy School

Roberto Frenkel, CEDES Argentina

Kevin Gallagher, Boston University

Chris Georges, Hamilton College

Reza Ghorashi, Richard Stockton College

Jayati Ghosh, JNU New Delhi and Ideas

David Gold, New School University

Neva Goodwin, Tufts University

María Florencia Granato, Corporación Andina de Fomento

Martin Hart-Landsberg, Lewis and Clark

Conrad Herold, Hofstra University

P. Sai-wing Ho, University of Denver

Andreas Hoth

Gustavo Indart, University of Toronto

Joseph Joyce, Wellesley College

J K Kapler, University of Massachusetts Boston

Martin Khor, South Centre

Gabriele Koehler

Andrew Kohen, James Madison University

Nikoi Kote-Nikoi

Pramila Krishnan, University of Cambridge

David Legge, La Trobe University

Henry Levin, Columbia University

Mah hui Lim, South Centre

Rodrigo Lopez-Pablos

Robert Lynch, Washington College

Arthur MacEwan, University of Massachusetts Boston

Jeff Madrick, The Century Foundation

Cheryl Maranto, Marquette University

Ann Markusen, University of Minnesota

Julie Mattahei, Wellesley College

Kathleen McAfee, San Fransisco State University

Elaine McCrate, University of Vermont

Hannah McKinney, Kalamazoo College

Thomas Michl, Colgate University

William Milberg, New School for Social Research

Larry Mishel, Economic Policy Institute

Mritiunjoy Mohanty, Indian Institute of Management

Nicolás Moncaut

Tracy Mott, University of Denver

Michael Murray, Bates College

Luiz M Niemeyer, Pontifical Catholic University of São Paulo

Machiko Nissanke, SOAS University of London

Manfred Nitsch, Free University of Berlin

Jose Antonio Ocampo, Columbia University

Carlos Oya, University of London

Marco Palacios, El Colegio de México

Antonella Palumbo, Roma Tre University

Dimitri B. Papadimitriou, Levy Economics Institute of Bard College

Mark Paul, University of Massachusetts Amherst

Lorenzo Pellegrini, International Institute of Social Studies

Lucia Pittaluga Fonseca, Universidad de la República (Uruguay)

Renee Prendergast, Queen's University- Belfast

Mark Price, Keystone Research Center

Alicia Puyana, Facultad Latinoamercana de Ciencias Sociales

Charles Revier, Colorado State University

Joseph Ricciardi, Babson College

Malcolm Robinson, Thomas More College

Leopoldo Rodriguez, Portland State University

John Roemer, Yale University

David Rosnick, Center for Economic and Policy Research

Antonio Savoia, University of Manchester

John Schmitt, Center for Economic and Policy Research

Stepphanie Seguino, University of Vermont

Anwar Shaikh, New School for Social Research

Kannan Srinivasan

James Stanfield

Eduardo Strachman

William K. Tabb, Queens College

Ezequiel Tacsir, United Nations University

Philipp Temme, Free University of Berlin

Frank Thompson, University of Michigan

Chris Tilly, University of California, Los Angeles

Mario Tonveronachi, University of Siena

Lawal Tosin

Chiwuike Uba, African Heritage Institution

Bunu Goso Umara

Leanne Ussher, Queens College, CUNY

Rolph van der Hoeven, International Institute of Social Studies

Irene van Staveren, International Institute of Social Studies

Matías Vernengo, Bucknell University

David Weiman, Barnard College

Mark Weisbrot, Center for Economic and Policy Research

Thomas Weisskopf, University of Michigan

John Willoughby, American University

Yavuz Yasar, University of Denver

A. Erinc Yeldan, Yasar University

Erhan Yildirim, Cukurova University

Ben Zipperer, University of Massachusetts, Amherst

### 

## Let's Talk About It





This work is licensed under a Creative Commons Attribution 4.0 International License

# EXHIBIT L

# 12-105-cv(L)

12-109-cv(CON),   12-111-cv(CON),   12-157-cv(CON),   12-158-cv(CON),
12-163-cv(CON),   12-164-cv(CON),   12-170-cv(CON),   12-176-cv(CON),
12-185-cv(CON),   12-189-cv(CON),   12-214-cv(CON),   12-909-cv(CON),
12-914-cv(CON),   12-916-cv(CON),   12-919-cv(CON),   12-920-cv(CON),
12-923-cv(CON),   12-924-cv(CON),   12-926-cv(CON),   12-939-cv(CON),
12-943-cv(CON),   12-951-cv(CON),   12-968-cv(CON),   12-971-cv(CON)

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS

*(caption continued on inside cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF THE REPUBLIC OF ARGENTINA'S PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

STUART F. DELERY,
*Principal Deputy Assistant Attorney General*

MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff Civil Division,*
*Department of Justice*

CHRISTOPHER J. MEADE,
*Acting General Counsel,*
*Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser,*
*Department of State*

PREET BHARARA,
*United States Attorney for the Southern District of New York,*
*Attorney for the United States of America as Amicus Curiae*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2716

JOHN D. CLOPPER,
JEANNETTE A. VARGAS,
BENJAMIN H. TORRANCE,
*Assistant United States Attorneys,*
*Of Counsel*

OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA
INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA
CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA
ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN
VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ,
OLIFANT FUND, LTD.,

*Plaintiffs-Appellees*,

—v.—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant*,

THE BANK OF NEW YORK MELLON, as Indenture Trustee,
EXCHANGE BONDHOLDER GROUP,
ICE CANYON LLC, FINTECH ADVISORY INC.,

*Non-Party Appellants*,

EURO BONDHOLDERS,

*Intervenor.*

# TABLE OF CONTENTS

PAGE

Interest of the United States. . . . . . . . . . . . . . . . . . .  1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

POINT I—THE PANEL'S INTERPRETATION OF THE
  *PARI PASSU* CLAUSE IS INCORRECT AND
  ADVERSE TO THE UNITED STATES' POLICY
  INTERESTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

POINT II—THE INJUNCTION CONTRAVENES THE
  FSIA AND MAY HARM U.S. FOREIGN
  RELATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

ii

TABLE OF AUTHORITIES

*Cases*:

*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*,
   475 F.3d 1080 (9th Cir. 2007) . . . . . . . . . . . . . . . 7

*Af-Cap Inc. v. Republic of Congo*,
   383 F.3d 361 (5th Cir. 2004) . . . . . . . . . . . . . . . . 7

*Af-Cap Inc. v. Republic of Congo*,
   462 F.3d 417 n.8 (5th Cir. 2006) . . . . . . . . . . . . . 8

*Allied Bank v. Banco Credito Agricola*,
   757 F.2d 516 (2d Cir. 1985) . . . . . . . . . . . . . . . . 5

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989). . . . . . . . . . . . . . . . . . . . . . . 6

*Grupo Mexicano v. Alliance Bond Fund, Inc.*,
   527 U.S. 308 (1999). . . . . . . . . . . . . . . . . . . . . . . 2

*Letelier v. Republic of Chile*,
   748 F.2d 790 (2d Cir. 1984) . . . . . . . . . . . . . . . 6, 7

*S&S Mach. Co. v. Masinexportimport*,
   706 F.2d 411 (2d Cir. 1983) . . . . . . . . . . . . . . . 6, 7

*Stephens v. Nat'l Distillers & Chem. Corp.*,
   69 F.3d 1226 (2d Cir. 1995) . . . . . . . . . . . . . . . . 7

*Walker Int'l Holdings Ltd. v. Republic of Congo*,
   395 F.3d 229 (5th Cir. 2004) . . . . . . . . . . . . . . . 7

*Whiteman v. Dorotheum GmbH & Co.*,
   431 F.3d 57 (2d Cir. 2005) . . . . . . . . . . . . . . . . . 8

iii

PAGE

*Statutes*:

28 U.S.C. §§ 1609-1611 . . . . . . . . . . . . . . . . . . . . . . . .  5

*Rules*:

Fed. R. App. P. 35(a)  . . . . . . . . . . . . . . . . . . . . . . . . .  1

*Other Authorities*:

Financial Markets Law Comm. (Bank of England),
     *Pari Passu Clauses: Analysis of the Role, Use and*
     *Meaning of Pari Passu Clauses in Sovereign Debt*
     *Obligations as a Matter of English Law* (2005) ......2

Allen & Overy Global Law Intelligence Unit, *The Pari*
     *Passu Clause and the Argentine Case* (Dec. 27,
     2012)..........................................................2

Roubini, *From Argentina to Greece: Crisis in the*
     *Global Architecture of Orderly Sovereign Debt*
     *Restructurings*, Roubini Global Econ. (Nov. 28,
     2012)................................................2, 4

Lubben, *Possible Ripples from the Argentine Bond*
     *Litigation*, N.Y. Times Dealbook (Dec. 13, 2012) ....3

Schumacher et al., *Sovereign Defaults in Court: The*
     *Rise of Creditor Litigation 1976-2010* ...................3

Zettlemeyer et al., *The Greek Debt Exchange: An*
     *Autopsy*, Sept. 2010 draft ........................................4

iv

PAGE

Das et al., *Sovereign Debt Restructurings 1950-2010:
Literature Survey, Data, and Stylized Facts*, IMF
Working Paper WP/12/203 (Aug. 2012)...................4

**Interest of the United States**

The panel in this case adopted a novel interpretation of a standard *pari passu* clause found in many sovereign debt instruments, in a manner that runs counter to longstanding U.S. efforts to promote orderly restructuring of sovereign debt. The panel further affirmed injunctive relief that constrains a sovereign state's disposition of assets that are not subject to execution under the Foreign Sovereign Immunities Act ("FSIA"). By unduly restricting the immunity afforded to foreign state property, the decision not only contradicts this Court's precedent, but could adversely affect U.S. foreign relations and threaten U.S. government assets. While the United States does not condone Argentina's actions in the international financial arena, Argentina's petition for rehearing en banc presents a "question of exceptional importance," and rehearing is needed to secure the "uniformity of the court's decisions." Fed. R. App. P. 35(a). Accordingly, the petition should be granted.

## A R G U M E N T

### POINT I—THE PANEL'S INTERPRETATION OF THE *PARI PASSU* CLAUSE IS INCORRECT AND ADVERSE TO THE UNITED STATES' POLICY INTERESTS

The panel held Argentina had violated the *pari passu* clause in its bonds and agreement by subordination of non-exchanged bonds through conduct resulting in selective repayment of creditors. That construction contradicts the settled market understanding of *pari passu* clauses and could undermine

2

longstanding U.S. efforts to promote orderly resolutions of sovereign debt crises.

The settled understanding of *pari passu* clauses is that selective repayment does *not* violate the clause, even if it is the result of sovereign policy. This view has been expressed not only by the United States, but by academics, governmental bodies, and market participants—not merely the sources the panel characterized as "arguably biased" (slip op. 17). *See, e.g.*, Financial Markets Law Comm. (Bank of England), *Pari Passu Clauses: Analysis of the Role, Use and Meaning of Pari Passu Clauses in Sovereign Debt Obligations as a Matter of English Law* (2005) ("FMLC Study"); Brief of *Amicus Curiae* Clearing House Ass'n at 4-5. Moreover, the United States' view is reinforced by historical experience, as *pari passu* clauses in sovereign debt instruments were not impediments to restructurings in the 1980s and 1990s.[1]

The reaction to the panel's decision has confirmed that it was contrary to settled understanding. *See* Allen & Overy Global Law Intelligence Unit, *The Pari Passu Clause and the Argentine Case* (Dec. 27, 2012); Roubini, *From Argentina to Greece: Crisis in the Global Architecture of Orderly Sovereign Debt Restructurings*, Roubini Global Econ. (Nov. 28, 2012);

---

[1]    In general, an insolvent debtor "may prefer one creditor to another, in discharging his debts." *Grupo Mexicano v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 321 (1999). There is no reason to believe that the *pari passu* clause here was intended to alter that rule.

3

Lubben, *Possible Ripples from the Argentine Bond Litigation*, N.Y. Times Dealbook (Dec. 13, 2012).

The panel believed that the first sentence of the *pari passu* clause prohibits "the issuance of other superior debt" and the second prohibits "the giving of priority to other payment obligations." Slip op. 18-19. The better reading, however, is that the two sentences separately address changes in rank *within* a particular bond issuance and changes in rank *across* all external indebtedness, not a debtor's obligations as issuer and as payor, *see* FMLC Study at 4, as the panel believed. Thus, the first sentence bars changes in legal rank in bonds "among themselves" and the second sentence—which requires only that payment "*obligations*" (as opposed to the payments themselves) rank equally—prohibits changes in legal rank among all "External Indebtedness." *See id.*

The panel's reasoning that preferential payment can breach a *pari passu* clause threatens core U.S. policy regarding international debt restructuring. The effect could extend well beyond Argentina: creditor litigation has increased significantly in the past decade, adversely affecting even low-income countries such as Liberia and Zambia. *See* Schumacher et al., *Sovereign Defaults in Court: The Rise of Creditor Litigation 1976-2010* (http://dx.doi.org/10.2139/ssrn.2189997). As the government explained in its prior *amicus* brief, voluntary sovereign debt restructuring will become far more difficult if holdout creditors can use novel interpretations of boilerplate bond provisions to interfere with the performance of a restructuring plan accepted by most creditors, and to greatly

4

tilt incentives away from voluntary debt exchanges and negotiated restructuring in the first place.

A sovereign's potential resistance to paying non-exchanged debt is a critical tool in its efforts to negotiate broad creditor support for restructuring. This leverage will be lost if creditors believe that a holdout strategy will eventually result in substantial or full payment. If enough creditors adopt this strategy, foreign sovereign debt restructuring will become impossible. While holdouts retain the right to assert legal claims in court and enforce resultant judgments in appropriate circumstances and in a manner consistent with the FSIA, the creation of new rights and new vehicles for enforcement alters and destabilizes the landscape of sovereign debt restructuring.

The panel suggested that the prevalence since 2005 of collective action clauses in bonds governed by New York law will eliminate any threat to orderly sovereign debt restructuring. Slip op. 27. But most bonds issued under New York law before 2005 lack collective action clauses, and the United States expects many to be in the market for the foreseeable future. Moreover, as demonstrated in the recent Greek debt exchange, holdouts can block amendment of bond issues despite collective action clauses. *See* Zettlemeyer et al., *The Greek Debt Exchange: An Autopsy*, Sept. 2010 draft (http://ssrn.com/abstract= 2144932); Das et al., *Sovereign Debt Restructurings 1950-2010: Literature Survey, Data, and Stylized Facts*, IMF Working Paper WP/12/203 (Aug. 2012) at 43-45; Roubini, *supra*, at 5.

5

The Court also erroneously suggested that its opinion would be of limited reach because it was applicable only to bonds governed by New York law. Most bonds issued by emerging-market countries are governed by New York or English law, *see* Das et al., *supra*, at 41, making the decision highly significant to the worldwide bond market. In addition, the decision could harm U.S. interests in promoting issuers' use of New York law and preserving New York as a global financial jurisdiction. *See Allied Bank v. Banco Credito Agricola*, 757 F.2d 516, 521 (2d Cir. 1985) ("The United States has an interest in maintaining New York's status as one of the foremost commercial centers in the world."). The decision could encourage issuers to issue debt in non-U.S. currencies in order to avoid the U.S. payments system, causing a detrimental effect on the systemic role of the U.S. dollar.

Finally, the panel's construction was unnecessary for its legal conclusion. Had the panel stopped at its determination that "even under Argentina's interpretation of the [*pari passu* clause] as preventing only 'legal subordination' . . . , the Republic breached the Provision" through enactment of legislation such as the Lock Law, slip. op. 20, a measure that seems largely unique to Argentina, the far-reaching consequences of the ruling could have been avoided—and could to this extent be easily corrected upon panel rehearing or en banc review.[2]

_____

[2]   While the United States has taken no position on whether the unique Lock Law itself violates the

6

## POINT II—THE INJUNCTION CONTRAVENES THE FSIA AND MAY HARM U.S. FOREIGN RELATIONS

The panel further erred in affirming the extraordinary injunctive relief entered by the district court. That relief contravenes the FSIA, which sets out the exclusive means of obtaining jurisdiction over a foreign state and enforcing judgments against it in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989). Even when a court has jurisdiction to enter a judgment against a foreign state, injunctive relief can be enforced only if consistent with the FSIA provisions governing immunity from attachment, execution, or arrest, 28 U.S.C. §§ 1609-1611. *S&S Mach. Co. v. Masinexport-import*, 706 F.2d 411, 418 (2d Cir. 1983). Here, although the district court has properly exercised jurisdiction over Argentina, the injunction affirmed by the panel constrains Argentina's use and disposition of sovereign property that is immune from execution. That result improperly circumvents the careful limits on execution established by Congress. *See Letelier v. Republic of Chile*, 748 F.2d 790, 798-99 (2d Cir. 1984).

This ruling conflicts with *S&S*, 706 F.2d at 418, which held that courts may not grant, "by injunction, relief which they may not provide by attachment" under the FSIA. The panel reasoned that the injunction did not implicate § 1609 because it did not "transfer . . . dominion or control over sovereign prop-

———————

*pari passu* clause, it appears that such a ruling would not harm sovereign debt restructuring generally.

7

erty to the court." Slip op. 25. But that formalistic interpretation would permit courts to "eviscerate [the FSIA's] protections merely by denominating their restraints as injunctions against the . . . use of property rather than as attachments of that property." *S&S*, 706 F.2d at 418. "[T]he principle behind the prohibition against attachments should apply broadly," *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1230 (2d Cir. 1996), particularly as Congress enacted the FSIA against a background practice in which sovereign property was absolutely immune, *Letelier*, 748 F.2d at 799. When judicial action constrains a foreign state's use of its property, § 1609's protections apply. *See Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007) (garnishment action); *Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229 (5th Cir. 2004) (same); *Af-Cap Inc. v. Republic of Congo*, 383 F.3d 361 (5th Cir. 2004) (same).

That Argentina's dominion over its property was constrained is demonstrated by the panel's own logic. The Court stated that Argentina could comply with the injunction by paying "all amounts owed to its exchange bondholders" and all to the holdouts, or by making partial payments to both, slip op. 25; but in each case Argentina would be compelled to use sovereign funds in a particular way. Similarly, if Argentina decides not to pay the holdouts, it is constrained in its use of funds with which it would pay the exchange bondholders. Either way, Argentina is compelled to do something in particular with its immune property.

Finally, U.S. foreign relations may be harmed by a holding constraining a foreign state's use of its prop-

8

erty outside the United States, particularly such
property inside the foreign state's territory. As ex-
plained more fully in the government's prior *amicus*
brief, such an order could have adverse consequences
for the treatment of U.S. property under principles of
reciprocity. The laws of many foreign nations do not
permit a court to enter an injunction against a for-
eign state; those foreign states may expect the United
States to extend them the same consideration. Al-
though the United States' position regarding foreign
policy implications of particular exercises of jurisdic-
tion should be accorded deference by the courts, *see,
e.g.*, *Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d
57, 69-74 (2d Cir. 2005); *Af-Cap Inc. v. Republic of
Congo*, 462 F.3d 417, 428 n.8 (5th Cir. 2006), especial-
ly with respect to the extraordinary equitable relief of
an injunction against a foreign sovereign, the panel
here did not even address the government's position.

9

Dated:    New York, New York
          December 28, 2012

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States as*
                        *Amicus Curiae.*

                    JOHN D. CLOPPER,
                    JEANNETTE A. VARGAS,
                    BENJAMIN H. TORRANCE,
                    *Assistant United States Attorneys,*
                        *Of Counsel.*

STUART F. DELERY,
*Principal Deputy Assistant Attorney General,*
MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff*
*Civil Division, Department of Justice*

CHRISTOPHER J. MEADE,
*Acting General Counsel, Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser, Department of State*

# EXHIBIT M

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------x
                                           :
NML CAPITAL, LTD.,                         :
                                           :            **ORDER**
                      Plaintiff,           :
                                           :        08 Civ. 6978 (TPG)
              – against –                  :        09 Civ. 1707 (TPG)
                                           :        09 Civ. 1708 (TPG)
REPUBLIC OF ARGENTINA,                     :
                                           :
                      Defendants.          :
                                           :
-------------------------------------------x

**AMENDED FEBRUARY 23, 2012 ORDER**

WHEREAS, in an Order dated December 7, 2011, this Court found that, under Paragraph 1(c) of the 1994 Fiscal Agency Agreement ("FAA"), the Republic is "required . . . at all times to rank its payment obligations pursuant to NML's Bonds at least equally with all the Republic's other present and future unsecured and unsubordinated External Indebtedness."

WHEREAS, in its December 7, 2011 Order, this Court granted partial summary judgment to NML on its claim that the Republic repeatedly has breached, and continues to breach, its obligations under Paragraph 1(c) of the FAA by, among other things, "ma[king] payments currently due under the Exchange Bonds, while persisting in its refusal to satisfy its payment obligations currently due under NML's Bonds."

1

And WHEREAS NML Capital, Ltd. ("NML") has filed a renewed motion for equitable relief as a remedy for such violations pursuant to Rule 65(d) of the Federal Rules of Civil Procedure and the Court's inherent equitable powers.

Upon consideration of NML's renewed motion, the response of the Republic of Argentina (the "Republic") thereto, NML's reply, and all other arguments submitted to the Court in the parties' papers and at oral argument, it is HEREBY ORDERED that:

1.    It is DECLARED, ADJUDGED, and DECREED that NML is irreparably harmed by and has no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA, and that the equities and public interest strongly support issuance of equitable relief to prevent the Republic from further violating Paragraph 1(c) of the FAA, in that:

  a.  Absent equitable relief, NML would suffer irreparable harm because the Republic's payment obligations to NML would remain debased of their contractually-guaranteed status, and NML would never be restored to the position it was promised that it would hold relative to other creditors in the event of default.

  b.  There is no adequate remedy at law for the Republic's ongoing violations of Paragraph 1(c) of the FAA because the Republic has made clear – indeed, it has codified in Law 26,017 and Law

2

26,547 – its intention to defy any money judgment issued by this Court.

c. The balance of the equities strongly supports this Order in light of the clear text of Paragraph 1(c) of the FAA and the Republic's repeated failures to make required payments to NML.  In the absence of the equitable relief provided by this Order, the Republic will continue to violate Paragraph 1(c) with impunity, thus subjecting NML to harm.  On the other hand, the Order requires of the Republic only that which it promised NML and similarly situated creditors to induce those creditors to purchase the Republic's bonds.  Because the Republic has the financial wherewithal to meet its commitment of providing equal treatment to both NML (and similarly situated creditors) and those owed under the terms of the Exchange Bonds, it is equitable to require it to do so.  Indeed, equitable relief is particularly appropriate here, given that the Republic has engaged in an unprecedented, systematic scheme of making payments on other external indebtedness, after repudiating its payment obligations to NML, in direct violation of its contractual commitment set forth in Paragraph 1(c) of the FAA.

d. The public interest of enforcing contracts and upholding the rule of law will be served by the issuance of this Order, particularly here, where creditors of the Republic have no

3

recourse to bankruptcy regimes to protect their interests and must rely upon courts to enforce contractual promises.  No less than any other entity entering into a commercial transaction, there is a strong public interest in holding the Republic to its contractual obligations.

2.    The Republic accordingly is permanently ORDERED to specifically perform its obligations to NML under Paragraph 1(c) of the FAA as follows:

a.  Whenever the Republic pays any amount due under terms of the bonds or other obligations issued pursuant to the Republic's 2005 or 2010 Exchange Offers, or any subsequent exchange of or substitution for the 2005 and 2010 Exchange Offers that may occur in the future (collectively, the "Exchange Bonds"), the Republic shall concurrently or in advance make a "Ratable Payment" to NML (as defined below and as further defined in the Court's Opinion of November 21, 2012).

b.  Such "Ratable Payment" that the Republic is ORDERED to make to NML shall be an amount equal to the "Payment Percentage" (as defined below) multiplied by the total amount currently due to NML in respect of the bonds at issue in these cases (08 Civ. 6978, 09 Civ. 1707, and 09 Civ. 1708), including pre-judgment interest (the "NML Bonds").

c.  Such "Payment Percentage" shall be the fraction calculated by dividing the amount actually paid or which the Republic

4

intends to pay under the terms of the Exchange Bonds by the total amount then due under the terms of the Exchange Bonds.

d. The Republic is ENJOINED from violating Paragraph 1(c) of the FAA, including by making any payment under the terms of the Exchange Bonds without complying with its obligation pursuant to Paragraph 1(c) of the FAA by concurrently or in advance making a Ratable Payment to NML.

e. Within three (3) days of the issuance of this ORDER, the Republic shall provide copies of this ORDER to all participants in the payment process of the Exchange Bonds ("Participants"). Such Participants shall be bound by the terms of this ORDER as provided by Rule 65(d)(2) and prohibited from aiding and abetting any violation of this ORDER, including any further violation by the Republic of its obligations under Paragraph 1(c) of the FAA, such as any effort to make payments under the terms of the Exchange Bonds without also concurrently or in advance making a Ratable Payment to NML.

f. "Participants" refer to those persons and entities who act in active concert or participation with the Republic, to assist the Republic in fulfilling its payment obligations under the Exchange Bonds, including: (1) the indenture trustees and/or registrars under the Exchange Bonds (including but not limited to The Bank of New York Mellon f/k/a/ The Bank of New York);

(2) the registered owners of the Exchange Bonds and nominees of the depositaries for the Exchange Bonds (including but not limited to Cede & Co. and The Bank of New York Depositary (Nominees) Limited) and any institutions which act as nominees;  (3) the clearing corporations and systems, depositaries, operators of clearing systems, and settlement agents for the Exchange Bonds (including but not limited to the Depository Trust Company, Clearstream Banking S.A., Euroclear Bank S.A./N.V. and the Euroclear System);  (4) trustee paying agents and transfer agents for the Exchange Bonds (including but not limited to The Bank of New York (Luxembourg) S.A. and The Bank of New York Mellon (including but not limited to the Bank of New York Mellon (London));  and (5) attorneys and other agents engaged by any of the foregoing or the Republic in connection with their obligations under the Exchange Bonds.

g. Nothing in this ORDER shall be construed to extend to the conduct or actions of a third party acting solely in its capacity as an "intermediary bank," under Article 4A of the U.C.C. and N.Y.C.L.S. U.C.C. § 4-A-104, implementing a funds transfer in connection with the Exchange Bonds.

h. Any non-party that has received proper notice of this ORDER, pursuant to Rule 65(d)(2), and that requires clarification as to

its duties, if any, under this ORDR may make an application to this Court, with notice to the Republic and NML.  Such clarification will be promptly provided.

    i.   Concurrently or in advance of making a payment on the Exchange Bonds, the Republic shall certify to the Court and give notice of this certification to its Participants, and to counsel for NML, that the Republic has satisfied its obligations under this ORDER to make a Ratable Payment to NML.

3.    NML shall be entitled to discovery to confirm the timing and amounts of the Republic's payments under the terms of the Exchange Bonds; the amounts the Republic owes on these and other obligations; and such other information as appropriate to confirm compliance with this ORDER;

4.    The Republic is permanently PROHIBITED from taking action to evade the directives of this ORDER, render it ineffective, or to take any steps to diminish the Court's ability to supervise compliance with the ORDER, including, but not limited to, altering or amending the processes or specific transfer mechanisms by which it makes payments on the Exchange Bonds, without obtaining prior approval by the Court;

5.    This Court shall retain jurisdiction to monitor and enforce this ORDER, and to modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances.

Dated:  New York, New York
        November, 21 2012

Thomas P. Griesa
U.S. District Judge



# EXHIBIT N

# 12-105-cv(L)

**12-109-cv(CON), 12-111-cv(CON), 12-157-cv(CON), 12-158-cv(CON), 12-163-cv(CON), 12-164-cv(CON), 12-170-cv(CON), 12-176-cv(CON), 12-185-cv(CON), 12-189-cv(CON), 12-214-cv(CON), 12-909-cv(CON), 12-914-cv(CON), 12-916-cv(CON), 12-919-cv(CON), 12-920-cv(CON), 12-923-cv(CON), 12-924-cv(CON), 12-926-cv(CON), 12-939-cv(CON), 12-943-cv(CON), 12-951-cv(CON), 12-968-cv(CON), 12-971-cv(CON)**

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

◄ ◆◆◆ ►

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD., ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC, AURELIUS

*(caption continued on inside cover)*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA AS *AMICUS CURIAE* IN SUPPORT OF REVERSAL

STUART F. DELERY,
*Acting Assistant
Attorney General*
MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff
Civil Division,
Department of Justice*

GEORGE W. MADISON,
*General Counsel,
Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser,
Department of State*

PREET BHARARA,
*United States Attorney for the
Southern District of New York,
Attorney for the United States
of America as Amicus Curiae*
86 Chambers Street, 3rd Floor
New York, New York 10007
(212) 637-2678

JEANNETTE A. VARGAS,
JOHN D. CLOPPER,
SARAH S. NORMAND,
*Assistant United States Attorneys,
Of Counsel*

OPPORTUNITIES FUND II, LLC, PABLO ALBERTO VARELA, LILA INES BURGUENO, MIRTA SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO, LEANDRO DANIEL POMILIO, SUSANA AQUERRETA, MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL, NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO, CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES, MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees*,

—v.—

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

# TABLE OF CONTENTS

PAGE

Interest of the United States . . . . . . . . . . . . . . . . . . .  2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

POINT I—THIS COURT SHOULD REJECT THE DISTRICT
   COURT'S INTERPRETATION OF THE *PARI PASSU*
   CLAUSE IN SOVEREIGN DEBT INSTRUMENTS . . . . .  6

   A.  The United States Has Long Promoted
   Consensual, Orderly Sovereign Debt
   Restructuring Efforts Within a Framework of
   Contractual Certainty . . . . . . . . . . . . . . . . .  6

   B.  The District Court's Interpretation of the
   *Pari Passu* Clause Disrupts Settled
   Expectations, and Is Incorrect as a Matter of
   Law and Adverse to the United States' Policy
   Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      1.  The Ratable Payment Interpretation of
      the *Pari Passu* Clause Is Incorrect and
      Creates Uncertainty in Sovereign
      Contractual Relationships . . . . . . . . . .  10

         a.  Longstanding Market Practice
         Supports a Narrow Reading of the
         *Pari Passu* Clause . . . . . . . . . . . .  11

         b.  The Ratable Payment Interpretation
         of the *Pari Passu* Clause Deviates
         From This Settled Market
         Understanding .. . . . . . . . . . . . . .  13

ii

2. The Ratable Payment Interpretation of the *Pari Passu* Clause Would Disrupt the Orderly Resolution of Sovereign Debt Crises . . . . . . . . . . . . . . . . . . . . . . . . . . 17

3. The Ratable Payment Interpretation of the *Pari Passu* Clause Could Prevent Sovereign Debtors From Servicing Debts to International Financial Institutions . . . . . . . . . . . . . . . . . . . . . . 19

POINT II—THE DISTRICT COURT'S ORDERS ARE IMPERMISSIBLY BROAD . . . . . . . . . . . . . . . . . . . . . 21

A. The Orders Contravene the Purpose and Structure of the FSIA . . . . . . . . . . . . . . . . . 22

B. The Orders Are Harmful to the United States' Foreign Relations . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

iii

PAGE

TABLE OF AUTHORITIES

*Cases*:

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*,
    475 F.3d 1080 (9th Cir. 2007) . . . . . . . . . . . . . .  24

*Af-Cap, Inc. v. Republic of Congo*,
    462 F.3d 417 (5th Cir. 2006) . . . . . . . . . . .  22, 28

*Argentine Republic v. Amerada Hess Shipping
    Corp.*, 488 U.S. 428 (1989) . . . . . . . . . . . . . . . .  22

*Autotech Technologies LP v. Integral Research
    & Dev. Corp.*, 499 F.3d 737 (7th Cir. 2007) .  22, 23

*Elliot Assocs., L.P. v. Banco de la Nacion*,
    General Docket No. 2000/QR/92 (Court of
    Appeals of Brussels, 8th Chamber,
    Sept. 26, 2000) . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Kensington Int'l Ltd. v. Republic of the Congo*,
    2002 No. 1088, [2003] . . . . . . . . . . . . . . . . . . .  16

*Mangattu v. M/V Ibn Hayyan*,
    35 F.3d 205 (5th Cir. 1994) . . . . . . . . . . . . . . .  27

*NML Capital, Ltd. v. Banco Central de la
    Republica Argentina*, 652 F.3d 172
    (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Persinger v. Islamic Republic of Iran*,
    729 F.2d 835 (D.C. Cir. 1984) . . . . . . . . . . . . .  29

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) . . . . . . . . . . . . .  26

iv

*Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal. App. 3d 1058 (Cal. Ct. App. 1990) . . . . . . . . . . . . . . . . . . . . . . 26

*Red Mountain Finance, Inc. v. Democratic Republic of Congo*, No. CV-00-0164 R (C.D. Cal.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Republic of Nicaragua v. LNC Investments and Euroclear Bank S.A.*, Docket No. 240/03 (Brussels Commercial Ct. Sept. 11, 2003) . . . . . 15

*Republic of Philippines v. Pimentel*, 128 S. Ct. 2180 (2008) . . . . . . . . . . . . . . . . . . . . . 24

*Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011) . . . . . . . . . . . . . . . 27

*S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411 (2d Cir. 1983) . . . . . . . . . . . . . 25, 26

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) . . . . . 10

*In re Southeast Banking Corp.*, 93 N.Y.2d 178 (1999) . . . . . . . . . . . . . . . . . . . . . 10

*Walters v. Industrial and Comm. Bank of China, Ltd.*, 651 F.3d 280 (2d Cir. 2011) . . 23, 26

*Walters v. People's Republic of China*, 672 F. Supp. 2d 573 (S.D.N.Y. 2009) . . . . . . . . 23

*Weston Compagnie de Finance et D'Investissement, S.A. v. Republic del Ecuador*, 823 F. Supp. 1106 (S.D.N.Y. 1993) . . . . . . . . . . 26

v

PAGE

*Whiteman v. Dorotheum GmbH & Co.*,
    431 F.3d 57 (2d Cir. 2005) . . . . . . . . . . . . . . . . .  28

*Statutes*:

22 U.S.C. § 5324 . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

28 U.S.C. § 517 . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

28 U.S.C. § 1604 . . . . . . . . . . . . . . . . . . . . . . . . . .  23

28 U.S.C. § 1606 . . . . . . . . . . . . . . . . . . . . . . . . . .  27

28 U.S.C. § 1609 . . . . . . . . . . . . . . . . . . . . . . . . . .  23

28 U.S.C. § 1610 . . . . . . . . . . . . . . . . . . . . . . . . . .  23

Department of State, Foreign Operations, and
    Related Programs Appropriations Act, 2012,
    div. I, Pub. L. No. 112-74, § 7071(b), 125 Stat.
    786.1254 (2011) . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Legislative History*:

Foreign Sovereign Immunities Act of 1976,
    House Report No. 94-1487, 5 U.S.C.A.A.N.
    6604 (Sept. 9, 1976) . . . . . . . . . . . . . . . . . . .  22, 24

*Miscellaneous*:

Edwin Borchard, 1 *State Insolvency and Foreign
    Bondholders* (1951) . . . . . . . . . . . . . . . . . . . . . . .  13

vi

Michael H. Bradley, James D. Cox & Mitu Gulati,
*The Market Reaction to Legal Shocks and Their
Antidotes: Lessons from the Sovereign Debt
Market*, 39 J. Legal Studies 289 (2010) . . .  14, 15

Lee C. Buchheit & Jeremiah S. Pam, *The Pari
Passu Clause in Sovereign Debt Instruments*,
53 Emory L.J. 869 (2004) . . . . . . . . . . .  11, 12, 14

Lee C. Buchheit & Ralph Reisner, *The Effect of the
Sovereign Debt Restructuring Process on Inter-
Creditor Relationships*,
1988 U. Ill. L. Rev. 493 (1988) . . . . . . . . . . . . .  12

Financial Markets Law Committee, *Pari Passu
Clauses: Analysis of the Role, Use and Meaning
of Pari Passu Clauses in Sovereign Debt
Obligations as a Matter of English Law*
(2005) . . . . . . . . . . . . . . . . . . . . . . . . . .  14, 18, 19

H. Fox, "International Law and the Restraints on
the Exercise of Jurisdiction by National Courts
of States," in M. Evans, ed., *International Law*,
364 (2003) . . . . . . . . . . . . . . . . . . . . . . . . .  28, 29

G. Mitu Gulati & Kenneth N. Klee, *Sovereign
Piracy*, 56 Bus. Law. 635 (2001) . . . . . . . .  15, 16

John W. Head, *Suspension of Debtor Countries'
Voting Rights in the IMF: An Assessment of the
Third Amendment to the IMF Charter*,
33 Va. J. of Int'l Law 591 (1993) . . . . . . . . . . .  20

Matthew H. Hurlock, *New Approaches to
Economic Development: The World Bank, the
EBRD, and the Negative Pledge Clause*,
35 Harv. Int'l L. J. 345 (1994) . . . . . . . . . . . . .  21

vii

PAGE

Rodrigo Olivares-Caminal, *To Rank Pari Passu or Not to Rank Pari Passu: That is the Question in Sovereign Bonds After the Latest Episode of the Argentine Saga*, 15 Law and Business Review of the Americas 745 (2009) . . . . . . . . . . . . . . . . . .  14

Rodrigo Olivares-Caminal, *Understanding the Pari Passu Clause in Sovereign Debt Instruments: A Complex Quest*, 43 Int'l Law. 1217 (Fall 2009) . . . . . . 11, 13, 18

Mark Weidemaier, Robert Scott & G. Mitu Gulati, *Origin Myths, Contracts and the Hunt for Pari Passu*, UNC Legal Studies Research Paper No. 1633439 (2011).. . . . . . . . . . . . . . .  14

Philip R. Wood, Pari Passu *Clauses—What Do They Mean?*, 18 Butterworths J. of Int'l Banking and Financial L. 371 (2003) . . . . . . . . . . . . . . . . . .  11

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

**Docket Nos. 12-105(L), 12-109-cv (CON),
12-111-cv (CON), 12-157-cv (CON),
12-158-cv (CON), 12-163-cv (CON),
12-164-cv (CON), 12-170-cv (CON),
12-176-cv (CON), 12-185-cv (CON),
12-189-cv (CON), 12-214-cv (CON),
12-909-cv (CON), 12-914-cv (CON),
12-916-cv (CON), 12-919-cv (CON),
12-920-cv (CON), 12-923-cv (CON),
12-924-cv (CON), 12-926-cv (CON),
12-939-cv (CON), 12-943-cv (CON),
12-951-cv (CON), 12-968-cv (CON),
12-971-cv (CON)**

———————

NML CAPITAL, LTD., AURELIUS CAPITAL MASTER, LTD.,
ACP MASTER, LTD., BLUE ANGEL CAPITAL I LLC,
AURELIUS OPPORTUNITIES FUND II, LLC, PABLO
ALBERTO VARELA, LILA INES BURGUENO, MIRTA
SUSANA DIEGUEZ, MARIA EVANGELINA CARBALLO,
LEANDRO DANIEL POMILIO, SUSANA AQUERRETA,
MARIA ELENA CORRAL, TERESA MUNOZ DE CORRAL,
NORMA ELSA LAVORATO, CARMEN IRMA LAVORATO,
CESAR RUBEN VAZQUEZ, NORMA HAYDEE GINES,
MARTA AZUCENA VAZQUEZ, OLIFANT FUND, LTD.,

*Plaintiffs-Appellees,*

—v.—

2

THE REPUBLIC OF ARGENTINA,

*Defendant-Appellant.*

---

**BRIEF FOR THE UNITED STATES OF AMERICA AS
AMICUS CURIAE IN SUPPORT OF REVERSAL**

---

**Interest of the United States**

Pursuant to 28 U.S.C. § 517 and Rule 29(a) of the Federal Rules of Appellate Procedure, the United States respectfully submits this brief as amicus curiae supporting reversal of orders entered by the United States District Court for the Southern District of New York (Griesa, *J.*), on December 7 and December 13, 2011 (the "December Orders") (SPA 10-25), and February 23, 2012 (the "February 23 Orders") (SPA 28-54) (collectively, the "Orders").

This litigation involves efforts by so-called "holdout creditors" to collect on defaulted bonds from the Republic of Argentina ("Argentina"). In 2001, the Argentine government announced a moratorium on its repayment of approximately $80 billion in public foreign debt. *See NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 175 (2d Cir. 2011). Since 2001, Argentina has not made any payments on the defaulted bonds. *Id.* Instead, Argentina restructured approximately 92 percent of its debt by launching global exchange offers in 2005 and 2010, pursuant to which creditors holding the defaulted bonds could exchange them for new securities with modified terms. *Id.* at 176 & n.4. Plaintiffs-appellees

3

did not accept the exchange offers and instead sought recourse from the courts.

In the December Orders, the district court adopted a broad and novel interpretation of the standard *pari passu* provision found in many sovereign debt instruments. The district court concluded that Argentina breaches the *pari passu* provision whenever it makes payments to those bondholders who accepted the exchange offers without fsimultaneously paying the full amount of principal and interest owed to plaintiffs-appellees. (SPA 13).

The February 23 Orders in turn require that Argentina pay the full amount due to plaintiffs-appellees whenever Argentina makes a payment under the terms of the exchange bonds. (*See, e.g.*, SPA 33). The court further prohibited third parties from assisting Argentina in servicing payments on the exchange bonds without ensuring that full payment to plaintiffs-appellees are also made. (*See, e.g.*, SPA 34). Finally, the court prohibited Argentina from altering the process by which Argentina makes payments on the exchange bonds without obtaining approval from the court. (*See, e.g.*, SPA 34-35).

In supporting reversal of the Orders, the United States does not condone or excuse a foreign state's failure to comply with the judgment of a U.S. court imposing liability on the state. The United States consistently has maintained, and continues strongly to maintain, that Argentina immediately should normalize relations with all of its creditors, both public and private.

4

In addition to Argentina's unwillingness to resolve remaining issues with all of its bondholders, the United States has several concerns regarding Argentina's failure to honor its international obligations. We encourage Argentina to continue to work with the International Monetary Fund ("IMF") and to participate in IMF surveillance as required under its Articles of Agreement, to improve its statistical reporting, clear its arrears to the United States and other Paris Club members, and honor final awards of arbitration panels convened under the auspices of the International Centre for Settlement of Investment Disputes ("ICSID"). Argentina's failure to honor its obligations or to engage with international institutions remains a concern, given that Argentina is a member of the G-20, the IMF, the World Bank, and other international fora, and is a middle-income country with great potential to generate prosperity for its citizens. It is for these reasons that the United States has opposed lending to Argentina through multilateral development banks such as the World Bank and the Inter-American Development Bank. In addition, on March 26, 2012, President Obama suspended Argentina's eligibility under the Generalized System of Preferences program because of Argentina's failure to pay two longstanding ICSID arbitral awards in favor of U.S. companies.

Notwithstanding these concerns regarding Argentina's continued failure to abide by its obligations, and our strong insistence that it do so promptly, the United States respectfully submits this brief because these consolidated appeals raise two issues of vital

5

public policy and legal importance to the United States that extend beyond the particular facts of this case.*

First, the district court's interpretation of the *pari passu* clause, a boilerplate provision contained in a number of sovereign debt instruments, in a manner that deviates from decades of settled market expectations is contrary to United States economic policy. Notwithstanding recent developments in sovereign debt contracts that promote collective action by creditors, the district court's interpretation of the *pari passu* provision could enable a single creditor to thwart the implementation of an internationally supported restructuring plan, and thereby undermine the decades of effort the United States has expended to encourage a system of cooperative resolution of sovereign debt crises. Allowing creditors recourse to such an enforcement mechanism would have adverse consequences on the prospects for voluntary sovereign debt restructuring, on the stability of international financial markets, and on the repayment of loans extended by international financial institutions ("IFIs"). Accordingly, the United States opposes the adoption of the district court's ratable payment interpretation of the *pari passu* clause as contrary to United States policy interests.

Second, the United States has a significant interest in ensuring that courts correctly construe the laws

_____

\* In 2004, the United States filed a Statement of Interest in related litigation addressing the proper interpretation of the *pari passu* clause and the permissible scope of relief against a foreign sovereign. (*See* A-1760–A-1785).

6

relating to foreign sovereign immunity, including immunity from enforcement of judgments against the property of foreign states. The issues raised in this appeal regarding the appropriate scope of an injunction issued against a foreign sovereign could affect all foreign sovereigns in U.S. courts, and have a significant, detrimental impact on our foreign relations, as well as on the reciprocal treatment of the United States and its extensive property holdings.

## A R G U M E N T

### POINT I

### THIS COURT SHOULD REJECT THE DISTRICT COURT'S INTERPRETATION OF THE *PARI PASSU* CLAUSE IN SOVEREIGN DEBT INSTRUMENTS*

### A. The United States Has Long Promoted Consensual, Orderly Sovereign Debt Restructuring Efforts Within a Framework of Contractual Certainty

Recognizing the serious difficulties that sovereign solvency crises present for both sovereign borrowers

———————

\* In addition to holding that the *pari passu* clause was violated when Argentina made payments to the holders of exchange bonds without also satisfying its payment obligations under the bonds held by the appellees (SPA-32 at ¶ 5), the district court found that the *pari passu* clause was violated by the enactment of Argentina's Lock Law (SPA-32 at ¶¶ 6-7). The parties here dispute the proper characterization of the Lock Laws. Argentina argues that the Lock Law does not

7

and the international financial system, the United
States has adopted, as a cornerstone of its foreign
economic policy, the position that emerging markets
should embrace strong macroeconomic policies that will
produce economic growth, allow them to fully satisfy
their external debt obligations, and strengthen the
international financial system. In those rare cases
where a sovereign cannot meet its external obligations,
however, the policy of the United States is that the
orderly and consensual restructuring of sovereign debt,
in conjunction with needed macroeconomic adjust-
ments, is the most appropriate response. This policy
promotes international economic and financial stability
by allowing a debtor nation to move expeditiously past
a balance of payment crisis, while at the same time
minimizing potentially devastating "ripple effects" that

―――――――――

legally subordinate debt, but merely requires legislative
approval to authorize new settlements with
bondholders. Brief of Defendant-Appellant the Republic
of Argentina ("Arg. Br.") at 45. Plaintiffs-appellees
contend, in contrast, that the Lock Law is a legislative
enactment that prohibits payments with respect to
their bonds and accords a higher legal preference to the
exchange bonds. (A-2122). The United States does not
have particular expertise on the application of
Argentine law in the context of its 2005 and 2010 debt
restructuring. Moreover, legal mechanisms to effectuate
a default or a restructuring of debt are likely to vary
from country to country, and may not exist in all cases.
Accordingly, the United States takes no position as to
whether the district court correctly concluded that the
enactment of the Lock Law constituted a breach of the
*pari passu* clause.

8

sovereign defaults could otherwise have on the global economy.

In response to the sovereign debt crises of the 1980s, the United States urged sovereign debtors to adopt economic policy reforms in conjunction with increased lending from the IFIs. In a subsequent initiative known as the Brady Plan, the United States explicitly recognized the role restructuring must play in resolving sovereign debt crises. The Brady Plan encouraged commercial banks to find alternatives to new lending in dealing with the sovereign debt problem, and called for debt and debt service reduction by banks. This policy was codified in the International Debt Management Act, 22 U.S.C. § 5324.

Over the past decade, the United States has recognized that the shift of the emerging market creditor base from commercial banks to bondholders has increased uncertainty surrounding the sovereign debt restructuring process and complicated decision-making for private creditors, the public sector, and sovereign debtors alike. Accordingly, the United States has been engaged in a concerted effort to promote greater orderliness and predictability in the restructuring process. The United States has advocated the incorporation of a package of new clauses into sovereign debt contracts that would provide for a more orderly restructuring process and facilitate countries' efforts to restructure their debt in order to reach more rapidly sustainable debt positions.

For example, the United States has encouraged the inclusion of collective action clauses in sovereign debt contracts, which would permit a super-majority of bondholders to amend a debt instrument even when a

9

minority creditor refuses to agree to the amendment. The United States considers the progress made in this initiative a demonstration that sovereign debt restructuring can be achieved within the existing framework of contractual relations and consensual negotiation.

Despite these actions to promote voluntary restructuring as the solution to sovereign debt crises, the growth of the secondary market for sovereign debt means that creditors have a wide range of financial interests. The disparate nature of creditor interests complicates the orderly resolution of sovereign debt crises, which depends on the voluntary actions of individual debtholders and the affected sovereign state in developing jointly negotiated solutions to balance of payment crises.

In this context, ensuring the certainty and predict-ability of sovereign contractual relations becomes essential. Indeed, U.S. sovereign debt policy implicitly recognizes the critical role of the contract in resolving a debt crisis. Restructuring negotiations must take place within a framework where creditors can seek recourse to the courts to enforce contractual obligations. Moreover, creditors must be assured that the terms of any new debt instruments issued pursuant to a restructuring plan will be legally enforceable. It would, however, harm the process that has evolved to address sovereign debt problems if creditors, in negotiating with debtors, also retained the option to litigate to obtain incorrect interpretations of standard terms than are not supported by commercial market practice. Because it is the United States' policy that neither party should be allowed to alter through litigation the terms of a

10

sovereign debt instrument, it is vital that such terms be interpreted according to settled market understanding.

Settled market understanding most clearly reflects the *ex ante* understanding of the parties at the time they entered their contractual relationship. In contrast, altering settled market understanding of existing debt instruments renders contractual relations less certain. International markets are adversely affected by uncertainty regarding provisions in sovereign debt instruments, particularly where, as here, it injects further unpredictability and disorder into the already complex problems posed by sovereign defaults. Such a lack of certainty could also discourage international lending to distressed sovereigns.

**B. The District Court's Interpretation of the *Pari Passu* Clause Disrupts Settled Expectations, and Is Incorrect as a Matter of Law and Adverse to the United States' Policy Interests**

The district court's construction of the *pari passu* clause in the December Orders is both contrary to the settled understanding of this standard contractual provision and at odds with the established framework for resolving sovereign payment crises through consensual restructuring of debt.

**1. The Ratable Payment Interpretation of the *Pari Passu* Clause Is Incorrect and Creates Uncertainty in Sovereign Contractual Relationships**

As an initial matter, by failing to analyze, let alone defer to, the market understanding of boilerplate language in a commercial instrument, the district

11

court's decision was contrary to New York law, which governs the interpretation of the loan documents at issue. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048 (2d Cir. 1982) ("[T]he creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets."); *In re Southeast Banking Corp.*, 93 N.Y.2d 178, 183-84 (1999) (noting importance of settled marking understanding in construing terms of indenture instruments). Moreover, because *pari passu* clauses substantially similar to those at issue here have been common in sovereign debt instruments since the 1970s, adoption of the district court's novel interpretation is likely to disrupt financial markets for a considerable period.

### a. Longstanding Market Practice Supports a Narrow Reading of the *Pari Passu* Clause

The United States accepts the established market understanding of *pari passu* clauses in sovereign debt instruments. "The international financial markets have long understood the [*pari passu*] clause to protect a lender against the risk of legal subordination in favor of another creditor . . . ." Lee C. Buchheit & Jeremiah S. Pam, *The Pari Passu Clause in Sovereign Debt Instruments*, 53 Emory L.J. 869, 870 (2004); *see also id.* at 872 n.3; Rodrigo Olivares-Caminal, *Understanding the Pari Passu Clause in Sovereign Debt Instruments: A Complex Quest*, 43 Int'l Law. 1217, 1227 (Fall 2009) [hereinafter, "*Understanding the Pari Passu Clause*"]; Philip R. Wood, *Pari Passu Clauses—What Do They*

12

*Mean?*, 18 Butterworths J. of Int'l Banking and Financial L. 371, 372 (2003).

It is clear that the market does not understand the *de facto* actions or policies of a sovereign regarding payment of its debt obligations to affect the "rank" of debt within the meaning of the *pari passu* clause. To the contrary, market understanding has consistently reflected that a "borrower does not violate [the *pari passu*] clause by electing as a matter of practice to pay certain indebtedness in preference to the obligations outstanding under the agreement in which this clause appears." Lee C. Bucheit & Ralph Reisner, *The Effect of the Sovereign Debt Restructuring Process on Inter-Creditor Relationships*, 1988 U. Ill. L. Rev. 493, 497 (1988). The customary inclusion of *pari passu* provisions in sovereign debt instruments throughout the 1980s and 1990s was never viewed as a barrier to the resolution of sovereign defaults on foreign loans through the negotiation of consensual rescheduling and restructuring agreements. In fact, it was common practice throughout this period for sovereigns to exclude some debt from restructuring—such as debt owed to trade creditors or multilateral lending institutions—while restructuring other public debt. *See* Buchheit & Pam, *supra*, at 883.*

---

    * This was consistent with historical sovereign lending practice. In his treatise, former Yale law professor Edwin Borchard described how the principle of equal treatment of sovereign debt was understood in the early twentieth century, before the term "*pari passu*" had entered the sovereign debt lexicon:

13

### b. The Ratable Payment Interpretation of the *Pari Passu* Clause Deviates From This Settled Market Understanding

Notwithstanding this settled commercial under-standing, in September 2000, a Belgian court in an *ex parte* proceeding relied upon the *pari passu* clause to enjoin payments by Peru through Euroclear to the holders of bonds issued under a restructuring

---

> The principle of equality . . . does not signify uniformity of treatment. . . . While the private law of bankruptcy is governed by the principle of equality of claims in the distribution of the debtor's assets, differential treatment of the holders of foreign government bonds in case of default is the ordinary rule. The reason therein lies in the semipolitical nature of government loans and in the great variety of forms and purposes for which such loans are issued.

Edwin Borchard, 1 *State Insolvency and Foreign Bondholders* 337-38 (1951). Professor Borchard went on to note the variety of ways in which discrimination among classes of state obligations had been tolerated in the past. For example, creditors tolerated preferences in favor of certain other creditors in order for the state to maintain its basic functions (*e.g.,* salaries for public employees) and to conduct trade (*e.g.,* preferred payment of short-term trade credits over longer term external loan contracts). *Id.*

14

agreement. *See Elliot Assocs., L.P. v. Banco de la Nacion*, General Docket No. 2000/QR/92 (Court of Appeals of Brussels, 8th Chamber, Sept. 26, 2000). The Belgian Court of Appeals held, without citation to any authority, that "the various creditors benefit from a *pari passu* clause that in effect provides that the debt be repaid *pro rata* among all creditors." *Id.* at 3. The Peruvian government was ultimately forced to pay substantially all of the holdout creditor's debt to avoid defaulting on its Brady Bonds. *See Understanding the Pari Passu Clause*, *supra*, at 1225.

The Belgian court's construction of the *pari passu* clause deviated from well-established market practice and was viewed with almost universal consternation by international financial markets. *See, e.g.*, Mark Weidemaier, Robert Scott & G. Mitu Gulati, *Origin Myths, Contracts and the Hunt for Pari Passu*, UNC Legal Studies Research Paper No. 1633439, at 5 (2011), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1633439 ("The decision sent shockwaves through the sovereign debt world . . . ."); Rodrigo Olivares-Caminal, *To Rank Pari Passu or Not to Rank Pari Passu: That is the Question in Sovereign Bonds After the Latest Episode of the Argentine Saga*, 15 Law and Business Review of the Americas 745, 746 (2009) [hereinafter "*To Rank Pari Passu*"]; Michael H. Bradley, James D. Cox & Mitu Gulati, *The Market Reaction to Legal Shocks and Their Antidotes: Lessons from the Sovereign Debt Market*, 39 J. Legal Studies 289, 303 (2010) ("[T]he [Belgian] court's decision came as a shock to the market and was clearly unanticipated.").

15

Most commentators concluded that the Belgian court had misconstrued the *pari passu* clause in a way that would cause problems in the sovereign debt markets. *See, e.g.*, Financial Markets Law Committee, *Pari Passu Clauses: Analysis of the Role, Use and Meaning of Pari Passu Clauses in Sovereign Debt Obligations as a Matter of English Law*, at 9-22 (2005) (A-1823–A-1849) (noting that the Belgian court's interpretation would be unworkable and contrary to market practice); *To Rank Pari Passu*, *supra*, at 746; Weidemaier, Scott & Gulati, *supra*, at 2; Buchheit & Pam, *supra*, at 917; G. Mitu Gulati & Kenneth N. Klee, *Sovereign Piracy*, 56 Bus. Law. 635, 640 (2001).

The Belgian government itself effectively overruled the *Elliot* decision in November 2004, by enacting legislation that precludes holdout creditors from obtaining orders blocking payments through Euroclear in future cases. *See* Belgium Law 4765 [C-2004/03482]; Bradley, Cox & Gulati, *supra*, at 9, 15 & n.33.*

---

    * Although two other lower level courts have issued orders requiring a sovereign to make *pro rata* payments to holders of defaulted sovereign debt instruments, neither court engaged in any substantive consideration of the *pari passu* clause, and both orders were later vacated. A Belgian court enjoined Euroclear from making payments to holders of debt instruments issued by the Republic of Nicaragua, but this decision merely adhered to the precedent set by the *Elliot* decision. *Republic of Nicaragua v. LNC Investments and Euroclear Bank S.A.*, Docket No. 240/03 (Brussels Commercial Ct. Sept. 11, 2003). This decision was reversed on appeal on grounds unrelated to the

16

The one court to examine the *pari passu* clause in depth since the *Elliot* decision was issued expressed skepticism regarding its conclusion. In *Kensington Int'l Ltd. v. Republic of the Congo*, 2002 No. 1088, [2003] EWHC 2331 (Comm) (Commercial Ct. Apr. 16, 2003), the court denied an application for an injunction requiring Congo to make *pro rata* payments to its creditors. The court ultimately based its decision upon, *inter alia*, the excessive and intrusive nature of the injunction that was sought. *Id.* at ¶¶ 93-94. The court nonetheless observed that it gave "little weight" to the *Elliot* decision, which "was made upon an *ex parte* application," *id.* at ¶ 63, and which was contrary to language in the Encyclopaedia of Banking Law stating that the *pari passu* clause is not violated "merely because one creditor is, in fact, paid before another," *id.* at ¶ 67.

---

interpretation of the *pari passu* clause. In another case, a district court in California denied a judgment creditor's motion for specific performance of the *pari passu* clause. Despite denying that motion, the court nonetheless enjoined the Democratic Republic of Congo from making payments on any debts unless proportionate payments were made to the plaintiff in that case. Order dated May 21, 2001, *Red Mountain Finance, Inc. v. Democratic Republic of Congo*, No. CV-00-0164 R (C.D. Cal.) (A-1369–A-1372). The district court's order contained no reasoning and so it is unclear on what basis the court entered the injunction. In any event, the injunction was vacated after the parties arrived at a settlement while the case was on appeal. (A-2216–A-2225).

17

Like the *Elliot* decision, the district court's decision here failed to analyze market practices or commercial understanding of the *pari passu* clause, much less consider how its interpretation of the *pari passu* clause might affect the financial markets. Because the district court's interpretation of the *pari passu* clause disrupts settled expectations concerning the scope and effect of boilerplate language contained in many sovereign debt instruments, it is contrary to U.S. policy interests. *See* Gulati & Klee, *supra*, at 649-50.

## 2. The Ratable Payment Interpretation of the *Pari Passu* Clause Would Disrupt the Orderly Resolution of Sovereign Debt Crises

The district court's broad interpretation of the *pari passu* clause also imperils the United States' efforts to promote voluntary debt restructuring, along with macroeconomic reform and support as necessary from the IFIs, as the most effective way to resolve sovereign balance of payment crises while minimizing economic damage. Voluntary sovereign debt restructuring will become substantially more difficult, if not impossible, if holdout creditors are allowed to use novel interpretations of boilerplate bond provisions to interfere with the performance of a restructuring plan accepted by most creditors and to dramatically tilt the incentives away from consensual, negotiated restructuring in the first place.

Reinterpreting standard *pari passu* clauses after decades of settled market practice could change the balance of interests that, to date, has induced the majority of creditors and debtors to recognize a

18

mutuality of interest in finding jointly negotiated solutions to balance of payment crises. The ratable payment interpretation of the *pari passu* clause presents a classic collective action problem: no creditor will be willing to accept the reductions in debt necessary for a consensual restructuring plan if creditors are contractually guaranteed to receive the full amount of their outstanding loan obligation at some point in the future, when the sovereign inevitably makes payment on other external indebtedness. Moreover, if, as happened in *Elliot*, creditors can interfere with payments by sovereign debtors to those creditors who have already accepted a reduction in the sovereign's debt obligation, this will reduce the incentives of such creditors to agree to a restructuring.

At the same time, the knowledge that creditors might be able to rely upon the *pari passu* clause to leverage greater recoveries from sovereign debtors would encourage more creditors to pursue holdout litigation strategies. *See Understanding the Pari Passu Clause*, *supra*, at 1219. The threat of increased litigation by holdout creditors relying upon the *pari passu* clause to target the implementation of a debt restructuring plan undermines the orderly consensual restructuring process the United States has been at pains to foster for the past several decades.

Indeed, a broad construction of the *pari passu* clause could ultimately involve the federal courts in rendering determinations concerning payments on Argentina's debts of all kinds and in many countries, including in Argentina itself. This may force the district court to assume the role of a sovereign bankruptcy court, issuing stays on all outflow of Argentina's assets and

19

supervising the timing and amount of payments made by Argentina to its creditors.

Finally, the ratable payment interpretation could have the cascading effect of turning short-term and limited balance of payment problems into full-fledged sovereign defaults. It was partly for this reason that the Financial Markets Law Committee ("FMLC"), an independent committee of private sector English lawyers sponsored by the Bank of England, rejected the ratable payment construction of the *pari passu* clause as unworkable and contrary to market practice. FMLC, *supra*, at 13-15. The FMLC observed that, following the ratable payment theory to its natural conclusion could have dramatic consequences: Because the ratable payment construction of the *pari passu* clause prohibits the creation of preferences among creditors, as soon as a sovereign became unable to pay all of its external indebtedness, even temporarily, the sovereign's only options would be to default on all of its outstanding obligations or violate the *pari passu* clause by prioritizing payments. *Id.* at 14. The *pari passu* clause should not be read to have such drastic implications.

### 3. The Ratable Payment Interpretation of the *Pari Passu* Clause Could Prevent Sovereign Debtors From Servicing Debts to International Financial Institutions

The ratable payment interpretation of the *pari passu* clause adopted by the district court could also impede the repayment of loans extended by IFIs to sovereigns experiencing unserviceable debt burdens. Although the district court's holding that Argentina breached the *pari passu* clause by its terms is limited to

20

Argentina's payments to holders of exchange bonds, the logical implication of its decision is that any selective payment of external indebtedness by a sovereign debtor, including to IFIs, constitutes a violation of the *pari passu* clause.

The United States relies upon the IFIs to play a critical role in resolving sovereign debt crises. The IFIs were established by the international community to advance shared public policy interests in promoting global economic growth and stability. For example, the IMF—with U.S. urging—played a central role in the international financial community's efforts to tackle the Latin debt crises of the 1980s, to promote the transition of Eastern European and former Soviet Union economies to market-based systems, and to address the Asian financial crisis in the second half of the 1990s.

Most recently, the IMF has worked with private bondholders and European leaders to restructure Greece's sovereign debt, thereby preventing a disorderly Greek default. The IMF has provided critical support for economic reform programs in Greece, Ireland, and Portugal in partnership with Europe, actions that have helped limit the damage from the European financial crisis to the United States and to economies around the world.

The IFIs—with the encouragement of the United States and other members—provide financial support to reforming countries at times when private capital is unavailable. Continued financial support for nations facing balance of payment difficulties and undertaking needed reforms is vital to maintaining the stability of the international financial system. *See, e.g.*, International Monetary Fund, Policy on Lending into

Arrears to Private Creditors, available at http://www.imf.org/external/pubs/ft/ privcred/ (1999).

The IFIs would be hampered in their ability to serve this function were they no longer able to expect timely and complete payments from their borrowers. *See* John W. Head, *Suspension of Debtor Countries' Voting Rights in the IMF: An Assessment of the Third Amendment to the IMF Charter*, 33 Va. J. of Int'l Law 591, 603-04 (1993). Therefore, as a matter of established custom, sovereign debtors routinely service debts owed to IFIs—even though those debtors may lack the resources to pay their other obligations. This custom is well understood by the international financial community. *See, e.g.*, Matthew H. Hurlock, *New Approaches to Economic Development: The World Bank, the EBRD, and the Negative Pledge Clause*, 35 Harv. Int'l L. J. 345, 365-66 (1994); Testimony of Deputy Assistant Secretary Mark Sobel Before the House Oversight Committee on TARP, Financial Services, and Bailouts of Public and Private Programs (Dec. 16, 2011), available at http://www.hftreview.com/pg/newsfeeds/hftreview/item/30378/written-testimony-of-deputy-assistant-secretary-mark-sobel-before-the-house-oversight-and-government-reform-subcommittee-on-tarp-financial-services-and-bailouts-of-public-and-private-programs-what-the-euro-crisis-means-for-taxpayers-and-the-us-economy ("The Fund is regarded as the world's preferred creditor, meaning that the IMF's member countries acknowledge and agree that it gets repaid first."); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2012, div. I, Pub. L. No. 112-74, § 7071(b), 125 Stat. 786.1254 (2011) (directing the Secretary of the Treasury to "instruct the United States Executive Director of the [IMF] to seek to ensure that

22

any loan will be repaid to the IMF before other private creditors"). Any interpretation of the *pari passu* clause that would potentially prevent states from continuing to service their IFI debt during, or as they emerge from, financial crisis is contrary to U.S. interests.

## POINT II

## THE DISTRICT COURT'S ORDERS ARE IMPERMISSIBLY BROAD

The district court exceeded the permissible scope of its jurisdiction when it directed a sovereign state to marshal assets that are immune from the court's exercise of its execution powers under the Foreign Sovereign Immunities Act of 1976 ("FSIA") restrained the sovereign's use of such immune property, and commanded the sovereign to refrain from altering its processes for servicing its debt obligations to third parties not before the court. In the context of the FSIA, such an injunction constitutes a "breathtaking assertion of extraterritorial jurisdiction," *Autotech Technologies LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 750 (7th Cir. 2007), and, as discussed in further detail below, is inconsistent with directly relevant Second Circuit precedent. Furthermore, the extraordinary intrusiveness of the Orders could have adverse effects on our foreign relations and pose reciprocal concerns with respect to U.S. government assets.

### A. The Orders Contravene the Purpose and Structure of the FSIA

The injunctive relief ordered by the district court must be considered against the backdrop of the

23

statutory scheme established in the FSIA. The FSIA
sets out the "sole, comprehensive scheme" for obtaining
and enforcing a judgment against a foreign state in a
civil case in the U.S. courts. *Af-Cap, Inc. v. Republic of
Congo*, 462 F.3d 417, 428 (5th Cir. 2006); *see also
Argentine Republic v. Amerada Hess Shipping Corp.*,
488 U.S. 428, 433 (1989); Foreign Sovereign Immunities
Act of 1976, House Report No. 94-1487, 5 U.S.C.A.A.N.
6604, 6610 (Sept. 9, 1976) [hereinafter H.R. 94-1487]
(the FSIA "prescribes . . . [the] circumstances under
which attachment and execution may be obtained
against the property of foreign states to satisfy a
judgment"). Under the FSIA, a foreign state is immune
from jurisdiction except as immunity is removed by
statute, 28 U.S.C. § 1604, and foreign state-owned
property is "immune from attachment arrest and
execution except as provided in" 28 U.S.C. §§ 1610 and
1611, 28 U.S.C. § 1609. Accordingly, the FSIA does not
provide for plenary enforcement of the orders of U.S.
courts, but instead cabins courts' enforcement authority
to those mechanisms set forth in the statute. *Id.*
§§ 1609-1611.

The FSIA's presumption of enforcement immunity
contains exceptions for foreign state property located
"in the United States" that is "used for a commercial
activity in the United States" and that meets one of
seven other requirements, 28 U.S.C. § 1610(a).
Sovereign property located outside of the United States
plainly falls outside the court's enforcement authority.
*See, e.g.*, *Walters v. Industrial and Comm. Bank of
China, Ltd.*, 651 F.3d 280, 288-89 (2d Cir. 2011) (noting
that "special protection [is] afforded to the property of
a foreign sovereign" under the FSIA because the
judicial seizure of sovereign property is viewed as a

24

greater affront to sovereignty than the exercise of jurisdiction over a state by itself); *Walters v. People's Republic of China*, 672 F. Supp. 2d 573, 574 (S.D.N.Y. 2009) (citing cases). "The FSIA did not purport to authorize execution against a foreign state's property . . . wherever that property is located around the world." *Autotech*, 499 F.3d at 750.

The FSIA's carefully circumscribed limits on the judiciary's exercise of jurisdiction over sovereigns and foreign state property reflect a deliberate policy choice on the part of Congress. As Congress recognized at the time it enacted the FSIA, "enforcement [of] judgments against foreign state property remains a somewhat controversial subject in international law." H.R. 94-1487, 5 U.S.C.A.A.N. at 6626. The judicial seizure of the property of a foreign state may well "be regarded as 'an affront to its dignity and may . . . affect our relations with it.' " *Republic of Philippines v. Pimentel*, 128 S. Ct. 2180, 2190 (2008). Accordingly, the provisions of the FSIA allowing execution against foreign state property impose limits on the extraterritorial exercise of jurisdiction by U.S. courts. *See, e.g.*, *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1088-89 (9th Cir. 2007).

According to Argentina, "the Republic makes its payments on the restructured debt *outside the United States* when it transfers the necessary funds to a trustee." Arg. Br. at 50. If plaintiffs were to reduce their claims to money judgment, they would be prevented from seeking to attach the funds utilized to pay the exchange bonds under the FSIA's strictures on enforcement of judgments, as the funds at issue are located outside the United States. Presumably in an

25

effort to avoid these restrictions, plaintiffs-appellees chose instead to move for equitable relief that purports to constrain Argentina's use of such property.

A court may issue an injunction against a sovereign only if it is "clearly appropriate." H.R. 94-1487, 5 U.S.C.A.A.N. at 6621. An injunction restraining a sovereign's use of property that the FSIA expressly provides is immune from execution is inconsistent with the structure of the FSIA and thus not "clearly appropriate."

Although the injunctions at issue here do not formally effectuate a transfer of property interests, the February 23 Orders have the practical effect of requiring Argentina to transfer funds amounting to the balance of principal and interest owed to plaintiffs-appellees on the next occasion that it makes a payment on the exchange bonds. Courts are not permitted to achieve by injunction what they are prohibited from doing in the exercise of their limited execution authority under the FSIA. *See S&S Machinery Co. v. Masinexportimport*, 706 F.2d 411, 418 (2d Cir. 1983).

In *S&S Machinery Co.*, this Court considered the propriety of an injunction that restrained the use of assets that were immune from attachment under the FSIA. The Court squarely rejected the notion that a district court's jurisdiction over a foreign state permitted it to restrain the use of sovereign property that was not itself subject to the court's jurisdiction:

> [S]uch [an injunction] could only have resulted in the disingenuous flouting of the FSIA ban on prejudgment attachment of assets belonging to a

26

> 'foreign state'. . . . The FSIA would
> become meaningless if courts could
> eviscerate its protections merely by
> denominating their restraints as
> injunctions against the negotiation or
> use of property rather than as
> attachments of that property. We hold
> that courts in this context may not
> grant, by injunction, relief which they
> may not provide by attachment.

*Id.* at 418; *see also Weston Compagnie de Finance et D'Investissement, S.A. v. Republic del Ecuador*, 823 F. Supp. 1106, 1115-16 (S.D.N.Y. 1993) (denying injunction that directed sovereign to return funds that had passed through New York but were now located abroad).

Courts have repeatedly resisted creditors' attempts to evade the restrictions on enforcement set forth in the FSIA, even if creditors frame the collection method as an exercise of jurisdiction over the sovereign, rather than the sovereign's property. For example, in *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010), the Ninth Circuit rejected a creditor's argument that the court's exercise of *in personam* jurisdiction over a sovereign provided it with authority to enter an order requiring the sovereign to assign foreign state assets located outside the United States, and hence immune from execution under the FSIA, to the creditor. *Id.* at 1130-32 ("The FSIA does not provide methods for the enforcement of judgments against foreign states, only that those judgments may not be enforced by resort to immune property."); *see also Philippine Export and Foreign Loan Guarantee Corp. v. Chuidian*, 218 Cal.

27

App. 3d 1058, 1094, 1099-100 (Cal. Ct. App. 1990) (rejecting argument that assignment order applying to assets worldwide would be "a valid exercise of the court's personal jurisdiction" over state instrumentality, because such an order would "ignore a long-standing immunity under international law and under the FSIA," and give the creditor what he could not achieve "through ordinary creditors' remedies, namely, execution upon foreign property"); *cf. Walters*, 651 F.3d at 288-89 ("[T]he FSIA's provisions governing jurisdictional immunity, on the one hand, and execution immunity, on the other, operate independently.").

To the extent that plaintiffs-appellees rely upon section 1606 as the basis for the district court's authority to enter the injunctions, this argument is unavailing. Section 1606 establishes that, with respect to a claim for which a state is not entitled to immunity, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Yet section 1606 concerns "the scope of *liability*, [not] the scope of *execution*. Although [a state] may be found liable in the same manner as any other private defendant, the options for executing a judgment remain limited." *Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011) (rejecting argument that section 1606 provides authority to subject sovereign to broad discovery orders in aid of execution of judgment). Accordingly, section 1606 does not expand upon the enforcement remedies that are available against a sovereign defendant. *See Mangattu v. M/V Ibn Hayyan*, 35 F.3d 205, 209 (5th Cir. 1994). Nor is it even clear that a U.S. court would have the authority to issue such

28

a broad injunction—which also purports to bind non-parties in Argentina—against a private party.

In sum, parties cannot avoid the limitations deliberately imposed by Congress on judicial execution authority and expand the scope of remedies available to them in an action against a sovereign simply by refraining from asking the court to reduce their claims to judgment. There is no indication in the statutory text or history that Congress intended for litigants to be able to sidestep sections 1609-1611 by seeking an injunction that restrains the sovereign's use of immune assets until a judgment is satisfied, rather than an order of execution against those same assets.

## B. The Orders Are Harmful to the United States' Foreign Relations

In addition to being contrary to the purpose and structure of the FSIA, the February 23 Orders could cause heightened tensions in our foreign relations. The United States' views regarding the foreign policy implications of particular exercises of a court's jurisdiction under the FSIA are accorded deference by the courts. *See, e.g.*, *Af-Cap*, 462 F.3d at 428 n.8; *Whiteman v. Dorotheum GmbH & Co.*, 431 F.3d 57, 69-74 (2d Cir. 2005).

As an initial matter, the same foreign relations concerns that animate the FSIA's restrictions on execution of judgments with respect to sovereign property located abroad exist whether the order is denominated an order of attachment or an injunction restricting the use of sovereign funds. Although there is a widespread acceptance in modern international law that foreign states' immunity from adjudication may be

29

restricted, "immunity from enforcement jurisdiction remains largely absolute," and "a foreign State continues largely immune from forcible measures of execution against its person or property." H. Fox, "International Law and the Restraints on the Exercise of Jurisdiction by National Courts of States," in M. Evans, ed., *International Law*, 364, 366, 371 (2003).

Moreover, the laws of many foreign nations do not even permit a court to enter an injunction against a foreign state, and the foreign state may expect the United States to extend to it the same respect and courtesy. It is important to recognize in this regard the strongly held view of many foreign states that they are not subject to coercive orders of U.S. courts. *See* Fox, *supra*, at 371 ("Nor may an injunction or order for specific performance be directed by a national court against a foreign State on pain of penalty if not obeyed."). The potential for affront is particularly heightened where, as here, the U.S. court purports to control the foreign state's conduct within its own borders. The breadth of the injunctions at issue here, which not only purport to exercise jurisdiction over foreign state property, but also have the effect of dictating to a sovereign state the implementation of its sovereign debt policy within its own territory, is particularly likely to raise foreign relations tensions.

The February 23 Orders are also problematic in their application to third parties. An order by a U.S. court directing third parties' actions with respect to foreign property could lead to friction in our foreign relations by imposing obligations on foreign persons or entities with possession of foreign state assets. Such third parties might have inconsistent obligations with

30

regard to those assets as a matter of domestic law or by contract.

Finally, an order by a U.S. court authorizing execution against foreign state property could have adverse consequences for the treatment of the United States and its property abroad under principles of reciprocity. As the D.C. Circuit recognized in *Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 841 (D.C. Cir. 1984), because "some foreign states base their sovereign immunity decisions on reciprocity," a U.S. court's decision to exercise jurisdiction over a foreign state can "subject the United States to suits abroad" in like circumstances. The district court's Orders restraining the use of foreign state property and purporting to direct the conduct of a sovereign state could encourage foreign courts to issue like orders against the United States and its property abroad.

31

**CONCLUSION**

**For the foregoing reasons, the Orders should be reversed.**

Dated:    New York, New York
          April 4, 2012

                    Respectfully submitted,

                    PREET BHARARA,
                    *United States Attorney for the*
                    *Southern District of New York,*
                    *Attorney for the United States as*
                         *Amicus Curiae*

                    JEANNETTE A. VARGAS,
                    JOHN D. CLOPPER,
                    SARAH S. NORMAND,
                    *Assistant United States Attorneys,*
                         *Of Counsel.*

STUART F. DELERY,
*Acting Assistant Attorney General*
MARK B. STERN,
SHARON SWINGLE,
*Attorneys, Appellate Staff*
*Civil Division, Department of Justice*

GEORGE W. MADISON,
*General Counsel, Department of the Treasury*

HAROLD HONGJU KOH,
*Legal Adviser, Department of State*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B). As measured by the word processing system used to prepare this brief, there are 6924 words in this brief.

PREET BHARARA,
*United States Attorney for the*
*Southern District of New York*

By: JEANNETTE A. VARGAS,
*Assistant United States Attorney*

# EXHIBIT O

```
                                                        1
      C2N4NMLC
 1    UNITED STATES DISTRICT COURT
 1    SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x
 2    NML CAPITAL LTD,
 3                Plaintiff,
 3            v.
 4                                    03CV8845(TPG)
 4    THE REPUBLIC OF ARGENTINA,
 5                Defendant.
 5    ------------------------------x
 6                                    New York, N.Y.
 6                                    February 23, 2012
 7                                    11:15 a.m.
 7    Before:
 8                      HON. THOMAS P. GRIESA
 8                                    District Judge
 9
 9                      APPEARANCES
10
10    GIBSON, DUNN & CRUTCHER
11         Attorneys for Plaintiff NML
11    THEODORE B. OLSON
12    MATTHEW D. McGILL
12    JASON J. MENDRO
13    MISHA TSEYTLIN
13
14    DECHERT
14         Attorneys for Plaintiff NML
15    ROBERT A. COHEN
15
16    FRIEDMAN KAPLAN SEILER & ADELMAN
16         Attorneys for Plaintiff Olifant Fund (10CV9587)
17    EDWARD A. FRIEDMAN
17    DANIEL B. RAPPORT
18    ROBERT CARROLL
18
19    MILBERG
19         Attorneys for Plaintiff Varela (10CV5338)
20    MICHAEL C. SPENCER
20
21    CLEARY GOTTLIEB STEEN & HAMILTON
21         Attorneys for Defendant Republic of Argentina
22    CARMINE D. BOCCUZZI
22    MICHAEL M. BRENNAN
23    EZEQUIEL SANCHEZ-HERRERA
23    MONA WILLIAMS
24
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300
```

C2N4NMLC

1  obligation to NML would be half of what it owed to NML.  We are
2  not asking for a greater percentage of payment of the
3  outstanding obligation.  We are asking for an equal percentage
4  of payment.
5          THE COURT:  Let me go to (c).  Such payment percentage
6  shall be the fraction calculated by dividing the amount
7  actually paid or which the Republic intends to pay under the
8  terms of the exchange bonds by the total amount then due under
9  the terms of the exchange bonds, by the total amount then due.
10 What you are saying is if $1 million in interest is due and
11 they are going to pay the $1 million, then the percentage is
12 100.
13         MR. OLSON:  Correct.  That's what equal payment
14 obligation means.  Payment obligation for $1 million is 100
15 percent, then 100 percent is owed over here, the same
16 percentage.  That's all we are trying to do in language that
17 would produce that exact result so that the payment obligations
18 would be equal.  If Argentina decides for some reason to come
19 to the bargaining table and say we will pay 75 percent of this
20 but we will pay you 75 percent of that or something like that,
21 then that's what would be required, but that is the only
22 reasonable interpretation of the equal payment obligation.
23         THE COURT:  What is due to NML?
24         MR. OLSON:  The amount that's due to NML in connection
25 with the three cases that are before you today is approximately

C2N4NMLC

```
 1    $650 million.  That is one/third of the amount that Argentina
 2    paid to the exchange bondholders in connection with payments
 3    they made in December of last year, just two months ago.  They
 4    paid over $2 billion to the exchange bondholders two months ago
 5    after your December 7 order.  The amount owed to NML is $650
 6    million.  The amount owed to the other bondholders who are here
 7    represented in court today, if my calculations are correct, is
 8    another $670-some million.
 9              Both of those added together are less than two/thirds
10    of what Argentina paid out in December to the exchange
11    bondholders.
12              THE COURT:  Just a minute.
13              Give me the figure for NML again.
14              MR. OLSON:  NML, the figure I have in front of me, I
15    could give it to the penny, but it's approximately $650
16    million.
17              THE COURT:  How is that arrived at?
18              MR. OLSON:  That is the principal plus prejudgment
19    interest as of a few days ago.
20              THE COURT:  What happened when the default occurred?
21    The principal was accelerated, right.
22              MR. OLSON:  Yes.
23              THE COURT:  And so the judgments would have been for
24    that accelerated principal, right.
25              MR. OLSON:  Yes.  These are prejudgment interests; the
```

27

C2N4NMLC

1    three cases before you today are prejudgment cases.
2               THE COURT:  But have judgments been entered?
3               MR. OLSON:  Judgments have been entered in other cases
4    on behalf of other bondholders and there are also judgments in
5    NML cases.  We brought the interpretation of the pari passu
6    clause provision with respect to cases in which you have not
7    yet entered judgment.
8               THE COURT:  Why did you decide to do that?
9               MR. OLSON:  Because those cases were still open.  We
10   thought, Argentina made the point, there might be issues with
11   respect to the interpretation of the pari passu clause with
12   respect to cases where there have already been judgments.
13   These are cases where, the cases are still pending, there have
14   not been judgments.
15              THE COURT:  If you win on this, are we going to have
16   motion as to the others.
17              MR. OLSON:  Possibly.  But that would raise this other
18   issue because of having entered the judgment.  We determined
19   that it would be more straightforward to deal with this issue
20   without having to deal with that separate issue at this time.
21              THE COURT:  650 million for NML and the other people.
22              MR. OLSON:  The other bondholders represented today,
23   if the information in my possession is correct and I believe it
24   is, is 677 million.
25              THE COURT:  OK.  Let's take a short break then I will
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

C2N4NMLC
```
 1   hear from the other parties.
 2              MR. OLSON:  Thank you, your Honor.
 3              (Recess)
 4              THE COURT:  Mr. Boccuzzi.
 5              MR. BOCCUZZI:  Thank you, your Honor.  Good afternoon.
 6   Your Honor, you asked Mr. Olson several times whether there was
 7   legal authority to support an order that would interfere with
 8   payments to the exchange offer-takers.  In a word, no, there is
 9   no legal authority.  There is also no legal authority for this
10   conditioning that Mr. Olson is seeking to impose.  That is the
11   point your Honor raised when you said why is the obligation to
12   pay the exchange offer-takers conditioned on NML also being
13   paid.  There is no legal authority that would link those two
14   together.  There is nothing in the pari passu clause that does
15   that.
16              There are, as part of the discussion last time, there
17   are authorities in the record that make clear when parties want
18   to bargain for, for example, if one creditor gets a recovery,
19   everybody shares in that, the sharing clause, a clause not in
20   this document, gives folks that right.  So there is no legal
21   authority that would allow that hinging of those two
22   obligations.  So, this order that they are proposing, he is not
23   entitled to it.  It's an injunction so all the equities and
24   equitable balances come into play.
25              One point about the authorities, apart from it just
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300